No. 23-12472

_____

# In the United States Court of Appeals
# for the Eleventh Circuit

_____

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; AND ALEXANDER
CONTRERAS,

*Plaintiffs/Appellees*,

v.

CITY OF MIAMI,

*Defendant/Appellant.*

_____

On Appeal From The United States District Court
For The Southern District of Florida
No. 1:22-cv-24066-KMM

_____

APPELLANT'S EMERGENCY MOTION TO STAY ORDER REJECTING
REDISTRICTING MAP [DE94]

_____

GRAYROBINSON, P.A.
Jason L. Unger (FBN 991562)
George T. Levesque (FBN 55551)
Andy Bardos (FBN 822671)
301 S. Bronough Street Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
junger@gray-robinson.com
glevesque@gray-robinson.com
abardos@gray-robinson.com

GRAYROBINSON, P.A.
Christopher N. Johnson (FBN 69329)
Marlene Quintana, B.C.S. (FBN 88358)
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Christopher.Johnson@gray-robinson.com
Marlene.Quintana@gray-robinson.com

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
*Attorneys for Defendant/Appellant*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Appellant, the City of Miami, furnishes this certificate of interested persons

and corporate disclosure statement.

1.    Abbott, Carolyn, Plaintiff/Appellee's expert

2.    ACLU Foundation of Florida, Inc., Counsel for Plaintiffs/Appellees

3.    Alford, John, Defendant/Appellant's expert

4.    Bardos, Andy, Counsel for Defendant/Appellant

5.    Carollo, Joe, Defendant/Appellant

6.    City of Miami, Defendant/Appellant

7.    Cody, Steven, Defendant/Appellant's expert

8.    Contreras, Alexander, Plaintiff/Appellee

9.    Cooper, Clarice, Plaintiff/Appellee

10.   Covo, Sabina, Defendant/Appellant

11.   De Grandy, Miguel, Defendant/Appellant's expert

12.   Dechert LLP, Counsel for Plaintiffs/Appellees

13.   Diaz de la Portilla, Alex, Defendant/Appellant

14.   Engage Miami, Inc., Plaintiff/Appellee

15.   GrayRobinson, P.A., Counsel for Defendant/Appellant

16.   Grace, Inc., Plaintiff/Appellee

17.   Greco, John A, Counsel for Defendant/Appellant

18.   Johnson, Christopher N., Counsel for Defendant/Appellant

19.    Johnson, Jared, Plaintiff/Appellee

20.    Jones, Kevin R., Counsel for Defendant/Appellant

21.    King, Christine, Defendant/Appellant

22.    Kirsch, Jocelyn Kirsch, Counsel for Plaintiff/Appellee

23.    Levesque, George T., Counsel for Defendant/Appellant

24.    McCartan, Cory, Plaintiff/Appellee's expert

25.    McNamara, Caroline A., Counsel for Plaintiff/Appellee

26.    McNulty, Kerri L., Counsel for Defendant/Appellant

27.    Méndez, Victoria, Counsel for Defendant/Appellant

28.    Merken, Christopher J., Counsel for Plaintiff/Appellee

29.    Miami-Dade Branch of the NAACP, Plaintiff/Appellee

30.    Moore, K. Michael, United States District Judge, Southern District of
       Florida

31.    Moy, Bryant J., Plaintiff/Appellee's expert

32.    Quintana, Marlene, Counsel for Defendant/Appellant

33.    Reyes, Manolo, Defendant/Appellant

34.    South Dade Branch of the NAACP, Plaintiff/Appellee

35.    Steiner, Neil A., Counsel for Plaintiff/Appellee

36.    Suarez, Francis, Defendant/Appellant

37.    Tilley, Daniel T., Counsel for Plaintiff/Appellee

38.    Unger, Jason L., Counsel for Defendant/Appellant

39.    Valdes, Yanelis, Plaintiff/Appellee

40.    Warren, Nicholas L.V., Counsel for Plaintiff/Appellee

41.    Wysong, George, Counsel for Defendant/Appellant

Appellant, the City of Miami, certifies that, to the best of its knowledge, no publicly traded company or corporation has an interest in the outcome of the case or appeal.

## Introduction

Pursuant to Rule 8 of the Federal Rules of Appellate Procedure, Defendant, City of Miami (the "City"), moves this Court for a stay of the trial court's Order [DE 94] rejecting the redistricting plan, City of Miami Resolution 23-271 (The "New Plan"), and imposing a court-ordered remedial plan, pursuant to the injunction set forth in the trial court's Order (the "Order")(DE 60) adopting the Report and Recommendation (the "R&R")[DE 52] granting Plaintiffs' Motion for Injunction.  DE 26.  The City requests that this Court stay the injunction and imposition of Plaintiffs' proposed redistricting plan and permit the New Plan enacted by the City to be given full effect pending appeal.

The City sought a stay in the district court [DE 96], which the Court denied. DE 98.  The court directed the City on Sunday, July 30, 2023 to submit the court-imposed plan to the Miami-Dade County Elections Department on July 31, 2023. DE 94.

The trial court preliminarily found that Plaintiffs had a likelihood of prevailing that the City's redistricting map set forth in City of Miami Resolution 22-131 (the "Enjoined Plan") unconstitutionally racially gerrymandered the City to preserve "three Hispanic districts, one Black district, and one Anglo district."  DE 60 p.16; DE 94 pp.20-21.  The trial court has now rejected the City's New Plan finding that it failed to correct the prior racial predominance of the Enjoined Plan. DE 94 pp.27,35-39.  The trial court mandated that the City adopt a plan proposed

by Plaintiffs (the "Mandated Plan") that did not just preserve that racial predominance, it exacerbated it. The trial court's articulated purpose was to ensure that the new districting plan "completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." DE 94 p.16. The Mandated Plan still inevitably preserves three Hispanic districts as supermajorities. In a 70% Hispanic City it is mathematically impossible not to, but the court now maximally packs one Hispanic district in excess of 95%. DE 82-12 p.16. The Mandated Plan also makes the so-called Anglo District, which recently elected a Hispanic Commissioner, whiter than either the Enjoined Plan or the Mandated Plan. *Compare Id. to* DE 82-12 p.15. While everyone agreed below on the constitutionality of creating a Voting Rights Act ("VRA") Black District 5, the court rejected the City's version of the district for not being narrowly tailored before mandating a plan that is not statistically significantly different.[1] *Id*.

The trial court emphasized core retention as a basis for finding racial predominance, but it divorced the notion of core retention from its context as a permissible traditional redistricting consideration. This is not a case of vote dilution. Plaintiffs have never alleged that in their pleadings or filings. It is solely a case of alleged "racial sorting," which the trial court did not "correct." In the

---

[1] The court reversed the burden of proof, and violated the Supreme Court's instruction that the number need not be selected with mathematical precision. *Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 196 (2017).

name of changing the core for the three supermajority Hispanic districts,[2] the trial court intensified the racial sorting. The result imposes a very different electoral map barely more than three months before an election, writes one commissioner out of his district, and substitutes Plaintiff's political decisions for those of the City's duly elected representatives. This violates the principal articulated in *Purcell v. Gonzalez*, 549 U.S. 1 (2006): "[F]ederal district courts ordinarily should not enjoin state election laws in the period close to an election."

This Motion is an emergency because the trial court has directed compliance by the next day, today, July 31, 2023.

## I. Standard for Stay and Standard of Review

### A. Standard for Stay

"While an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). The following factors determine whether a stay pending appeal is warranted:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

---

[2] The map imposed by the trial court preserves 96.7% of the core of District 2, a plurality district, and 92.5% of the core of District 5, the Black district. DE 86-2 p.6.

*See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019)). "'When the balance of equities . . . weighs heavily in favor of granting the stay'—[the Eleventh Circuit has] relax[ed] the likely-to-succeed-on-the-merits requirement." *Id.* (quoting *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)). "[T]he 'traditional test for a stay' likewise 'does not apply' in the particular circumstance that this case presents— namely, 'when a lower court has issued an injunction of a state's election law in the period close to an election.'" *League of Women Voters of Fla., Inc. v. Florida Secretary of State*, 32 F.4th 1363, 1370 (11th Cir. 2022), quoting *Merrill v. Milligan*, 142 S. Ct. 879, 880, (2022) (Kavanaugh, J. concurrence).

> [T]he reviewing court must be cognizant that "orders affecting elections ... can themselves result in voter confusion." Id. at 4-5. And that risk only increases as an election draws closer. Id. at 5, 127 S.Ct. 5. For that reason, the Purcell principle teaches that "federal district courts ordinarily should not enjoin state election laws in the period close to an election."

*Id.* at 1371. "Purcell effectively serves to lower the state's bar to obtain the stay it seeks. The state need not show, for instance—as a plaintiff would to obtain a "late-breaking injunction" in the first place—that its position is "entirely clearcut." *Id.* Rather, it need only show that plaintiffs' position is not." *Id.* at 1372.

**B.    Standard of review.**

A denial of a stay is reviewed for abuse of discretion, with underlying legal conclusions reviewed *de novo* and findings of fact reviewed for clear error. *See*

*Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1317 (11th Cir. 2019).

Courts consider the following factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*See Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019)).  The likely-to-succeed-on-the-merits requirement is relaxed when the balance of equities weighs heavily in favor of granting the stay.  *League of Women Voters*, 32 F.4th at 1370 (11th Cir. 2022). "In that scenario, the stay may be granted upon a lesser showing of a 'substantial case on the merits." *Id*.

## II.  Statement of the Case

The City has had single member districts since 1997. DE 23 ¶ 33-39, 59-64. These districts have had substantially the same shape and essentially the same racial demographic make-up since first constituted. DE 24-80 to 83. The shape of the districts are largely dictated by the municipal borders and certainly are not characterized by irregular shapes and appendages like those at issue in *Cooper v. Harris*, 581 U.S. 285, 323 (2017) (depicting challenged Districts 1 and 12 in North Carolina's enacted plan).



The United States Census of 2020 (the "2020 Census") revealed that the City's districts no longer had substantial equality of population.  DE 23, ¶¶ 72-74. Following the 2020 Census, the ideal district size was 88,448.  *Id.*, ¶ 72.  D2, the waterfront district, had grown significantly larger than the other four districts and needed to "shed" population to the other four districts.  *Id.*, ¶ 75.  On March 24, 2022, the City adopted a redistricting plan that equalized population and preserved D5 as a majority Black district under section 2 of the VRA.

Nine months after passage, Plaintiffs sued.  The Amended Complaint (DE 23) asserts that all five districts racially gerrymander in violation of the Equal Protection Clause.  Plaintiffs moved for preliminary injunction two months later on

February 10, 2023. DE 26 & 24.  They asked the ruling to be expedited because the map had to be submitted to the county elections department by August 1 to be used in the November election.  DE 26 p.36.  Defendants responded (DE 36) and the Court conducted a hearing on March 29, 2023.  On May 3, 2023, the Magistrate recommended enjoining the City's map for racially sorting the City into three Hispanic Districts, a Black District and a so-called "Anglo" District.  DE 52.  The R&R recognized the *Purcell* principal may be applicable because it left the City without an election map.  DE 52 p.99.  The City objected (DE 56) and the Court overruled the objections and enjoined the City from moving forward with the Enjoined Plan.  DE 60.  The Court issued a scheduling order for a remedial map. DE 69.

On June 14, 2023, the City passed the New Plan, and filed it with the Court. DE 77.  The New Plan was not a remedial plan because it replaced the Enjoined Plan.  *Id*.



Plaintiffs objected[3] to the New Plan on Friday, July 7, 2023 and for the first

time proposed their Map 4.  DE 83.  Plaintiffs' maps are similar to the City's:



All five plans have a coastal District 2 that is a non-minority majority.[4]

*Compare* DE 82-24 *to* 34-37.  In, fact Plaintiffs' Maps 2, 3 and 4 have a greater

White Voting Aged Population (WVAP) in District 2 than the Enacted Plan.

Compare DE 82-1 p.15 to 16.  All of the plans have a VRA protected Black

District 5.  Plaintiffs previously accused the City of "packing" Black voters into

---

[3] The preliminary injunction did not restricted the City's lawmaking power, and Plaintiffs have not amended their pleadings to assert new claims against the New Plan.

[4] "Anglo" district is a misnomer; District 2 has no racial majority. Plaintiffs said they didn't "designate" an Anglo access district (DE 82-2 p.6), but they created one in each plan and preserved the Whitest community in Miami, Coconut Grove, inviolate.  They claimed not to "pack Hispanics" into three districts, but they did. DE 82-12 p.16.

District 5 by looking at Black <u>Citizen</u> Voting Age Population (BCVAP), Plaintiffs and the City now seem to be essentially in agreement on the size of that District. Plan 3's BCVAP is 56.5% and Plan 4's BCVAP is 55.8% compared to the New Plan's 57.4%. *Compare* DE 82-1 p.15 *to* 16.[5] Defendant responded (DE 86),[6] and the Court sustained Plaintiffs' objections and directed the City to file Plaintiffs' new Map 4 with the County the following day. DE 94.

## III.   Likelihood of Success on the Merits

The trial court acknowledged there is a "'presumption of legislative good faith,' even after a finding of past discrimination, and that the 'burden of proof lies with [Plaintiffs], not the State' to demonstrate the remedial map is unconstitutional." DE 94 p.16 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). Of course, there has been no finding of past discrimination here; the previous ruling was an interlocutory injunction order. The court nevertheless did not grant deference to the City. It instead presumed discriminatory intent and then mandated a map with greater racial gerrymandering.

> Redistricting "is primarily the duty and responsibility of the State," and "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions.

*Abbott*, 138 S .Ct. at 2324. The court imposed a burden of proof on the City to provide non-racial reasons for districting decisions, even though the burden lies

---

[5]If their plan is narrowly tailored, then so is the City's. DE 86-1 (Alford Report).
[6] The City had to respond to the Friday objection by Wednesday July 12 and were given ten pages to respond to Plaintiffs' thirty.

with Plaintiffs under *Abbot,* and then rejected those reasons as not being sufficiently proven.  It imposed on the City a Mandated Plan that exacerbated the alleged racial sorting that caused it to issue the injunction in the first place.

## A.    The May 11 Meeting Is Not Direct Evidence of Racial Gerrymandering

The trial court placed undue emphasis on statements made at a May 11, 2023 meeting wherein Commissioner Diaz de la Portilla suggested going to at-large elections.  He and Commissioner Reyes observed that in a city that is 70% Hispanic, that would likely lead to an all Hispanic Commission.  The trial court took this as an announcement of an intention to racially sort.

> [T]he May 11 Meeting is better understood as the Commissioners explaining why they believed their initial approach when enacting the Enjoined Plan (i.e. creating the gerrymandered districts), was the correct approach, and after some discussion, unanimously directing De Grandy to maintain the racial breakdown of each district in a new map.

DE 94 p.24.  Determining legislative intent from statements by a minority of the Commission is always problematic.  *Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir. 2021) (observing "determining the intent of the legislature is a problematic and near-impossible challenge" and rejecting the assertion that discriminatory intent could be found in the statements of one legislator, even where the legislator may be the sponsor).

In this case, there was no expressed intent to racially sort; the trial court is inferring it.  That inference is mistaken.  The Commission is due a presumption of

good faith, not the opposite.    Moreover, the Commissioners were commenting on a mathematical reality of a city with a supermajority Hispanic population that is likely to elect three Hispanic districts and a district that will perform for the Black candidate of choice—a reality reflected in every map considered by the trial court. At-large elections have a likelihood of electing an all Hispanic Commission. Single member districts will all have a VRA-protected Black District and then unavoidably have three Hispanic districts because the remainder of the City is 75% Hispanic.  DE 82-2 p.9:1-8.

> Moreover, redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, …. That sort of race consciousness does not lead inevitably to impermissible race discrimination.

*Shaw v. Reno*, 509 U.S. 630, 646 (1993).  The trial court improperly inferred bad faith from an acknowledgment of a demographic fact.

Each of Plaintiffs' four plans racially sorted the City into three Hispanic Districts, a coastal district with the highest white population, and a VRA-protected Black district in the North.  *Compare* DE 82-24 *to* 34-37.  Plaintiffs' Maps 2, 3 and 4 have a greater WVAP in District 2 than the Enacted Plan.  *Compare* DE 82-1 p.15 *to* 16.  Plaintiffs exacerbate the alleged racial sorting.

## B. The Circumstantial Evidence Does Not Establish Racial Gerrymandering

The court placed undue emphasis on the notion of core retention, divorcing it from its context. DE 94 p.16. "[R]etaining previous occupants in new legislative

districts" is a traditional redistricting criterion. *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002)(citing *Karcher v. Daggett*, 462 U.S. 725, 740 (1983);). *See also Larios v. Cox*, 300 F. Supp. 2d 1320, 1334 (N.D. Ga. 2004). Core retention can only be suspect insofar as it perpetuates the harms of a racial gerrymander —but the retention of core districts is also a traditional redistricting principle. *See Miller v. Johnson*, 515 U.S. 900, 906 (1995). The court talismanically invoked the term core retention not to reduce racial predominance, but to exacerbate it. The court has relied heavily upon *Jacksonville Branch of NAACP v. City of Jacksonville ("Jacksonville II")*, No. 3:22-cv-493-MMH-LLL, 2022 WL 17751416, at *11 (M.D. Fla. Dec. 19, 2022), throughout these proceedings. But that was a case of vote dilution. There the new plan still diluted minority votes, and the court replaced it with a plan that did not dilute those votes. This is not a case of vote dilution. Plaintiffs have never even alleged it. It is solely a case of alleged racial sorting, which the court did not "correct," but intensified. It would be akin to the *Jacksonville* court finding the municipality's plan still diluted minority votes and then replacing it with a plan with greater packing and more dilution.[7]

The Commissioners focused on legitimate, non-racial criteria, such as political considerations, where they had invested substantial district resources, and

---

[7] The trial court observed that there is insufficient time to appoint a special master and therefore simply adopted one of Plaintiffs' plans. DE 94 p.41. It erred by then directing the City to go forward with Plaintiffs' plan instead of applying *Purcell*.

where candidates reside.  DE 94 p.12.  The court disregarded those publicly-expressed reasons because it found those considerations "had the impact of perpetuating, rather than completely correcting, the constitutional infirmities." *Id*.[8] That finding is belied by the fact that each of Plaintiffs' plans, including the Mandated Plan all resulted in the same racial demographics.  If it is inconceivable that a plan could be adopted for race neutral reasons that would still perpetuate the alleged constitutional infirmity, than the Mandated Plan is unconstitutional for perpetuating the same Constitutional infirmity.  The court highlights that "areas that were approximately 90% HVAP were shuffled among Districts 1, 3, and 4—'creating the illusion they changed while maintaining their demographics.'"  DE 94 p.27.  This is precisely what the Mandated Plan does.  In the Enjoined Plan those districts were 89.5%, 88.3% and 89.5% Hispanic Voting Age Population (HVAP) respectively.  DE 82-12 p.14.   In the New Plan they are 89.7%, 84.5% and 90%.  *Id*. p.15.  In the Mandated Plan they are 85.8% 85.1% and 95.6%.  *Id*. p.16.  The Mandated Plan simply shuffles Hispanics from Districts 1 and 3 to District 4 to maximally pack District 4.  Likewise the court observed District 2 "retains a large Anglo population."  DE 94 p.27.  The WVAP in the New Plan is 36.5%.  In the Enjoined Plan it was 37.4%.  In the Mandated Plan it is

---

[8] The court outright rejected that partisan considerations formed any part of the New Plan.  DE 94 p.40.  It based this on the statements of one commissioner.  *Id*. The political considerations were laid out in the record.  DE 82-2 p.9:9 to 11:2; DE 77 pp.24-25.  When it comes to political gerrymandering, courts lack jurisdiction to undo what is essentially a political question.  *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507-08  (U.S. 2019).  Yet that is what the trial court did.

37.9%.   The only real difference between the New Plan and the Mandated Plan is that the Commission was entitled to a presumption of constitutionality and good faith, the Plaintiffs and the trial court are not.

As it did in the injunction, the court focused on District 5 to finds alleged racial gerrymandering.  The trial court's discussion of the borders of Overtown and Morningside are misplaced.  Racial motivations are not unconstitutional where, like here, it is a VRA protected district as the trial court acknowledged.  DE 94 p.4 n.2.  The court found that there is insufficient evidence District 5 is narrowly tailored.  DE 94 pp.38-39.

As the adopted R&R found, the BVAP in the district need not be determined with precision and the City has no duty to memorialize the analysis or compile a comprehensive record of that analysis.   DE 52 p.82.    Yet this is precisely the burden the trial court imposed.

> "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." … [T]he requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to satisfy the Voting Rights Act, "even if a court does not find that the actions were necessary for statutory compliance."

*Bethune-Hill*, 580 U.S. at 187 (citation omitted).  The City does not have to prove that it pared the majority down to the minimum with mathematical precision.

> "The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5 demands." The question is whether the State had "good reasons" to believe a 55% BVAP floor was necessary to avoid liability under § 5. The State did have good reasons under these circumstances. Holding

otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 196 (citations omitted).

Narrow tailoring exists to protect the group being racially sorted.

The purpose of the narrow tailoring requirement is to ensure that "the means chosen `fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.").

*Grutter v. Bollinger*, 539 US 306, 333 (2003).  To "narrowly tailor" in this context the City cannot, in the guise of complying with the VRA, pack Black residents into the district to diminish their influence elsewhere.[9]  Because the city set the district at a bare 50% voting age population, it had every reason to believe that the district could not be more narrowly tailored, especially in light of undeniable demographic trends concerning the year to year decrease of Black residents.  DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).

To undercut the facial validity of a bare 50%, the injunction observed that the BCVAP of the Enjoined Plan was 58%. DE 52 p.85. This line of reasoning is based on a misreading of *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997).  No case has *required* a City, when drawing a district under the

---

[9] *See*, *e.g.*, *Jacksonville Branch of NAACP v. City of Jacksonville*, Case No. 3:22-cv-493-MMH-LLL, 2022 WL 7089087, at *2 (M.D. Fla. Oct. 12, 2022).

VRA, to base it on the *citizen* population.[10]  *Negron* stood for the inverse. To prove dilution, a plaintiff must establish that they had a sufficiently large and compact minority voter population to elect a representative, and that the population was divided to dilute their impact. If there are not enough voting eligible minority residents to allow them to elect their desired representative, it is impossible for them to meet the standard. But the opposite is not true. Not all citizens vote, or even can vote. Plaintiffs proffered evidence that only 52.76% (25,307/47,958) of registered voters in District 5 were Black as of February 1, 2023. DE 24-93 p.37. It also ignores the population trend. Black registered voters were down from 56.86% the previous year (26477/45562). DE 24-93 p.35.  Plaintiffs' own filings show that the Black population in the City of Miami decreased in both relative and absolute terms in each cycle; there were 10% fewer Black residents in the City in 2023 as compared to the previous census. DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).

No case has ever held a VRA district was required, but must be below 50% VAP.  The court in *Jacksonville Branch of NAACP v. City of Jacksonville ("Jacksonville III")*, No. 3:22-cv-493-MMH-LLL, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022), was careful to state that it was not a VRA case, and it did not find that less than 50% would satisfy the VRA. *Id* at * n.7.  The court in *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1088, 1089 n.5 (N.D. Fla. 1992), created two

---

[10] Legislatures are not required to draw boundaries by citizenship rather than total population. *Evenwel v. Abbott*, 578 U.S. 54, 58 (2016).

majority-minority districts, and created a third "influence district" that was less than 50%. The court did not find that the majority-minority districts needed to be less than 50%.

Plaintiffs never claimed the influence of black voters was diluted elsewhere, thus there was no issue that the number was being used for an illegitimate motive. Without vote dilution, there is no legitimate claim that the number was set too high for an improper purpose, and therefore it could not be more narrowly tailored. The court, instead of looking at whether the district was actually narrowly tailored, instead framed the issue in evidentiary terms finding that there was insufficient proof that Alford's analysis was presented prior to the passage of the New Plan.

The Order does not address the question of whether District 5 in the New Plan is <u>actually</u> narrowly tailored. It nevertheless goes on to adopt a plan with very similar percentages. The BVAP in the Mandated Plan is 48.4% and in the New Plan it is 50.3%. In the Injunction, the trial court focused on the BCVAP. The BCVAP in the Mandated Plan is 55.8%. In the New Plan it is 57.4%. Bearing in mind that mathematical precision is not required, if the Mandated Plan is constitutional, then so is the New Plan.

## IV.    Irreparable Injury

The trial court's injunction does not preserve the status quo, but directs the City to redistrict for the November 2023 election on the eve of an election deadline. The court substantially changed the shapes of districts where

22

commissioners have already been running, and drawn one commissioner out of his district.  *Compare* DE 24-22 *to* DE 94 p.15.  That bell cannot be unrung; the election will have occurred.  Such districting changes are "prescriptions for chaos." *Merrill*, 142 S. Ct. at 880.  They will "affect candidates, campaign organizations, independent groups, political parties, and voters, among others."  *Id*.  As in *Milligan*, the Order would change the districts where candidates and elected officials live, where they may run, and where they must campaign.

The Order doesn't just affect Commissioners who are up for reelection in November.  The court drew an incumbent out of the district he represents and candidates out of districts in which they are running.  Miami has a one year residency requirements.  City of Miami,  Code of Ordinances § 16-6(b)(3); Miami Charter § 4(c).  Commissioners who are up for reelection may be drawn out of their districts with no opportunity to qualify in a new district.

The preliminary injunction is an "extraordinary remedy."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  "When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [the court] deny relief."  *MacGovern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986)).

## V.    The Plaintiffs Unduly Delayed Seeking Preliminary Injunctive Relief.

The ordinance being challenged was enacted in March, 2022. This case was

filed in December. Plaintiffs waited two more months before filing the Motion. A special election was held on February 27, 2023, and another election is coming on November 7, 2023. DE 26 pp.2, 4. The challenge essentially attacks decisions made 25 years earlier when the alleged racial districts were first drawn. If Plaintiffs are challenging decisions that have been in place for 25 years and simply preserved in 2022, then Plaintiffs as a group are 25 years too late. The alleged harms have been in place for every election cycle. If anything, the New Plan lessens those alleged harms, and the Mandated Plan exacerbates them.

Further, Plaintiffs assert that the new districts would have to be set by August 1. DE 26 p.36. "[A] party seeking a preliminary injunction must generally show reasonable diligence. That is true in election law cases as elsewhere." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). They waited nine months to file their lawsuit, two months to seek preliminary injunctive relief. The R&R recognized this delay was problematic [DE 52 p.95], but concluded that it was justified because, as Plaintiffs "explain in their reply" they needed the time to prepare their case. DE 52 p.95. Plaintiffs put on no evidence other than argument of counsel to justify or excuse the delay. Rather, the R&R implies that the City bore the burden to prove that the delay was "intentional, strategic, or even negligent." That is not the standard. Plaintiffs must show reasonable diligence where there has been delay.

## VI.  *Purcell* Applies

"[F]ederal district courts ordinarily should not enjoin state election laws in the period close to an election."  *Purcell v. Gonzalez*, 549 U.S. 1 (2006).  The next election is November 7, 2023, three months and a week away.

> Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill*, 142 S. Ct. at 880; *Alpha Phi Alpha Fraternity Inc.*, 587 F. Supp. at 1238–39.  There is less than four months before an election.  This new plan was not even disclosed by Plaintiffs until three weeks ago.  The court then issued an order mandating that plan on Sunday, July 30, 2023, directing a submission of all materials necessary to implement it the next day, one day before the deadline provided by the Miami-Dade County elections department.  DE 94 p.6.  This Court must weigh these "practical considerations."  "The Court has recognized that 'practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges.'"  *Id*. at 880, quoting *Riley v. Kennedy*, 553 U. S. 406, 426 (2008).   The Order throws out the core of districts for the entire redistricting plan that have been in place since 1997 and draws an incumbent out of his district.  The change is sweeping and disruptive.  The timing of the court's plan, a mere 2 days before the City's deadline to submit districts to the Supervisor of

Elections, effectively eliminates any opportunity for appellate review. The practical impact of this ruling, without a stay, is that the City's voters will be bound by a district court's decision that departs from the good faith determination of their elected representatives. *Purcell* is present. The injunction should be stayed.

## VII.  Public Interest

The Order jeopardizes the ability of the voters of District 5 to elect a candidate of their choice. The trial court did not find that less than 50% would be sufficient, only that Defendant did not meet its burden of establishing that it had sufficient support for selecting 50%. The Mandated Plan dilutes their vote in District 5, automatically creating risk of a section 2 VRA challenge. As set forth above, the Mandated Plan throws the upcoming election into chaos makes sweeping changes to three districts that have elections in November, and draws an incumbent out of his district, arguably in violation of the residency requirements. Staying the Order serves the public interest.

WHEREFORE, Defendant respectfully asks this Court to stay the Order pending appeal.


## Certificate of Conferral

I certify that prior to filing this motion, I attempted to resolve the matter in good faith by discussing the relief requested via email on Monday, July 31, 2023 with opposing counsel. They oppose the relief sought.

Respectfully submitted,

By:   *s/ Christopher N. Johnson*

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile:  (850) 577-3311

GRAYROBINSON, P.A.
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida  33131
Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130

27

Telephone: (305) 416-1800
Facsimile:  (305) 416-1801
*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I certify that this motion has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ *Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
GRAYROBINSON, P.A.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 31, 2023, the foregoing was filed with the Court's CM/ECF system generating service upon all counsel of record.

/s/ *Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
GRAYROBINSON, P.A.