No. 23-12472

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

GRACE, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

CITY OF MIAMI,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Florida, No. 1:22-cv-24066 (Moore, J.)

## PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION TO
## APPELLANT CITY OF MIAMI'S EMERGENCY MOTION TO STAY

Nicholas L.V. Warren
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Caroline A. McNamara
Daniel B. Tilley
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
cmcnamara@aclufl.org
dtilley@aclufl.org

Neil A. Steiner*
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
neil.steiner@dechert.com

Christopher J. Merken
**DECHERT LLP**
Cira Centre
2929 Arch Street,
Philadelphia, PA 19104
(215) 994-4000
christopher.merken@dechert.com
* *Not admitted in the Eleventh Circuit*

*Attorneys for Plaintiffs-Appellees*

No. 23-12472 — *GRACE, Inc. v. City of Miami*

**CERTIFICATE OF INTERESTED PERSONS**

Under FRAP 26.1 and this Circuit Rule 26.1, Plaintiffs-Appellees certify that the following have an interest in the outcome of this appeal:

1.  Abott, Carolyn, *Testifying Expert for Plaintiffs-Appellees*

2.  ACLU Foundation of Florida, Inc., *Counsel for Plaintiffs-Appellees*

3.  Alford, John, *Testifying Expert for Defendant-Appellant*

4.  Bardos, Andy, *Counsel for Defendant-Appellant*

5.  Carollo, Joe, *Defendant-Appellant*

6.  City of Miami, *Defendant-Appellant*

7.  Cody, Steven, *Defendant-Appellant's expert*

8.  Contreras, Alexandra, *Plaintiff-Appellee*

9.  Cooper, Clarice, *Plaintiff-Appellee*

10. Covo, Sabina, *Defendant-Appellant*

11. De Grandy, Miguel, *Testifying Expert for Defendant-Appellant*

12. Dechert LLP, *Counsel for Plaintiffs-Appellees*

13. Díaz de la Portilla, Alex, *Defendant-Appellant*

14. Engage Miami, Inc., *Plaintiff-Appellee*

15. GrayRobinson, P.A., *Counsel for Defendant-Appellant*

16. Grove Rights and Community Equity, Inc. (GRACE), *Plaintiff-Appellee*

17. Greco, John A., *Counsel for Defendant-Appellant*

No. 23-12472 — *GRACE, Inc. v. City of Miami*

18. Johnson, Christopher N., *Counsel for Defendant-Appellant*

19. Johnson, Jared, *Plaintiff-Appellee*

20. Jones, Kevin R., *Counsel for Defendant-Appellant*

21. King, Christine, *Defendant-Appellant*

22. Kirsch, Jocelyn, *Counsel for Plaintiffs-Appellees*

23. Levesque, George T., *Counsel for Defendant-Appellant*

24. Louis, Lauren F., *U.S. Magistrate Judge, Southern District of Florida*

25. McCartan, Cory, *Testifying Expert for Plaintiffs-Appellees*

26. McNamara, Caroline A., *Counsel for Plaintiffs-Appellees*

27. McNulty, Kerri L., *Counsel for Defendant-Appellant*

28. Méndez, Victoria, *Counsel for Defendant-Appellant*

29. Merken, Christopher J., *Counsel for Plaintiffs-Appellees*

30. Miami-Dade Branch of the NAACP, *Plaintiff-Appellee*

31. Moore, K. Michael, *U.S. District Judge, Southern District of Florida*

32. Moy, Bryant J., *Testifying Expert for Plaintiffs-Appellees*

33. NAACP Florida State Conference, *State Affiliate of Plaintiffs-Appellees*

34. Quintana, Marlene, *Counsel for Defendant-Appellant*

35. Reyes, Manolo, *Defendant-Appellant*

36. NAACP, *National Affiliate of Plaintiffs-Appellees*

37. South Dade Branch of the NAACP, *Plaintiff-Appellee*

No. 23-12472 — *GRACE, Inc. v. City of Miami*

38. Steiner, Neil A., *Counsel for Plaintiffs-Appellees*

39. Suarez, Francis X., *Defendant-Appellant*

40. Tilley, Daniel B., *Counsel for Plaintiffs-Appellees*

41. Unger, Jason L., *Counsel for Defendant-Appellant*

42. Valdes, Yanelis, *Plaintiff-Appellee*

43. Warren, Nicholas L.V., *Counsel for Plaintiffs-Appellees*

44. Wysong, George, *Counsel for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Under FRAP 26.1, Plaintiffs-Appellees certify that GRACE, Inc.; Engage Miami, Inc.; South Dade Branch of the NAACP; and Miami-Dade Branch of the NAACP each has no parent corporation, and no publicly held corporation owns 10% or more of any of those entities' stock. The remaining Plaintiffs-Appellees are individual persons.

Counsel for Plaintiffs-Appellees further certify that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: August 1, 2023

   */s/ Nicholas L.V. Warren*

Nicholas L.V. Warren
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

## INTRODUCTION

When sorting and distributing their constituents by race, Miami's leaders have not been shy. Some districts, we are informed, must be sure to "keep the same type of last names" and "faces." Report and Recommendation ("R&R") (Doc.52) p.26. One must also, we are told, be cautious if one district is "getting all the sirloin but none of the bone." Doc.24-13 103:18; *accord* R&R p.26. With Miami's Hispanic-rich areas being compared to "sirloin" and majority-white areas to "bone," R&R p.26, it's hardly surprising to see areas described as "attractive" not for their tree cover or cultural offerings but because of the race of their constituents, *id.* p.17, 74. Questioning this system of race-based sorting, though, does not earn one plaudits at the Commission. It instead garners accusations of being the product of someone (here, the magistrate judge) "who probably knows nothing about our city," Doc.82-1 5:15-16 (comments of Commissioner Díaz de la Portilla). The City does not contest those facts and chose not to appeal the preliminary injunction they impelled.

Although "[o]utright racial balancing is patently unconstitutional." *Students for Fair Admissions v. President & Fellows of Harvard Coll.* (*SFFA*), 143 S.Ct. 2141, 2219 (2023) (cleaned up), the commitment from Miami's leadership runs deep. Only District 5 is protected by the Voting Rights Act and thus can be drawn in a race-predominant manner, but the City drew all five districts with race as their predominant factor. Rather than seriously contesting the preliminary-injunction

order, the City passed a new map nearly identical to the enjoined map. Although this Court may not "know[] [much] about our city," Doc.82-1 5:15-16, it knows about the Constitution—and specifically that sorting and distributing citizens based on their "attractive" physical resemblance to cuts of steak does not comport with it.

## BACKGROUND

### I.    Proceedings Below

Plaintiffs—five Miami residents and four community membership organizations—sued the City, contending the Enjoined Plan violated the equal-protection clause by impermissibly sorting residents by race into different districts. On February 10, nearly nine months before the November 2023 election, Plaintiffs filed a motion for preliminary injunction. Doc.26. Upon referral, the magistrate judge held a five-and-a-half hour evidentiary hearing and argument on March 29. *See* Doc.48.

The magistrate judge's 101-page R&R recommended the district court issue an injunction. Doc.52. Following briefing, on May 23, the district court adopted the R&R and enjoined the City from using its unconstitutional map ("Enjoined Plan") during the pendency of the case, more than five months ahead of the November election. Doc.60.

Eight days later, the City appealed. Doc.63, docketed as No. 23-11854. The City voluntarily dismissed its appeal on July 11, effectively conceding that the

Enjoined Plan likely violated the Equal Protection Clause as an explicit racial gerrymander.

The City instead focused its efforts on the remedial mapmaking process in compliance with the preliminary injunction. The district court held a June 2 status conference to plan the remedial process and ensure completion before the August 1 date by which the County Elections Department said it needed a map to guarantee it could implement the November elections. Doc.68.[1] Before the conference, the parties submitted proposed remedial schedules. Exs.1-2. From the outset, the parties and court agreed that a district-court order on remedy needed to be entered by August 1—the polestar date for election administrators. At the June 2 conference, the district court expressed hope that the City's remedial-map process "will not contain similar infirmities" to the record that led to the preliminary injunction. Doc.99 12:13. Those "infirmities" were explicit racial division of the five Commission districts to ensure three Hispanic, one Black, and one Anglo district. *See* Doc.60 p.9-10; *id.* p.13 (emphasizing "the Commissioners' repeated instructions to [the City's consultant] De Grandy to preserve the 'ethnic integrity' of each district"). After the conference, the court entered a scheduling order setting the timeline for remedial-map submission and review. Doc.69.

The Commission adopted its proposed remedial map on June 14 by a 4-1 vote.

---

[1] The County Elections Department conducts elections for the City.

The City waited until the June 30 deadline to file the map with the district court—with no accompanying legal brief or supporting evidence. Doc.77. On July 7, Plaintiffs filed objections to the City's map along with Plaintiffs' suggested map and 39 supporting exhibits. Docs.82, 83. The City replied on July 12, Doc.86. After neither party requested an evidentiary hearing, the district court issued the July 30 order sustaining Plaintiffs' objections and adopting Plaintiffs' suggested remedial map. Doc.94 ("Op."). The current appeal and stay motion ("Mot.") followed.

## II.  The Order Sustaining Plaintiffs' Objections and Adopting Plaintiffs' Suggested Remedial Map

The Order described the factual record presented by the parties during the remedial process. The record begins after the R&R, at the Commission's May 11 meeting. Op.6. The meeting transcripts—which the City concedes "speak for themselves"—show "the Commissioners explaining why they believed their initial approach when enacting the Enjoined Plan (i.e. creating the gerrymandered districts), was the correct approach, and after some discussion, unanimously directing De Grandy to maintain the racial breakdown of each district in a new map." Op.23-24.

The Order also explains how the City met once more on June 14. Doc.83 p.4. At this meeting, the City's consultant presented a map labeled "Version 12"—nearly identical to the Enjoined Plan and which maintained many features the district court identified as unconstitutional—and the Commissioners made some tweaks to that

version before voting to adopt a final map ("Res. 23-271"). Op.7-14. The changes made from Version 12 to Res. 23-271 caused the map to hew even more closely to the Enjoined Plan, leaving 94.1% of Miamians in the same district. Op.26. The City refused to share any drafts before "Version 12," claiming no earlier versions existed. Op.8 n.5.

The Order walks through the direct evidence that the City's remedial map failed to correct the constitutional violations, and that in fact commissioners intended to perpetuate the City's tripartite racial division into designated districts for Black, Anglo, and Hispanic residents. Op.20-24. Other direct evidence showed commissioners deliberately moved "white affluent" areas from the "Black district" to the "Anglo district" and carefully rebalanced Hispanic populations to avoid "packing Hispanic voters." Op.37; Doc.82-2 9:9–10, 13:5–6, 14:17–18; Doc.77 p.34. The Order also summarizes the circumstantial evidence in the record supporting its conclusion—including the retention of specific, race-based features of the Enjoined Plan that the Commission perpetuated.[2] Op.24-40. Once the district

---

[2] These included (1) separating a white-majority part of Coconut Grove one commissioner compared to "bone" in the "Anglo district" from an adjacent part "where the Hispanic voters live" and where "there's ethnic diversity" into a "Hispanic district"; (2) retaining in a "Hispanic district," and excluding from the "Black district," an irregular appendage "described by the Commissioners as an 'attractive' area that was 'mainly Hispanic or Anglo,'" R&R.36, 41, 74; (3) balancing the Hispanic population among three districts by splitting Flagami, Shenandoah, Silver Bluff, and Little Havana; (4) dividing Allapattah, Omni,

court weighed the record for the remedial process, it was compelled to reject the City's remedial map. Op.40 (finding "the Remedial Plan fails to correct the constitutional violations it found substantially likely to exist in the Enjoined Plan, and that the Remedial Plan perpetuates the impact of the Enjoined Plan's unconstitutional racial gerrymandering of the election districts").

At that point, with the August 1 deadline looming, the district court had to choose an alternative plan that withstood constitutional scrutiny. Op.40-41. The district court assessed Plaintiffs' remedial submission and concluded it better satisfied the City's permissible policy choices without attempting to achieve racial balancing like the City instructed its consultant to do. Op.41-44. Plaintiffs' submission followed traditional redistricting criteria, Op.45-46, and narrowly tailored the use of race only to ensure District 5 complied with Section 2 of the Voting Rights Act, Op.46-48. Plaintiffs' submission thus met the standard the City's remedial map failed to achieve.

The Order imposes Plaintiffs' remedial map as the interim remedy for the 2023 election, two days before the August 1 date the parties agreed must govern the remedial timeline. Op.50. The Order further commanded the City to deliver the materials necessary to implement that map to the County officials on July 31. *Id.*

---

Downtown, and Brickell along racial lines, replicating the Commission's strategy of drawing the Enjoined Plan to "find adjacent areas with similar demographics." Doc.83 pp.12-14, 16-21, 23-25.

Although there is no evidence in the record that the City did this, Plaintiffs forwarded these materials to the County, and the County confirmed receipt. Ex. 3; *see also* Christina Vazquez, *Will New Miami Electoral Map Force Carollo Out?*, Local 10, https://www.local10.com/news/local/2023/07/31/will-new-miami-electoral-map-force-carollo-out-citys-redistricting-battle-not-over/.

## ARGUMENT

### I.    The City's Stay Motion is Procedurally Flawed

#### A. The City Seeks Reversal, Not a Stay

"Simply put, a stay preserves the status quo." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020). That's not what the City seeks here. Instead, it "requests that this Court ... permit the New Plan enacted by the City [Res. 23-271] to be given full effect pending appeal." Mot.6. In effect, the City seeks reversal of the district-court decision and an order implementing Res. 23-271. That request is inappropriate and unrelated to preserving the status quo.

There is only one viable map for the November elections: the court-ordered remedy. The City mischaracterizes the district-court order as "enjoin[ing] state election laws," Mot.25, as if Res. 23-271 is the status quo a stay would preserve. It isn't. As much as the City objects to the district-court characterization of Res. 23-271 as its "proposed remedial map," that is exactly what it is. After a court enjoins elections under an unconstitutional redistricting plan, "the legislature should be

given a reasonable opportunity *to recommend for consideration* a remedial plan that meets constitutional standards." *S.C. State Conf. of NAACP v. Alexander*, 2023 WL 118775, at \*14 (D.S.C. Jan. 6, 2023) (emphasis added), *appeal filed and prob. juris. noted*, 143 S.Ct. 2456; *see McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th Cir. 1988) (noting court must "consider whether the proffered remedial plan is legally unacceptable"); *see also United States v. Virginia*, 518 U.S. 515, 547, (1996) ("remedial decree" "must be shaped to place persons unconstitutionally denied an opportunity or advantage in the position they would have occupied in the absence of discrimination") (cleaned up); *Milligan v. Allen*, No. 2:21-cv-1530-AMM (N.D. Ala. July 27, 2023), Docs.168, 194 (three-judge court setting schedule to review legislature's enacted proposed remedy and plaintiffs' objections thereto).

The district court never approved the City's "proffered plan" as an interim remedy because it violates the Constitution. So there is no "injunction of Res. 23-271" to stay. What is the status quo, then? Not the original 2022 plan. The court enjoined that plan, and the City dismissed its appeal of that injunction. Instead, staying the remedial order would revert to a "status quo" of the plan enacted in 2013 using 2010 Census data. But those districts are now unconstitutionally malapportioned. Doc.24-31, p.34; *Avery v. Midland Cnty.*, 390 U.S. 474 (1968). Functionally, then, the City cannot now seek a stay—there is no legal status quo to preserve.

Instead, the City asks this Court for "permission" to "give full effect" to Res. 23-271. That is a reversal on the merits, sought in a time-sensitive posture, not a stay. This Court should deny that extraordinary request.

### B. *Purcell* Does Not Apply

The City tries, and fails, to invoke *Purcell* to shield its race-based sorting from judicial review. *Purcell* is inapplicable for three reasons.

***First***, the City cannot invoke *Purcell* after repeatedly representing that a remedy in place by August 1 would allow effective relief. Since the County Elections Department's January announcement that, to implement the November 2023 City Commission elections, it needed the district boundaries by August 1, that date has guided the district court's and parties' conduct. Doc.24-30. Indeed, "the Parties in this case 'worked backwards' from the August 1, 2023 deadline to craft a briefing schedule considering the potential time needed for a remedy." Doc.60 p.27 n.11 (quoting *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), 2022 WL 7089087, at *4 (M.D. Fla. Oct 12, 2022)). The City specifically acknowledged needing to develop a remedial map, field Plaintiffs' challenges, and get a district-court ruling by August 1. Doc.36 p.22; Doc.73 139:12-15. August 1 guided the Parties' proposed remedial schedules and the district court's remedial

scheduling order.[3] Docs.69,99.

Both the Supreme Court and this Court rejected similar gambits last year. In *Rose v. Raffensperger*, 143 S.Ct. 58 (2022), and *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*), 2022 WL 16754389 (11th Cir. Nov. 7, 2022), "the entire schedule on which the district court proceeded was developed with Appellant[], working backwards from the date they provided, and the final schedule was accepted 'without caveat.'" 2022 WL 16754389, at *2. So too here, the City cannot now "fairly ... advance" a *Purcell* argument "in light of [its] previous representations to the district court that the schedule on which the district court proceeded was sufficient to enable effectual relief." *Rose*, 143 S.Ct. 58; *see also Jacksonville II*, 2022 WL 16754389, at *2 ("Given Appellants' position that the election can be conducted on the schedule they made collaboratively with the district court and Appellees, we do not believe *Purcell* applies here.").

**Second**, *Purcell* does not apply at this stage of the case. *Purcell* seeks to avoid

---

[3]   Under the City's proposed schedule submitted to chambers before that status conference, briefing on the Commission's newly adopted plan would have concluded on July 17—five days *later* than under the schedule the district court set. Ex.1 ¶ 2–3. Further, the City said it was "amenable to the Plaintiffs' proposed schedule" in the event the Commission failed to propose a new map—a proposed schedule under which briefing would conclude on July 14, two days later than the district court's schedule. *Id.* ¶ 4. Additionally, the City was amenable to Plaintiffs' proposal under that scenario that the district court "will approve an interim remedial plan by August 1." The City is in no position to complain about the timing of a district-court order when it agreed to that timing just two months ago.

"[l]ate judicial tinkering with election laws" to avoid "disruption" and "unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S.Ct. 879, 881 (2022) (Kavanaugh, J., concurring). *Purcell*'s underlying principle is that, "[w]hen an election is close at hand, the rules of the road must be clear and settled," *id.* at 880–81, so the status quo should usually prevail.

Here, the City invokes *Purcell* to upend the status quo—the court-ordered remedy[4]—not preserve it. The judiciary's alteration of state voting procedures occurred in May, when the district court enjoined the City's 2022 map. The City did not object on *Purcell* grounds at that time and dismissed its appeal of that injunction. Doc.52 p.99; Doc.60 p.26 n.10; No. 23-11854. Now, the district court must fashion a remedial decree "in the light of well-known principles of equity," *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)), "ensur[ing] that [the] remedy 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future,'" *Covington v. North Carolina* (*Covington I*), 283 F.Supp.3d 410, 424 (M.D.N.C.) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)), *aff'd in relevant part*, 138 S.Ct. 2548 (2018). Although the district court was obliged to give the City

---

[4]   Court-ordered relief can constitute the benchmark for *Purcell* purposes. *Frank v. Walker*, 574 U.S. 929 (2014), *id.* at 929 (Alito, J., dissenting); *RNC v. DNC*, 140 S.Ct. 1205, 1207 (2020).

an opportunity to proffer a legislatively enacted plan, that plan was subject to the court's review and approval. Yet the court found the City's plan failed to cure the underlying constitutional violations, and instead continued to impermissibly sort voters because of their race. Ensuring "the rules of the road [were] clear and settled," *Merrill*, 142 S.Ct. at 880–81 (Kavanaugh, J., concurring), the district court adopted a remedial plan by the Parties' agreed-upon deadline.

It is the City, then, that seeks last-minute judicial tinkering with election laws. It insists this Court alter "the rules of the road" one day before the Elections Department says it needs a map. Consequently, granting the City's request risks chaos and may be wholly infeasible. Under these circumstances, if any party must meet the heightened *Purcell* standards, it's the City.[5]

**Third**, none of the hardships courts have found relevant for *Purcell* purposes

---

[5]   The City's inexplicable delay in developing and submitting its proffered remedy also weighs against it. The Commission convened to consider redistricting more than three weeks after the district-court injunction. Op.7. Even after the Commission adopted a map, the City waited 16 days to submit it to the district court. Op.14. The City cannot now claim the district-court decision came too late.

In that same vein, the City's gripe that Plaintiffs did not "disclose" P4 until 25 days ago rings hollow. Mot.25. The City "disclosed" its own plan only 23 days before that.  P3, the near-identical plan on which P4 is based (and which was altered to better conform to the *City's* permissible policy choices), was released *before* the City's plan. Doc.82-7. Candidate qualifying ends almost two whole months from now.   Candidate Qualifying, City of Miami, https://www.miamigov.com/My-Government/Elections/Candidate-Qualifying; *see Jacksonville II*, 2022 WL 16754389, at *6 (Lagoa, J., concurring) (finding *Purcell* inapplicable where new map was in place more than a month before the candidate qualifying deadline).

are present here. There is no substantial risk of harm, confusion, or disruption resulting from the district court implementing a remedy on the agreed-upon timeline, following its May 23 injunction that the City did not appeal.[6] Significantly, the City did not submit any evidence to support its case on harm, confusion, and disruption in the district court—*or even raise* Purcell *at all in the remedial process, until the court ordered a map the City did not like*. Doc.86. No statutory deadlines would have to be moved for relief; unlike the statewide injunction in *Milligan*, state and local officials won't need to coordinate; and the injunction here doesn't alter voting procedures in a way that courts have found would be a source of "judicially created confusion" in the past. *RNC*, 140 S.Ct. at 1207. There would be no "chaos" for

---

[6] The City condemns "draw[ing] an incumbent out of his district" as a "sweeping and disruptive" change. But were the court to consider this factor in weighing a remedial plan, it would be violating a Florida statutory mandate that the court is bound to follow. Fla. Stat. § 166.0321; *Perry v. Perez*, 565 U.S. 388, 394 (2012); *White v. Weiser*, 412 U.S. 783, 795 (1973). Even if that were not the case, incumbent protection has the effect of embedding racially-sorted districts, and must give way to the obligation to cure the racial gerrymandering. *Personhuballah v. Alcorn*, 155 F.Supp.3d 552, 561 n.8 (E.D. Va. 2016); *Jeffers v. Clinton*, 756 F.Supp. 1195, 1199–1200 (E.D. Ark. 1990). After all, what better way to protect incumbents than to give them the exact districts they had already won? That's not too different from what the Commission actually did, maintaining between 90%+ of the race-based districts. Doc.83 p.23-24. The law doesn't countenance this sort of "remedy."

Regardless, the City appears less worried about the impact on the incumbent in question than it represents to the Court. Joey Flechas, *Federal Appeals Court Temporarily Pauses Change to City of Miami Voting Maps*, MIA. HERALD (July 31, 2023), https://www.miamiherald.com/article277835528.html ("The Commissioner was elected until 2025, Méndez wrote. "Moreover, fairness dictates that he remains the Commissioner of the district until such time, regardless of redistricting and based on case law.").

election administrators—their assurance that they could implement a map in hand by around this time has guided this case's timeline.[7] *Accord Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville III*)*, 2022 WL 17751416, at \*21 (M.D. Fla. Dec. 19, 2022) (city twice as large as Miami implementing map ordered 13 weeks before election); *Black Voters Matter v. Lee*, No. 2022 CA 666 (Fla. 2nd Jud. Cir. Ct. Apr. 26, 2022), Doc.23 p.412–415 (affidavit of elections supervisor and then-president-elect of state association of county elections officials, testifying he could implement new congressional map less than 12 weeks before primary).

In short, the City inappropriately seeks an aggressive application of *Purcell*, without showing significant risk of harm to electoral administration, and after the district court managed the case to meet the August 1 agreed-upon deadline. This Court should not reward that tactic.

## II.    The City is Not Entitled to a Stay

### A. The City is Not Likely to Succeed on the Merits

The City failed to enact a constitutional map during its 2022 redistricting process. Its violations were blatant, explicit, and on the record: repeatedly directing its consultant to draw the five districts to ensure three Hispanic representatives, one

---

[7]    The City suggests it would be impractical to give the Elections Department all materials necessary to implement the court-ordered plan by the district-court deadline. Mot.25. Plaintiffs' counsel sent the relevant files to the Elections Department's attorneys, who confirmed receipt. Ex.3; Vazquez, *Will New Miami Electoral Map Force Carollo Out?*, *supra* p.11.

Black representative, and one Anglo representative.[8] Doc.60 p.9-10, 13. This "political apartheid" cannot withstand strict scrutiny. *Shaw v. Reno*, 509 U.S. 630, 647 (1993). The law is clear: "Outright racial balancing is patently unconstitutional." *SFFA*, 143 S.Ct. at 2219 (cleaned up); *see also Miller v. Johnson*, 515 U.S. 900, 911–12 (1995) ("When the [government] assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'") (quoting *Shaw*, 509 U.S. at 657).

The district-court injunction prevented the City from using that intentionally gerrymandered map in this November's elections. The City dismissed its appeal of that injunction. No. 23-11854. The time to appeal that ruling has passed. That preliminary finding is not presented to this Court for review in this appeal of the remedial map order; the preliminary injunction stands unchallenged. That precludes the City's arguments about delay seeking preliminary relief, which the district court weighed in the injunction. Doc.60 p.26.

---

[8]    *See, e.g.*, Doc.24-17 8:14-16 ("Our goal here is to have ... a white district"); Doc.24-15 (Commissioner Carollo: "Silver Bluff is one of those communities that was split in half to be able to create a District 2 that would elect someone like Mr. Russell – Commissioner Ken Russell: Japanese American. Commissioner Carollo: I didn't hear – well you didn't quite mention the Oriental part when you were running"). Doc.24-13 100:16-17 (sharing "intentions here today" "to have guaranteed Anglo representation, and to have three districts that were Hispanic"); Doc.24-12 ("[W]e have to make sure that we keep the … ethnic integrity … in those two districts.").

An appeal that has been voluntarily dismissed "cannot be revived after the expiration of the original appeal period." *Colbert v. Brennan*, 752 F.3d 412, 415–16 (5th Cir. 2014). Although the City may still assert the constitutionality of its explicit racial gerrymander at trial, its failure to appeal the preliminary injunction "logically preclude[s] a subsequent interlocutory appeal under § 1292(a)(1) from an unwarranted successive motion" that results from the preliminary injunction. *F.W. Kerr Chem. Co. v. Crandall Assoc.*, 815 F.2d 426, 428–29 (6th Cir. 1987); *see also Am. Optical Co. v. Rayex Corp.*, 394 F.2d 155, 156 (2d Cir. 1968) ("We will not further consider at this stage of the proceeding the validity of the underlying preliminary injunction from which appellants took no appeal.").

Given that the City's original 2022 map stands enjoined until trial on the merits, the sole issue presented on this appeal is whether the district court properly rejected the City's remedial map and instead chose to adopt Plaintiffs' proposed map. The merits of the City's appeal do not concern "an original racial gerrymandering challenge" to the City's remedial map, but how the district court evaluated the City's remedial map "after a finding that the Enjoined Plan was substantially likely to violate the Equal Protection Clause." *See Covington I*, 283 F.Supp.3d at 431.

Although the City's remedial plan begins with the "presumption of legislative good faith," *Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018), the district court must ensure that any remedial plan "so far as possible eliminate[s] the discriminatory

effects of the past as well as bar[s] like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154 (1965). "In the remedial posture, courts must ensure that a proposed remedial districting plan completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." *Covington I*, 283 F.Supp.3d at 431 (citing *Abrams v. Johnson*, 521 U.S. 74, 86 (1997)). If the legislature fails to enact "a constitutionally acceptable" remedial plan, then "the responsibility falls on the District Court" to reconfigure the unconstitutional districts. *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *see also White v. Weiser*, 412 U.S. 783, 795 (1973) (holding that a court should not "refrain from providing remedies fully adequate to address constitutional violations"); *Abrams*, 521 U.S. at 86 (holding a remedial districting plan cannot be sustained if it "would validate the very maneuvers that were a major cause of the unconstitutional districting"); *Jacksonville Branch of NAACP v. City of Jacksonville*, 2023 WL 119425, at *3 (11th Cir. Jan. 6, 2023) (citing *Covington*, 138 S.Ct. at 2554).

The district court's factual findings support its conclusion that the City's remedial plan failed to remedy the blatant constitutional violations of the Enjoined Plan. Op.6-7 (discussing the May 11 Commission meeting, where commissioners openly criticized the R&R and instructed their consultant to replicate the racial sorting of the Enjoined Plan); Op.7-14 (ensuring the racial sorting persists at the June 14 meeting, where the Commission tweaked the "Version 12" draft to hew even more

closely to the Enjoined Plan).

The record of the remedial process amply reflected the City's instruction to its consultant to perpetuate the racial sorting between the five districts. Op.67. The City failed to fix the "infirmities" that the district court identified at the outset of the remedial process. Doc.99 at 12:13. Commissioners knowingly reaffirmed their intent to gerrymander all five districts to achieve a balance of three Hispanic, one Black, and one Anglo commissioner. No presumption of good faith can overcome the blatant unconstitutionality of this instruction. Plaintiffs' Objections met their burden to overcome the presumption of good faith, and the City has offered no justification to satisfy strict scrutiny.

The City erroneously now attacks Plaintiffs' remedial map as improperly "packing Hispanics" into District 4. That argument is meritless. During the proceedings below, the City repeatedly conceded the VRA protects Black voters in Miami but does not apply to Hispanic voters (the majority of City residents) or Anglo voters. Doc.73 135:814, R&R.86-87. Because of these concessions, its arguments about how Hispanic and Anglo voters are distributed in the court-ordered map are irrelevant: intentional focus on the numbers of Hispanic and Anglo voters in Miami's districts is inappropriate, unsupported by the VRA, and cannot withstand strict scrutiny. *See* R&R.83, 86, 87.

Nor can the City invoke maintaining the cores of existing districts to

perpetuate the unconstitutional districts from the Enjoined Plan. Mot.16-17. "[W]here a government opts to preserve district cores to maintain the race-based lines created in previous redistricting cycles, '[t]he Supreme Court has been equally clear that this is not a legitimate objective.'" R&R.71 (quoting *Jacksonville II*, 2022 WL 16754389, at *3); *see also* Doc.39 p.3-5 (citing cases).[9] "[A] State [cannot] immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Allen v. Milligan*, 143 S.Ct. 1487, 1505 (2023).

The other "legitimate, non-racial criteria" the City claims motivated Res. 23-271 are either nowhere to be found in the actual record of commissioners' decision-making (political considerations, where candidates reside), or had only a minimal impact on the shapes of districts such that race still predominated in their design (where commissioners invested district resources).

For these reasons, the City's remedial map fails to correct the constitutional violations while the Plaintiffs' map does. The City is not likely to succeed on the merits of its appeal because the Order properly resolves the limited remedial issue facing the district court as a result of the City's explicit racial sorting.

---

[9] The City claims *Jacksonville* is inapposite because "that was a case of vote dilution." In fact, that case was identical to this. *Jacksonville I*, 2022 WL 7089087, at *42 n.62) ("Plaintiffs do not assert an intentional vote dilution claim in this case. Rather, the racial gerrymandering claim at issue here is based on *Shaw*.").

### B. The City Will Not Face Irreparable Harm

The City will not be irreparably harmed absent a stay—"the second 'most critical' factor" governing its request. *Florida v. HHS*, 19 F.4th 1271, 1291 (11th Cir. 2021) (quoting *Nken*, 556 U.S. at 434). Both the Supreme Court and this Court have explained a government can claim no harm from being enjoined from enforcing an unconstitutional election statute. *See Abbott*, 138 S.Ct. at 2324 (no irreparable harm in enjoining state from enforcing unconstitutional map); *New Ga. Project*, 976 F.3d at 1283 (same). "[T]he city has no legitimate interest in enforcing an unconstitutional ordinance," so it cannot be harmed by being barred from doing so. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Because the City makes no serious effort to contest the district-court determination that race predominated in its districting, it cannot be irreparably harmed by the injunction.

### C. A Stay Will Harm Plaintiffs and the Public

Holding elections under unconstitutionally racially gerrymandered maps cause irreparable harm. Granting a stay now will cause that harm, not just to Plaintiffs, but to all Miamians. They would continue to be forced to live in districts unconstitutionally based on racial "[c]lassifications … [that] 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw*, 509 U.S. at 643. Their "elected representatives," meanwhile, will continue receiving a "pernicious" message making them "more likely to believe that their

primary obligation is to represent only the members of [one racial] group." *Id.* at 648. These serious, irreparable harms are "altogether antithetical to our system of representative democracy." *Id.* Further, "the public … has no interest in enforcing an unconstitutional law," *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); it is always in the public interest to follow the Constitution. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).[10]

## CONCLUSION

For the foregoing reasons, the Court should deny the City's motion.


Respectfully submitted this 1st day of August, 2023,

 /s/ Nicholas L.V. Warren

| | |
|---|---|
| Nicholas L.V. Warren (FBN 1019018) | Neil A. Steiner* |
| **ACLU Foundation of Florida** | **Dechert LLP** |
| 336 East College Avenue, Suite 203 | Three Bryant Park |
| Tallahassee, FL 32301 | 1095 Avenue of the Americas |
| (786) 363-1769 | New York, NY 10036 |
| nwarren@aclufl.org | (212) 698-3822 |
| | neil.steiner@dechert.com |
| Caroline A. McNamara (FBN 1038312) | |
| Daniel B. Tilley (FBN 102882) | Christopher J. Merken |
| **ACLU Foundation of Florida** | **Dechert LLP** |
| 4343 West Flagler Street, Suite 400 | Cira Centre |

---

[10]   The City raises the specter of a VRA challenge against the court-ordered plan for diluting Black voters' ability in District 5. The district court found—and the City's own expert acknowledged—that District 5 under P4 will afford Black voters the ability to elect preferred candidates, as the VRA requires. Op.47-48; Doc.86-2 p.5.

Plaintiffs address the City's other arguments on public interest in the *Purcell* section, above.

Miami, FL 33134  
(786) 363-2714  
cmcnamara@aclufl.org  
dtilley@aclufl.org  

2929 Arch Street  
Philadelphia, PA 19104  
(215) 994-2380  
christopher.merken@dechert.com  

\* *Not admitted in the Eleventh Circuit*

***Counsel for Plaintiffs-Appellees***

## CERTIFICATE OF COMPLIANCE

This motion complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,198 words, excluding the parts that can be excluded. This motion also complies with Federal Rule of Civil Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word, 14-point Times New Roman font.

Dated: August 1, 2023                    */s/ Nicholas L.V. Warren*

                                         Nicholas L.V. Warren