Case No. 23-12472
_____

# United States Court of Appeals
# for the Eleventh Circuit
_____

CITY OF MIAMI,

    *Defendant/Appellant*,

v.

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

    *Plaintiffs/Appellees*.

---

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:22-cv-24066-KMM

---

## APPELLANT'S INITIAL BRIEF

---

GRAYROBINSON, P.A.
Jason L. Unger
George T. Levesque
Andy Bardos
301 S. Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
junger@gray-robinson.com
glevesque@gray-robinson.com
abardos@gray-robinson.com

GRAYROBINSON, P.A.
Christopher N. Johnson
Marlene Quintana, B.C.S.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: 305-416-6880
christopher.johnson@gray-robinson.com
marlene.quintana@gray-robinson.com

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, Florida 33130
Telephone: 305-416-1800
*Attorneys for Defendant/Appellant*

**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

Appellant, the City of Miami, furnishes this certificate of interested persons and corporate disclosure statement.

1. Abbott, Carolyn, Plaintiff/Appellee's expert

2. ACLU Foundation of Florida, Inc., Counsel for Plaintiffs/Appellees

3. Alford, John, Defendant/Appellant's expert

4. Bardos, Andy, Counsel for Defendant/Appellant

5. Carollo, Joe, Defendant/Appellant

6. City of Miami, Defendant/Appellant

7. Cody, Steven, Defendant/Appellant's expert

8. Contreras, Alexander, Plaintiff/Appellee

9. Cooper, Clarice, Plaintiff/Appellee

10. Covo, Sabina, Defendant/Appellant

11. De Grandy, Miguel, Defendant/Appellant's expert

12. Dechert LLP, Counsel for Plaintiffs/Appellees

13. Diaz de la Portilla, Alex, Defendant/Appellant

14. Donaldson, Carolyn, Corporate Representative for Plaintiff/Appellee

15. Engage Miami, Inc., Plaintiff/Appellee

16. Ford, Harold, Declarant for Plaintiff/Appellee

17. GrayRobinson, P.A., Counsel for Defendant/Appellant

18.    Grace, Inc., Plaintiff/Appellee

19.    Greco, John A, Counsel for Defendant/Appellant

20.    Hannon, Todd, Corporate Representative for Defendant/Appellant

21.    Johnson, Christopher N., Counsel for Defendant/Appellant

22.    Johnson, Jared, Plaintiff/Appellee

23.    Jones, Kevin R., Counsel for Defendant/Appellant

24.    King, Christine, Defendant/Appellant

25.    Kirsch, Jocelyn Kirsch, Counsel for Plaintiff/Appellee

26.    Levesque, George T., Counsel for Defendant/Appellant

27.    McCartan, Cory, Plaintiff/Appellee's expert

28.    McNamara, Caroline A., Counsel for Plaintiff/Appellee

29.    McNulty, Kerri L., Counsel for Defendant/Appellant

30.    Méndez, Victoria, Counsel for Defendant/Appellant

31.    Merken, Christopher J., Counsel for Plaintiff/Appellee

32.    Miami-Dade Branch of the NAACP, Plaintiff/Appellee

33.    Moore, K. Michael, United States District Judge, Southern District of Florida

34.    Moy, Bryant J., Plaintiff/Appellee's expert

35.    Pelham, Rebecca, Corporate Representative for Plaintiff/Appellee

36.    Pierre, Daniella, Corporate Representative for Plaintiff/Appellee

37.  Quintana, Marlene, Counsel for Defendant/Appellant

38.  Reyes, Manolo, Defendant/Appellant

39.  Robinson, Nathaniel, Corporate Representative for Plaintiff/Appellee

40.  South Dade Branch of the NAACP, Plaintiff/Appellee

41.  Spring, Larry, Corporate Representative for Defendant/Appellant

42.  Steiner, Neil A., Counsel for Plaintiff/Appellee

43.  Suarez, Francis, Defendant/Appellant

44.  Tilley, Daniel T., Counsel for Plaintiff/Appellee

45.  Unger, Jason L., Counsel for Defendant/Appellant

46.  Valdes, Yanelis, Plaintiff/Appellee

47.  Warren, Nicholas L.V., Counsel for Plaintiff/Appellee

48.  Wysong, George, Counsel for Defendant/Appellant

## <u>CORPORATE DISCLOSURE STATEMENT AND</u>
## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant, the City of Miami certifies that it is not publicly traded and has no parent corporation and that no publicly held corporation owns more than 10% of its stock.

## STATEMENT REGARDING ORAL ARGUMENT

Because the questions presented in this appeal affect the public interest, and because their resolution turns on complex questions of law arising under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the City of Miami respectfully requests oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ....................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................... i

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...............................................................2

STATEMENT OF THE CASE ..................................................................2

STANDARD OF REVIEW ......................................................................13

SUMMARY OF ARGUMENT ...............................................................14

   I.     UNDER *PURCELL*, THE TRIAL COURT SHOULD HAVE
           ABSTAINED FROM ENJOINING THE CITY'S NEW
           REDISTRICTING PLAN. ........................................................16

   II.    THE DISTRICT COURT'S CONCLUSION THAT RESOLUTION
           23-271 WAS NOT A CONSTITUTIONAL REMEDY RELIED ON
           AN INCORRECT APPLICATION OF THE LAW. ................................20

      A.    The May 11 Meeting Was Not Direct Evidence of Racial
           Gerrymandering....................................................................22

      B.    Circumstantial Evidence Does Not Establish Racial
           Gerrymandering....................................................................25

      C.    District 5 was narrowly tailored. ........................................28

   III.   PLAINTIFFS UNDULY DELAYED SEEKING THEIR RELIEF ........37

   IV.   PLAINTIFFS FAILED TO DEMONSTRATE IMPOSING THEIR
           PLAN WAS FEASIBLE BEFORE THE ELECTION WITHOUT
           SIGNIFICANT COST, CONFUSION, OR HARDSHIP ........................39

CONCLUSION........................................................................................41

CERTIFICATE OF COMPLIANCE......................................................43

CERTIFICATE OF SERVICE ...............................................................44

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,

    138 S. Ct. 2305 (2018) ...................................................................... 15, 19, 20, 29

*Abrams v. Johnson*,

    521 U.S. 74 (1997) ................................................................................. 19

*Alabama Legislative Black Caucus v. Alabama*,

    575 U.S. 254 (2015) ............................................................................ 22, 30, 34

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,

    587 F. Supp. 3d 1222 (N.D. Ga. 2022) .................................................. 14

*Baumgart v. Wendelberger*,

    No. 01-C-0121, 2002 WL 34127471 (E.D. Wis. May 30, 2002) ........................ 25

*Benisek v. Lamone*,

    138 S. Ct. 1942 (2018) ........................................................................ 39

*Bethune-Hill v. Virginia State Board of Elections*,

    580 U.S. 178 (2017) ..................................................................... passim

*Birmingham Ministries v. Secretary of State for State of Alabama*,

    992 F.3d 1299 (11th Cir. 2021) ............................................................. 23

*Chapman v. Meier*,

    420 U.S. 1 (1975) .............................................................................. 15, 16

*Cooper v. Harris,

   581 U.S. 285 (2017) ................................................................ 3, 21, 29

*Coral Springs Street Systems, Inc. v. City of Sunrise,

   371 F.3d 1320 (11th Cir. 2004) ...............................................18

*Covington v. North Carolina,

   283 F. Supp. 410 (M.D.N.C. 2018) ........................................19

*De Grandy v. Wetherell,

   794 F. Supp. 1076 (N.D. Fla. 1992) ................................... 34, 37

Democratic National Committee v. Wisconsin State Legislature,

   141 S. Ct. 28 (2020) .............................................................. 17, 41

Evenwel v. Abbott,

   578 U.S. 54 (2016) ..................................................................36

*Flanigan's Enterprises, Inc. of Georgia v, City of Sandy Springs, Georgia,

   868 F.3d 1248 (11th Cir. 2017) .......................................... 18, 19

Grutter v. Bollinger,

   539 US 306 (2003) ..................................................................35

Health Freedom Defense Fund v. President of United States,

   71 F.4th 888 (11th Cir. 2023) ..................................................18

Jacksonville Branch of NAACP v. City of Jacksonville,

   635 F. Supp. 3d 1229 (M.D. Fla. 2022) .............................. 26, 35

*Jacksonville Branch of NAACP v. City of Jacksonville*,

    No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022)

    .................................................................................... 26, 33, 37

*Karcher v. Daggett*,

    462 U.S. 725 (1983)..........................................................25

*Larios v. Cox*,

    300 F. Supp. 2d 1320 (N.D. Ga. 2004)..............................25

*\*League of Women Voters of Florida, Inc. v. Florida  Secretary of State*,

    32 F.4th 1363 (11th Cir. 2022) .............................. 14, 21, 41

*Louisiana v. United States*,

    380 U.S. 145 (1965)..........................................................19

*\*Merrill v. Milligan*,

    142 S. Ct. 879 (2022)............................................ 14, 21, 41

*\*Miller v. Johnson*,

    515 U.S. 900 (1995)............................................. 14, 21, 29

*Naturist Society, Inc. v. Fillyaw*,

    958 F.2d 1515 (11th Cir.1992) .........................................18

*Negron v. City of Miami Beach*,

    113 F.3d 1563 (11th Cir. 1997) .......................................36

*\*Purcell v. Gonzalez*,

    549 U.S. 1 (2006)................................................. 2, 7, 14, 15

*Richmond v. J.A. Croson Company*,

    488 U.S. 469 (1989) ..................................................................35

*Rucho v. Common Cause*,

    139 S. Ct. 2484 (U.S. 2019) .......................................................27

*Shaw v. Reno*,

    509 U.S. 630 (1993) ..................................................................24

*\*Thornburg v. Gingles*,

    478 U.S. 30 (1986) ............................................................. passim

*University of Texas v. Camenisch*,

    451 U.S. 390 (1981) ..................................................................20

*Vital Pharmaceuticals, Inc. v. Alfieri*,

    23 F.4th 1282 (11th Cir. 2022) .................................................20

*Wesch v. Folsom*,

    6 F.3d 1465 (11th Cir. 1993) ....................................................14

*\*Wisconsin Legislature v. Wisconsin Elections Commission*,

    142 S. Ct. 1245 (2022) ..............................................................29

## **Statutes**

§ 101.62(3)(a), Fla. Stat. (2023) ....................................................2

28 U.S.C. § 1292(a)(1) ....................................................................1

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1343 .............................................................................1

28 U.S.C. § 2201 ...................................................................................1

28 U.S.C. § 2202 ...................................................................................1

42 U.S.C. § 1983 ...................................................................................1

42 U.S.C. § 1988 ...................................................................................1

**Rules**

Fed. R. App. P. 4(a)(1)(A) .....................................................................1

**Other Authorities**

*City of Miami Resolution R-21-0485 ........................................... 5, 26-28

*City of Miami Resolution R-23-171 ..................................................2, 13

*City of Miami Resolution R-23-271 ................................... 17, 22, 39, 40

## **JURISDICTIONAL STATEMENT**

Plaintiffs brought the action below under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, under the Constitution and laws of the United States.  DE 23, ¶ 34.[1]  Plaintiffs brought a single claim for racial gerrymandering of the City's 2022 Redistricting Plan.  DE 23.

Following a hearing and a Report and Recommendation of the magistrate judge, *see* DE 52, the district court entered a preliminary injunction on May 23, 2023, prohibiting the use of the City's 2022 Redistricting Plan in elections until final judgment.  DE 60.  The district court established a schedule which afforded the City until June 30, 2023 to "enact and file an interim remedial plan."  DE 69.

The City enacted a new redistricting plan, effective June 29, 2023, and filed notice on June 30, 2023.  DE 77.  After consideration of Plaintiffs objections and filings, *see* DE 82 and 83, and Defendant's response, *see* DE 80, on July 30, 2023, the district court enjoined the City from using the 2023 Plan and imposing Plaintiffs' Plan 4, pending the entry of final judgment.  DE 94.

The City timely filed its notice of appeal that same day on July 30, 2023.  *See* Fed. R. App. P. 4(a)(1)(A).  Because this appeal seeks review of an interlocutory order granting an injunction, this Court has jurisdiction.  *See* 28 U.S.C. § 1292(a)(1).

---

[1] References to the district court Docket are to "DE *."  References to the Eleventh Circuit Court of Appeals docket are to "APP DE *."

## STATEMENT OF THE ISSUES

The main question presented in this appeal is whether the district court improperly enjoined the use of the City's 2023 Redistricting Plan and imposed a remedial plan.  Underlying that decision is (1) whether the district court should have refrained from interfering in upcoming elections processes under *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam); (2) whether the underlying merits of Plaintiffs' claims are entirely clearcut in their favor; (3) whether Plaintiffs have unduly delayed bringing their claim, (4) and whether Plaintiffs demonstrated imposing their plan was feasible before the election without significant cost, confusion, or hardship, such that injunctive relief should have been denied.

## STATEMENT OF THE CASE

With vote by mail for the City's next General Election starting less than two months away on September 23, on July 30, 2023, the district court cast aside a legislatively-crafted electoral map prepared with public input and ordered the City of Miami to adopt a new map drawn by the Plaintiffs in secret.[2]  DE 94, p. 50. This Court stayed the district court's order and remedied the departure from binding precedent, eliminating the core harm to the City and its residents that *Purcell v. Gonzalez*, 549 U.S. 1 (2006) counseled should be avoided.  This Court

---

[2] Vote by mail begins 45 days before a general election.  § 101.62(3)(a), Fla. Stat. (requiring elections supervisors to send mail ballots to absent uniformed services and overseas voters no later than 45 days before the election). Election day, November 7, 2023, was approximately three months away.  *See* City of Miami Resolution R-23-171.

2

should decide this matter consistent with its initial decision staying the district court's preliminary injunction.

This case comes to the Court with the pleadings still open, and the constitutionality of the City-drawn maps still yet to be decided, and the district court only having entered a preliminary injunction. There has been no trial on the merits. Importantly, no City of Miami district plan has ever been adjudged to be unconstitutional.

The City first implemented single-member districts in 1997. DE 23 ¶¶ 33-39, 59-64. Prior to that, Commissioners were elected at large. In 1996, when no Black commissioner was elected, a Voting Rights Act lawsuit ensued. DE 24-42; 24-43. Then mayor, now Commissioner Carollo, pushed for single-member districts. DE 24-44. These districts have had substantially the same shape and essentially the same racial demographic make-up since first constituted. DE 24-80 to 83. The shapes of the districts are largely dictated by the municipal borders and are not characterized by irregular shapes and appendages typically associated with a racial gerrymander like those at issue in *Cooper v. Harris*, 581 U.S. 285, 323 (2017) (depicting challenged Districts 1 and 12 in North Carolina's enacted plan).



The United States Census of 2020 (the "2020 Census") revealed that the City's districts no longer had substantial equality of population. DE 23, ¶¶ 72-74. Following the 2020 Census, the ideal district size was 88,448. *Id.*, ¶ 72. District 2, the waterfront district, had grown significantly larger than the other four districts and needed to "shed" population to the other four districts. *Id.*, ¶ 75.

The City commenced its redistricting process with its inaugural meeting on November 18, 2021. In that meeting the City provided express directions which were adopted by motion without objection. *See generally* DE 24-11. The City gave directions to maintain the core of existing districts. *Id.*, 24-11, p.17:18-19:2. The City gave directions to draw districts with politically cohesive minorities. *Id.*,

p.19:20-21:15. The City gave directions to draw districts with substantial equality of population, not mathematical equality. *Id.*, p. 21:21-22:4. These directions were memorialized in adopted City of Miami Resolution R-21-485. DE 50-1.

The Commission's instructions to Miguel De Grandy, its map drawing expert, in that official act were to:

a. Comply with the United States Constitution and the Voting Rights Act;
b. Maintain the core of existing districts to avoid voter confusion;
c. Factor in voter cohesion;
d. Achieve substantial equality of population as opposed to mathematical equality; and
e. Maintain communities of interest and neighborhoods where feasible.

DE 50-1. Mr. De Grandy testified that these were the directions he followed in drawing the districts.

On March 24, 2022, the City of Miami enacted a new 5-seat commission district map in light of the census that required reapportionment (City of Miami Resolution 22-131, the "2022 Plan"). *Id.*, ¶ 5. Plaintiffs, a combination of individuals and organizations, filed their initial Complaint on December 15, 2022. DE 1. On February 10, 2022, Plaintiffs filed their First Amended Complaint and their Expedited Motion for Preliminary Injunction, eleven months after the City had enacted the 2022 Plan. DE 23. Below, Plaintiffs argued that the 2022 Plan gerrymandered districts, "packing certain districts with as many Hispanic and Black residents as possible," DE 23, ¶ 2, but this is inaccurate. On the contrary, far from racially sorting people, the 2022 Plan maintained districts that were in place for 25 years. DE 24-80 to 83; DE 82-12, p. 16. Plaintiffs ignore the fact that the

City of Miami is 70% Hispanic, and it is impossible to draw a map without at least three super majority Hispanic Districts. DE 82-2. p. 9:3-8. Underscoring this reality is the fact that all four remedial maps proposed by the Plaintiffs also contained super majority Hispanic districts. DE 82-12, p. 16. The 2022 Plan reduced the racial percentage concentration in the Hispanic-majority and the Black-majority districts of Hispanic and Black residents, respectively, all in compliance with legal precedent.[3] DE 24-31, p. 23. Section 2 of the Voting Rights Act requires the City to draw a majority Black District 5, and the 2022 Plan *reduced* the percentage of Black voting age population until it comprised only a bare 50.3% of the District. Id. DE 36 pp.4-5. Thus, the City did not pack minorities into District 5: it created an exceptionally narrowly-tailored Black majority-minority VRA district. In every plan proposed by the City and Plaintiffs alike, Hispanics make up the largest portion of population in every other district other than District 5. DE 82-12, p. 14-16. That such districts occur simply reflects the reality of drawing districts when the remaining portion of the City is 75% Hispanic. *Id*.

---

[3] District 4 started with a Hispanic voting age population ("HVAP") of 91.6 % and a Hispanic Citizen voting age population ("HCVAP") of 90.1% (DE 23 ¶ 76), and ended with a HVAP of 89.5 % and a HCVAP of 88.2% (*Id*. ¶ 340). District 3 started with a HVAP of 88.5% and a HCVAP of 86.81% (*Id*., ¶ 76), and ended with a HVAP of 88.3 % and a HCVAP of 86.9% (*Id*. ¶ 326). District 1 in the enacted redistricting plan has a HVAP of 89.5% and a HCVAP 84.8%. (*Id*. ¶ 289). This too is less than before redistricting, when the percentages were 91% and 86.8%. *See Id*. ¶ 76.

Notwithstanding this undisputed data, the district court adopted a Report and Recommendation ("R&R") and preliminarily enjoined the City's 2022 Plan. DE 52 and 60. Critically, the R&R did not find either packing of minorities or ethnicities, or dilution of any group's influence. DE 52, p.8. It merely found that Plaintiffs had a likelihood of prevailing on their claim that the 2022 Plan unconstitutionally racially gerrymandered the City to preserve "three Hispanic districts, one Black district, and one Anglo district," and it took issue with certain minor, statistically insignificant changes to the district borders. DE 60, p.16. The R&R focused heavily on commissioners' public discussions of race in a vacuum, failing to consider the reality of the City's demographics. DE 52, p. 12-40. The R&R also recognized that the *Purcell* principle[4] may be applicable based on the proximity of the November election but nevertheless recommended a preliminary injunction based upon a finding of racial sorting. DE 52, p.99. Notably at that stage, Plaintiffs never presented a plan or argued the district map could be drawn any differently.

Though the district court enjoined the City's 2022 Plan on May 23, 2023, it did not implement an alternative plan, but instead ordered the City to submit an interim remedial plan. The City repeatedly urged that there would not be enough time to implement a plan before the November 2023 election without implicating the *Purcell* principle, DE 55, pp.21-22; DE 59, pp.5-6, but the district court

---

[4] "[F]ederal district courts ordinarily should not enjoin state election laws in the period close to an election." *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

rejected that argument.  DE 60.

The City initially appealed the preliminary injunction.  DE 63.  But on June 14, 2023, before any briefing on appeal, the City passed City of Miami Resolution R-23-271 ("2023 Plan") and filed the new redistricting plan with the Court.  DE 77.  This rendered the City's appeal moot[5] because the 2023 Plan was not intended as an interim remedial plan, but fully replaced the 2022 Plan.[6]  *Id.*



In lieu of an interim remedial plan, the 2023 Plan was an entirely new plan to address the district court's concerns and minimize disruption in the districts by maintaining the core of existing districts.  Proposals, including proposals from Plaintiffs, were discussed at a publicly-noticed commission meeting before the 2023 Plan's passage.  One of the proposals was revised and adopted on June 14,

---

[5] The City dismissed its appeal of the order enjoining the 2022 Plan.  *See* DE 88.
[6] The preliminary injunction did not restrict the City's lawmaking power, and at the time this appeal was filed, Plaintiffs had not amended their pleadings to assert new claims or allege any infirmities with respect to the 2023 Plan.

2023, subject to the ten-day veto period and the City's mandatory review

processes, and was certified by the Clerk on June 29, 2023.  DE 77, pp.7-8.  The

plan was filed with the district court the next day.  DE 77.  While Plaintiffs claim it

is "inexplicable" that the City did not file the 2023 Plan earlier, this ignores the

foregoing legislative process, of which they are well aware.  Notably, the Plaintiffs

urged the Mayor to veto the 2023 Plan during this legislative process.  DE 82-10.

Plaintiffs objected to the 2023 Plan on Friday, July 7, 2023, attaching four

alternative plans including, for the first time, their proposed Map 4[7] that, as this

Court would later observe, looked "a lot like the City's March 2022 redistricting

plan the district court enjoined."  APP DE 25, p.5; DE 83.



---

[7] Plan 4 was not publicly released until July 7, 2023 when it was filed with the court, almost three weeks after the City had adopted its plan.

All five plans have a coastal District 2 that is a plurality district with no racial majority.[8] *Compare* DE 82-24 *to* 82-34–82-37. Plaintiffs' Maps 2, 3, and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the 2023 Plan. *Compare* DE 82-12 p.15 to 16. All the plans have a VRA-protected Black District 5. DE 82-12. Plaintiffs previously accused the City of "packing" Black voters into District 5 by looking at Black <u>Citizen</u> Voting Age Population (BCVAP), but Plaintiffs and the City both seem to agree on the size of that District. *Compare* DE 82-12 p.15 to 16. Plaintiffs' Plan 3's BCVAP was 56.5% and Plan 4's BCVAP is 55.8% compared to the 2023 Plan's 57.4%. *Compare* DE 82-12 p.15 *to* 16. The City's consultant had explained how the districts were drawn and that Plaintiffs were attempting to redraw the City for political purposes, not to address race. DE 82-2 p. 8:3-16:13. Plaintiffs packed the most conservative voters in the western part of the City in the Flagami area, making it a 95% Hispanic district, and removed those voters from District 1 by pushing it further East, with the obvious intent of making it a more liberal seat on the Commission. *Id*. 9:9-10:22. The City promptly responded to Plaintiffs' Objections on July 12,

---

[8] "Anglo" district is a misnomer; District 2 has no racial majority. Plaintiffs said they did not "designate" an Anglo access district (DE 82-2 p.6), but they created one in each plan, preserving the Whitest community in Miami, Coconut Grove, inviolate. They claimed not to "pack Hispanics" into three districts, but they did just that. DE 82-12 p.16.

2023 (DE 86).[9]

On July 30, 2023, the district court rejected the 2023 Plan, finding that it failed to correct the prior racial predominance of the 2022 Plan, and, barely three months before the election (and less than two months before the start of vote-by-mail voting), ordered the City to adopt a plan unilaterally proposed by the Plaintiffs (the "Mandated Plan") without public input.[10]  DE 94 pp. 27, 35-39.  The Mandated Plan maintains three Hispanic districts as supermajorities and maximally packs one of those districts in excess of 95%.  DE 82-12 p. 16.  The Mandated Plan also makes District 2—the so-called "Anglo District" that recently elected a Hispanic Commissioner—whiter than either the 2022 Plan or the 2023 Plan. *Compare Id*. *to* DE 82-12, p.15.  In enjoining the 2023 Plan, the district court did not consider an expert report supporting the narrow tailoring of the 2023 Plan's District 5 because it was finalized after the Commission voted for the 2023 Plan.[11]  DE 94 pp. 38-39.  The district court also did not consider the history of the City's

_____

[9] The City had to respond to the Friday objections with its multiple expert reports by Wednesday, July 12, and were given ten pages to respond to Plaintiffs' thirty-page submission.  DE 69.

[10] The Mandated Plan was even different from the three prior plans that had been submitted to the City for consideration.

[11] Consultants were tasked with drawing up the districts presented to the Commission, but the districts were not finalized until the June 14, 2023 meeting. DE 77.  Because of the amendments made to the plan during the June 14 meeting, the final report could not be finished until after the districts were set.

map-drawing process.  The City had already conducted a *Gingles*[12] analysis to
determine whether a majority-minority district was required under the VRA and
functional analyses to determine if the prior versions of District 5 considered by
the City were likely to perform for the minority candidate.  DE 24-3, pp. 13-14.  It
is undisputed that District 5 is a VRA-protected district.  The City had no BVAP
target other than drawing a majority-minority district to meet the *Gingles*
requirement, and did not reference race or examine racial statistics when it changed
the borders of District 5 in its June 14 commission meeting.  *See generally* DE 82-
2.

 As a remedy, the Mandated Plan does not alter the overall racial makeup of
the districts from either the 2022 or 2023 Plans. *Compare* DE 82-12, p. 14 and 15
to 16.  It only marginally modifies the cores of Districts 2 and 5, but significantly
disrupts the cores of the three Hispanic Districts.[13] DE 82-11, p. 8.

 The result was a different electoral map than that enacted by the City that
was ordered to be implemented approximately two months before vote by mail
began for a November 7 election, that wrote one incumbent commissioner out of

---

[12]*Thornburg v. Gingles*, 478 U.S. 30 (1986).

[13] The map imposed by the district court preserves 96.7% of the core of District 2,
a plurality district, and 92.5% of the core of District 5, the Black district, but
significantly reorders the three supermajority Hispanic districts yet still maintains
three supermajority Hispanic districts.  DE 86-2, p.8.  This Court recognized that
"it is not clearcut" that the Mandated Plan "remediates the alleged racial sorting"
because "[c]omparing the maps," they "look[] a lot" alike.  APP DE 25, p.5.

his district and substituted Plaintiffs' self-made political decisions, which were made in secret, for those of the City's duly elected representatives occurring at a public meeting. Moreover, the City's electoral map was displaced just 40 days before candidate qualifying was to commence in Districts 1, 2, and 4. *See* City of Miami Resolution R 23-171 (setting qualification for Districts 1, 2 and 4 for Friday, September 8, 2023, and ending on Saturday, September 23, 2023).

On the same day the district court issued its preliminary injunction, DE 94, the City filed its notice of appeal, DE 96, and emergency motion to stay, DE 97, on July 30, 2023, with the district court. The district court denied the motion to stay the following day, DE 98, issued a supplemental order presenting his reasoning on August 2, 2023, DE 101, and the City made emergency application to this Court for stay that same day on July 31, 2023. APP DE 2. This Court stayed the district court's preliminary injunction, APP DE 25, and this appeal ensued.

## STANDARD OF REVIEW

The grant of an injunction is reviewed for abuse of discretion but, if the trial court misapplies law, the reviewing court will review and correct the error without deference to that court's determination. *Wesch v. Folsom*, 6 F.3d 1465 (11th Cir. 1993). Specific to circumstances involving elections:

> the reviewing court must be cognizant that "orders affecting elections can themselves result in voter confusion. And that risk only increases as an election draws closer. For that reason, the Purcell principle teaches that federal district courts ordinarily should not enjoin state election laws in the period close to an election.

13

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371

(11th Cir. 2022) (cleaned up and citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006), and

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring)); *see also*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1238–39

(N.D. Ga. 2022).  Here, where a court has entered a preliminary injunction,

"*Purcell* effectively serves to lower the state's bar to obtain the stay it seeks. The

state need not show, for instance—as a plaintiff would to obtain a 'late-breaking

injunction' in the first place—that its position is 'entirely clearcut.' Rather, it need

only show that plaintiffs' position is not."  *League of Women Voters*, 32 F.4th at

1372.

## SUMMARY OF ARGUMENT

"Federal-court review of districting legislation represents a serious intrusion

on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995)

(quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)).  Here, the district court's

injunction setting aside the 2023 Plan and imposing the Mandated Plan

significantly intruded upon the democratically-established electoral processes of

the City.  The District Court's injunction failed to abide by the cautions that the

*Purcell* principle counsels for courts weighing whether relief should be provided

on the eve of an election.  Moreover, the district court did not afford the City the

requisite good faith presumption afforded to legislative enactments, but instead

shifted the burden to the City to demonstrate its plan was constitutionally

14

compliant, in contravention of the clear directive set forth in *Abbott v. Perez,* 138 S. Ct. 2305 (2018). In so doing, the district court failed to properly analyze Plaintiffs' claims and the City's enacted plans.

As for Plaintiffs' single racial gerrymandering claim, Plaintiffs never plead claims against the 2023 Plan, only objections.  But even so, the success of Plaintiffs' claims was never clear-cut because, at bottom, the City of Miami is a majority-minority city with a 70% Hispanic population.  The district court ignored this central, inescapable fact, misinterpreted or failed to credit the City's actions in preparing its plans, relieved the Plaintiffs of their burden of proof when seeking an injunction on the eve of an election, and concluded that the City racially gerrymandered its districts when it drew three Hispanic Districts, a Black district, and a plurality district.  Plaintiffs' efforts to have one of four alternative plans imposed highlights the inconsistency as each of their plans submitted to the district court includes three Hispanic Districts, a Black district, and a plurality district.  It defies logic to conclude the City's 2023 Plan is a racial gerrymander, but the Plaintiffs have not also proposed four alternative gerrymandered plans.

The remedy proposed by the district court does not fit the crime because there was no crime.  Moreover, because of Plaintiffs' eleven month delay in seeking injunctive relief and the fact that they failed to present any evidence that implementation of their plans would not present undue hardship, the district court

erred in granting the preliminary injunction. For reasons set forth below, this

Court should reverse the district court's preliminary injunction.

## I.    UNDER *PURCELL*, THE TRIAL COURT SHOULD HAVE ABSTAINED FROM ENJOINING THE CITY'S NEW REDISTRICTING PLAN.

The district court's order enjoining the City's new plan failed to consider the

*Purcell* principle as it related to both the enjoining of the 2023 Plan and the

imposition of a Mandated Plan. DE 60. It is well settled that "reapportionment is

primarily the duty and responsibility of the State." *Chapman v. Meier*, 420 U.S. 1,

27 (1975). As this Court explained in its order staying the district court's

injunction, federal courts should not enjoin state election laws close to an election

because of the confusion it creates.

> "That important principle of judicial restraint not only
> prevents voter confusion but also prevents election
> administrator confusion—and thereby protects the [local]
> interest in running an orderly, efficient election and in
> giving citizens (including the losing candidates and their
> supporters) confidence in the fairness of the election."
> *Democratic Nat'l Comm. v. Wis. State Legislature*, 141
> S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). "Court
> orders affecting elections . . . can themselves result in
> voter confusion and consequent incentive to remain away
> from the polls." *Purcell*, 549 U.S. at 4-5. "When an
> election is close at hand, the rules of the road should be
> clear and settled." *Democratic Nat'l Comm*., 141 S. Ct. at
> 31 (Kavanaugh, J., concurring). That's because running an
> election "is a complicated endeavor." *Id*. "Lawmakers
> initially must make a host of difficult decisions about
> how best to structure and conduct the election." *Id*.
> "[V]olunteers must participate in a massive coordinated
> effort to implement the lawmakers' policy choices on the

16

ground before and during the election, and again in counting the votes afterwards." *Id.* "And at every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting." *Id.*

APP DE 25, p.3.

While the district court's May 23, 2023 Order temporarily enjoining the City's use of the 2022 Plan created a legal vacuum which needed to be filled, the Order properly left it to the City to have the first opportunity to fill that vacuum. DE 60. The preliminary injunction did not strip the City Commission—a legislative body—of its law-making authority, so the Commission was still empowered to, and did, pass a new map. When it did so, it was not passing a temporary stopgap but had adopted a new redistricting plan that would be in place until after the next decennial census, when the City would be required to adopt a new plan if the equalization of population was required. Res. R-23-271; DE 77, p. 7 ("These election districts shall be applicable for all purposes, including but not limited to, *any election of City Commissioners, following the effective date of this resolution.*") (emphasis added).

A challenge is generally mooted by the repeal of the challenged statute. *Coral Springs Street Systems, Inc.*, 371 F.3d at 1329. When a city resolution is repealed by the enactment of a superseding resolution, the superseding statute resolution "moots a case only to the extent that it removes challenged features of the prior law." *Id.* at 1342 (quoting *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515,

17

1520 (11th Cir.1992)). "Rarely will challenges to a law's validity survive a mootness analysis when that law is no longer effective." *Health Freedom Defense Fund v. President of United States*, 2023 WL 4115990 (11th Cir. June 22, 2023). While it is usually the burden of the party asserting mootness, "governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." *Flanigan's Enterprises, Inc. of Ga. v, City of Sandy Springs, Ga.*, 868 F.3d 1248, 1256 (quoting *Coral Springs,* 371 F.3d at 1328–29)). Once a challenged law is repealed, "the plaintiff bears the burden of presenting affirmative evidence that the case is no longer moot." *Id.* The justification for this rule is that the repeal of a challenged law is one of those "subsequent events that makes it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citations omitted). This is doubly true when one considers the presumption of good faith and the burden of proof that applies even to a remedial plan. *Abbott,* 138 S.Ct. at 2324 ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination."). The "key inquiry" is "whether the evidence leads [the Court] to a reasonable expectation that the City will reverse course and reenact the allegedly offensive portion of its Code should this Court grant its motion to dismiss." *Flanigan's Enterprises,* 868 F.3d at 1256. Nothing suggests that was the case here.

18

Instead the district court appeared to elevate its May 23 Order granting a preliminary injunction on the 2022 Plan to equivalency of a judgment on the merits, stating it was duty-bound to "ensure that any remedial plan 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future." DE 94, p. 16 (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965). But the district court's conclusion was based upon preliminary proceedings, and in each of the authorities cited by the district court, the lower court's obligation was triggered by a judgment on the merits. *See* DE 94, p. 16, citing *Louisiana*, 380 U.S. at 145 (upholding three-judge panel's permanent injunction following trial and entry of judgment); *Covington v. North Carolina*, 283 F.Supp. 410 (upholding three-judge panel's permanent injunction following bench trial, entry of judgment, appeal, and remand); and *Abrams v. Johnson,* 521 U.S. 74 (affirming three-judge panel's judgment). Here, however, there has been no judgment, and "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1289 (11th Cir. 2022) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 396 (1981)).

In sum, the *Purcell* issue loomed over the entire process after the district court first enjoined use of the 2022 Plan. Because of the proximity to the upcoming election, the district court should have stayed its hand in enjoining the use of the 2023 Plan.

19

## II.  THE DISTRICT COURT'S CONCLUSION THAT RESOLUTION 23-271 WAS NOT A CONSTITUTIONAL REMEDY RELIED ON AN INCORRECT APPLICATION OF THE LAW.

The district court acknowledged there is a "'presumption of legislative good faith,' even after a finding of past discrimination, and that the 'burden of proof lies with [Plaintiffs], not the State' to demonstrate the remedial map is unconstitutional."  DE 94 p.16 (quoting *Abbott*, 138 S. Ct. at 2324).  Of course, there has been no finding of past discrimination here, as the previous ruling was an interlocutory injunction order, not a judgment.  It also does not appear that the Court granted that good faith deference, but instead imposed the burden on the City to demonstrate compliance.  First, the court began its discussion critiquing the City's justifications for the 2023 Plan, instead of analyzing Plaintiffs claims.  DE 94, p. 17.  Had the court started with an analysis of Plaintiffs' claims, there would have been a different outcome.  Moreover, it is not apparent that the district court applied the proper standard when evaluating *Purcell*.

Preliminarily, even though *Purcell* counsels that federal courts should generally refrain from altering election rules in close proximity to an election, such intrusion may be justified if Plaintiffs can "establish[] at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff[s]; (ii) the plaintiff[s] would suffer irreparable harm absent the injunction; (iii) the plaintiff[s] have not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion,

or hardship." *Merrill,* 142 S. Ct. at 881 (Kavanaugh, J., concurring); *accord League of Women Voters,* 32 F.4th at 1372–73 (applying Justice Kavanaugh's framework from *Merrill).* It is not apparent that the district court conducted its analysis through this framework.

Proving a racial gerrymandering claim under the Fourteenth Amendment requires a demonstration that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). The test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in *a racial gerrymander of a significant number of voters*. *Id.* It applies district-by-district, and a whole map challenge is improper. *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). But Plaintiffs never alleged district-by-district claims correlating to each Plaintiff for a particular district against Resolution 23-271, and the district court effectively aggregated the intent of the Commission as a whole to reach its conclusion that the entire 2023 Plan was constitutionally impaired.[14] As a result, the district court enjoined the use of the 2023 Plan for being racially gerrymandered and replaced it with the Mandated Plan which had substantially the same racial makeup as both the 2022 and 2023 Plans.

---

[14] The district court did conduct a district-specific analysis, but not in relation to any claim raised by any specific Plaintiff. When the district court entered its order enjoining the 2023 Plan, Plaintiffs had not yet amended their complaint or presented any allegations or testimony as to their treatment under the 2023 Plan.

### A.    The May 11 Meeting Was Not Direct Evidence of Racial Gerrymandering

The court placed undue emphasis on statements made at a May 11, 2023, meeting wherein Commissioner Diaz de la Portilla suggested going to single member districts.[15]  DE 94, p. 6-7.  He and Commissioner Reyes observed that in a city that is 70% Hispanic, that would likely lead to an all Hispanic Commission. *Id*.  The court interpreted this as an announcement of an intention to racially sort.

> [T]he May 11 Meeting is better understood as the Commissioners explaining why they believed their initial approach when enacting the 2022 Plan (i.e. creating the gerrymandered districts), was the correct approach, and after some discussion, unanimously directing De Grandy to maintain the racial breakdown of each district in a new map.

DE 94, p.24.  Determining legislative intent from statements by a minority of the Commission is problematic.  *Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir. 2021) (observing "determining the intent of the legislature is a problematic and near-impossible challenge" and rejecting the assertion that discriminatory intent could be found in the statements of one legislator, even where the legislator may be the sponsor).

In this case, there was no expressed intent to racially sort; the district court inferred it.  There certainly are no expressions of direct intent to sort a significant number of voters into a particular district based upon their race. *See generally* DE

---

[15] At that point in time, the magistrate judge had issued the R&R, but the City had not filed its objections, and the district court had not yet issued its ruling.

82-2.  No commissioner directed the movement of a population to increase or

decrease the racial makeup of a district.  To draw an inference from such

statements ignores the presumption of good faith due the Commission.  Moreover,

the Commissioners were discussing districts in the context of the mathematical

reality of a city with a supermajority Hispanic population that is likely to have

three supermajority Hispanic districts and a district that will perform for the Black

candidate of choice—a reality reflected in every map considered by the district

court, including all four plans proposed by Plaintiffs.  *See* DE 82-12, pp. 14-16.

Where at-large elections have a likelihood of electing an all-Hispanic commission,

single member districts will all have a VRA-protected Black District 5 and

unavoidably have three supermajority Hispanic districts because, once one draws

District 5, the remainder of the City is 75% Hispanic.  DE 82-2 p.9:1-8.

> Moreover, redistricting differs from other kinds of state
> decision making in that the legislature always is aware of
> race when it draws district lines, just as it is aware of age,
> economic status, religious and political persuasion, and a
> variety of other demographic factors. That sort of race
> consciousness does not lead inevitably to impermissible
> race discrimination.

*Shaw v. Reno*, 509 U.S. 630, 646 (1993).  The Court inferred improper intent from

the Commission's acknowledgment of an inescapable demographic fact.  The

priests of an ancient religion may claim the need to perform a yearly ritual to make

the sun rise, but though they claim credit for a sunrise, it does not mean they have

necessarily caused the sun to rise.  The Commission may have discussed three

Hispanic districts, a Black district, and a plurality district, because that is because it is the only way the City's redistricting plan can be drawn.

The foregoing mathematical reality is punctuated by the fact that each of Plaintiffs' four plans draw three supermajority Hispanic Districts, a coastal district with the highest white population, and a VRA-protected Black district. *See* DE 82-12, p. 16. All plans have a coastal District 2 that is a plurality district. *Compare* DE 82-24 to 34-37; *See* DE 82-12, p. 16. In, fact Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the Enacted Plan, yet Plaintiffs accuse the City of drawing the 2023 Plan to create an "Anglo" district. *Compare* DE 82-1 p.15 to 16. All of the plans have a VRA-protected Black District 5 in the North. District 2 and District 5 are substantially similar in shape and demographics. The most significant difference between the 2023 Plan and Plaintiffs' Plans, including the Mandated Plan, is Plaintiffs' configuration of the three supermajority Hispanic districts. These facts beg the questions, what racially gerrymandering has occurred in the 2023 Plan, and what harm is being remedied by the Mandated Plan when every single map includes an identical number of minority districts with substantially similar demographic populations? Plaintiffs failed to demonstrate that racial gerrymandering of significant number of voters has occurred, and their own maps and the related statistics underscore that it did not.

**B.    Circumstantial Evidence Does Not Establish Racial Gerrymandering**

The district court placed undue emphasis on the notion of core retention from the 2022 Plan, divorcing it from its comparative context of the 2013 Benchmark Plan and prior redistricting plans going back to 1997. DE 94, p.16. "[R]etaining previous occupants in new legislative districts" is a traditional redistricting criterion. *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002) (citing *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)); *see also Larios v. Cox*, 300 F. Supp. 2d 1320, 1334 (N.D. Ga. 2004). However, in the district court's reasoning, "core retention" did not reduce racial predominance, it exacerbated it.  DE 94, pp. 25-26, 36-37.

The district court relied heavily upon *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-cv-493-MMH-LLL, throughout these proceedings.  *See e.g.* DE 60, pp. 16, 22; DE 94, p. 15.  But though framed as a claim of racial gerrymandering under the Equal Protection Clause, the case involved actual allegations of vote dilution.  *See Jacksonville Branch of NAACP v. City of Jacksonville ("Jacksonville I")*, 635 F. Supp. 3d 1229, 1242 (M.D. Fla. 2022), *appeal dismissed ("Jacksonville II")*, No. 22-13544-HH, 2023 WL 2966338 (11th Cir. Jan. 12, 2023); and *Jacksonville Branch of NAACP v. City of Jacksonville ("Jacksonville III")*, No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416, at *1 (M.D. Fla. Dec. 19, 2022), *appeal dismissed*, No. 22-14260-HH, 2023 WL

25

4161697 (11th Cir. June 6, 2023). In that case, the new plan actually continued to dilute the votes of minority voters, and the court replaced it with a plan that did not dilute those votes. *Id.* This is not a case of vote dilution. It is solely a case of alleged racial sorting with zero effect—which the district court did not "correct" because there was nothing to correct. The district court's remedy here is akin to the *Jacksonville* Court finding the municipality's plan still diluted minority votes and then replacing it with a plan with at least as much, if not greater, packing and dilution.

The Commissioners focused on legitimate, non-racial criteria, such as political considerations, where they had invested substantial district resources, and where candidates reside. DE 94, p.12. The district court nevertheless disregarded those publicly-expressed reasons because it found those considerations "had the impact of perpetuating, rather than completely correcting, the constitutional infirmities." *Id.*[16] The district court highlighted that "areas that were approximately 90% HVAP were shuffled among Districts 1, 3, and 4—'creating the illusion they changed while maintaining their demographics.'" DE 94, p.27.

---

[16] The district court also outright rejected that partisan considerations formed any part of the 2023 Plan. DE 94 p.40. The court based this on the statements of one commissioner. *Id.* The political consideration was laid out in the record after consultations with the Commissioners, DE 82-2, p.9:9 to 11:2; DE 77, pp.24-25, but the direction of maintaining voter cohesion was a directive the City gave to Mr. De Grandy when it started the process. DE 50-1; DE 24-11, pp. 32:21-33:3 and 35:20-36:11. When it comes to political gerrymandering, courts lack jurisdiction to undo what is essentially a political question. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507-08 (U.S. 2019). Yet that is what the district court did in the Mandated Plan.

But the Mandated Plan accomplishes the same result—three supermajority Hispanic districts. In the 2022 Plan, those districts were 89.5%, 88.3%, and 89.5% Hispanic Voting Age Population (HVAP), respectively. DE 82-12 p.14. In the 2023 Plan, they are 89.7%, 84.5%, and 90%. *Id*. p.15. In the Mandated Plan, they are 85.8%, 85.1%, and 95.6%, respectively.[17] *Id*. p.16. The Mandated Plan simply shuffled Hispanics from Districts 1 and 3 to District 4 to effect maximal packing in District 4. Likewise, the district court observed, District 2 "retains a large Anglo population." DE 94 p.27. The White Voting Age Population (WVAP) in the 2023 Plan is 36.5%. In the 2022 Plan it was 37.4%. In the Mandated Plan it is 37.9%. The only real difference between the 2023 Plan and the Mandated Plan is that the Commission is entitled to a presumption of constitutionality and good faith; the Plaintiffs are not.

The district court generalized and dismissed the argument that political purposes had a role in the drawing of the map. DE 94, p. 40. But that was clearly on the commissioners' minds based upon their instructions to Mr. De Grandy. DE 50-1; DE 24, pp. 32:21-33:3 and 35:20-36:11. As courts have repeatedly noted, the drawing of district lines is laden with political motive. Conflating political motives with partisanship, the district court noted that a commissioner had

---

[17] District 4 in all four of Plaintiffs' plans pack in 95% Hispanic population into its borders, under the auspices of keeping the neighborhood of Flagami whole. However, Flagami has been split between District 1 and 4 since single-member districts were initially imposed in 1997, and no member of the public testified before any commission meeting that Flagami should be united in a single district.

expressed that the position is not partisan and that no commissioner expressed partisanship as a reason.  DE 94, p. 40.  But such conclusions overlook one of the express directives that was given to De Grandy in the opening of the process— "factor in voter cohesion."  DE 50-1.  As De Grandy explained when maintaining the split in Flagami—and no commissioner appeared to take exception—the "more conservative voters in the west" were split between Districts 1 and 4.  DE 82-2, p. 9:9-10:5.  Had the Court afforded the appropriate good faith to these publicly expressed reasons, it may have reached a different conclusion as to the Commission's motives.

### C.    District 5 was narrowly tailored.

The lynchpin of this case is District 5, and Plaintiffs' claims are not so clearcut as they relate to that district.  Racial gerrymandering claims are generally subject to a two-step analysis.  First, Plaintiffs bear the burden of establishing that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916).  The test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in a racial gerrymander of *a significant number of voters*.  *Id.*  If Plaintiffs make the requisite showing, the City "bears the burden of showing that the design of that district withstands strict scrutiny." *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022).

Racial considerations can predominate the drawing of a district if the City had a compelling interest such as complying with the VRA. *Abbott*, 138 S. Ct. at 2315 ("[W]e have assumed that complying with the VRA is a compelling state interest, and that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the State has 'good reasons' for believing that its decision is necessary in order to comply with the VRA."). The "Good Reasons" standard "does not require the State to show that its action was actually necessary to avoid a statutory violation, so that, but for its use of race, the State would have lost in court." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 194 (2017) (cleaned up). The question is not whether 50% was required, but "whether the [City] had 'good reasons' to believe" a 50% BVAP was necessary to avoid liability under the section 2 *Gingles* analysis. *Id.* at 195 (*quoting Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015).

There is no dispute that District 5 must be drawn to comply with the VRA. District 5 could be drawn along racial lines so long as the drawing of the district lines was narrowly tailored. But drawing district lines is not an exact science. The lower court ignored the presumption of good faith that attaches to enacted plans and effectively imposed a heightened standard in concluding the City failed to demonstrate it had "good reason" to believe compliance with the VRA was required.

29

Where the *Gingles* inquiry as a threshold question asks whether "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50, the City's drawing of a 50% district should be deemed compliant as a matter of law.  The City's belief that bare compliance with that criteria at 50.3% BVAP was narrowly tailored would seem to be "good reason"—it was only three-tenths of a percent above the *Gingles* threshold.  *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015) ("The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population [the VRA] demands.").

Even so, the City presented sufficient evidence of its good reason.  Despite observing (1) the percentage of Black voting age population in the district need not be determined with precision, DE 52, p. 82; (2) the City had no duty to memorialize the analysis or compile a comprehensive record of that analysis, *id.*; (3) that De Grandy, the City's map drawing expert, testified to the Commission that analysis of District 5 was performed and the district would continue to perform for the minority candidate of choice, DE 52, p. 28; (4) that De Grandy's testified about gentrification in District 5 and the long history and continuing decline in Black population in the district, DE 52, pp. 31, 43, 48, and 50; (5) and that De Grandy drew District 5 to perform for the next decade given these trends, DE 52, p. 83, n. 25, the district court still concluded that the City had not introduced enough evidence to support its decision.  Certainly, such evidence was sufficient to

demonstrate that the City had a sufficiently "good reason" to believe that the bare minimum of 50% was required to comply with the VRA.

The R&R, citing De Grandy's testimony in a commission meeting that a plan with a BVAP of less than 50% would also be VRA-compliant, apparently concluded anything above 50% was somehow not narrowly tailored, *see* DE 52 at 81, 84.  But the percentage De Grandy validated was *49.97%*.  *See* DE 26, at 29.  The constitutionality of a district should not be contingent on less than four tenths of a percent.  *See id.*; *see also Bethune-Hill*, 580 U.S. at 196 (noting that "[d]etermining what minority population percentage will satisfy [the VRA] is a difficult task . . ." and upholding a BVAP target of 55%).  To conclude otherwise undercuts clear precedents that such precision is not required of legislative decision making.  *See id*.

District 5 was drawn at 50.3% in both the 2022 and 2023 Plans, barely over the threshold for satisfying the *Gingles* precondition.  Because the City set the BVAP at a bare 50% voting age population, it unsurprisingly believed that the district could not be more narrowly tailored, especially in light of undeniable demographic and gentrification trends concerning the year to year decrease of Black residents.  DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).  While the R&R recognized that Mr. De Grandy testified that he performed the analysis, and that the City has no duty to memorialize the analysis or compile a comprehensive record of that analysis (DE 52 p.82), it still found that

the City did not meet its burden at the injunction phase and therefore entered the first injunction.

Furthermore, when the City presented the 2023 Plan to the district court (DE 77), it attached the opinion of Dr. John Alford to support the conclusion that the 50.3% BVAP was narrowly tailored. DE 86-2. Notably, the 2023 Plan's BVAP is statistically similar to the BVAP in both the 2022 Plan and the Mandated Plan, so if the latter is narrowly tailored, it logically follows that so, too, is the former. *Id.*, 8-9. Dr. Alford also observed the statistical similarity between Plaintiffs' Plan 3 (56.5% BCVAP) and the 2023 Plan (57.4. % BCVAP). *Id.*, p. 3

But the district court did not examine whether District 5 was, in fact, narrowly tailored, and instead erroneously focused on what the Commission reviewed before implementing the 2023 Plan. The district court thus mistakenly disregarded Dr. Alford's analysis because it found insufficient proof that Dr. Alford's analysis was presented to the Commission before passing the 2023 Plan.[18] Respectfully, this focus was misplaced. And despite castigating the City, the district court adopted a plan with very similar percentages. The BVAP in the Mandated Plan is 48.4% and in the 2023 Plan is 50.3%. Similarly, the BCVAP

---

[18] How could it be? The Commission relied on the consultants to perform the analysis to present a constitutional plan, which they did and which they represented was compliant, but the 2023 Plan was redrawn publicly during the meeting. Given the district court's tight timeframes, it was impossible to settle on a plan, perform the analysis, declare a second meeting to present it, and vote to adopt it. Nevertheless, District 5 in the 2023 Plan was substantially similar to the version in V12 which did have a functional analysis as well as the prior versions of District 5 in the 2022 Plan.

(which the district court focused on) in the Mandated Plan is 55.8%, and in the 2023 Plan is 57.4%.

The Plaintiffs theory that the City had to set District 5's BVAP at less than 50% voting age population for a section 2 VRA district is novel, because no case has ever held that. The cases cited by the district court do not hold differently. In *Jacksonville III*, 2022 WL 17751416, the court was careful to state that it was not a VRA case, and it did not find that less than 50% would satisfy the VRA. *Id.,* n.7. Similarly, the court in *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1088, 1089 n.5 (N.D. Fla. 1992), created *two majority-minority districts*. That court did not find that the majority-minority districts needed to be less than 50%. In fact, it expressly rejected that premise. *Id.* at 1085 ("Where, in a statewide redistricting case such as the present one, this court can reasonably draw a majority-minority district, we cannot choose to create an influence district or districts."). The district court also focused on a discussion of the borders of Overtown and Morningside as grounds for finding a racial gerrymander. But as the district court acknowledged, racial motivations are not unconstitutional where, like here, the district is VRA-protected. DE 94, p.4 n.2. The district court went on to find that there was insufficient evidence District 5 was narrowly tailored. DE 94, pp.38-39.

> When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the Voting Rights Act, "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." … [T]he requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to

33

satisfy the Voting Rights Act, "even if a court does not find that the actions were necessary for statutory compliance."

*Bethune-Hill*, 580 U.S. at 187 (quoting *Alabama Legis. Black Caucus v. Alabama (ALBC I)*, 575 U.S. 254 (2015)). The City did not have to prove that it pared the majority down to the minimum with mathematical precision.

> "The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5 demands." The question is whether the State had "good reasons" to believe a 55% BVAP floor was necessary to avoid liability under § 5. The State did have good reasons under these circumstances. Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id.* at 196 (citations omitted).

Narrow tailoring exists to protect the group being racially sorted.

> The purpose of the narrow tailoring requirement is to ensure that "the means chosen `fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.").

*Grutter v. Bollinger*, 539 US 306, 333 (2003)(quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)). For example, to "narrowly tailor" in this context the City could not, in the guise of complying with the VRA, pack Black residents into the district to the diminishment of their influence elsewhere.[19] Because the

---

[19] *See*, *e.g.*, *Jacksonville I*, 635 F. Supp. 3d at 1239 ("Plaintiffs argue that preliminary injunctive relief is warranted in advance of the upcoming election because the Enacted Plan packs Black voters into just four of fourteen districts, the result of which is to dilute and depress the influence of Black voters in City Council elections across the rest of the City.")

City set the district at a bare 50% voting age population—the bare minimum to satisfy the first *Gingles* element—it unsurprisingly believed that the district could not be more narrowly tailored, especially in light of undeniable demographic trends concerning the year to year decrease of Black residents.  DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).

When the district court rejected the 2022 Plan, it did not find that the BVAP was too high, that Black voters were being packed, or that there was any diminution of Black voters' influence in any other District.  To undercut the facial validity of a bare 50%,[20] the injunction observed that the BCVAP of the 2022 Plan was 58%. DE 52, p.85. This line of reasoning is based on a misreading of *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997), in Plaintiffs' briefing.  No case has *required* a City, when drawing a district under the VRA, to base it on the *citizen* population.[21]  *Negron* stood for the inverse. To prove a dilution case, a plaintiff needed to establish that they had a sufficiently large and compact minority voter population to elect a representative, and that the population was divided among districts to dilute their impact. In *Negron*, the court stated that if a plaintiff claims they have sufficient numbers to create a majority-minority district in compliance with the VRA, but there are not enough voting-eligible minority

---

[20] There is no issue that it should have been higher, because that would be less narrowly tailored.  50.3% is hardly "uncritical majority-minority district maximization." DE 52, p.86.

[21] Legislatures are not required to draw boundaries by citizenship rather than total population. *Evenwel v. Abbott*, 578 U.S. 54, 58 (2016).

residents to allow that minority group to elect their desired representative, it is impossible for them to meet the standard. *Negron*, 113 F.3d at 1569.

But the opposite is not true. Not all citizens vote, or even can vote. Plaintiffs proffered evidence that only 52.76% (25,307/47,958) of registered voters in District 5 were Black as of February 1, 2023. DE 24-93 p.37.  Moreover, the population trend shows that Black registered voters were down from 56.86% the previous year (26477/45562). DE 24-93, p.35.  Plaintiffs' own filings show that the Black population in the City of Miami decreased in both relative and absolute terms in each cycle; there were 10% fewer Black residents in the City in 2023 as compared to the previous census. DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).

Additionally, because Plaintiffs did not dispute that the influence of black voters was not diminished elsewhere, there was no issue that the number was being used for an illegitimate motive.  Without a dilution of their vote elsewhere, there is no legitimate claim that the number was set too high for an improper purpose, and therefore it could not be more narrowly tailored.  The district court, instead of looking at whether the district was actually narrowly tailored, instead framed the issue in evidentiary terms finding that there was insufficient proof that Dr. Alford's analysis was presented prior to the passage of the 2023 Plan.  It also ignored that a *Gingles* analysis had already been performed to demonstrate a Black VRA district

was required, and that an analysis of the prior plan was performed. DE 24-3, pp. 13-14.

In sum, the Order did not address the critical question of whether District 5 in the 2023 Plan is <u>actually</u> narrowly tailored, and it adopted a plan with similar percentages, which does not remedy any of the purported problems the court had with the 2023 Plan. The BVAP in the Mandated Plan is 48.4% and in the 2023 Plan is 50.3%. The BCVAP in the Mandated Plan is 55.8% and in the 2023 Plan is 57.4%. Bearing in mind that mathematical precision is not required, if the Mandated Plan is constitutional, then so is the 2023 Plan.

## III.   PLAINTIFFS UNDULY DELAYED SEEKING RELIEF

The ordinance being challenged was enacted on March 24, 2022. DE 23, ¶5. This case was filed on December 15, 2021. DE 1. Plaintiffs waited two more months before filing their Expedited Motion for Preliminary Injunction. A special election was held on February 27, 2023, and the general election is set for November 7, 2023. DE 26, pp.2, 4. If Plaintiffs are challenging decisions that have been in place for 25 years and simply preserved in 2022, then Plaintiffs as a group are 25 years too late. The alleged harms have been in place for every election cycle. And it still remains unclear what harm is being remedied by a Mandated Plan with two districts that appear substantially similar to the 2022 and 2023 Plans—District 2, the plurality district, and District 5, the Black district—and 3 districts that are significantly revamped—Districts 1, 3, and 4, the three Hispanic

Districts—but which still maintain comparable Hispanic populations.  If anything, the 2023 Plan lessens the harms alleged by the Plaintiffs, and the Mandated Plan exacerbates them.

"[A] party seeking a preliminary injunction must generally show reasonable diligence. That is true in election law cases as elsewhere." *Benisek v. Lamone,* 138 S. Ct. 1942, 1944 (2018). Plaintiffs waited nine months to file their lawsuit, and two months to seek preliminary injunctive relief. The R&R recognized this delay was problematic [DE 52 p.95], but concluded that it was justified because, as Plaintiffs "explain[ed] in their reply" they needed the time to prepare their case. DE 52, p.95. It took the City five months to draw the 2022 Plan—which was presented and revised in public meetings—but the Plaintiffs apparently needed nine months to present a case to attack it.  And the City was afforded even less time—38 days—to draw the 2023 plan to replace the original plan.  Plaintiffs put on no evidence, and only argument of counsel, to justify or excuse the delay. And the R&R applied the wrong standard by implying that the City bore the burden to prove that the delay was "intentional, strategic, or even negligent." On the contrary, Plaintiffs were required to show reasonable diligence, which they failed to do.

## IV.    PLAINTIFFS FAILED TO DEMONSTRATE IMPOSING THEIR PLAN WAS FEASIBLE BEFORE THE ELECTION WITHOUT SIGNIFICANT COST, CONFUSION, OR HARDSHIP

As this Court observed in its Order staying the district court's injunction, Plaintiffs bore the burden to overcome the *Purcell* principle and establish their plan could be implemented without significant cost, confusion, or hardship.  DE 25, p. 5.  The district court did not consider the issue, and Plaintiffs presented only argument—not evidence—that demonstrated setting aside the 2023 Plan was feasible, let alone that it would not present confusion or hardship in conducting elections.  Thus, they failed to meet their burden.

When the City passed Resolution 23-271, it was not necessary for the district court to bless the City's work before it could take legal effect, and Resolution R-23-271 became effective on June 29, 2023—four months and nine days before the November election.  The district court's injunction, which had full legal effect a full month later and only 100 days before the November election, indisputably disrupted the election processes that were already under way.  Moreover, the Court's imposition of the Mandated Plan—which radically restructured the three supermajority Hispanic districts in the 2023 Plan to three *different* supermajority Hispanic districts—was also indisputably disruptive of the election processes. Qualifying for Districts 1, 2 and 4 was set to begin Friday, September 8, 2023, just 40 days after the district court swapped in map that substantially changed districts. Of course, there would be confusion and hardship for voters and candidates alike.

This is exactly the type of disruption that *Purcell* and prior decisions of this

Court counsel against.  Again, as the motion panel of this Court stated:

> "[E]ven seemingly innocuous late-in-the-day judicial alterations to [local] election laws can interfere with administration of an election and cause unanticipated consequences." *League of Women Voters [of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022)] (quotation omitted). "If a court alters election laws near an election, election administrators must first understand the court's injunction, then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). The *Purcell* "principle also discourages last minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring)

APP DE 25 p.3-4.

The fact that the preliminary injunction was entered in May but rightfully

afforded the opportunity to draw a replacement redistricting plan to the City does

not obviate the disruption to the electoral processes that was wrought by the district

court's late-July injunction of the 2023 Plan.  The district court's brink-of-election

tinkering is precisely the type of harm that *Purcell* seeks to prevent.  Notably, the

May injunction itself recognized that the *Purcell* principle might later apply, DE 52

p.99.[22]  Under Plaintiffs' interpretation of *Purcell*, a lower court could tinker with election laws at any time—right up to the eve of the election—so long as it issued a preliminary order enjoining the use of a law well in advance of an election.  That is not how *Purcell* is applied.  That is how *Purcell* is enervated.

## **CONCLUSION**

WHEREFORE, Defendant respectfully asks this Court to reverse the district court's preliminary injunction.

Dated October 11, 2023.

Respectfully submitted,

/s/ *George T. Levesque*
GRAYROBINSON, P.A.
George T. Levesque (FBN 55551)
george.levesque@gray-robinson.com
Jason L. Unger (FBN 991562)
jason.unger@gray-robinso.com
Andy Bardos (FBN 822671)
andy.bardos@gray-robinson.com
301 S. Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090

GRAYROBINSON, P.A.
Christopher N. Johnson (FBN 69329)
christopher.johnson@gray-robinson.com
Marlene Quintana, B.C.S. (FBN 88358)

---

[22] Plaintiffs did not object to that finding.

41

marlene.quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: 305-416-6880

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation and Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, Florida 33130
Telephone: 305-416-1800

*Attorneys for Defendant/Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), undersigned counsel certifies, in reliance on the word count of the word-processing system used to prepare this document, that this document contains 10,430 words and therefore complies with the type-volume limitation set forth in Federal Rule of Appellate Rule 27(d)(2).

Undersigned counsel further certifies that this document was prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font and therefore complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

<div align="right">

/s/ <em>George T. Levesque</em>
George T. Levesque (FBN 555541)
GRAYROBINSON, P.A.

</div>

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 11, 2023, the foregoing was filed

with the Court's CM/ECF system generating service upon all counsel of record.


/s/ *George T. Levesque*
George T. Levesque (FBN 555541)
GRAYROBINSON, P.A.

# ADDENDUM

**City of Miami
Resolution R-21-0485**



**City of Miami**

**Resolution R-21-0485**

**Legislation**

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number: 11104**                    **Final Action Date:  11/18/2021**

A RESOLUTION OF THE MIAMI CITY COMMISSION SETTING FORTH THE
REDISTRICTING CRITERIA TO BE EMPHASIZED WHEN DRAFTING THE
2022 CITY COMMISSION REDISTRICTING PLAN; DIRECTING THE
REDISTRICTING CONSULTANTS TO PREPARE DRAFT REDISTRICTING
MAPS DEPICTING THE PROPOSED CHANGES TO THE CITY COMMISSION
DISTRICTS AND TO REPORT BACK TO THE CITY COMMISSION AT THE
DECEMBER 9, 2021, CITY COMMISSION MEETING.


BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1.  The Miami City Commission sets forth the following criteria to be emphasized
by the City's Expert Consultant for redistricting, Mr. Miguel De Grandy, Esq., when drafting the
2022 City Commission redistricting plan:

    a.  Comply with the United States Constitution and the Voting Rights Act;
    b.  Maintain the core of existing districts to avoid voter confusion;
    c.  Factor in voter cohesion;
    d.  Achieve substantial equality of population as opposed to mathematical equality; and
    e.  Maintain communities of interest and neighborhoods where feasible.

Section 2.  The Miami City Commission directs the City's Expert Consultant for
redistricting, Mr. Miguel De Grandy, Esq., to prepare draft redistricting maps depicting the
proposed changes to the 2022 City Commission districts and to report back to the City
Commission at the December 9, 2021, City Commission meeting.

Section 3.  This Resolution shall become effective immediately upon its adoption.

APPROVED AS TO FORM AND CORRECTNESS:


Victoria Méndez, City Attorney          4/15/2022

---

**City of Miami
Resolution R-22-0131**



# City of Miami

## Resolution R-22-0131

## Legislation

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number: 11751**                                          **Final Action Date:  3/24/2022**

A RESOLUTION OF THE MIAMI CITY COMMISSION, WITH ATTACHMENT(S), PROVIDING THE NEW JURISDICTIONAL BOUNDARIES OF THE CITY COMMISSION DISTRICTS FOLLOWING THE RESULTS OF THE 2020 UNITED STATES CENSUS; OFFICIALLY DELINEATING THE BOUNDARIES OF EACH DISTRICT AS SET FORTH IN "EXHIBIT 1," ATTACHED AND INCORPORATED; MAKING FINDINGS; AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, the voters of the City of Miami ("City") adopted a Charter Amendment on September 4, 1997, providing for a non-voting Executive Mayor elected City-wide, and five (5) City Commissioners elected from districts; and

WHEREAS, the City Commission adopted Resolution No. 97-495 providing for the jurisdictional boundaries of the City Commission Districts; and

WHEREAS, on May 8, 2003, the City reapportioned district boundaries in Resolution No. 03-0448 following the results of the 2000 Census; and

WHEREAS, on May 23, 2013, the City reapportioned district boundaries in Resolution No. R-13-0208 following the results of the 2010 Census; and

WHEREAS, on or about September 30, 2021, the United States Census bureau released the results of the 2020 decennial Census; and

WHEREAS, the City Commission retained the services of a professional redistricting consultant to provide redistricting advice to the City; and

WHEREAS, the results of the 2020 Census show that in 2020, the population of the City had grown to 442,241, an increase of 42,752 or 10.7 percent and that the growth has not been uniform across all five of the City's Commission districts; and

WHEREAS, the 14th Amendment to the U.S. Constitution as interpreted by federal case law requires "substantial equality" of population among single member districts and a review of the Census data shows that the current plan is malapportioned and cannot be used for subsequent elections; and

WHEREAS, Section 2, 52 U.S.C. § 10301 of the Voting Rights Act of 1965 (the "Voting Rights Act"), is a permanent nationwide prohibition on voting practices that discriminate on the basis of race, color, or membership in a language minority group (as defined in Sections 4(f)(2) and 14(c)(3) of the Act, 52 U.S.C. §§ 10303(f)(2),

---

10310(c)(3)) and prohibits both voting practices that result in citizens being denied equal access to the political process on account of race, color, or membership in a language minority group, and voting practices adopted or maintained for the purpose of discriminating on those bases; and

WHEREAS, presently, the district with the largest population, District 2, has 116,742 persons, and is 28,364 persons above the ideal population for each district and District 3, has 79,309 residents, which is 9,069 below the ideal population. Taken together, that 37,433 person variance represents a total deviation of 42.35% from the ideal; far above what is allowed by the U.S. Constitution as interpreted by federal case-law and thus, the current plan is malapportioned and cannot be used for subsequent elections; and

WHEREAS, the Supreme Court observed in *Reynolds v. Sims*, 377 U.S. 533 (1964), that all that is necessary when drafting state legislative districts is achieving "substantial equality of population among the various districts." The phrase "substantial equality of population" has come to generally mean that a legislative or local government plan will not be held to violate the Equal Protection clause if the overall deviation between the smallest and largest district is less than 10%. In *Avery v. Midland County*, 390 U.S. 474 (1968), the United States Supreme Court applied the Reynolds decision to local governments; and

WHEREAS, the City Commission directed that the reapportionment process include publicly conducted meetings and workshops on the subject of City Commission Redistricting to apprise the public of the potential district boundary changes and for public input and participation; and

WHEREAS, the City's redistricting consultant analyzed the polarized voting patterns in the City and further determined that the three factors enunciated in the case of *Thornburg v. Gingles, 478 U.S. 30 (1986)*, were evident; and

WHEREAS, the City Commission held six (6) publicly noticed City Commission meetings to discuss the redistricting process on November 18, 2022, December 9, 2020, February 7, 2022, February 25, 2022, March 11, 2022, and March 24, 2022 at City Hall, 3500 Pan American Drive, Miami, Florida; and

WHEREAS, on December 9, 2020, the City Commission directed that the following redistricting criteria be used in developing a new plan and their order of importance:

Achieve substantial equality as opposed to mathematical equality in order to accommodate redistricting criteria (overall deviation of 10% or less);

Maintain the core of existing districts and configuration;

Voter cohesion; and

Preserve traditional Neighborhoods and communities of interest together when feasible; and

WHEREAS, on February 7, 2022, the City's redistricting consultant presented a Preliminary Plan for the City Commission's consideration; and

WHEREAS, after hearing from the public and discussing the Preliminary Plan, the City Commission requested additional changes thereto; and

WHEREAS, at that same meeting the City Commission voted to direct the redistricting consultant to use population in District 2 which is South of US 1 to equalize population of surrounding districts as may be necessary; and

WHEREAS, on February 25, 2022, the redistricting consultant presented a Revised Redistricting Plan for the City Commission's consideration; and

WHEREAS, after hearing from the public and discussing the Revised Plan, the City Commission voted to utilize the Revised Plan as the Base Plan for consideration of additional changes or amendments; and

WHEREAS, at that same meeting the City Commission deferred consideration of the Base Plan to the March 11, 2022, special meeting of the Commission in order to have time to conduct Community meetings in all five Districts and obtain additional public input; and

WHEREAS, on March 11, 2022, the City Commission set another special meeting to discuss redistricting; and

WHEREAS, after hearing from the public at the March 11, 2022, meeting and discussing the Base Plan, the City Commission directed the redistricting consultant to meet with each Commissioner individually and develop any amendments a Commissioner would like to propose to the Base Plan; and

WHEREAS, on March 24, 2022, at a Special City Commission meeting, the redistricting consultant presented the Base Plan along with proposed alternatives sponsored by Commissioners; and

WHEREAS, after hearing from the public, the City Commission debated the different Plans and ultimately voted to adopt the Base Plan with one amendment of an area that did not include population; and

WHEREAS, the demographics of the city are as follow: approximately 70% of the population is Hispanic, approximately 16.3% of the population is black, and approximately 11.9% of the population is non-Hispanic white; and

WHEREAS, the Base Plan provides for 3 majority Hispanic districts, one majority African American district, and one competitive district with approximately 37% white

non-Hispanic population, approximately 7.5% black population, and roughly 48.7% Hispanic population; and

WHEREAS, the Base Plan allows the City's constituent minority groups an equal opportunity to elect a candidate of their choice, satisfying the demands of the Voting Rights Act; and

WHEREAS, the base Plan achieves substantial equality of population among the districts; and

WHEREAS, the minor deviations from the ideal population of each district are based on rational City objectives, including preserving majority/minority districts, maintaining the core of existing districts to avoid voter confusion, and minimizing to the extent practical the movement of population south of US 1 to adjoining districts; and

WHEREAS, the Plan is legally sound, meets the prime directive that the plan should abide by the Constitution and the Voting Rights Act, and also substantially meets each of the other adopted redistricting criteria;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1. The recitals and findings contained in the Preamble to this Resolution are adopted by reference and incorporated as fully set forth in this Section and represent findings of the City Commission.

Section 2. The City delineates the jurisdictional boundaries of each of the five (5) delineated City Commission districts, as set forth in "Exhibit 1", attached and incorporated. These election districts shall be applicable for all purposes, including but not limited to, any election of City Commissioners, following the effective date of this resolution.

Section 3. This Resolution shall become effective immediately upon adoption and signature by the Mayor.[1]

APPROVED AS TO FORM AND CORRECTNESS:

Victoria Mendez, City Attorney            4/19/2022

---

[1] If the Mayor does not sign this Resolution, it shall become effective at the end of ten (10) calendar days from the date it was passed and adopted. If the Mayor vetoes this Resolution, it shall become effective immediately upon override of the veto by the City Commission.

# *City of Miami Commission Districts Adopted March 24, 2022*

**Commission District:** 1

**Legend**
City Boundary    Streets





# City of Miami Commission Districts Adopted March 24, 2022

**Commission District: 2**

**Legend**
City Boundary — Streets

0 0.5 1 Miles

N



Author: D. Lopez  Date: 4/12/2022 D:\GIS\Commission_Redistricting_2022\Proposed_CommissionDistricts_BookLandscapeFinal.mxd

# City of Miami Commission Districts Adopted March 24, 2022

**Commission District: 3**

**Legend**

City Boundary   Streets





# City of Miami Commission Districts Adopted March 24, 2022

**Commission District:** 4

**Legend**
City Boundary ⬡ Streets ⟋⟍

0 0.5 1 Miles

N





# *City of Miami Commission Districts Adopted March 24, 2022*

**Commission District: 5**

**Legend**
City Boundary — Streets

0   0.5   1
Miles

USCA11 Case: 23-12472   Document: 36   Date Filed: 10/11/2023   Page: 70 of 92



Author: O. Lopez  Date: 4/12/2022 D:\GIS\Commission_Redistricting_2022\Proposed_CommissionDistricts_BookLandscapeFinal.mxd

**City of Miami**
**Resolution R-23-0271**



**City of Miami**
**Certified Copy**

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number: 14173**                                    **Enactment Number: R-23-0271**

---

A RESOLUTION OF THE MIAMI CITY COMMISSION, WITH ATTACHMENT(S),
PROVIDING THE NEW JURISDICTIONAL BOUNDARIES OF THE CITY
COMMISSION DISTRICTS FOLLOWING THE RESULTS OF THE 2020
UNITED STATES CENSUS; OFFICIALLY DELINEATING THE BOUNDARIES
OF EACH DISTRICT AS SET FORTH IN "COMPOSITE EXHIBIT 1,"
ATTACHED AND INCORPORATED; MAKING FINDINGS; AND PROVIDING AN
EFFECTIVE DATE.

WHEREAS, the voters of the City of Miami ("City") adopted a Charter Amendment on
September 4, 1997, providing for a non-voting Executive Mayor elected City-wide, and five (5)
City Commissioners elected from districts; and

WHEREAS, the City Commission adopted Resolution No. 97-495 providing for the
jurisdictional boundaries of the City Commission Districts; and

WHEREAS, on May 8, 2003, the City reapportioned district boundaries in Resolution No.
03-0448 following the results of the 2000 Census; and

WHEREAS, on May 23, 2013, the City reapportioned district boundaries in Resolution
No. R-13-0208 following the results of the 2010 Census; and

WHEREAS, on March 24, 2022, the City Commission reapportioned the district
boundaries in Resolution No. R-22-0131 ("2022 Map") following the results of the 2020 Census;
and

WHEREAS, on December 15, 2022, nine (9) months after the adoption of the 2022 Map,
certain community organizations filed a federal lawsuit against the City of Miami challenging the
new redistricting plan alleging it violated the 14th Amendment's Equal Protection Clause; and

WHEREAS, the Federal court entered an order enjoining the City from calling,
conducting, supervising, or certifying any elections using the 2022 map; and

WHEREAS, the City Commission retained the services of a professional redistricting
consultant to provide redistricting advice to the City; and

WHEREAS, the results of the 2020 Census show that in 2020, the population of the City
had grown to 442,241, an increase of 42,752 or 10.7 percent and that the growth has not been
uniform across all five of the City's Commission districts; and

WHEREAS, the 14th Amendment to the U.S. Constitution as interpreted by federal case
law requires "substantial equality" of population among single member districts and a review of
the Census data shows that the current plan is malapportioned and cannot be used for
subsequent elections; and

---

WHEREAS, Section 2, 52 U.S.C. § 10301 of the Voting Rights Act of 1965 (the "Voting Rights Act"), is a permanent nationwide prohibition on voting practices that discriminate on the basis of race, color, or membership in a language minority group (as defined in Sections 4(f)(2) and 14(c)(3) of the Act, 52 U.S.C. §§ 10303(f)(2), 10310(c)(3)) and prohibits both voting practices that result in citizens being denied equal access to the political process on account of race, color, or membership in a language minority group, and voting practices adopted or maintained for the purpose of discriminating on those bases; and

WHEREAS, the Supreme Court observed in Reynolds v. Sims, 377 U.S. 533 (1964), that all that is necessary when drafting state legislative districts is achieving "substantial equality of population among the various districts." The phrase "substantial equality of population" has come to generally mean that a legislative or local government plan will not be held to violate the Equal Protection clause if the overall deviation between the smallest and largest district is less than 10%. In Avery v. Midland County, 390 U.S. 474 (1968), the United States Supreme Court applied the Reynolds decision to local governments; and

WHEREAS, the City's redistricting consultant met individually with the five district City Commissioners for the purpose of getting input from them to develop a new map that addressed the concerns of the federal court and also achieved compliance with the Voting Rights Act and the Equal Protection Clause; and

WHEREAS, as a result of the meetings, the redistricting consultant developed an amalgamated proposed map that took into consideration the policy and political suggestions of the City Commissioners, resident input and the Court's order and named the map Version 12; and

WHEREAS, the City's redistricting consultant analyzed the polarized voting patterns in the City and determined that the Version 12 map was consistent with the three factors enunciated in the case of Thornburg v. Gingles, 478 U.S. 30 (1986); and

WHEREAS, on June 14, 2023, at a Special City Commission meeting, the redistricting consultant presented the Version 12 map to the City Commission and the public; and

WHEREAS, after hearing from the public, the City Commission considered the Version 12 map and made some modifications which among other changes included reuniting a portion of Coconut Grove into District 2, made changes between the boundaries of D3 And D4 to restore the Domino park area to D3, moved an area from District 1 into District 5 that contained a restaurant that the District 5 Commissioner had committed significant effort and funding to ensure its success and made other changes necessary to rebalance the population and reduce the Map's overall deviation; and

WHEREAS, the amendments to the Version 12 map were named the District 3 Version 3 Map ("D3 V3 Map"); and

WHEREAS, the D3 V3 Map achieves substantial equality of population among the districts; and

WHEREAS, the D3 V3 Map is legally sound and meets the City Commission's prime directive that the redistricting plan should abide by the Constitution and the Voting Rights Act;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1. The recitals and findings contained in the Preamble to this Resolution are adopted by reference and incorporated as fully set forth in this Section and represent findings of the City Commission.

Section 2. The City delineates the jurisdictional boundaries of each of the five (5) delineated City Commission districts, as set forth in "Composite Exhibit 1," attached and incorporated. These election districts shall be applicable for all purposes, including but not limited to, any election of City Commissioners, following the effective date of this resolution.

Section 3. This Resolution shall become effective immediately upon adoption and signature by the Mayor.[1]

| | |
|---|---|
| **DATE:** | **6/14/2023** |
| **RESULT:** | **ADOPTED** |
| **MOVER:** | **Alex Diaz de la Portilla, Commissioner** |
| **SECONDER:** | **Manolo Reyes, Commissioner** |
| **AYES:** | Christine King, Joe Carollo, Alex Diaz de la Portilla, Manolo Reyes |
| **NAYS:** | Sabina Covo |

I, Todd B. Hannon, City Clerk of the City of Miami, Florida, and keeper of the records thereof, do hereby certify that this constitutes a true and correct copy of Resolution No. R-23-0271, with attachment(s), passed by the City Commission on 6/14/2023.

_____
**City Clerk, Deputy City Clerk**
**(for Todd B. Hannon, City**
**Clerk)**

June 29, 2023
_____
**Date Certified**

---

[1] If the Mayor does not sign this Resolution, it shall become effective at the end of ten (10) calendar days from the date it was passed and adopted. If the Mayor vetoes this Resolution, it shall become effective immediately upon override of the veto by the City Commission.



# City of Miami

## Master Report

**Enactment Number: R-23-0271**

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number:** 14173          **File Type:** Resolution          **Status:** ADOPTED

**Revision:**                                                    **Controlling Body:** City Commission

**File Name:** Resolution Adopted Map D3 V3 - 3.6 Dev -          **Introduced:** 6/15/2023
Redistricting of City Commission Districts

**Requesting Dept:** City Commission                             **Final Action Date:** 6/14/2023

---

**Title:** A RESOLUTION OF THE MIAMI CITY COMMISSION, WITH ATTACHMENT(S), PROVIDING THE NEW JURISDICTIONAL BOUNDARIES OF THE CITY COMMISSION DISTRICTS FOLLOWING THE RESULTS OF THE 2020 UNITED STATES CENSUS; OFFICIALLY DELINEATING THE BOUNDARIES OF EACH DISTRICT AS SET FORTH IN "COMPOSITE EXHIBIT 1," ATTACHED AND INCORPORATED; MAKING FINDINGS; AND PROVIDING AN EFFECTIVE DATE.

---

**Notes:**

---

**Links:**

**Attachments:**    14173 Composite Exhibit 1(PDF)

**History of Legislative File:**

---

| Revision: | Acting Body: | Date: | Action: | Result: |
|---|---|---|---|---|
| | City Commission | 6/14/2023 | Meeting | Completed |
| | City Commission | 6/14/2023 | ADOPTED | Passed |
| | Mayor's Office | 6/23/2023 | Unsigned by the Mayor | Completed |
| | City Clerk's Office | 6/23/2023 | Signed and Attested by the City Clerk | Completed |
| | Legislative Division | 6/27/2023 | Legislative Division Review | Completed |
| | George K. Wysong III | 6/29/2023 | ACA Review | Completed |
| | Marie Gouin | 6/29/2023 | Budget Review | Completed |
| | Victoria Méndez | 6/29/2023 | Approved Form and Correctness | Completed |
| | City Clerk's Office | 6/29/2023 | Rendered | Completed |



# *City of Miami Commission Districts Adopted June 14, 2023*



**Legend**

**Adopted Commission Districts**

🟦 City Boundary

〰️ Streets

USCA11 Case: 23-12472   Document: 36   Date Filed: 10/11/2023   Page: 76 of 92

Author: O. Lopez  Date: 6/26/2023  D:\GIS\Commission_Redistricting_2023\Proposed_CommissionDistricts_BookLandscapeFinal2023Allv2.mxd

# City of Miami Commission Districts Adopted June 14, 2023



**Commission District:** 1

### Legend

City Boundary

0    0.5    1
Miles

USCA11 Case: 23-12472    Document: 36    Date Filed: 10/31/2023    Page: 77 of 92



Author: O. Lopez  Date: 6/24/2023  D:\GIS\Commission_Redistricting_2023\Proposed_CommissionDistricts_BookLandscapeFinal2023.mxd

# City of Miami Commission Districts Adopted June 14, 2023



**Commission District: 2**

### Legend

City Boundary

USCA11 Case: 23-12472   Document: 36   Date Filed: 10/11/2023   Page: 78 of 92





# *City of Miami Commission Districts Adopted June 14, 2023*

**Commission District: 3**

**Legend**

City Boundary

0   0.5   1 Miles

USCA11 Case: 23-12472    Document: 36    Date Filed: 10/11/2023    Page: 79 of 92



Author: O. Lopez   Date: 6/24/2023   D:\GIS\Commission_Redistricting_2023\Proposed_CommissionDistricts_BookLandscapeFinal2023.mxd

# City of Miami Commission Districts Adopted June 14, 2023

## Commission District: 4

**Legend**

City Boundary

0 0.5 1
Miles

N





# City of Miami Commission Districts Adopted June 14, 2023

**Commission District: 5**

Author: O. Lopez Date: 6/24/2023 D:\GIS\Commission_Redistricting_2023\Proposed_CommissionDistricts_BookLandscapeFinal2023.mxd



**City of Miami
Resolution R-23-0171**



# City of Miami

## Resolution R-23-0171

## Legislation

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number: 13692**                              **Final Action Date:  4/13/2023**

A RESOLUTION OF THE MIAMI CITY COMMISSION, WITH ATTACHMENT(S), PROVIDING FOR A GENERAL MUNICIPAL ELECTION ON NOVEMBER 7, 2023, FOR THE PURPOSE OF ELECTING THREE COMMISSIONERS; FURTHER PROVIDING FOR A RUN-OFF ELECTION, IF REQUIRED, ON NOVEMBER 21, 2023; PROVIDING FOR THE REGISTRATION OF PERSONS QUALIFIED TO VOTE IN BOTH ELECTIONS; DESCRIBING PERSONS QUALIFIED TO VOTE IN BOTH ELECTIONS; DESCRIBING THE REGISTRATION BOOKS AND RECORDS MAINTAINED UNDER THE PROVISIONS OF THE GENERAL LAWS OF FLORIDA AND CHAPTER 16 OF THE CODE OF THE CITY OF MIAMI, FLORIDA, AS AMENDED, WHICH THE CITY OF MIAMI HAS ADOPTED FOR USE IN GENERAL MUNICIPAL AND RUN-OFF ELECTIONS; DESIGNATING AND APPOINTING THE CITY CLERK AS THE OFFICIAL REPRESENTATIVE OF THE CITY COMMISSION WITH RESPECT TO THE USE OF SUCH REGISTRATION BOOKS AND RECORDS; DIRECTING THE CITY CLERK TO GIVE NOTICE BY PUBLICATION OF THE ADOPTION OF THIS RESOLUTION AND THE PROVISIONS HEREOF; CONTAINING A SEVERABILITY CLAUSE; PROVIDING FOR AN IMMEDIATE EFFECTIVE DATE.


WHEREAS, Section 7 of the Charter of the City of Miami, Florida ("City Charter") provides:

A general municipal election for the mayor and city commissioners shall be held on the first Tuesday after the first Monday in November in odd-numbered years. A runoff election for the mayor and city commissioners shall be held on the third Tuesday after the first Monday in November in odd-numbered years; and

WHEREAS, pursuant to Section 7 of the City Charter, the 2023 General Municipal Election is mandated to be scheduled on November 7, 2023, and the Run-Off Election is mandated to be scheduled two (2) weeks afterward on November 21, 2023;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1.  The recitals and findings contained in the Preamble to this Resolution are adopted by reference and incorporated as if fully set forth in this Section.

Section 2. Pursuant to Section 7 of the City Charter and the Florida Election Code, the City Commission directs a general municipal election in the City of Miami, Florida ("City") at the polling places designated in Exhibit No. 1, attached and incorporated, on Tuesday, November 7, 2023, from 7:00 A.M. until 7:00 P.M., to elect the following officers of the City: three District Commissioners who are to be elected from Districts 1, 2, and 4.

---

Section 3. A run-off election, if required, is directed to be held in the City at the polling places designated in Exhibit No. 1, attached and incorporated, on Tuesday, November 21, 2023, from 7:00 A.M. until 7:00 P.M.

Section 4. The candidate qualifying period for the November 2023 General Municipal Election will be scheduled from Friday, September 8, 2023, until Saturday, September 23, 2023, at 6:00 P.M.

Section 5. The precinct clerks and inspectors to serve at said polling places on said dates shall be designated by the Supervisor of Elections of Miami-Dade County ("Supervisor") for such purposes in accordance with the general laws of the State of Florida ("State").

Section 6. Persons who are qualified to vote in said elections and who have not registered under the provisions of the Florida Election Code and Chapter 16 of the Code of the City of Miami, Florida, as amended, or who have transferred their legal residence from one voting precinct to another voting precinct in the City may register at such branch offices as may be approved by the Supervisor and at the Supervisor's office which will be open at the following location and during the following times:

MIAMI-DADE COUNTY ELECTIONS DEPARTMENT
2700 Northwest 87th Avenue, Miami, Florida
Monday to Friday, 8:00 A.M. - 5:00 P.M.

In addition to the above, said qualified persons may also register at branch offices and may also use any means as provided by general laws of the State for the purpose of registration in order to vote in the herein described elections during such times and on such dates as may be designated by the Supervisor.

Section 7. The elections shall be held at the polling places in the precincts designated on Exhibit No. 1, attached and incorporated, or as may be designated by the Supervisor in conformity with the provisions of the Florida Election Code. A description of the registration books and records which pertain to election precincts wholly or partly within the City and which the City is adopting and desires to use for holding such elections is all voter information cards, registration books, records, and certificates pertaining to electors of the City and established and maintained as official by the Supervisor in conformity with the provisions of the Florida Election Code, are hereby adopted and declared to be and shall hereafter be recognized and accepted as official voter information cards, registration books, records, and certificates of the City.

Section 8. The ballots to be used in said elections shall be so prepared that the names of the qualified candidates will appear on said ballots in alphabetical order according to surname for each election contest; provided, however, that the ballots and their preparation shall comply with the general election laws of the State. Vote-by-Mail ballots may be used by qualified electors of the City for voting. The form of such ballot shall be in accordance with the requirements prescribed by the general election laws of the State.

Section 9. (a) In compliance with the Florida Election Code, the City Clerk is authorized and directed to publish notice of this Resolution and of the provisions hereof at least twice during the thirty (30) days prior to the beginning of qualifying in a newspaper of general circulation in the City which notice shall be substantially as set forth in the following form:

NOTICE OF GENERAL MUNICIPAL ELECTION
IN THE CITY OF MIAMI, FLORIDA
TO BE HELD ON TUESDAY, NOVEMBER 7, 2023
PURSUANT TO RESOLUTION NO. R-23-XXXX
FOR THE PURPOSE OF ELECTING THE OFFICES OF
THREE CITY COMMISSIONERS WHO ARE TO BE ELECTED FROM SINGLE MEMBER
DISTRICTS 1, 2, AND 4

A general municipal election will be held on Tuesday, November 7, 2023, from 7:00 A.M. until 7:00 P.M. in the City of Miami, Florida, at the polling places in the several election precincts designated by the Miami-Dade County Supervisor of Elections, at which election the qualified electors participating therein will vote for the following municipal officers: three District Commissioners who are to be elected from single member Districts 1, 2, and 4. A run-off election, if required, is to be held on Tuesday, November 21, 2023.

(b)    The precinct clerks and inspectors to serve at said polling places on said dates shall be those designated by the Supervisor for such purpose in accordance with the general laws of the State. The registration books and records for the registration of persons qualified to vote in said elections shall be those maintained by the Supervisor.

(c)    The official ballot shall be in substantially the following form:

**Official Ballot**
**General Municipal Election**
**November 7, 2023**
**Miami, Florida**

**District Wide**
**Commissioner – District 1**
(Vote for 1)
Names of Candidates          (Position Number)

**District Wide**
**Commissioner – District 2**
(Vote for 1)
Names of Candidates          (Position Number)

**District Wide**
**Commissioner – District 4**
(Vote for 1)
Names of Candidates          (Position Number)

(d)    In the event a run-off election is required to be held on Tuesday, November 21, 2023, the official ballot to be used at such run-off election shall be in substantially the same form as above except that the heading of the ballot shall be in substantially the following form:

**Official Ballot**
**Run-Off Election**
**November 21, 2023**
**Miami, Florida**

(e)      A run-off election will be held on Tuesday, November 21, 2023, from 7:00 A.M. until 7:00 P.M. in the City at the polling places set forth herein. The precinct clerks and inspectors at said general municipal election shall be those designated by the Supervisor for such purpose. The registration books and records for the registration of persons qualified to vote in said general municipal election shall be those maintained by the Supervisor.

Section 10. Todd B. Hannon, the City Clerk of the City, or his duly appointed successor, is designated and appointed as the official representative of the City Commission in all transactions with the Supervisor in relation to matters pertaining to the use of the registration books for the holding of the herein general municipal election and the herein run-off election.

Section 11. The City Clerk shall cause to be prepared Vote-by-Mail ballots for the use of electors who are unable or unwilling to go to the polls to vote and entitled to cast such ballots in said elections.

Section 12. All qualified electors of the City shall be permitted to vote in said general municipal election and the Supervisor is requested, authorized, and directed to furnish, at the cost and expense of the City, a list of all qualified electors residing in the City as shown by the registration books and records of the Supervisor and duly certify the same for delivery to and for use by the election officials designated to serve at the respective polling places in said election precincts.

Section 13. The City Clerk is directed, upon the adoption of this Resolution, to transmit a certified copy of this Resolution to the Supervisor.

Section 14. If any section, part of a section, paragraph, clause, phrase, or word of this Resolution is declared invalid, the remaining provisions of this Resolution shall not be affected.

Section 15. This Resolution shall become effective immediately upon its adoption.[1]

APPROVED AS TO FORM AND CORRECTNESS:


Victoria Mendez, City Attorney               3/30/2023

---

[1] This is an administrative act that is not subject to Mayoral veto.

**Christina White**
Supervisor of Elections

MIAMI-DADE
COUNTY
Miami-Dade County, FL

**EXHIBIT NO. 1**

# Precinct List
## FOR SELECTED DISTRICT

Florida Statute 101.71: A notice of the change of the polling place involved shall be mailed, at least 14 days prior to an election, to each registered elector or to each household in which there is a registered elector.

**DISTRICT:**  **Miami Dist 1**

| Prec/PP | Place Name | Office Location | CITY | ZIP |
|---|---|---|---|---|
| 285.1 | Melrose Elementary School | 3050 NW 35 St | Miami | 33142 |
| 509.0 | The Universal Church of The Kingdom of God | 3501 W Flagler St | Miami | 33135 |
| 509.1 | The Universal Church of The Kingdom of God | 3501 W Flagler St | Miami | 33135 |
| 512.1 | St. Paul Institutional AME Church | 1892 NW 51 Ter | Miami | 33142 |
| 522.1 | Moore Park | 765 NW 36 St | Miami | 33127 |
| 523.0 | Ebenezer United Methodist Church | 2001 NW 35 St | Miami | 33142 |
| 526.0 | Curtis Park Community House | 1901 NW 24 Ave | Miami | 33125 |
| 526.1 | Curtis Park Community House | 1901 NW 24 Ave | Miami | 33125 |
| 527.0 | Juan P. Duarte Park | 1776 NW 28 St | Miami | 33142 |
| 528.0 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 528.1 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 529.0 | Jose De Diego Middle School | 3100 NW 5 Ave | Miami | 33127 |
| 530.0 | Comstock Elementary School | 2420 NW 18 Ave | Miami | 33142 |
| 531.0 | Claude Pepper Community Center II | 750 NW 18 Ter | Miami | 33136 |
| 540.0 | Comstock Elementary School | 2420 NW 18 Ave | Miami | 33142 |
| 545.0 | Miami Police Benevolent Association | 2300 NW 14 St | Miami | 33125 |
| 545.1 | Miami Police Benevolent Association | 2300 NW 14 St | Miami | 33125 |
| 549.0 | Kensington Park Elementary School | 711 NW 30 Ave | Miami | 33125 |
| 549.1 | Kensington Park Elementary School | 711 NW 30 Ave | Miami | 33125 |
| 550.0 | Miami Fire Fighter Benevolent Association | 2980 NW S River Dr | Miami | 33125 |
| 550.1 | Miami Fire Fighter Benevolent Association | 2980 NW S River Dr | Miami | 33125 |
| 551.0 | Grapeland Park | 1550 NW 37 Ave | Miami | 33125 |
| 551.1 | Grapeland Park | 1550 NW 37 Ave | Miami | 33125 |
| 556.0 | Residential Plaza | 5617 NW 7 St | Miami | 33126 |
| 556.1 | Residential Plaza | 5617 NW 7 St | Miami | 33126 |
| 588.0 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 588.1 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 588.2 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 589.0 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 589.1 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 589.2 | Allapattah Branch Library | 1799 NW 35 St | Miami | 33142 |
| 591.0 | Malcolm Ross Senior Center | 2800 NW 18 Ave | Miami | 33142 |

# Christina White
Supervisor of Elections
Miami-Dade County, FL



## Precinct List
### FOR SELECTED DISTRICT

Florida Statute 101.71: A notice of the change of the polling place involved shall be mailed, at least 14 days prior to an election, to each registered elector or to each household in which there is a registered elector.

**DISTRICT:    Miami Dist 1**

| | | | |
|---|---|---|---|
| 592.0 | Curtis Park Community House | 1901 NW 24 Ave | Miami | 33125 |
| 594.0 | Juan P. Duarte Park | 1776 NW 28 St | Miami | 33142 |
| 595.0 | Juan P. Duarte Park | 1776 NW 28 St | Miami | 33142 |
| 595.1 | Juan P. Duarte Park | 1776 NW 28 St | Miami | 33142 |
| 597.0 | Moore Park | 765 NW 36 St | Miami | 33127 |
| 598.0 | Moore Park | 765 NW 36 St | Miami | 33127 |
| 656.0 | Jack Orr Senior Center | 550 NW 5 St | Miami | 33128 |
| 656.1 | Jack Orr Senior Center | 550 NW 5 St | Miami | 33128 |
| 974.0 | Charlie DeLucca Park (Kinloch Park) | 455 NW 47 Ave | Miami | 33126 |
| 975.0 | Claude Pepper Community Center II | 750 NW 18 Ter | Miami | 33136 |
| 980.0 | Comstock Elementary School | 2420 NW 18 Ave | Miami | 33142 |
| 980.1 | Comstock Elementary School | 2420 NW 18 Ave | Miami | 33142 |
| 981.0 | Allapattah Neighborhood Service Center | 1897 NW 20 St | Miami | 33142 |
| 985.0 | Jack Orr Senior Center | 550 NW 5 St | Miami | 33128 |
| 987.0 | Curtis Park Community House | 1901 NW 24 Ave | Miami | 33125 |
| 989.0 | H U D | 1407 NW 7 St | Miami | 33125 |
| 990.0 | H U D | 1407 NW 7 St | Miami | 33125 |
| 991.0 | Iglesia Bautista Misionera Renovacion | 50 NW 51 Pl | Miami | 33126 |
| 992.0 | Iglesia Bautista Misionera Renovacion | 50 NW 51 Pl | Miami | 33126 |

| | **Total Number of Precincts** | | | |
|---|---|---|---|---|
| | **51** | | | |

Date : 03/17/2023
Time : 8:10 AM

USCA11 Case: 23-12472    Document 36    Date Filed: 10/11/2023    Page: 89 of 92

Christina White
Supervisor of Elections
Miami-Dade County, FL



# Precinct List
## FOR SELECTED DISTRICT

Florida Statute 101.71: A notice of the change of the
polling place involved shall be mailed, at least 14
days prior to an election, to each registered elector or
to each household in which there is a registered
elector.

**DISTRICT:**    Miami Dist 2

| Prec/PP | Place Name | Office Location | CITY | ZIP |
|---------|-----------|-----------------|------|-----|
| 516.0 | Morningside Park | 750 NE 55 Ter | Miami | 33137 |
| 516.1 | Morningside Park | 750 NE 55 Ter | Miami | 33137 |
| 532.0 | Christ Episcopal Church | 3481 Hibiscus St | Miami | 33133 |
| 534.1 | Miami Fire Station #2 | 1901 N Miami Ave | Miami | 33136 |
| 534.2 | Miami Fire Station #2 | 1901 N Miami Ave | Miami | 33136 |
| 534.3 | Miami Fire Station #2 | 1901 N Miami Ave | Miami | 33136 |
| 534.5 | Miami Fire Station #2 | 1901 N Miami Ave | Miami | 33136 |
| 534.7 | Miami Fire Station #2 | 1901 N Miami Ave | Miami | 33136 |
| 536.1 | Phillis Wheatley Elementary School | 1801 NW 1 Pl | Miami | 33136 |
| 538.0 | Temple Israel of Greater Miami | 137 NE 19 St | Miami | 33132 |
| 538.1 | Temple Israel of Greater Miami | 137 NE 19 St | Miami | 33132 |
| 538.4 | Temple Israel of Greater Miami | 137 NE 19 St | Miami | 33132 |
| 538.5 | Temple Israel of Greater Miami | 137 NE 19 St | Miami | 33132 |
| 538.6 | Temple Israel of Greater Miami | 137 NE 19 St | Miami | 33132 |
| 541.0 | First Presbyterian Church | 609 Brickell Ave | Miami | 33131 |
| 544.0 | Trinity Cathedral Hall | 464 NE 16 St | Miami | 33132 |
| 546.0 | Miami City Hall | 3500 Pan American Dr | Miami | 33133 |
| 568.0 | Simpson Park Recreation Building | 55 SW 17 Rd | Miami | 33129 |
| 569.0 | Simpson Park Recreation Building | 55 SW 17 Rd | Miami | 33129 |
| 582.0 | Vizcaya Village Garage - Historic Garage | 3250 S Miami Ave | Miami | 33129 |
| 582.2 | Vizcaya Village Garage - Historic Garage | 3250 S Miami Ave | Miami | 33129 |
| 582.3 | Vizcaya Village Garage - Historic Garage | 3250 S Miami Ave | Miami | 33129 |
| 582.4 | Vizcaya Village Garage - Historic Garage | 3250 S Miami Ave | Miami | 33129 |
| 583.0 | Miami Fire Station #8 | 2975 Oak Ave | Miami | 33133 |
| 584.0 | Elizabeth Virrick Park | 3255 Plaza St | Miami | 33133 |
| 585.0 | Elizabeth Virrick Park | 3255 Plaza St | Miami | 33133 |
| 586.0 | Miami-Dade Water & Sewer Authority | 3575 S Le Jeune Rd | Miami | 33133 |
| 587.0 | Plymouth Congregational Church | 3400 Devon Rd | Miami | 33133 |
| 624.0 | Knights of Columbus Miami Council 1726 | 3601 S Miami Ave | Miami | 33133 |
| 658.0 | Trinity Cathedral Hall | 464 NE 16 St | Miami | 33132 |
| 659.0 | Trinity Cathedral Hall | 464 NE 16 St | Miami | 33132 |
| 659.1 | Trinity Cathedral Hall | 464 NE 16 St | Miami | 33132 |

# Christina White
Supervisor of Elections
Miami-Dade County, FL

USCA11 Case: 23-12472     Document: 36     Date Filed: 10/11/2023     Page: 90 of 92



## Precinct List
### FOR SELECTED DISTRICT

Florida Statute 101.71: A notice of the change of the
polling place involved shall be mailed, at least 14
days prior to an election, to each registered elector or
to each household in which there is a registered
elector.

**DISTRICT:**     Miami Dist 2

| | | | |
|---|---|---|---|
| 668.0 | Simpson Park Recreation Building | 55 SW 17 Rd | Miami | 33129 |
| 982.0 | Alfred I. DuPont Building | 169 E Flagler St | Miami | 33131 |
| 983.0 | Alfred I. DuPont Building | 169 E Flager | Miami | 33131 |
| 984.0 | Alfred I. DuPont Building | 169 E Flagler St | Miami | 33131 |
| 984.1 | Alfred I. DuPont Building | 169 E Flagler St | Miami | 33131 |
| 993.0 | Vizcaya Village Garage - Historic Garage | 3250 S Miami Ave | Miami | 33129 |
| 993.1 | Vizcaya Village Garage - Historic Garage | 3250 S Miami Ave | Miami | 33129 |
| 995.0 | Knights of Columbus Miami Council 1726 | 3601 S Miami Ave | Miami | 33133 |
| 996.0 | Vizcaya Village Garage - Historic Garage | 3250 S Miami Ave | Miami | 33129 |
| 999.0 | Morningside Park | 750 NE 55 Ter | Miami | 33137 |
| 999.2 | Morningside Park | 750 NE 55 Ter | Miami | 33137 |
| 999.3 | Morningside Park | 750 NE 55 Ter | Miami | 33137 |

| | | | |
|---|---|---|---|
| | **Total Number of Precincts** | | | |
| | **44** | | | |

# Christina White
### Supervisor of Elections
Miami-Dade County, FL

MIAMI-DADE
COUNTY

## Precinct List
### FOR SELECTED DISTRICT

Florida Statute 101.71: A notice of the change of the
polling place involved shall be mailed, at least 14
days prior to an election, to each registered elector or
to each household in which there is a registered
elector.

**DISTRICT:**  Miami Dist 4

| Prec/PP | Place Name | Office Location | CITY | ZIP |
|---|---|---|---|---|
| 465.0 | West End Park Community House | 6030 SW 2nd St | Miami | 33144 |
| 510.0 | The Universal Church of The Kingdom of God | 3501 W Flagler St | Miami | 33135 |
| 548.1 | Miami-Dade County Auditorium | 2901 W Flagler St | Miami | 33135 |
| 552.0 | Armando Badia Senior Center | 25 Tamiami Blvd | Miami | 33144 |
| 553.0 | Robert King High Community House | 7025 W Flagler St | Miami | 33144 |
| 554.0 | Iglesia Bautista Misionera Renovacion | 50 NW 51 Pl | Miami | 33126 |
| 557.0 | Sunlight Miami | 4585 W Flagler St | Miami | 33134 |
| 558.0 | Charlie DeLucca Park (Kinloch Park) | 455 NW 47 Ave | Miami | 33126 |
| 559.0 | Ebenezer Freewill Baptist Church | 4111 SW 4 St | Miami | 33134 |
| 560.0 | Kinloch Park Middle School | 4340 NW 3 St | Miami | 33126 |
| 561.0 | Iglesia Bautista Resurreccion | 2323 SW 27 Ave | Miami | 33145 |
| 561.1 | Iglesia Bautista Resurreccion | 2323 SW 27 Ave | Miami | 33145 |
| 572.0 | Shenandoah Elementary School | 1023 SW 21 Ave | Miami | 33135 |
| 573.0 | Rene Janero Recreation Center | 1800 SW 21 Ave | Miami | 33145 |
| 574.0 | Rene Janero Recreation Center | 1800 SW 21 Ave | Miami | 33145 |
| 575.0 | Central Christian Church of Dade County | 222 Menores Ave | Coral Gables | 33134 |
| 576.0 | Coral Gate Park Community Center | 1415 SW 32 Ave | Miami | 33145 |
| 577.0 | Providence Road/Coral Baptist Church | 2732 SW 32 Ave | Miami | 33133 |
| 577.1 | Providence Road/Coral Baptist Church | 2732 SW 32 Ave | Miami | 33133 |
| 578.0 | Providence Road/Coral Baptist Church | 2732 SW 32 Ave | Miami | 33133 |
| 578.1 | Providence Road/Coral Baptist Church | 2732 SW 32 Ave | Miami | 33133 |
| 579.0 | Silver Bluff Elementary School | 2609 SW 25 Ave | Miami | 33133 |
| 583.1 | Miami Fire Station #8 | 2975 Oak Ave | Miami | 33133 |
| 584.1 | Elizabeth Virrick Park | 3255 Plaza St | Miami | 33133 |
| 611.1 | Coral Gables Senior High School | 450 Bird Rd | Coral Gables | 33146 |
| 670.1 | Miami-Dade County Auditorium | 2901 W Flagler St | Miami | 33135 |
| 670.2 | Miami-Dade County Auditorium | 2901 W Flagler St | Miami | 33135 |
| 971.0 | Kinloch Park Middle School | 4340 NW 3 St | Miami | 33126 |
| 994.0 | Ebenezer Freewill Baptist Church | 4111 SW 4 St | Miami | 33134 |

**Total Number of Precincts**

**29**

# City of Miami

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

## Master Report

### Enactment Number: R-23-0171

---

**File Number:** 13692　　　**File Type:** Resolution　　　**Status:** **ADOPTED**

**Revision:**　　　**Controlling Body:** City Commission

**File Name:** 2023 Municipal Election Dates　　　**Introduced:** 3/15/2023

**Requesting Dept:** Office of the City Clerk　　　**Final Action Date:** 4/13/2023

---

**Title:**　A RESOLUTION OF THE MIAMI CITY COMMISSION, WITH ATTACHMENT(S), PROVIDING FOR A GENERAL MUNICIPAL ELECTION ON NOVEMBER 7, 2023, FOR THE PURPOSE OF ELECTING THREE COMMISSIONERS; FURTHER PROVIDING FOR A RUN-OFF ELECTION, IF REQUIRED, ON NOVEMBER 21, 2023; PROVIDING FOR THE REGISTRATION OF PERSONS QUALIFIED TO VOTE IN BOTH ELECTIONS; DESCRIBING PERSONS QUALIFIED TO VOTE IN BOTH ELECTIONS; DESCRIBING THE REGISTRATION BOOKS AND RECORDS MAINTAINED UNDER THE PROVISIONS OF THE GENERAL LAWS OF FLORIDA AND CHAPTER 16 OF THE CODE OF THE CITY OF MIAMI, FLORIDA, AS AMENDED, WHICH THE CITY OF MIAMI HAS ADOPTED FOR USE IN GENERAL MUNICIPAL AND RUN-OFF ELECTIONS; DESIGNATING AND APPOINTING THE CITY CLERK AS THE OFFICIAL REPRESENTATIVE OF THE CITY COMMISSION WITH RESPECT TO THE USE OF SUCH REGISTRATION BOOKS AND RECORDS; DIRECTING THE CITY CLERK TO GIVE NOTICE BY PUBLICATION OF THE ADOPTION OF THIS RESOLUTION AND THE PROVISIONS HEREOF; CONTAINING A SEVERABILITY CLAUSE; PROVIDING FOR AN IMMEDIATE EFFECTIVE DATE.

---

**Notes:**　Pursuant to the resolution, this item became effective immediately upon adoption by the Commission.

---

**Links:**

**Attachments:**　13692 Exhibit No. 1　　(PDF)
13692 Memo to Mayor and Commissioners re 2023 Election　(PDF)

**History of Legislative File:**

| Revision: | Acting Body: | Date: | Action: | Result: |
|---|---|---|---|---|
| | Victoria Méndez | 3/30/2023 | Approved Form and Correctness | Completed |
| | City Commission | 4/13/2023 | Meeting | Completed |
| | City Commission | 4/13/2023 | ADOPTED | Passed |
| | City Clerk's Office | 4/18/2023 | Rendered | Completed |