**Case No. 23-12472**

_____

**United States Court of Appeals
for the Eleventh Circuit**

_____

CITY OF MIAMI,
Defendant/Appellant,

v.

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

Plaintiffs/Appellees.

_____

On Appeal From The United States District Court
For The Southern District of Florida
No. 1:22-cv-24066-KMM

_____

**APPELLANT'S APPENDIX FOR INITIAL BRIEF
VOLUME ONE**

_____

GRAYROBINSON, P.A.
Jason L. Unger (FBN 991562)
George T. Levesque (FBN 55551)
Andy Bardos (FBN 822671)
301 S. Bronough Street Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
junger@gray-robinson.com
glevesque@gray-robinson.com
abardos@gray-robinson.com

GRAYROBINSON, P.A.
Christopher N. Johnson (FBN 69329)
Marlene Quintana, B.C.S. (FBN 88358)
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida  33131
Telephone: (305) 416-6880
Christopher.Johnson@gray-robinson.com
Marlene.Quintana@gray-robinson.com

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800

*Attorneys for Defendant/Appellant*

# INDEX

## [VOLUME ONE]

**Tab**

District Court Docket Sheet ........................................................................A

Complaint ........................................................................................DE-1

Paperless Pretrial Order ......................................................................DE-7

Amended Complaint ...........................................................................DE-23

Miguel DeGrandy, Redistricting the city of Miami, Nov. 18, 2021..............DE-24-3

Miguel DeGrandy & Stephen Cody, Initial Russell
Plan Presentation 3/11/22 ...................................................................DE-24-9

Miami City Commission, Nov. 18, 2021-Afternoon Session, p.17-19 .......DE-24-11

Expert Report of Dr. Carolyn Abott, January 31, 2023 ...............................DE-24-31

Expert Report of Dr. Bryant Moy ..........................................................DE-24-32

## [VOLUME TWO]

Expert Report of Dr. Bryant Moy (Continued)...........................................DE-24-32

Declaration of Carolyn Donaldson .........................................................DE-24-33

Miguel DeGrandy & Stephen M. Cody, 2013 Initial Report ......................DE-24-76

Miguel DeGrandy, Pablo Tamayo & Stephen M. Cody
2013 Final Report.............................................................................DE-24-78

1997 Plan.......................................................................................DE-24-80

2003 Plan ......................................................................................DE-24-81

2013 Plan.......................................................................................DE-24-82

# INDEX CONTINUED

**Tab**

**[VOLUME TWO]**

2022 Enacted Plan.........................................................................DE-24-83

District Demographic Analysis......................................................DE-24-93

**[VOLUME THREE]**

District Demographic Analysis (Continued) ................................DE-24-93

Plaintiffs' Expedited Motion For Preliminary Injunction ...............DE-26

Defendant's Exhibits Introduced Into Evidence at Plaintiffs' Expedited
Motion For Preliminary Injunction Hearing Held on March 28, 2023 ............DE-50

City of Miami Resolution R-21-0485 .........................................DE-50-1

Report and Recommendations .......................................................DE-52

**[VOLUME FOUR]**

Report and Recommendations (Continued)....................................DE-52

Defendant's Objections To Report and Recommendation DE52....................DE-55

Order on Report and Recommendation of the Hon. Lauren F. Louis ............DE-60

Scheduling Order ...........................................................................DE-69

Defendant's Notice of Passage of Redistricting Plan .....................DE-77

June 14, 2023 Meeting Transcript, Miami City Commission, p. 8-16 .........DE-82-2

Letter Regarding Veto the Commission's Unconstitutional map................DE-82-10

Expert Report, Cory McCartan, Ph.D., July 1, 2023 ...................DE-82-11

# <u>INDEX CONTINUED</u>

<u>**Tab**</u>

## [VOLUME FOUR]

Second Expert Report of Dr. Carolyn Abott, July 5. 2023, p. 14-16 ..........DE-82-12

Resolution 23-271 ...................................................................................DE-82-24

P1 – Plaintiffs' Map 1 ............................................................................DE-82-34

P2 – Plaintiffs' Map 2 .............................................................................DE-82-35

## [VOLUME FIVE]

P3 – Plaintiffs' Map 3 ............................................................................DE-82-36

P4 – Plaintiffs' Map 4 ............................................................................DE-82-37

Expert Report, John R. Alford Ph.D. July 12, 2023 ......................................DE-86-2

Order on Defendant City of Miami's Notice of Passage
Of Redistricting Plan.................................................................................DE-94

Notice of Appeal To The Eleventh Circuit Court of Appeals .........................DE-96

Defendant's Emergency Motion To Stay Order Rejecting
Redistricting Map [DE94].............................................................................DE-97

Paperless Order on Defendant's Emergency Motion To Stay
Order Rejecting Redistricting Map .................................................................DE-98

Appellant's Emergency Motion To Stay Order Rejecting
Redistricting Map [DE94] ...................................................... USCA11 DE-2

Order on Defendant's Emergency Motion To Stay
Order Rejecting Redistricting Map.................................................................DE-101

United States Court of Appeals Order of The Court ....................... USCA11 DE-25

# TAB A
## DISTRICT COURT DOCKET SHEET

## U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:22-cv-24066-KMM

| | |
|---|---|
| GRACE, Inc. et al v. City of Miami | Date Filed: 12/15/2022 |
| Assigned to: Judge K. Michael Moore | Jury Demand: None |
| Referred to: Magistrate Judge Lauren Fleischer Louis | Nature of Suit: 440 Civil Rights: Other |
| Case in other court: USCA, 23-11854-D | Jurisdiction: Federal Question |
|            USCA, 23-12472-D | |
| Cause: 42:1983 Civil Rights Act | |

**Plaintiff**

**GRACE, Inc.**                                                          represented by **Caroline Andrews McNamara**
American Civil Liberties Union of Florida
4343 West Flagler Street
Suite 400
Miami, FL 33134
786-363-1392
Email: cmcnamara@aclufl.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
ACLU Foundation of Florida, Inc.
4343 West Flagler Street
Suite 400
Miami, FL 33134
United Sta
786-363-2714
Fax: 786-363-1257
Email: dtilley@aclufl.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory P. Luib**
Dechert LLP
1900 K Street NW
Washington, DC 20006
202-261-3413
Email: gregory.luib@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Markham-Cameron**
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
212-641-5685
Email: julia.markham-cameron@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
Email: Christopher.Merken@dechert.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
ACLU Foundation of Florida
4343 W Flagler Street
Suite 400
Miami, FL 33134
7863632707
Email: jlopez@aclufl.org
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
Dechert LLP
2929 Arch Street
Philadelphia, PA 191047
(215) 994-2000
Email: Jocelyn.Kirsch@dechert.com
*TERMINATED: 06/30/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil A. Steiner**
Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
Email: Neil.Steiner@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**
ACLU Foundation of Florida, Inc.
336 East College Ave.
Suite 203
Tallahassee, FL 32301
786-363-1769
Email: nwarren@aclufl.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**Engage Miami, Inc.**                represented by   **Caroline Andrews McNamara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory P. Luib**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Markham-Cameron**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
(See above for address)
*TERMINATED: 06/30/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil A. Steiner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**South Dade Branch Of The NAACP**                represented by  **Caroline Andrews McNamara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory P. Luib**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Markham-Cameron**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
(See above for address)
*TERMINATED: 06/30/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil A. Steiner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**

*(See above for address)*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miami-Dade Branch Of The NAACP**                represented by **Caroline Andrews McNamara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory P. Luib**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Markham-Cameron**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
(See above for address)
*TERMINATED: 06/30/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil A. Steiner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Clarice Cooper**                represented by **Caroline Andrews McNamara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory P. Luib**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**Julia Markham-Cameron**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
(See above for address)
*TERMINATED: 06/30/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil A. Steiner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yanelis Valdes**                                                    represented by    **Caroline Andrews McNamara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory P. Luib**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Markham-Cameron**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil A. Steiner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jared Johnson**                                    represented by **Caroline Andrews McNamara**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Daniel Boaz Tilley**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Gregory P. Luib**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Julia Markham-Cameron**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Christopher J. Merken**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Janine Marie Lopez**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jocelyn Kirsch**
                                                     (See above for address)
                                                     *TERMINATED: 06/30/2023*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Neil A. Steiner**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Nicholas Lyndol Villacor Warren**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alexandra Contreras**                              represented by **Caroline Andrews McNamara**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory P. Luib**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Markham-Cameron**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
(See above for address)
*TERMINATED: 06/30/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil A. Steiner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Steven Miro**                    represented by **Gregory P. Luib**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Markham-Cameron**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Caroline Andrews McNamara**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Janine Marie Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Lyndol Villacor Warren**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Miami**        represented by **Andre Velosy Bardos**
                   Gray Robinson, P.A.
                   301 South Bronough Street, Suite 600
                   Post Office Box 11189 (32302)
                   Tallahassee, FL 32301
                   850-577-9090
                   Fax: 850-577-3311
                   Email: andy.bardos@gray-robinson.com
                   *LEAD ATTORNEY*
                   *ATTORNEY TO BE NOTICED*

                   **Christopher N. Johnson**
                   GrayRobinson, P.A.
                   Wells Fargo Building
                   333 S.E. 2nd Avenue
                   Suite 3200
                   Miami, FL 33131
                   305-416-6880
                   Fax: (305) 416-6887
                   Email: Christopher.Johnson@gray-robinson.com
                   *LEAD ATTORNEY*
                   *ATTORNEY TO BE NOTICED*

                   **George Ty Levesque**
                   Gray Robinson
                   301 S. Bronough Street
                   Suite 600
                   Suite 600
                   Tallahassee, FL 32312
                   8505779090
                   Email: george.levesque@gray-robinson.com
                   *LEAD ATTORNEY*
                   *ATTORNEY TO BE NOTICED*

                   **Jason Lawrence Unger**
                   Gray Robinson
                   301 S Bronough Street
                   Suite 600
                   Tallahassee, FL 32301
                   850-577-9090
                   Fax: 577-3311
                   Email: jason.unger@gray-robinson.com
                   *LEAD ATTORNEY*
                   *ATTORNEY TO BE NOTICED*

                   **Kevin Renard Jones**
                   City of Miami
                   Office of the City Attorney
                   444 SW 2nd Ave
                   Suite Ste. 945
                   Miami, FL 33130
                   305-416-1800
                   Fax: 305-416-1801
                   Email: krjones@miamigov.com
                   *ATTORNEY TO BE NOTICED*

                   **Marlene Quintana**
                   GrayRobinson, P.A.
                   333 SE 2 Avenue
                   Suite 3200
                   Miami, FL 33131
                   305-416-6880

Email: marlene.quintana@gray-robinson.com
*ATTORNEY TO BE NOTICED*

**Sydney Michelle Feldman**
Gray Robinson
333 SE 2nd Ave.
Suite 3200
Miami, FL 33131
(305) 416-6880
Email: sydney.feldman@gray-robinson.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/15/2022 | 1 | COMPLAINT against City of Miami. Filing fees $ 402.00 receipt number AFLSDC-16174909, filed by Yanelis Valdes, South Dade Branch of the NAACP, Jared Johnson, Engage Miami, Inc., Alexandra Contreras, GRACE, Inc., Miami-Dade Branch of the NAACP, Clarice Cooper. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s)) (Warren, Nicholas) (Entered: 12/15/2022) |
| 12/15/2022 | 2 | Clerks Notice of Judge Assignment to Judge K. Michael Moore.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lauren F. Louis is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (rbe) (Entered: 12/15/2022) |
| 12/15/2022 | 3 | Summons Issued as to City of Miami. (rbe) (Entered: 12/15/2022) |
| 12/15/2022 | 4 | Bar Letter re: Admissions sent to attorney Neil A. Steiner, Christopher J. Merken, mailing date December 15, 2022, (pt) (Entered: 12/15/2022) |
| 12/15/2022 | 5 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Neil A. Steiner. Filing Fee $ 200.00 Receipt # AFLSDC-16176168 by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 12/29/2022 (Attachments: # 1 Certification of Neil A. Steiner, # 2 Text of Proposed Order)(Warren, Nicholas) (Entered: 12/15/2022) |
| 12/15/2022 | 6 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Christopher J. Merken. Filing Fee $ 200.00 Receipt # AFLSDC-16176211 by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 12/29/2022 (Attachments: # 1 Certification of Christopher J. Merken, # 2 Text of Proposed Order)(Warren, Nicholas) (Entered: 12/15/2022) |
| 12/16/2022 | 7 | PAPERLESS PRETRIAL ORDER. This order has been entered upon the filing of the complaint. Plaintiff's counsel is hereby ORDERED to forward to all defendants, upon receipt of a responsive pleading, a copy of this Order. It is further ORDERED that S.D. Fla. L.R. 16.1 shall apply to this case and the parties shall hold a scheduling conference no later than twenty (20) days after the filing of the first responsive pleading by the last responding defendant, or within sixty (60) days after the filing of the complaint, whichever occurs first. However, if all defendants have not been served by the expiration of this deadline, Plaintiff shall move for an enlargement of time to hold the scheduling conference, not to exceed 90 days from the filing of the Complaint. Within ten (10) days of the scheduling conference, counsel shall file a joint scheduling report. Failure of counsel to file a joint scheduling report within the deadlines set forth above may result in dismissal, default, and the imposition of other sanctions including attorney's fees and costs. The parties should note that the time period for filing a joint scheduling report is not tolled by the filing of any other pleading, such as an amended complaint or Rule 12 motion. The scheduling conference may be held via telephone. At the conference, the parties shall comply with the following agenda that the Court adopts from S.D. Fla. L.R. 16.1: (1) Documents (S.D. Fla. L.R. 16.1.B.1 and 2) - The parties shall determine the procedure for exchanging a copy of, or a description by category and location of, all documents and other evidence that is reasonably available and that a party expects to offer or may offer if the need arises. Fed. R. Civ. P. 26(a)(1)(B). (a) Documents include computations of the nature and extent of any category of damages claimed by the disclosing party unless the computations are privileged or otherwise protected from disclosure. Fed. R. Civ. P. 26(a)(1)(C). (b) Documents include insurance agreements which may be at issue with the satisfaction of the judgment. Fed. R. Civ. P. 26(a)(1)(D). (2) List of Witnesses - The parties shall exchange the name, address and telephone number of each individual known to have knowledge of the facts supporting the material allegations of the pleading filed by the party. Fed. R. Civ. P. 26(a)(1)(A). The parties have a continuing obligation to disclose this information. (3) Discussions and Deadlines (S.D. Fla. L.R. 16.1.B.2) - The parties shall discuss the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case. Failure to comply with this Order or to exchange the information listed above may result in sanctions and/or the exclusion of documents or witnesses at the time of trial. S.D. Fla. L.R. 16.1.I. |

The parties are hereby on notice that this Court requires all filings to be formatted in 12 point Times New Roman font and double spaced, including any footnotes, with one inch margins on all sides. Failure to follow these formatting guidelines may result in the filing being stricken, any opposing filing being granted by default, and the imposition of other sanctions, including attorney's fees and costs. **Multiple Plaintiffs or Defendants shall file joint motions with co-parties unless there are clear conflicts of position.** If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with ANY of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. **The parties shall seek extensions of time in a timely fashion.** "A motion for extension of time is not self-executing.... Yet, by filing these motions on or near the last day, and then sitting idle pending the Court's disposition of the motion, parties essentially grant their own motion. The Court will not condone this." Compere v. Nusret Miami, LLC, 2020 WL 2844888, at *2 (S.D. Fla. May 7, 2020) (internal citations omitted).

Pursuant to Administrative Order 2016-70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal Operating Procedures, within three (3) days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non-documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016-70 unless directed otherwise by the Court.

Telephonic appearances are not permitted for any purpose. Upon reaching a settlement in this matter the parties are instructed to notify the Court by telephone and to file a Notice of Settlement within twenty-four (24) hours.

Signed by Judge K. Michael Moore on 12/16/2022. (fpi) (Entered: 12/16/2022)

| | | |
|---|---|---|
| 12/16/2022 | 8 | PAPERLESS ORDER REFERRING PRETRIAL DISCOVERY MATTERS TO MAGISTRATE JUDGE LAUREN F. LOUIS. PURSUANT to 28 U.S.C. § 636 and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, the above-captioned Cause is referred to United States Magistrate Judge Lauren F. Louis to take all necessary and proper action as required by law with respect to any and all pretrial discovery matters. Any motion affecting deadlines set by the Court's Scheduling Order is excluded from this referral, unless specifically referred by separate Order. It is FURTHER ORDERED that the parties shall comply with Magistrate Judge Lauren F. Louis's discovery procedures. Signed by Judge K. Michael Moore on 12/16/2022. (fpi) (Entered: 12/16/2022) |
| 12/16/2022 | 9 | SUMMONS (Affidavit) Returned Executed on 1 Complaint, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Yanelis Valdes, South Dade Branch Of The NAACP, Jared Johnson, Engage Miami, Inc., Alexandra Contreras, GRACE, Inc., Miami-Dade Branch Of The NAACP, Clarice Cooper. City of Miami served on 12/16/2022, response/answer due 1/6/2023. (Warren, Nicholas) (Entered: 12/16/2022) |
| 12/16/2022 | 10 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiffs' Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Neil A. Steiner and Christopher J. Merken. 5 , 6 . UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motions ( 5 , 6 ) are GRANTED. Neil A. Steiner and Christopher J. Merken may appear pro hac vice in this matter. The Clerk of Court shall provide electronic notification of all electronic filings to: (1) Neil.Steiner@dechert.com; and (2) Christopher.Merken@dechert.com. Signed by Judge K. Michael Moore on 12/16/2022. (fpi) (Entered: 12/16/2022) |
| 01/05/2023 | 11 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint, by City of Miami. Attorney Marlene Quintana added to party City of Miami(pty:dft). (Attachments: # 1 Text of Proposed Order) (Quintana, Marlene) (Entered: 01/05/2023) |
| 01/06/2023 | 12 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Unopposed Motion for an Extension of Time. 11 . Therein, Defendant requests a twenty-one (21) day extension of time to respond to Plaintiff's Complaint 1 because Defense counsel is still in the process of being retained and consulting with its client regarding the action. See 11 at 1. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 11 is GRANTED. Defendant shall file its response to Plaintiff's Complaint 1 on or before January 30, 2023. Signed by Judge K. Michael Moore on 1/6/2023. (fpi) (Entered: 01/06/2023) |
| 01/23/2023 | 13 | NOTICE of Attorney Appearance by Andre Velosy Bardos on behalf of City of Miami. Attorney Andre Velosy Bardos added to party City of Miami(pty:dft). (Bardos, Andre) (Entered: 01/23/2023) |
| 01/23/2023 | 14 | NOTICE of Attorney Appearance by Jason Lawrence Unger on behalf of City of Miami. Attorney Jason Lawrence Unger added to party City of Miami(pty:dft). (Unger, Jason) (Entered: 01/23/2023) |
| 01/23/2023 | 15 | NOTICE of Change of Address, Email or Law Firm Name by Jason Lawrence Unger (Unger, Jason) (Entered: 01/23/2023) |

| 01/25/2023 | 16 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jocelyn Kirsch. Filing Fee $ 200.00 Receipt # AFLSDC-16265865 by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 2/8/2023 (Attachments: # 1 Certification of Jocelyn Kirsch, # 2 Proposed Order)(Warren, Nicholas) (Entered: 01/25/2023) |
| 01/25/2023 | 17 | NOTICE of Attorney Appearance by George Ty Levesque on behalf of City of Miami. Attorney George Ty Levesque added to party City of Miami(pty:dft). (Levesque, George) (Entered: 01/25/2023) |
| 01/25/2023 | 18 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jocelyn Kirsch. 16 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 16 is GRANTED. Jocelyn Kirsch may appear pro hac vice in this matter. The Clerk of Court shall provide electronic notification of all electronic filings to: Jocelyn.Kirsch@dechert.com. Signed by Judge K. Michael Moore on 1/25/2023. (fpi) (Entered: 01/25/2023) |
| 01/30/2023 | 19 | Defendant's MOTION TO DISMISS 1 Complaint, FOR FAILURE TO STATE A CLAIM *Plaintiff's Complaint* by City of Miami. Responses due by 2/13/2023 (Quintana, Marlene) (Entered: 01/30/2023) |
| 01/31/2023 | 20 | NOTICE of Attorney Appearance by Christopher N. Johnson on behalf of City of Miami. Attorney Christopher N. Johnson added to party City of Miami(pty:dft). (Johnson, Christopher) (Entered: 01/31/2023) |
| 01/31/2023 | 21 | Unopposed MOTION for Leave to File Excess Pages by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, South Dade Branch Of The NAACP, Yanelis Valdes. (Warren, Nicholas) (Entered: 01/31/2023) |
| 02/01/2023 | 22 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiffs' Unopposed Motion for Leave to File Excess Pages. 21 . Therein, Plaintiffs request that they be permitted to file "a preliminary injunction motion and incorporated memorandum of law of 50 pages, and a reply memorandum of 20 pages." Id. at 1. Plaintiffs also aver that they "do not oppose Defendant having leave to file an opposing memorandum of 50 pages." Id.<br><br>While the Court understands that the nature of the underlying dispute in this action is complex, the Parties' Motion assumes that the instant action is the only case on the Court's docket. The Parties ask for significantly more than double the standard page-lengths as prescribed by Local Rule 7.1(c)(2). See S.D. Fla. L.R. 7.1(c)(2) ("Absent prior permission of the Court, neither a motion and its incorporated memorandum of law nor the opposing memorandum of law shall exceed twenty (20) pages; a reply memorandum shall not exceed ten (10) pages."). Considering that Plaintiffs' Complaint itself is 55 pages (and Defendant was able to summarize its 12(b)(6) arguments in a mere sixteen pages), the Court is confident that, through succinct writing and tactful references to other documents, neither Party will need fifty pages to state their positions at this juncture.<br><br>Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is ORDERED AND ADJUDGED that the Motion 21 is GRANTED IN PART. Plaintiffs may file a motion for preliminary injunction, and Defense may respond, with up to 35 pages as counted by Local Rule 7.1(c). Plaintiffs may reply to Defendant's opposition with up to 15 pages as counted by Local Rule 7.1(c). Signed by Judge K. Michael Moore on 2/1/2023. (fpi) (Entered: 02/01/2023) |
| 02/10/2023 | 23 | First AMENDED COMPLAINT against City of Miami, filed by Yanelis Valdes, South Dade Branch Of The NAACP, Jared Johnson, Engage Miami, Inc., Alexandra Contreras, GRACE, Inc., Miami-Dade Branch Of The NAACP, Clarice Cooper, Steven Miro.(Warren, Nicholas) (Entered: 02/10/2023) |
| 02/10/2023 | 24 | NOTICE by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes *of Filing Exhibits in Support of Motion for Preliminary Injunction* (Attachments: # 1 Res. 22-131, # 2 Master Rep. for Res. 22-131, # 3 11/18/21 Slide Presentation, # 4 2/7/22 Slide Presentation, # 5 2/7/22 Presentation Outline, # 6 2/7/22 Cody Memo, # 7 2/25/22 Slide Presentation, # 8 3/11/22 Slide Presentation, # 9 3/11/22 Initial Russell Plan Presentation, # 10 3/24/22 Slide Presentation, # 11 Tr. 1 (11/18/21), # 12 Tr. 2 (12/9/21), # 13 Tr. 3 (2/7/22), # 14 Tr. 4A (2/25/22 AM), # 15 Tr. 4B (2/25/22 PM), # 16 Tr. 5A (3/11/22 AM), # 17 Tr. 5B (3/11/22 PM), # 18 Tr. 6 (3/24/22), # 19 1/25/21 Flechas Article, # 20 2/26/21 Flechas Article, # 21 6/22/21 Turner Article, # 22 3/4/22 Ceballos Article, # 23 12/15/22 Ceballos Article, # 24 12/29/22 Flechas Article, # 25 1/9/23 Flechas Article, # 26 First Russell Resignation Letter, # 27 Second Russell Resignation Letter, # 28 First ACLU-FL Letter, # 29 Second ACLU-FL Letter, # 30 Email from SOE's Office, # 31 Abott Report, # 32 Moy Report, # 33 Donaldson Declaration, # 34 Pelham Declaration, # 35 Ford Declaration, # 36 Pierre Declaration, # 37 Cooper Declaration, # 38 Johnson Declaration, # 39 Miro Declaration, # 40 Contreras Declaration, # 41 Valdes Declaration, # 42 11/21/96 Chardy Article, # 43 12/30/96 Branch Article, # 44 1/20/97 Branch Article, # 45 3/13/97 Garcia Article, # 46 3/14/97 Garcia Article, # 47 3/15/97 Herald Article, # 48 3/15/97 Herald Article, # 49 5/5/97 Branch Article, # 50 6/19/97 Chardy Article, # 51 6/24/97 Herald Article, # 52 6/25/97 Branch Article, # 53 6/27/97 Branch Article, # 54 6/29/97 Branch Article, # 55 7/2/97 Branch Article, # 56 7/3/97 Branch Article, # 57 7/3/97 Herald Editorial, # 58 7/4/97 Branch Article, # 59 7/11/97 Branch Article, # 60 7/12/97 Balmaseda Column, # 61 7/14/97 Patterson Column, # 62 7/20/97 Hampton Op-Ed, # 63 9/5/97 Viglucci Article, # 64 9/5/97 Branch & Keating |

McGrory Article, # 68 6/8/12 Metro, Final Article, # 69 3/24/2013 McGrory Article, # 68 12/15/13 McGrory Article, # 69 4/26/13 Rabin Article, # 70 5/24/13 Rabin Article, # 71 Res. 97-495, # 72 Res. 03-448, # 73 Res. 13-208, # 74 Agenda Item Summary Form for Res. 13-208, # 75 2/14/13 Commission Minutes, # 76 2013 Initial Report, # 77 2013 Second Report, # 78 2013 Final Report, # 79 2013 Presentation, # 80 1997 Plan, # 81 2003 Plan, # 82 2013 Plan, # 83 2022 Enacted Plan, # 84 Feb. 7 Draft, # 85 Feb. 22 Draft/Base Plan, # 86 Russell Sketch, # 87 Initial Russell Plan, # 88 Revised Russell Plan, # 89 Reyes Plan, # 90 2022 Precinct Map, # 91 2020 Voting Tabulation Districts, # 92 2/1/22 District Demographic Analysis, # 93 2/1/23 District Demographic Analysis) (Warren, Nicholas) Link Modified on 2/10/2023 (scn). (Entered: 02/10/2023)

| | | |
|---|---|---|
| 02/10/2023 | 25 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's filing of its First Amended Complaint. 23 . The amended complaint moots Defendant's Motion to Dismiss. 19 . Accordingly, UPON CONSIDERATION of the Amended Complaint 23 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is ORDERED and ADJUDGED that Defendant's Motion to Dismiss 19 is DENIED AS MOOT. Signed by Judge K. Michael Moore on 2/10/2023. (fpi) (Entered: 02/10/2023) |
| 02/10/2023 | 26 | EXPEDITED MOTION for Preliminary Injunction by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. (Warren, Nicholas) (Entered: 02/10/2023) |
| 02/13/2023 | 27 | PAPERLESS ORDER REFERRING MOTIONS. PURSUANT to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, the above-captioned cause is hereby referred to United States Magistrate Judge Lauren Fleischer Louis to take all necessary and proper action as required by law and/or issue a Report and Recommendation regarding Plaintiffs' Expedited Motion for Preliminary Injunction. 26 . Motions referred to Judge Lauren Fleischer Louis. Signed by Judge K. Michael Moore on 2/13/2023. (fpi) (Entered: 02/13/2023) |
| 02/20/2023 | 28 | MOTION for Extension of Time Defendant's Unopposed Motion for an Extension of Time to Respond to Plaintiffs' Expedited Motion for Preliminary Injunction re 26 EXPEDITED MOTION for Preliminary Injunction by City of Miami. Responses due by 3/6/2023 (Johnson, Christopher) (Entered: 02/20/2023) |
| 02/21/2023 | 29 | PAPERLESS ORDER granting Defendant's 28 Unopposed Motion for an Extension of Time to Respond to Plaintiffs' Motion for Preliminary Injunction. Defendant shall file its response to Plaintiffs' Motion for Preliminary Injunction on or before March 10, 2023. Signed by Magistrate Judge Lauren Fleischer Louis on 2/21/2023. (as06) (Entered: 02/21/2023) |
| 02/21/2023 | | Reset Deadline per DE#29 as to 26 EXPEDITED MOTION for Preliminary Injunction. Responses due by 3/10/2023. (scn) (Entered: 02/21/2023) |
| 02/23/2023 | 30 | Joint SCHEDULING REPORT - Rule 26(f) by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes (McNamara, Caroline) (Entered: 02/23/2023) |
| 02/23/2023 | 31 | Notice and Consent to Jurisdiction US Magistrate Judge signed by all parties . Filed by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes (McNamara, Caroline) (Entered: 02/23/2023) |
| 02/24/2023 | 32 | PAPERLESS ORDER SCHEDULING TRIAL IN MIAMI. This case is now set for trial commencing the two-week trial period of January 29, 2024 at 9 a.m. in Courtroom 13-1, (thirteenth floor) United States Courthouse, 400 North Miami Avenue, Miami, Florida. All parties are directed to report to the calendar call on January 25, 2024, at 2 p.m., at which time all matters relating to the scheduled trial date may be brought to the attention of the Court. A final pretrial conference as provided for by Rule 16, Fed. R. Civ. P., and Rule 16.1(C), S.D. Fla. L.R., is scheduled for January 16, 2024, at 11 a.m. A bilateral pretrial stipulation and all other pretrial preparations shall be completed NO LATER THAN FIVE DAYS PRIOR TO THE PRETRIAL CONFERENCE. All motions to amend the pleadings or to join additional parties must be filed by the later of forty-five (45) days after the date of entry of this Order, or forty-five (45) days after the first responsive pleading by the last responding defendant. Any and all pretrial motions, including motions for summary judgment, Daubert motions, and motions in limine must be filed no later than eighty (80) days prior to the trial date. Responses to summary judgment motions must be filed no later than fourteen (14) days after service of the motion, and replies in support of the motion must be filed no later than seven (7) days after service of the response, with both deadlines computed as specified in Rule 6, Fed. R. Civ. P. The Parties are hereby notified that this Court requires strict compliance with Local Rule 56.1 regarding the filing of any motion for summary judgment and corresponding statements of material facts. For evidence not previously filed on the docket, and to the extent practicable, evidentiary support for a Party's statement of material facts shall be filed as separate exhibits within the Court's electronic case filing system; the first citation to any evidence in support of a motion for summary judgment or statement of material facts shall provide the docket entry for that evidence using the form "ECF No." In all circumstances, citations to any composite exhibit shall provide both the page number assigned by the Court's electronic case filing system (i.e., the page number of the PDF) and the page number of the document. Each party is limited to one Daubert motion. If all evidentiary issues cannot be addressed in a 20-page memorandum, the parties must file for leave to exceed the page limit. Each party is also limited to one motion in limine (other than Daubert motions). If all evidentiary issues cannot be addressed |

was 20-page memorandum; the parties must file to exceed the page limit. Rule 26(a)(2) expert
disclosures shall be completed one hundred thirty (130) days prior to the date of trial. All discovery, including
expert discovery, shall be completed one hundred (100) days prior to the date of trial. The failure to engage in
discovery pending settlement negotiations shall not be grounds for continuance of the trial date. All exhibits must
be pre-marked, and a typewritten exhibit list setting forth the number and description of each exhibit must be
submitted at the time of trial. Plaintiff's exhibits shall be marked numerically with the letter "P" as a prefix.
Defendant's exhibits shall be marked numerically with the letter "D" as a prefix. For a jury trial, counsel shall
prepare and submit proposed jury instructions to the Court. The Parties shall submit their proposed jury
instructions and verdict form jointly, although they do not need to agree on each proposed instruction. Where the
parties do not agree on a proposed instruction, that instruction shall be set forth in bold type. Instructions proposed
only by a plaintiff should be underlined. Instructions proposed only by a defendant should be italicized. Every
instruction must be supported by citation to authority. The parties should use the Eleventh Circuit Pattern Jury
Instructions for Civil Cases as a guide, including the directions to counsel contained therein. The parties shall
jointly file their proposed jury instructions via CM/ECF, and shall also submit their proposed jury instructions to
the Court via e-mail at moore@flsd.uscourts.gov in WordPerfect or Word format. For a non-jury trial, the parties
shall prepare and submit to the Court proposed findings of fact and conclusions of law fully supported by the
evidence, which counsel expects the trial to develop, and fully supported by citations to law. The proposed jury
instructions or the proposed findings of fact and conclusions of law shall be submitted to the Court no later than
five (5) business days prior to the scheduled trial date. Pursuant to Administrative Order 2016-70 of the Southern
District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal
Operating Procedures, within three days of the conclusion of a trial or other proceeding, parties must file via
CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non-
documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in
Administrative Order 2016-70 unless directed otherwise by the Court.

THE FILING BY COUNSEL OF A "NOTICE OF UNAVAILABILITY" BY MOTION OR OTHERWISE IS
NOT PROVIDED FOR UNDER THE LOCAL RULES AND SHALL NOT BE PRESUMED TO ALTER OR
MODIFY THE COURT'S SCHEDULING ORDER.

Signed by Judge K. Michael Moore on 2/24/2023. (fpi)

**Pattern Jury Instruction Builder** - To access the latest, up to date changes to the 11th Circuit Pattern Jury
Instructions go to https://pji.ca11.uscourts.gov or click here (Entered: 02/24/2023)

| | | |
|---|---|---|
| 02/24/2023 | 33 | PAPERLESS ORDER OF REFERRAL TO MEDIATION. Trial having been set in this matter for the two-week trial period beginning January 29, 2024, at 9:00 a.m. pursuant to Rule 16 of the Federal Rule of Civil Procedure and Rule 16.2 of the Local Rules of the United States District Court for the Southern District of Florida, it is hereby ORDERED AND ADJUDGED as follows: 1. All parties are required to participate in mediation. The mediation shall be completed no later than eighty (80) days before the scheduled trial date. 2. Plaintiff's counsel, or another attorney agreed upon by all counsel of record and any unrepresented parties, shall be responsible for scheduling the mediation conference. The parties are encouraged to avail themselves of the services of any mediator on the List of Certified Mediators, maintained in the office of the Clerk of this Court, but may select any other mediator. The parties shall agree upon a mediator and file a Notice of Mediator Selection within fifteen (15) days from the date of this Order. If there is no agreement, lead counsel shall file a request for the Clerk of Court to appoint a mediator in writing within fifteen (15) days from the date of this Order, and the Clerk shall designate a mediator from the List of Certified Mediators. Designation shall be made on a blind rotation basis. 3. The parties shall agree upon a place, date, and time for mediation convenient to the mediator, counsel of record, and unrepresented parties and file a Notice of Scheduling Mediation no later than one hundred and ten (110) days prior to the scheduled trial date. If the parties cannot agree to a place, date, and time for the mediation, they may motion the Court for an order dictating the place, date, and time. 4. **The physical presence of counsel and each party or representatives of each party with full authority to enter in a full and complete compromise and settlement is mandatory.** The mediation shall take place in person absent good cause shown by the parties. If insurance is involved, an adjuster with authority up to the policy limits or the most recent demand, whichever is lower, shall attend. 5. All discussions, representations and statements made at the mediation conference shall be confidential and privileged. 6. At least ten (10) days prior to the mediation date, all parties shall present to the mediator a brief written summary of the case identifying issues to be resolved. Copies of those summaries shall be served on all other parties. 7. The Court may impose sanctions against parties and/or counsel who do not comply with the attendance or settlement authority requirements herein, or who otherwise violate the terms of this Order. The mediator shall report non-attendance and may recommend imposition of sanctions by the Court for non-attendance. 8. The mediator shall be compensated in accordance with the standing order of the Court entered pursuant to Rule 16.2.B.6, or on such basis as may be agreed to in writing by the parties and the mediator selected by the parties. The cost of mediation shall be shared equally by the parties unless otherwise ordered by the Court. All payments shall be remitted to the mediator within 30 days of the date of the bill. Notice to the mediator of cancellation or settlement prior to the scheduled mediation conference must be given at least two (2) full business days in advance. Failure to do so will result in imposition of a fee for one hour. 9. If a full or partial settlement is reached in this case, counsel shall promptly notify the Court of the settlement in accordance with Local Rule |

USCA11 Case: 23-12472    Document: 2-3    Date Filed: 07/31/2023    Page: 1 of 235

| | | |
|---|---|---|
| | | conference. Thereafter, the parties shall forthwith submit an appropriate pleading concluding the case. 10. Within five (5) days following the mediation conference, the mediator shall file a Mediation Report indicating whether all required parties were present. The report shall also indicate whether the case settled (in full or in part), was continued with the consent of the parties, or whether the mediator declared an impasse. 11. If mediation is not conducted, the case may be stricken from the trial calendar, and other sanctions may be imposed. Signed by Judge K. Michael Moore on 2/24/2023. (fpi) (Entered: 02/24/2023) |
| 02/24/2023 | 34 | Defendant's MOTION to Dismiss 23 Amended Complaint/Amended Notice of Removal, *Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint* by City of Miami. Responses due by 3/10/2023 (Johnson, Christopher) (Entered: 02/24/2023) |
| 03/10/2023 | 35 | NOTICE of Mediator Selection. Selected/Added Israel Reyes as Mediator. (Johnson, Christopher) (Entered: 03/10/2023) |
| 03/10/2023 | 36 | RESPONSE to Motion re 26 EXPEDITED MOTION for Preliminary Injunction *Defendant's Memorandum Of Law In Response To Plaintiffs' Expedited Motion For Preliminary Injunction* filed by City of Miami. Replies due by 3/17/2023. (Johnson, Christopher) (Entered: 03/10/2023) |
| 03/10/2023 | 37 | RESPONSE in Opposition re 34 Defendant's MOTION to Dismiss 23 Amended Complaint/Amended Notice of Removal, *Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint* filed by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Replies due by 3/17/2023. (Warren, Nicholas) (Entered: 03/10/2023) |
| 03/15/2023 | 38 | ORDER SETTING HEARING ON EXPEDITED MOTION FOR PRELIMINARY INJUNCTION. An Evidentiary and Preliminary Injunction Hearing on the 26 Expedited Motion for Preliminary Injunction is now set before United States Magistrate Judge Lauren F. Louis for Wednesday, March 29, 2023, at 9:30 AM in Miami Division at the C. Clyde Atkins United States Courthouse, 11th Floor, 301 North Miami Avenue, Miami, Florida, 33128. Signed by Magistrate Judge Lauren Fleischer Louis on 3/15/2023. *See attached document for full details.* (elm) (Entered: 03/15/2023) |
| 03/15/2023 | | Set/Reset Deadlines/Hearings as to 26 EXPEDITED MOTION for Preliminary Injunction . Motion Hearing set for 3/29/2023 09:30 AM in Miami Division before Magistrate Judge Lauren Fleischer Louis. (elm) (Entered: 03/15/2023) |
| 03/16/2023 | 39 | REPLY to Response to Motion re 26 EXPEDITED MOTION for Preliminary Injunction filed by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. (Warren, Nicholas) (Entered: 03/16/2023) |
| 03/17/2023 | 40 | REPLY to 37 Response in Opposition to Motion, *Defendant's Reply Memorandum of Law In Support of Motion to Dismiss Plaintiffs' First Amended Complaint* by City of Miami. (Johnson, Christopher) (Entered: 03/17/2023) |
| 03/22/2023 | 41 | NOTICE by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes re 38 Order Setting Hearing on Motion,, *Regarding Time for Argument* (Warren, Nicholas) (Entered: 03/22/2023) |
| 03/22/2023 | 42 | NOTICE by City of Miami re 38 Order Setting Hearing on Motion,, (Levesque, George) (Entered: 03/22/2023) |
| 03/22/2023 | 43 | MOTION for clarification 38 Order Setting Hearing on Motion,, by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 4/5/2023 (Warren, Nicholas) (Entered: 03/22/2023) |
| 03/23/2023 | 44 | PAPERLESS ORDER ON MOTION FOR CLARIFICATION. THIS CAUSE is before the Court upon Plaintiffs' Motion for Clarification Regarding Order Setting Hearing, 43 . The request for clarification of the Court's Order Setting Hearing on Expedited Motion for Preliminary Injunction, 38 , is GRANTED. The following clarification is provided.<br><br>At the March 29, 2023 Evidentiary and Preliminary Injunction Hearing, the Court intends to (1) resolve any factual disputes presented in the Parties' briefing on the Expedited Motion for Preliminary Injunction, 26 , to the extent any factual disputes exist and to the extent required for disposition of the Expedited Motion, and (2) hear argument on the Expedited Motion for Preliminary Injunction. Accordingly, any Party that intends to present live witness testimony to support facts advanced in briefing on the Expedited Motion consistent with the foregoing shall file a witness list in accordance with the Court's Order Setting Hearing, 38 . In addition, all exhibits shall be pre-marked for the hearing as required by the Court's Order Setting Hearing, 38 , and thereafter filed and served within CM/ECF in accordance with Local Rule 5.3(b)(2) of the Local Rules of the Southern District of Florida.<br><br>Further, Plaintiffs may prior to the hearing depose defense witnesses who are advanced according to the above. Any deposition must comply with the reasonable notice requirements of Federal Rule of Civil Procedure 30(b)(1) and Local Rule 26.1(h). To the extent noticing of a deposition in compliance with Local Rule 26.1(h) would |

| | | necessitate postponement of the March 29, 2023 hearing, Plaintiffs must request a continuance by separate motion upon a showing of good cause.

Signed by Magistrate Judge Lauren Fleischer Louis on 3/23/2023. (elm) (Entered: 03/23/2023) |
|---|---|---|
| 03/24/2023 | 45 | Exhibit List *FOR HEARING ON PLAINTIFFS EXPEDITED MOTION FOR PRELIMINARY INJUNCTION* by City of Miami.. (Levesque, George) (Entered: 03/24/2023) |
| 03/24/2023 | 46 | Witness List *FOR HEARING ON PLAINTIFFS EXPEDITED MOTION FOR PRELIMINARY INJUNCTION* by City of Miami.. (Levesque, George) (Entered: 03/24/2023) |
| 03/24/2023 | 47 | Exhibit List *FOR HEARING ON PLAINTIFFS EXPEDITED MOTION FOR PRELIMINARY INJUNCTION* by City of Miami.. (Levesque, George) (Entered: 03/24/2023) |
| 03/29/2023 | 48 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Lauren Fleischer Louis: **Evidentiary Motion Hearing** held on 3/29/2023 re 26 Expedited Motion for Preliminary Injunction. Plaintiffs' exhibits ##'s 1-93 admitted. Opening statement heard. Witness Miguel de Grandy sworn and testified. Closing argument heard. Matter taken under advisement. Report and Recommendation to follow. Total time in court: 5 hour(s) : 30 minutes. Attorney Appearance(s): Nicholas Lyndol Villacor Warren, Caroline Andrews McNamara, Daniel Boaz Tilley, Christopher J. Merken, Christopher N. Johnson, George Ty Levesque. Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. (aw) (Entered: 03/29/2023) |
| 03/30/2023 | 49 | Exhibit List *of Joint and Plaintiffs' Exhibits at Preliminary Injunction Hearing* by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes.. (Warren, Nicholas) (Entered: 03/30/2023) |
| 03/30/2023 | 50 | Exhibit List *Defendant's Exhibits Introduced Into Evidence At Plaintiffs' Expedited Motion For Preliminary Injunction Hearing Held On March 28, 2023* by City of Miami.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Johnson, Christopher) (Entered: 03/30/2023) |
| 03/30/2023 | 51 | CERTIFICATE of Compliance Re Admitted Evidence for exhibit(s): 1 through 12 by Christopher N. Johnson on behalf of City of Miami (Johnson, Christopher) (Entered: 03/30/2023) |
| 05/03/2023 | 52 | REPORT AND RECOMMENDATIONS on 26 Plaintiffs' Expedited Motion for Preliminary Injunction. Recommending that the 26 Expedited Motion be GRANTED. Objections to R&R due by 5/13/2023. Response to Objections due 5/20/2023. Signed by Magistrate Judge Lauren Fleischer Louis on 5/3/2023. *See attached document for full details.* (elm) (Entered: 05/03/2023) |
| 05/09/2023 | 53 | Defendant's MOTION for Extension of Time To File Objections to Magistrate Judge's Report and Recommendation re 52 REPORT AND RECOMMENDATIONS re 26 EXPEDITED MOTION for Preliminary Injunction filed by South Dade Branch Of The NAACP, Engage Miami, Inc., Steven Miro, Yanelis Valdes, Miami-Dade Branch Of The NAACP, GRACE, Inc., Alexandra Contr by City of Miami. Responses due by 5/23/2023 (Attachments: # 1 Text of Proposed Order Proposed Order)(Johnson, Christopher) (Entered: 05/09/2023) |
| 05/11/2023 | 54 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Motion for Extension of Time to File Objections to Magistrate Judge's Report and Recommendation. 53 . Therein, Defendant requests an extension of time to file objections because of the "complexity, length, and serious consequences of the Report and Recommendation." Id. at 2. However, in the March 29, 2023 Evidentiary and Preliminary Injunction Hearing, see (ECF No. 48), the Parties consented to this expedited briefing schedule. Therefore, the Court fails to find good cause warranting an extension. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 53 is DENIED. Defendant shall file any Objections to the Report and Recommendation on or before May 13, 2023. Signed by Judge K. Michael Moore on 5/11/2023. (rhr) (Entered: 05/11/2023) |
| 05/13/2023 | 55 | OBJECTIONS to 52 Report and Recommendations *DEFENDANTS OBJECTIONS TO MAGISTRATE'S REPORT & RECOMMENDATION* by City of Miami. (Levesque, George) (Entered: 05/13/2023) |
| 05/13/2023 | 56 | OBJECTIONS to 52 Report and Recommendations by City of Miami. (Levesque, George) (Entered: 05/13/2023) |
| 05/18/2023 | 57 | RESPONSE TO OBJECTION to 52 Report and Recommendations by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. (Warren, Nicholas) (Entered: 05/18/2023) |
| 05/18/2023 | 58 | Defendant's MOTION for Leave to File *Reply In Support Of Objections To Magistrate Judge's Report and Recommendation* by City of Miami. (Attachments: # 1 Text of Proposed Order Proposed Order)(Johnson, Christopher) (Entered: 05/18/2023) |
| 05/19/2023 | 59 | Defendant's REPLY to 55 Objections to Report and Recommendations, 52 REPORT AND RECOMMENDATIONS re 26 EXPEDITED MOTION for Preliminary Injunction filed by South Dade Branch Of The NAACP, Engage Miami, Inc., Steven Miro, Yanelis Valdes, Miami-Dade Branch Of The NAACP, GRACE, |

| 05/19/2023 | | Cantero, Alexandra Contr., 57 Response to Objection to Report and Recommendations, by City Of Miami (Johnson, Christopher) (Entered: 05/19/2023) |
|---|---|---|
| 05/23/2023 | 60 | ORDER granting 26 Expedited Motion; Adopting 52 Report and Recommendations on 26 Expedited Motion, filed by South Dade Branch Of The NAACP, Engage Miami, Inc., Steven Miro, Yanelis Valdes, Miami-Dade Branch Of The NAACP, GRACE, Inc., Alexandra Contreras, Jared Johnson, Clarice Cooper, 52 Report and Recommendations,. Signed by Judge K. Michael Moore on 5/23/2023. *See attached document for full details.* (rhr) (Entered: 05/23/2023) |
| 05/23/2023 | 61 | PAPERLESS ORDER OF REFERRAL TO SUPPLEMENTAL MEDIATION. THIS CAUSE came before the Court upon (ECF No. 60 ). Trial having been set in this matter for the two-week trial period beginning January 29, 2024 at 9:00 a.m. pursuant to Rule 16 of the Federal Rule of Civil Procedure and Rule 16.2 of the Local Rules of the United States District Court for the Southern District of Florida, and upon the Court's Order granting Plaintiffs' Motion for Preliminary Injunction, it is hereby ORDERED AND ADJUDGED as follows: 1. All parties are required to participate in mediation. The mediation shall be completed no later than thirty (30) days from the date of this Order. 2. Plaintiff's counsel, or another attorney agreed upon by all counsel of record and any unrepresented parties, shall be responsible for scheduling the mediation conference. The parties are encouraged to avail themselves of the services of any mediator on the List of Certified Mediators, maintained in the office of the Clerk of this Court, but may select any other mediator. The parties shall agree upon a mediator and file a Notice of Mediator Selection within fifteen (15) days from the date of this Order. If there is no agreement, lead counsel shall file a motion with the Court requesting the designation of a mediator. 3. The parties shall agree upon a place, date, and time for mediation convenient to the mediator and counsel of record, file a Notice of Scheduling Mediation no later than thirty (15) days from the date of this Order. If the parties cannot agree to a place, date, and time for the mediation, they may motion the Court for an order dictating the place, date, and time. 4. The physical presence of counsel and each party or representatives of each party with full authority to enter in a full and complete compromise and settlement is mandatory. The mediation shall take place in person absent good cause shown by the parties. If insurance is involved, an adjuster with authority up to the policy limits or the most recent demand, whichever is lower, shall attend. 5. All discussions, representations and statements made at the mediation conference shall be confidential and privileged. 6. At least ten (10) days prior to the mediation date, all parties shall present to the mediator a brief written summary of the case identifying issues to be resolved. Copies of those summaries shall be served on all other parties. 7. The Court may impose sanctions against parties and/or counsel who do not comply with the attendance or settlement authority requirements herein, or who otherwise violate the terms of this Order. The mediator shall report non-attendance and may recommend imposition of sanctions by the Court for non-attendance. 8. The mediator shall be compensated in accordance with the standing order of the Court entered pursuant to Rule 16.2.B.6, or on such basis as may be agreed to in writing by the parties and the mediator selected by the parties. The cost of mediation shall be shared equally by the parties unless otherwise ordered by the Court. All payments shall be remitted to the mediator within 30 days of the date of the bill. Notice to the mediator of cancellation or settlement prior to the scheduled mediation conference must be given at least two (2) full business days in advance. Failure to do so will result in imposition of a fee for one hour. 9. If a full or partial settlement is reached in this case, counsel shall promptly notify the Court of the settlement in accordance with Local Rule 16.2.F, by filing a notice of settlement signed by the counsel of record within ten (10) days of the mediation conference. Thereafter, the parties shall forthwith submit an appropriate pleading concluding the case. 10. Within five (5) days following the mediation conference, the mediator shall file a Mediation Report indicating whether all required parties were present. The report shall also indicate whether the case settled (in full or in part), was continued with the consent of the parties, or whether the mediator declared an impasse. 11. If mediation is not conducted, the case may be stricken from the trial calendar, and other sanctions may be imposed. Signed by Judge K. Michael Moore on 5/23/2023. (rhr) (Entered: 05/23/2023) |
| 05/23/2023 | 62 | PAPERLESS ORDER Setting Status Conference: Status Conference Re: Scheduling/Deadlines/Procedural Matters set for 6/2/2023 04:00 PM in Miami Division before Judge K. Michael Moore. Per Chambers. (rhr) (Entered: 05/23/2023) |
| 05/31/2023 | 63 | Notice of Appeal *To The Eleventh Circuit Court of Appeals* as to 60 Order on Expedited Motion,, Order on Report and Recommendations, by City of Miami. Filing fee $ 505.00 receipt number AFLSDC-16657779. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Johnson, Christopher) (Entered: 05/31/2023) |
| 05/31/2023 | 64 | Defendant's MOTION to Stay re 60 Order on Expedited Motion,, Order on Report and Recommendations, by City of Miami. Responses due by 6/14/2023 (Johnson, Christopher) (Entered: 05/31/2023) |
| 05/31/2023 | 65 | NOTICE of Mediator Selection and Hearing. Selected/Added Raoul G. Cantero as Mediator. Mediation Hearing set for 6/13/2023 at 3:00 p.m.. (Warren, Nicholas) (Entered: 05/31/2023) |
| 05/31/2023 | | Transmission of Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re 63 Notice of Appeal. Notice has been electronically mailed. (jes) (Entered: 06/02/2023) |

USCA11 Case: 23-12472    Document: 38-1    Date Filed: 10/18/2023    Page: 23 of 235

| | | |
|---|---|---|
| 06/01/2023 | | **PAPERLESS** \*\*TIME CHANGE ONLY\*\* Status Conference Re: Scheduling/Deadlines/Procedural Matters set for 6/2/2023 02:00 PM in Miami Division before Judge K. Michael Moore. Per Chambers. (rhr) (Entered: 06/01/2023) |
| 06/01/2023 | 66 | Unopposed MOTION to Stay *Discovery* by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 6/15/2023 (Warren, Nicholas) (Entered: 06/01/2023) |
| 06/02/2023 | 67 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiffs' Unopposed Motion to Stay Discovery ("Motion" or "Mot."). 66 . Therein, Plaintiffs request a stay of discovery until after the interim remedial phase of this case concludes. See id. at 1. Plaintiffs aver that a stay of discovery "during this period will allow the Parties to focus their efforts on developing an interim remedial plan and will facilitate mediation and potential settlement." Id. Defendant does not oppose the Motion. "The district court has broad discretion to stay proceedings as an incident to its power to control its own docket." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A., 377 F.3d 1164, 1172 n.7 (11th Cir. 2004) (quoting Clinton v. Jones, 520 U.S. 681, 706 (1997)). The length of the requested stay will not be indefinite or immoderate. See Ortega Trujillo v. Conover & Co. Commc'ns, 221 F.3d 1262, 1264 (11th Cir. 2000). Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiffs' Motion to Stay Discovery 66 is GRANTED. Discovery in this case is hereby STAYED until the interim remedial phase of this case has concluded. Signed by Judge K. Michael Moore on 6/2/2023. (rhr) (Entered: 06/02/2023) |
| 06/02/2023 | 68 | PAPERLESS Minute Entry for proceedings held before Judge K. Michael Moore: Status Conference held on 6/2/2023. The Parties discussed their proposed timelines for mediation and for briefing on new proposed electoral maps. Defense discussed its concerns regarding its representation at the mediation conference. Total time in court: 25 minutes. Court Reporter: Vernita Allen-Williams, 305-523-5048 / Vernita_Allen-Williams@flsd.uscourts.gov. (fpi) (Entered: 06/02/2023) |
| 06/02/2023 | 69 | SCHEDULING ORDER Signed by Judge K. Michael Moore on 6/2/2023. *See attached document for full details.* (rhr) (Entered: 06/02/2023) |
| 06/07/2023 | 70 | ORDER denying 64 Motion to Stay. Signed by Judge K. Michael Moore on 6/6/2023. *See attached document for full details.* (rhr) (Entered: 06/07/2023) |
| 06/07/2023 | 71 | Acknowledgment of Receipt of NOA from USCA re 63 Notice of Appeal, filed by City of Miami. Date received by USCA: 06/02/2023. USCA Case Number: 23-11854-D. (jes) (Entered: 06/07/2023) |
| 06/14/2023 | 72 | TRANSCRIPT INFORMATION FORM by City of Miami re 63 Notice of Appeal,,. No Transcript Requested. (Johnson, Christopher) (Entered: 06/14/2023) |
| 06/22/2023 | 73 | TRANSCRIPT of the Evidentiary and Motion Preliminary Injunction hearing held on 03/29/23, before Magistrate Judge Lauren Fleischer Louis, 1-160 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/13/2023. Redacted Transcript Deadline set for 7/24/2023. Release of Transcript Restriction set for 9/20/2023. (smn) (Entered: 06/22/2023) |
| 06/23/2023 | 74 | FINAL MEDIATION REPORT by Raoul G. Cantero. Disposition: Case did not settle. (Cantero, Raoul) (Entered: 06/23/2023) |
| 06/23/2023 | 75 | FINAL MEDIATION REPORT by Raoul Cantero. Disposition: Case did not settle. (Levesque, George) (Entered: 06/23/2023) |
| 06/28/2023 | 76 | Unopposed MOTION to Withdraw as Attorney by Jocelyn Kirsch for / by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 7/12/2023 (Warren, Nicholas) (Entered: 06/28/2023) |
| 06/30/2023 | 77 | NOTICE by City of Miami re 69 Order *Defendant's Notice of Passage of Redistricting Plan* (Johnson, Christopher) (Entered: 06/30/2023) |
| 06/30/2023 | 78 | PAPERLESS ORDER PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiffs' Motion for Withdrawal of Counsel. 76 . Therein, Plaintiffs request leave for attorney Jocelyn Kirsch to withdraw as a counsel of record, and notices that remaining co-counsel will continue to represent Plaintiffs in this case. Id. at 1. Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion to Withdraw 76 is GRANTED. Attorney Jocelyn Kirsch is relieved of all further responsibilities related to this action. The Clerk of Court is INSTRUCTED to REMOVE Jocelyn Kirsch as counsel of record for Defendants. Signed by Judge K. Michael Moore on 6/30/2023. (rhr) (Entered: 06/30/2023) |

| 07/03/2023 | 79 | NOTICE of Attorney Appearance by Kevin Renard Jones on behalf of City of Miami. Attorney Kevin Renard Jones added to party City of Miami(pty:dft). (Jones, Kevin) (Entered: 07/03/2023) |
|---|---|---|
| 07/03/2023 | 80 | MOTION to Dismiss 23 Amended Complaint/Amended Notice of Removal, *Defendant's Motion To Dismiss Plaintiffs' First Amended Complaint as Moot* by City of Miami. Responses due by 7/17/2023 (Johnson, Christopher) (Entered: 07/03/2023) |
| 07/05/2023 | 81 | PAPERLESS ORDER REQUIRING EXPEDITED BRIEFING. THIS CAUSE came before the Court upon Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint as Moot. 80 . In light of the time-sensitive nature of this Matter, the Court finds that expedited briefing is appropriate. Accordingly, Plaintiffs shall file a response to Defendant's Motion to Dismiss on or before July 10, 2023 at 5:00 PM. To the extent Defendant intends to file a reply, it shall do so on or before July 12, 2023 at 5:00 PM. Signed by Judge K. Michael Moore on 7/5/2023. (rhr) (Entered: 07/05/2023) |
| 07/05/2023 | | Set/Reset Deadlines/Hearings per DE 81 as to 80 MOTION to Dismiss 23 Amended Complaint/Amended Notice of Removal, *Defendant's Motion To Dismiss Plaintiffs' First Amended Complaint as Moot*. Responses due by 7/10/2023 Replies due by 7/12/2023. (pcs) (Entered: 07/05/2023) |
| 07/06/2023 | 82 | NOTICE by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes *of Filing Exhibits in Support of Objections to City's Proposed Interim Remedial Plan* (Attachments: # 1 5/11 Tr., # 2 6/14 Tr., # 3 5/11 Marked Agenda, # 4 6/14 Meeting Notice, # 5 6/14 Agenda (Pre-Meeting), # 6 6/14 Marked Agenda, # 7 Four Emails Sharing Plfs' Maps, # 8 Supp. Info. on P1 & P2, # 9 Moy Rep. on P1 & P2, # 10 Plfs' Letter Urging Veto, # 11 McCartan Report, # 12 2nd Abott Report, # 13 Supp. Moy Report, # 14 King's 5/26 Instagram Post, # 15 King's 6/14 Facebook Post, # 16 Morrell Article, # 17 Warren Declaration, # 18 6/23 Johnson Email, # 19 6/23 Warren Email, # 20 6/30 Warren Email, # 21 Laws of Fla. ch. 2023-101, # 22 2013 Plan, # 23 2022 Enjoined Plan, # 24 Res. 23-271, # 25 Version 12, # 26 D1 Alt Map (Version 14), # 27 D2 Alt Map, # 28 D3 Alt Map v.1, # 29 D3 Alt Map v.2, # 30 D5 Alt Map, # 31 Areas Moved - Enjoined to Res. 23-271, # 32 Areas Moved - V.12 to Res. 23-271, and Other Areas, # 33 Overtown, # 34 P1, # 35 P2, # 36 P3, # 37 P4, # 38 2022 Precinct Map, # 39 2020 Voting Tabulation Districts) (Warren, Nicholas) (Entered: 07/06/2023) |
| 07/07/2023 | 83 | Objections to 77 Notice (Other) by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. (Attachments: # 1 Arriola Declaration)(Warren, Nicholas) (Entered: 07/07/2023) |
| 07/10/2023 | 84 | RESPONSE in Opposition re 80 MOTION to Dismiss 23 Amended Complaint/Amended Notice of Removal, *Defendant's Motion To Dismiss Plaintiffs' First Amended Complaint as Moot* filed by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Replies due by 7/17/2023. (Warren, Nicholas) (Entered: 07/10/2023) |
| 07/12/2023 | 85 | RESPONSE in Support re 80 MOTION to Dismiss 23 Amended Complaint/Amended Notice of Removal, *Defendant's Motion To Dismiss Plaintiffs' First Amended Complaint as Moot* filed by City of Miami. (Levesque, George) (Entered: 07/12/2023) |
| 07/12/2023 | 86 | RESPONSE to 82 Notice (Other),,,,, 83 Response/Reply (Other), *Defendant's Memorandum of Law In Response To Plaintiffs' Objections To The City's Proposed Interim Remedial Plan* by City of Miami. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Johnson, Christopher) (Entered: 07/12/2023) |
| 07/12/2023 | 87 | MOTION to Strike *Motion To Strike Carolyn Abott's Improper Opinions Assessing The Credibility Of Witnesses And Speculating About The City's Considerations And Motivations In Creating A New Plan* by City of Miami. Responses due by 7/26/2023 (Johnson, Christopher) (Entered: 07/12/2023) |
| 07/13/2023 | 88 | ORDER of DISMISSAL from USCA. Motion to voluntarily dismiss appeal filed by Appellant City of Miami is GRANTED by clerk re: 63 Notice of Appeal, filed by City of Miami. USCA # 23-11854-D. (jes) (Entered: 07/13/2023) |
| 07/17/2023 | 89 | Notice of Supplemental Authority re 84 Response in Opposition to Motion, 83 Response/Reply (Other), by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes (Warren, Nicholas) (Entered: 07/17/2023) |
| 07/17/2023 | 90 | Notice of Supplemental Authority re 89 Notice of Supplemental Authority, *Attachment - S.C. State Conf. of NAACP v. Alexander, No. 3:21-cv-3302 (D.S.C. Feb. 4, 2023), ECF 501* by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes (Warren, Nicholas) (Entered: 07/17/2023) |
| 07/18/2023 | 91 | ORDER denying 80 Motion to Dismiss. Signed by Judge K. Michael Moore on 7/18/2023. *See attached document for full details.* (rhr) (Entered: 07/18/2023) |

| 07/25/2023 | 92 | RESPONSE in Opposition re 87 MOTION to Strike *Motion To Strike Carolyn Abott's Improper Opinions Assessing The Credibility Of Witnesses And Speculating About The City's Considerations And Motivations In Creating A New Plan* filed by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Replies due by 8/1/2023. (Attachments: # 1 Exhibit Instructions to Carolyn Abott June 19 2023)(McNamara, Caroline) (Entered: 07/25/2023) |
|---|---|---|
| 07/28/2023 | 93 | REPLY *In Support Of Motion To Strike Carolyn Abott's Improper Opinions Assessing The Credibility Of Witnesses And Speculating About The City's Considerations And Motivations In Creating A New Plan [DE 87]* by City of Miami. (Johnson, Christopher) (Entered: 07/28/2023) |
| 07/30/2023 | 94 | ORDER sustaining Objections to Defendant's Notice of Passing Remedial Plan (ECF No. 83 ) Signed by Judge K. Michael Moore on 7/30/2023. *See attached document for full details.* (rhr) (Entered: 07/30/2023) |
| 07/30/2023 | 95 | PAPERLESS ORDER. Per (ECF No. 94 ), Defendant's Motion to Strike (ECF No. 87 ) is DENIED AS MOOT. Signed by Judge K. Michael Moore on 7/30/2023. (rhr) (Entered: 07/30/2023) |
| 07/30/2023 | 96 | Notice of Appeal *To The Eleventh Circuit Court Of Appeals* as to 94 Order by City of Miami. Filing fee $ 505.00 receipt number AFLSDC-16802016. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Johnson, Christopher) (Entered: 07/30/2023) |
| 07/30/2023 | 97 | EMERGENCY MOTION with Certification of Emergency included *Defendant's Emergency Motion To Stay Order Rejecting Redistricting Map [DE94]* by City of Miami. Responses due by 8/14/2023 (Johnson, Christopher) (Entered: 07/30/2023) |
| 07/31/2023 | 98 | PAPERLESS ORDER. THIS CAUSE comes before the Court upon Defendant's Emergency Motion to Stay Order Rejecting Redistricting Map (ECF No. 97 ). Therein, Defendant requests a stay of the Court's Order sustaining Objections to Defendant's Notice of Passing Remedial Plan (ECF No. 94 ), pending appeal. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 97 is DENIED. Because of the time-sensitive nature of this Motion, a reasoned order will be forthcoming. Signed by Judge K. Michael Moore on 7/31/2023. (rhr) (Entered: 07/31/2023) |
| 07/31/2023 | | Transmission of Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re: 96 Notice of Appeal. Notice has been electronically mailed. (jes) (Entered: 07/31/2023) |
| 07/31/2023 | 99 | TRANSCRIPT of Status Conference held on 6-2-23 before Judge K. Michael Moore, Volume Number 1 of 1, 1-13 pages, re: 96 Notice of Appeal,, Court Reporter: Vernita Allen-Williams, 305-523-5048 / Vernita_Allen-Williams@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/21/2023. Redacted Transcript Deadline set for 8/31/2023. Release of Transcript Restriction set for 10/30/2023. (vas) (Entered: 07/31/2023) |
| 07/31/2023 | 100 | Acknowledgment of Receipt of NOA from USCA re: 96 Notice of Appeal, filed by City of Miami. Date received by USCA: 07/31/2023. USCA Case Number: 23-12472-D. (jes) (Entered: 07/31/2023) |
| 08/03/2023 | 101 | SUPPLEMENTAL ORDER Per (ECF No. 98). Signed by Judge K. Michael Moore on 8/3/2023. *See attached document for full details.* (rhr) (Entered: 08/03/2023) |
| 08/10/2023 | 102 | ORDER from USCA. "Plaintiffs-Appellees' Motion to Transfer Consideration of Attorneys' Fees on Appeal to the District Court" is GRANTED. Consideration of whether Appellees are entitled to appellate attorney's fees and the amount of appellate attorney's fees to which Appellees are entitled, if any, is TRANSFERRED to the district court re: 63 Notice of Appeal, filed by City of Miami. USCA # 23-11854-D. (jes) (Entered: 08/14/2023) |
| 08/14/2023 | 103 | TRANSCRIPT INFORMATION FORM by City of Miami re 96 Notice of Appeal,,. No Transcript Requested. (Levesque, George) (Entered: 08/14/2023) |
| 08/25/2023 | 104 | Defendant's MOTION to Stay *Case Pending Appeal And To Continue Trial and Pretrial Deadlines* by City of Miami. Responses due by 9/8/2023 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Johnson, Christopher) (Entered: 08/25/2023) |
| 08/28/2023 | 105 | MOTION for Leave to File *Supplemental Complaint* by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. (Attachments: # 1 Proposed Supplemental Complaint)(Warren, Nicholas) (Entered: 08/28/2023) |
| 08/30/2023 | 106 | PAPERLESS ORDER. THIS CAUSE comes before the Court upon a sua sponte examination of the Record. On May 23, 2023, the Court issued an order granting a preliminary injunction preventing Defendant from using Resolution 22-131 in upcoming elections pending the final resolution of the instant Action. (ECF No. 60). The |

USCA11 Case: 23-12472   Document: 36-2   Date Filed: 04/18/2023   Page: 26 of 235

Court then issued a remedial order finding that Defendant's remedial plan, Resolution 23-209, failed to adequately remedy the likely constitutional violations from the enjoined plan. (ECF No. 94). The Eleventh Circuit issued a stay of the Court's order pending appeal, which is now proceeding on a normal schedule. See GRACE, Inc. v. City of Miami, Case No. 23-12472 (11th Cir. Aug. 4, 2023), Doc. 25. Following the stay, Defendant filed a motion to continue trial and pretrial deadlines, and to stay the case pending appeal. (ECF No. 104). Plaintiff filed a motion requesting leave to file a supplemental complaint purporting to identify additional facts supporting the allegation that Resolution 23-271 does not remedy the unconstitutional aspects of the enjoined plan. (ECF No. 105).

Given the procedural posture of this case and considering the current pretrial deadlines, the Parties are HEREBY ORDERED to file a Joint Status Report on or before September 6, 2023 addressing the following issues: (1) what discovery, if any, the Parties still seek; (2) whether the Parties intend to file motions for summary judgment; and (3) whether further mediation would assist in a resolution of the instant Action. By issuing this Order, the Court takes no position on either Defendant's or Plaintiffs' Motions (ECF Nos. 104, 105). Signed by Judge K. Michael Moore on 8/30/2023. (rhr) (Entered: 08/30/2023)

| | | |
|---|---|---|
| 08/30/2023 | | Set/Reset Deadlines/Hearings per DE 106 Status Report due by 9/6/2023. (pcs) (Entered: 08/30/2023) |
| 09/06/2023 | 107 | STATUS REPORT by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes (Warren, Nicholas) (Entered: 09/06/2023) |
| 09/07/2023 | 108 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiffs' Motion for Leave to File Supplemental Complaint. 105 . Therein, Plaintiffs requests that the Court permit them to supplement their First Amended Complaint 23 in order to include facts in support of their allegation that the "five Miami City Commission districts continue to be racially gerrymandered in violation of the Equal Protection Clause." Id. at 1. <br><br> Pursuant to Federal Rule of Civil Procedure 15(d), the Court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The standard applicable to a motion for leave to supplement under Rule 15(d) is the same standard applied to a motion for leave to amend under Rule 15(a). Stoecklin v. U.S., 1997 WL 1039239, at *1 (M.D. Fla. Sept. 19, 1997). Leave to supplement a complaint should thus "be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court will therefore permit Plaintiffs to file a Supplemental Complaint. <br><br> Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 105 is GRANTED. Plaintiff is instructed to file the supplemental complaint separately on the docket on or before September 8, 2023. Consistent with Federal Rule of Procedure 15(a)(3), Defendant will have 14 days after service of the supplemental pleading to respond. Nothing in this Order shall disturb the Court's prior scheduling order, see (ECF No. 32), which set the appropriate deadlines for discovery and all pretrial motions. Signed by Judge K. Michael Moore on 9/7/2023. (rhr) (Entered: 09/07/2023) |
| 09/07/2023 | 109 | Supplemental AMENDED COMPLAINT against All Defendants filed in response to Order Granting Motion for Leave, filed by Yanelis Valdes, South Dade Branch Of The NAACP, Jared Johnson, Steven Miro, Engage Miami, Inc., Alexandra Contreras, GRACE, Inc., Miami-Dade Branch Of The NAACP, Clarice Cooper.(Warren, Nicholas) (Entered: 09/07/2023) |
| 09/08/2023 | 110 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's filing of its Supplemental Complaint. 109 . The Supplemental Complaint moots Defendant's Motion to Dismiss. 34 . Accordingly, UPON CONSIDERATION of the Supplemental Complaint 109 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is ORDERED AND ADJUDGED that Defendant's Motion to Dismiss 34 is DENIED AS MOOT. Signed by Judge K. Michael Moore on 9/8/2023. (rhr) (Entered: 09/08/2023) |
| 09/08/2023 | 111 | RESPONSE in Opposition re 104 Defendant's MOTION to Stay *Case Pending Appeal And To Continue Trial and Pretrial Deadlines* filed by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Replies due by 9/15/2023. (Warren, Nicholas) (Entered: 09/08/2023) |
| 09/12/2023 | 112 | ORDER denying 104 Motion to Stay. Signed by Judge K. Michael Moore on 9/12/2023. *See attached document for full details*. (rhr) (Entered: 09/12/2023) |
| 09/14/2023 | 113 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Julia Markham-Cameron. Filing Fee $ 200.00 Receipt # AFLSDC-16918763 by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 9/28/2023 (Attachments: # 1 Certification of Julia Markham-Cameron, # 2 Proposed Order)(Warren, Nicholas) (Entered: 09/14/2023) |
| 09/14/2023 | 114 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Gregory Luib. Filing Fee $ 200.00 Receipt # AFLSDC-16918786 by Alexandra Contreras, |

| | | |
|---|---|---|
| | | Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 9/28/2023 (Attachments: # 1 Certification of Gregory Luib, # 2 Proposed Order)(Warren, Nicholas) (Entered: 09/14/2023) |
| 09/15/2023 | 115 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Julia Markham-Cameron 113 , and Plaintiff's Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Gregory Luib 114 . UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motions 113 and 114 are GRANTED. Julia Markham-Cameron and Gregory Luib may appear pro hac vice in this matter. The Clerk of Court shall provide electronic notification of all electronic filings to: Julia.Markham-Cameron@dechert.com and Gregory.Luib@dechert.com. Signed by Judge K. Michael Moore on 9/15/2023. (rhr) (Entered: 09/15/2023) |
| 09/20/2023 | 116 | Joint MOTION to Waive Pretrial Mediation by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. (Warren, Nicholas) (Entered: 09/20/2023) |
| 09/21/2023 | 117 | MOTION to Dismiss 109 Amended Complaint/Amended Notice of Removal, *Defendant's Motion To Dismiss Plaintiffs' Supplemental Complaint* by City of Miami. Responses due by 10/5/2023 (Johnson, Christopher) (Entered: 09/21/2023) |
| 10/02/2023 | 118 | PAPERLESS ORDER. THIS CAUSE came before the Court the Parties' Joint Motion to Waive Pretrial Mediation. 116 . Therein, the Parties request that the Court relieve them of their obligation to mediate because the Parties have already mediated unsuccessfully at an earlier stage of the case. Id. at 1. Both Parties agree that further mediation would not be fruitful. Id. at 2. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 116 is GRANTED. IT IS HEREBY ORDERED that the Parties do not need to engage in further mediation. Signed by Judge K. Michael Moore on 10/2/2023. (rhr) (Entered: 10/02/2023) |
| 10/05/2023 | 119 | RESPONSE in Opposition re 117 MOTION to Dismiss 109 Amended Complaint/Amended Notice of Removal, *Defendant's Motion To Dismiss Plaintiffs' Supplemental Complaint* filed by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Replies due by 10/12/2023. (Warren, Nicholas) (Entered: 10/05/2023) |
| 10/10/2023 | 120 | NOTICE of Attorney Appearance by Sydney Michelle Feldman on behalf of City of Miami. Attorney Sydney Michelle Feldman added to party City of Miami(pty:dft). (Feldman, Sydney) (Entered: 10/10/2023) |
| 10/11/2023 | 121 | NOTICE of Attorney Appearance by Janine Marie Lopez on behalf of Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, Steven Miro, South Dade Branch Of The NAACP, Yanelis Valdes. Attorney Janine Marie Lopez added to party Alexandra Contreras(pty:pla), Attorney Janine Marie Lopez added to party Clarice Cooper(pty:pla), Attorney Janine Marie Lopez added to party Engage Miami, Inc.(pty:pla), Attorney Janine Marie Lopez added to party GRACE, Inc. (pty:pla), Attorney Janine Marie Lopez added to party Jared Johnson(pty:pla), Attorney Janine Marie Lopez added to party Miami-Dade Branch Of The NAACP(pty:pla), Attorney Janine Marie Lopez added to party Steven Miro(pty:pla), Attorney Janine Marie Lopez added to party South Dade Branch Of The NAACP(pty:pla), Attorney Janine Marie Lopez added to party Yanelis Valdes(pty:pla). (Lopez, Janine) (Entered: 10/11/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/12/2023 10:11:44 | | |
| **PACER Login:** cnj69329 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 1:22-cv-24066-KMM |
| **Billable Pages:** 29 | **Cost:** | 2.90 |

DE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No. 1:22-cv-24066**

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRANCH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDRA
CONTRERAS,

     *Plaintiffs,*

v.

CITY OF MIAMI,

     *Defendant.*

_____/

## COMPLAINT

1.     This action challenges the five Miami City Commission districts as racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment. But Miami's is not merely a run-of-the-mill racial gerrymander in which the majority seeks to diminish minority voters' influence and power. Rather, it is the product of a calculated scheme in which communities and neighborhoods were split along racial lines for the predominant purpose of maintaining racially segregated districts. As Commissioner Alex Díaz de la Portilla put it: "Our goal here is to have an African American district, . . . a white district, . . . and three Hispanic districts."

2.     Indeed, as detailed below, race-based considerations were not simply a factor in redrawing district lines; they were the *predominant* factor. Race was the predominant factor in maintaining arbitrary racial quotas for certain districts. It was the predominant factor in packing certain districts with as many Hispanic and Black residents as possible. It was the predominant factor in maintaining racial "purity" with the "same type of last name and faces." It was the

predominant factor resulting in diminished Black and Hispanic influence. And it was the predominant factor in the Commission's overt command that Black, Hispanic, and Anglo residents *must* be separated as much as possible into different districts because, in the Commission's view, each race needs to be represented by a co-ethnic, irrespective of communities, interests, and values.

3.    The predominance of race-based thinking in the City Commission's decisions does not advance representation and cannot be justified by compliance with the Voting Rights Act or another compelling interest.

4.    Stated simply, Miami's racially gerrymandered redistricting scheme violates Plaintiffs' rights to the equal protection of the laws. They bring suit to vindicate those rights.

**INTRODUCTION**

5.    On March 24, 2022, the Miami City Commission passed Resolution 22-131 (the "Enacted Plan"), redrawing the City Commission districts for the next decade. Mayor Francis X. Suarez declined to veto it, allowing the new map to go into effect for the next regularly scheduled City Commission elections on November 7, 2023.

6.    Plaintiffs—four community and civil rights organizations and four individual Miamians—bring suit to challenge all five City Commission districts as racially gerrymandered in violation of the Fourteenth Amendment to the United States Constitution.

7.    While redistricting bodies "will … almost always be aware of racial demographics," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), and are often required to look at race in drawing maps, the Fourteenth Amendment prohibits the unnecessary centering of race in redistricting decisions.

8.    Map-drawing in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making, is presumptively invalid under the Equal

Protection Clause. This type of excessively race-based line drawing is constitutional only where it satisfies strict scrutiny—where it is narrowly tailored to advance a compelling government interest. The Enacted Plan falls far short of this exacting standard.

9.     In developing the Enacted Plan, the Commission impermissibly elevated race above all other considerations. Commissioners and their consultants obsessed over an overriding racial goal: isolating Black from Hispanic from Anglo residents as much as possible into separate districts.

10.     In so doing, the Commission not only reduced the interests of Black, Hispanic, and Anglo Miamians to their race, but also ignored the interests of Miami's 14,000 American Indian, Asian American, and Pacific Islander residents, who were never once considered in the process.

11.     In furtherance of its goal of maximum racial separation, race dictated even the most granular line-drawing decisions in the Enacted Plan. The Commission was preoccupied by racial considerations, agonizing over the effects of minute changes on the racial composition of the districts, even debating the racial implications of moving individual city blocks and condo towers.

12.     The Commission presented no compelling governmental interest to justify this racial sorting. Compliance with Section 2 of the Voting Rights Act (VRA) is one of the few permissible justifications for allowing race to predominate when drawing district lines. But the Commission was not entitled to set racial targets based on uninformed guesses of what VRA compliance might look like. It was instead required to actually *assess* what VRA compliance involves. The Commission never attempted to do that. Nor do any facts indicate the Enacted Plan is necessary to achieve VRA compliance.

13.     The resulting harm to Plaintiffs is acute, and threefold. *First,* racial gerrymandering "reinforces racial stereotypes and undermines our system of representative democracy by signaling

3

to elected officials that they represent a particular racial group rather than their constituency as a whole." *Shaw v. Reno*, 509 U.S. 630, 650 (1993).

14. ***Second***, Plaintiffs are further harmed because, in pursuit of its racial goals, the Commission sacrificed genuine communities of interest, dividing neighborhoods across the city. Coconut Grove, Little Havana, Flagami, Allapattah, Shenandoah, Omni/Downtown, Brickell, and others were broken up. Commissioners explicitly acknowledged dividing these communities to maintain and enhance the racial separation of the five districts.

15. ***And third***, the Commission's racial gerrymandering packed Black and Hispanic voters into designated districts, stripping them from adjacent districts and reducing their influence there.

16. The Commission was on notice of the unjustness of its work. Miamians—including many of the Plaintiffs in this suit—stepped up to call out the Commission's blatantly unconstitutional actions. But they were ignored.

17. Indeed, the Commission's consultant responded to the public outcry with a PowerPoint slide bluntly titled: "Allegations of Racism are False and Inflammatory."

18. His PowerPoint was wrong. The Commission's intentional sorting by race, without narrow tailoring to achieve a compelling governmental interest, violates the Equal Protection Clause and renders the map—all five districts—an unconstitutional racial gerrymander.

## PARTIES

19. Plaintiff GROVE RIGHTS AND COMMUNITY EQUITY, INC. ("GRACE") is a nonprofit community-based membership organization serving Miami's West Coconut Grove neighborhood since 2019. GRACE advocates for equitable economic development while preserving the historic culture and community of the West Grove. GRACE's members, most of

whom are Black, are split across Commission Districts 2 and 4.

20.     Plaintiff ENGAGE MIAMI, INC. is a nonprofit membership organization centering young people's participation in civic engagement, with members who are largely Gen Z and Millennial Black and Latino Miamians who reside in all five districts. Founded in 2015, the mission of Engage Miami is to build a more just, democratic, and sustainable Miami by developing a local culture of civic participation for young people that is bold, creative, and impactful.

21.     Plaintiff SOUTH DADE BRANCH OF THE NAACP ("South Dade NAACP") is a nonprofit membership organization serving Miami-Dade County south of Flagler Street.

22.     Plaintiff MIAMI-DADE BRANCH OF THE NAACP ("Miami-Dade NAACP") is a nonprofit membership organization serving Miami-Dade County north of Flagler Street.

23.     The South Dade NAACP and Miami-Dade NAACP (together, "NAACP Branches") are affiliate branches of the Florida State Conference of Branches and Youth Units of the NAACP, the oldest civil rights organization in the state, formed in 1909. Their mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. Pursuant to this mission, the NAACP Branches advocate for the voting rights of African Americans and other voters of color in Miami, including their members. The NAACP Branches' members—most of whom are Black—reside in all five districts.

24.     If the Enacted Plan is not enjoined, the members of GRACE, Engage Miami, and the NAACP Branches (together, "Organizational Plaintiffs") will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

25.     Plaintiff CLARICE COOPER is a Black resident of the West Grove in District 2.

26.     Plaintiff JARED JOHNSON is a Black resident of Brickell in District 3.

27.     Plaintiff ALEXANDRA CONTRERAS is a Latina, Cuban American resident of

Little Havana in District 4.

28.     Plaintiff YANELIS VALDES is a Latina, Cuban American resident of Omni/Downtown in District 5.

29.     The Enacted Plan places Plaintiffs Cooper, Johnson, and Valdes in districts where they are not the predominant racial group. The Enacted Plan sends the message that their commissioner's job is to represent the predominant group, not them.

30.     The Enacted Plan places Plaintiff Contreras in a district where she *is* the predominant racial group. The Enacted Plan sends the message that she was placed in her district simply because of her race.

31.     Plaintiffs and their members are further harmed because the Enacted Plan splits up their neighborhoods—and they are split along racial lines.

32.     Defendant CITY OF MIAMI is a Florida municipality. As a municipal corporation established under Florida law, Miami has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law. Fla. Const. art. VIII, §§ 2(b), 3; Fla. Stat. § 100.3605; Miami Code of Ordinances ("City Code") ch. 16.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

34.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) because the Defendant resides in this District and a substantial part of the events giving rise to the claim occurred in this District.

35.     This Court has personal jurisdiction over the City of Miami.

## FACTS

### I. Overview of the City Commission and Its Elections

36.     Miami is governed by a five-member City Commission and a Mayor. Miami City Charter ("Charter") § 4(a).

37.     Except where the Charter provides otherwise, municipal elections are conducted according to the state's general election laws. *Id.* § 7.

38.     Since 1997, commissioners have been elected from single-member districts. *Id.* § 4(b).

39.     Commissioners run on a nonpartisan basis and serve four-year staggered terms, with Districts 1, 2, and 4 last elected in 2019 and next up in 2023, and Districts 3 and 5 last elected in 2021 and next up in 2025. *Id.*

40.     General municipal elections are held on the first Tuesday after the first Monday in November of odd-numbered years. *Id.* § 7.

41.     If no candidate receives a majority in the general election, a runoff between the top-two vote-getters is held fourteen days later. *Id.*

42.     Candidates file to run by filing an affidavit of candidacy with the City Clerk during the qualifying period, which is between 60 and 45 days before the general election. *Id.*

43.     For the 2023 election, candidate qualifying opens on September 8 and closes at 6:00 pm on September 23.

44.     Candidates may qualify by paying the $100 fee by the end of the qualifying period, or by the petition method. *Id.*; Fla. Stat. § 99.095.

45.     To qualify by petition, a candidate must, by the 28th day preceding the first day of the qualifying period, submit petitions signed by at least one percent of the total number of

registered voters in their district as of the last state general election. Fla. Stat. § 99.095(2)(a), (3).

46.     However, the state's general election laws provide that in "a year of apportionment," a candidate may collect the requisite number of signatures from anywhere in the jurisdiction, regardless of district boundaries. *Id.* § 99.095(2)(d).

47.     Regardless of whether a candidate qualifies by fee or petition, they must also pay a $582 state election assessment. *Id.* § 99.093.

48.     However, a candidate is exempt from paying the qualifying fee and/or election assessment if doing so would impose an undue burden on their resources. *Id.* § 99.093(2); City Code § 16-7. In these cases, a candidate may qualify without paying the fee or submitting petitions.

49.     The current commissioners are Alex Díaz de la Portilla (District 1), Ken Russell (District 2), Joe Carollo (District 3), Manolo Reyes (District 4), and Christine King (District 5).

50.     Díaz de la Portilla, Carollo, and Reyes are Hispanic and Cuban American. Russell is Japanese American and not Hispanic. King is Black and not Hispanic.

51.     Commissioners are limited to two consecutive terms. Charter § 4.

52.     Díaz de la Portilla was first elected in 2019 and is eligible for reelection in 2023.

53.     King was first elected in 2021 and is eligible for reelection in 2025.

54.     Reyes was first elected in a 2017 special election and is eligible for reelection when his current term ends in 2023.

55.     Carollo was first elected in 2017 and cannot run for reelection when his current term ends in 2025.

56.     Russell was first elected in 2015 and cannot run for reelection when his current term ends in 2023.

57.     Furthermore, before the redistricting process began, Russell planned to resign from

8

the Commission to run for higher office in the 2022 election.

58.     Russell ran for Congress in the 2022 election, and his resignation is effective January 3, 2023.

## II. Miami Redistricting History

59.     Before 1997, the Commission was elected at-large, citywide.

60.     Carollo served as Mayor from 1996 to 1997, and in 1997, he appointed a blue-ribbon panel to recommend a single-member district map for the Commission.

61.     Among the members of the blue-ribbon panel were Reyes and Miguel De Grandy.

62.     The blue-ribbon panel made recommendations and the Commission further developed a map with the assistance of redistricting consultant Allan Lichtman.

63.     The Commission adopted its 1997 map as Resolution 97-495 (the "1997 Plan").

64.     In September 1997, the voters adopted a charter amendment adopting single-member district elections. The 1997 Plan was implemented in the November 1997 elections.

65.     The Commission redistricted the map in 2003 and 2013 through Resolutions 03-448 and 13-208 (the "2003 Plan" and "2013 Plan").

66.     Miguel De Grandy and Stephen M. Cody served as the city's redistricting consultants for the 2003 and 2013 processes.

## III. The 2021–22 Redistricting Process

67.     Following the 2020 Census, the Commission again embarked on redistricting.

68.     On February 25, 2021, the Commission again hired De Grandy and Cody to serve as the city's redistricting consultants.

69.     The process proceeded through six Commission meetings between November 18, 2021 and March 24, 2022.

70.     During these meetings, De Grandy—assisted by Cody—gave presentations on the law and brought **draft maps for commissioners to workshop and provide feedback.**

### A. The November 18, 2021 Meeting

71.     At the November 18 meeting, De Grandy presented an initial report on redistricting considerations and the 2020 Census demographics of the districts under the 2013 Plan.



*Fig. 1. Miami City Commission districts under the 2013 Plan.*

72.     The Census data revealed that Miami's population had grown by 42,752 residents over the decade, to 442,241. The ideal population of each Commission district was now 88,448.

10

73.     De Grandy shared that redistricting was needed to bring the districts within the constitutionally allowable population range, to have no greater than 10% difference between the smallest and largest district.

74.     Analyzing the 2013 Plan under the 2020 Census numbers, Districts 1, 3, 4, and 5 were each under the ideal population (by 6,999; 8,279; 7,847; and 5,707 people, respectively) and needed to gain population.

75.     District 2 was overpopulated by 28,833 residents and needed to shed population.

76.     Under the 2013 Plan, Districts 1, 3, and 4 were majority Hispanic, with Hispanic voting-age populations (HVAPs) of 91.0, 88.5, and 91.6%, respectively, and Hispanic citizen voting-age populations (HCVAPs) of 86.6, 86.8, and 90.1%, respectively.[1]

77.     Under the 2013 Plan, District 5 was majority Black, with a Black voting-age population (BVAP) of 52.9% and a Black citizen voting-age population (BCVAP) of 59.4%.

78.     District 2 under the 2013 Plan had the highest non-Hispanic white (hereinafter "white" or "Anglo") population of the five districts, at 34.5% white voting-age population (WVAP) and 38.1% white citizen voting-age population (WCVAP).

79.     De Grandy explained the applicability of the Voting Rights Act to Miami and that "we can consider race as one of several factors that we will be conscious of in crafting a plan."

80.     De Grandy warned, however, that under the U.S. Supreme Court's racial gerrymandering jurisprudence, race "cannot be the overriding factor."

81.     The Commission ignored De Grandy's warning as the process unfolded.

82.     The Commission gave De Grandy four ranked directives for map-drafting. The first,

---

[1]     Total population and voting-age population figures cited herein are from the 2020 Census. Citizen voting-age population figures are from the Census Bureau's 2019 5-year American Community Survey (ACS).

11

moved by King, was to achieve substantial equality of population between districts, rather than precise mathematical equality.

83.     The second-ranked criterion, moved by Díaz de la Portilla, was to "maintain the core constituencies of the districts."

84.     The third-ranked instruction, moved by Carollo, was that, separate from what the VRA required, "the minority voters must be politically cohesive." The phrase "political cohesion" was subsequently used throughout the process as a shorthand for keeping racially homogenous areas together.

85.     The fourth-ranked instruction was to avoid splitting traditional communities and neighborhoods when feasible.

86.     However, Díaz de la Portilla noted that some neighborhoods could be divided if they "will elect the same kind of representative," for example Flagami—which is overwhelmingly Hispanic—being split between Reyes and himself. But, he said, putting part of Overtown or Liberty City (both predominantly Black) in his district would not be acceptable.

87.     Also at that meeting, Carollo recounted why districts were instituted when he was Mayor: "The original idea" was "to keep an even population and that minority voters would be politically cohesive within these districts," so that "there would be an African American sitting in this Commission and there would be an Anglo," and "that there were three Hispanic districts." And he explained that during the 2022 redistricting, each district would have to change to carry forward that "original idea."

### B. The December 9, 2021 Meeting

88.     The Commission met again on December 9, with De Grandy recapping his instructions and commissioners discussing what areas might be moved between districts.

12

89.     Some of the key elements of the Enacted Plan's racial gerrymandering originated at this meeting.

90.     Díaz de la Portilla stated that underpopulated Districts 3 and 4 would have to gain from overpopulated District 2, and cautioned De Grandy to add to each only "peripherally, a little bit into District 2" so as not to disrupt "the ethnic integrity" of Districts 3 and 4.

91.     With that warning in mind, Díaz de la Portilla asked if there was a problem with splitting Coconut Grove—which was wholly in District 2 under the 2013 Plan—and adding parts to Districts 3 and 4, given "there's ethnic diversity in Coconut Grove." He clarified that his question was "based on where the Hispanic voters live," giving Bay Heights as an example.

92.     De Grandy responded that there was no legal impediment to breaking up any community of interest.

93.     De Grandy continued that he functionally had "a wall" between Districts 2 and 5 and could only "play around the edges there without diluting that minority community." So, District 2 would have to shed population from its southern end—bordering Districts 3 and 4.

94.     Díaz de la Portilla urged De Grandy to shift the 2/5 "wall" eastward as much as he could, "without impacting the minority district, District 5," and De Grandy confirmed he would do so, "without diluting," but that he couldn't move it much.

95.     Given that explanation, Díaz de la Portilla suggested giving Districts 3 and 4 a little bit of Coconut Grove "to make sure we don't jeopardize the ethnic integrity of our districts."

96.     Carollo echoed that suggestion, stating that parts of Coconut Grove would have to be moved out of District 2 but "the biggest danger lies . . . in changing one or two of the Hispanic seats," given Districts 1 and 3 "are not as pure in the percentage of Hispanics" as District 4.

97.     Finally, De Grandy clarified a few additional criteria at this meeting. He confirmed

13

the Commission wanted districts to be contiguous (i.e., not broken up into different pieces).

98.     De Grandy advised that drawing compact districts should not be a consideration. The Commission agreed.

99.     On that subject, Díaz de la Portilla noted that "if you want to have an African American district and you want to have an Anglo district, it's almost impossible to emphasize compactness," so it's "a foregone conclusion" that districts would not be compact. De Grandy concurred.

100.    Lastly, De Grandy asked if using man-made and natural boundaries should be a factor, but there was no consensus.

101.    De Grandy agreed to take the Commission's directives, meet with commissioners one-on-one, and develop a draft plan to be presented at the next meeting.

### C. *The February 7, 2022 Meeting*

102.    De Grandy presented a draft plan on February 7, 2022 (the "Feb. 7 Draft") (Fig. 2).

103.    De Grandy walked through the populations and racial demographics of each draft district, noting Districts 1, 3, and 4 had HVAPs of 88.7, 88.4, and 88.0%; District 2 "remains a swing district" at 37.2% white population (WPOP) and 48% Hispanic population (HPOP); and District 5 was 51.7% Black population (BPOP) and 49.8% BVAP.

104.    Explaining the draft, De Grandy noted many of the race-based decisions he made in developing it.

105.    The Feb. 7 Draft proposed moving part of the historically Black West Grove neighborhood from District 2 into District 4, extending the southern boundary of District 4 across US 1. This proposal prompted intense criticism from members of the public, who objected to the division of a cohesive neighborhood and its excision from District 2.



***Fig. 2.*** *The Feb. 7 Draft, showing the 2013 Plan overlaid with blue lines.*

106. Among the members of the public who spoke against the division of Coconut Grove were Plaintiff Cooper; GRACE Chair Rev. Nathaniel Robinson III; and West Grove native and GRACE Board of Directors member Reynold Martin, who spoke on behalf of the South Dade NAACP. As Mr. Martin said: "We oppose anything that removes the area of the Grove as a unit. We work together as a family and we'd like to stay that way."

107. Rev. Robinson explained how GRACE objected to the map's "sever[ing] the cultural, social and historical ties to Coconut Grove and District 2 governance" and "disparately impact[ing] the voting rights of Village West Black residents by diluting their political impact,"

15

adding, "although it might be small, we do have a political impact."

108.    Responding to the public comment, De Grandy "put into context what we're moving into a majority-Hispanic district," noting the West Grove portion moved had 2,460 Hispanic, 1,915 white, and 497 Black residents—i.e., it was nearly a majority-Hispanic area.

109.    And, De Grandy made clear that, because he "cannot take any more population out of D2 into D5" without reducing District 5's Black numbers, he had to remove population from District 2 either from the Downtown area or from Coconut Grove.

110.    Carollo, also responding to the public criticism, objected to claims that by moving a portion of "the Black part of Coconut Grove to a district that's Hispanic, this disenfranchises them"—but "leav[ing] it in an Anglo area" would be fine.

111.    Carollo pointed out that no African Americans had ever been elected to District 2, implying that, since District 2 was the "Anglo seat" and District 4 was a "Hispanic seat," Black residents of the West Grove had no grounds to complain about being moved from one to the other.

112.    Carollo's comments exemplify the Commission's approach to the redistricting process: the preeminent consideration is ethnic/racial solidarity, and their mapmaking must revolve around that.

113.    Speaking more generally about the map's history, Carollo recounted that districts were established "to assure . . . that there would always be an African American commissioner and an Anglo commissioner," and that the other three districts stayed majority Hispanic.

114.    To accomplish that, Carollo explained, neighborhoods across the city were split: Silver Bluff, Shenandoah, Little Havana, and Flagami. Díaz de la Portilla mentioned another: Allapattah.

115.    And now, to keep "that same balance and having a balance in the Hispanic

16

districts," Carollo went on, a portion of Coconut Grove would have to be split as well.

116. Following that discussion, the Commission voted 4-1 to direct De Grandy to consider going south of US 1 into District 2 to "obtain voter consistency" and balance population, as he had done in Feb. 7 Draft. Only Russell voted no.

117. The Enacted Plan would indeed have Districts 3 and 4 "go south" of US 1 into District 2, moving portions of Coconut Grove.

118. De Grandy received further feedback from commissioners and would return with a revised plan.

### D. The February 25, 2022 Meeting

119. On February 25, De Grandy presented a revised plan he had submitted three days prior (the "Feb. 22 Draft") (Fig. 3). Except for three unpopulated census blocks that were later moved from District 1 to 5, the Feb. 22 Draft became the Enacted Plan.

120. The Feb. 22 Draft incorporated certain feedback shared during earlier Commission meetings, and during private meetings De Grandy had with individual commissioners.

121. The Feb. 22 Draft differed from the Feb. 7 Draft in several respects. *First*, District 4 added only 1,597 residents from the West Grove, rather than 5,071 under the Feb. 7 Draft. The portion moved into District 4 now had a higher Hispanic population—59.2% HVAP compared to 49.1% in the Feb. 7 Draft.

122. *Second*, District 3 added from District 2 an area near Bay Heights, including Natoma Manors, between 22nd Avenue and Alatka Street, rather than adding the area from 17th Avenue to 15th Road.

123. *Third*, a 76.6%-HVAP area in Allapattah was moved into District 1 from 5, and a 66.7%-HVAP area was moved out of District 1 into 5.

124. **Fourth**, at King's request, District 5 gained a small, 40% BVAP area of Downtown around the Miami Riverside Center (MRC) from District 1. In exchange, District 1 gained a 71.1% HVAP area between NW 6th and 8th Streets and NW 7th Avenue and I-95. As part of this shift, District 2 regained some area from District 1 that the Feb. 7 Draft had removed.

125. **Fifth**, certain Downtown areas were swapped along the District 2/5 "wall:" Two census blocks with a BVAP of 13.0% were moved into District 2; and a 32.2% BVAP area was moved into District 5.

126. **Finally**, the boundaries between Districts 1, 3, and 4 shifted around Little Havana.



*Fig. 3. The Feb. 22 Draft/Base Plan, showing the Feb. 7 Draft overlaid with blue lines.*

127.    As he did with his first draft, De Grandy walked through the populations and racial demographics of each draft district, noting Districts 1, 3, and 4 had HVAPs of 89.5, 88.3, and 89.5%; District 2 "remains a swing district" at 37% WPOP and 48.7% HPOP; and District 5 was 52.2% BPOP and 50.3% BVAP.

128.    De Grandy had managed to increase the dominant-group VAP in Districts 1, 4, and 5 from the Feb. 7 Draft. Of the three majority-Hispanic districts, the HVAP of the least-Hispanic district increased. The average HVAP of those three districts also increased.

129.    In terms of citizen voting-age population, Districts 1, 3, and 4 were 84.8, 86.9, and 88.2% HCVAP. District 2 was 41.5% WCVAP and 45.6% HCVAP. District 5 was 59.0% BCVAP.

130.    Public comment at this meeting again centered on objections to splitting Coconut Grove, including the continued division of a portion of the West Grove.

131.    Among those who gave comments were South Dade NAACP Second Vice President Carole Jackson, who spoke on behalf of both NAACP Branches; GRACE Board Vice Chair, South Dade NAACP Housing Committee Chair, and West Grove native Carolyn Donaldson; Plaintiff Valdes, who represented Engage Miami; and Engage Miami member Jessica Saint-Fleur. Plaintiff Cooper and Mr. Martin both spoke again as well.

132.    Díaz de la Portilla, Carollo, and Reyes were satisfied with the Feb. 22 Draft, though Reyes was willing to make some changes, including to remove the part of Coconut Grove in District 4. Russell wanted to try to avoid splitting Coconut Grove. King wanted more time to consider the map and see if Russell's concerns could be accommodated.

133.    Russell sketched out his own suggestion for the border of District 2 at this meeting (the "Russell Sketch"), which showed how it might be possible for District 2 to keep all of Coconut Grove, rather than splitting the neighborhood across Districts 2, 3, and 4.

19



*Fig. 4. The Russell Sketch (dark blue line).*

134.    Referencing the overwhelming public comment, Russell discussed the many nuanced reasons for keeping Coconut Grove in District 2—not just to preserve an African American community together in the West Grove, but also because of the area's history, architecture, cultural diversity, natural aesthetic, walkable character, access to the water, common tree canopy issues, affordable housing concerns, and its placement in two of Miami's three Neighborhood Conservation Districts (NCD-2 and NCD-3).

135.    Compared to the Feb. 22 Draft, the Russell Sketch kept all of Coconut Grove in District 2, and removed from District 2 the strip west of South Miami Avenue from 32nd Road to the Miami River (including part of Brickell).

136.    The Russell Sketch did not alter the boundary between Districts 2 and 5 from the Feb. 22 Draft.

20

137.    The Russell Sketch better equalized District 2's population, with its deviation dropping to within 2% of the ideal, compared to being 5.49% overpopulated in the Feb. 22 Draft.

138.    De Grandy confirmed that Russell's proposal did not violate any of the mapmaking directions the Commission had given him, and that it complied with all legal standards.

139.    But the Commission would reject the proposal for racial reasons later in the process.

140.    The meeting concluded with the Commission voting 4-1 to take the Feb. 22 Draft as the "Base Plan" for future changes, to be debated at the next meeting. Only Russell voted no.

### E. The March 11, 2022 Meeting

141.    The Commission took up the Base Plan again on March 11.

142.    The meeting opened with Carollo discussing allegations that the map moved a portion of North Coconut Grove into District 3 because he owned a house there, on Morris Lane.

143.    Carollo clarified that he was not supporting the changed District 2/3 boundary because it included his house.

144.    Carollo said he wanted to make sure that the fact that his house was being moved into District 3 would not be raised as grounds for challenging the redistricting in court later. So, he decided to abstain from the discussions that day.

145.    De Grandy summed up where they were in the process: the Commission had advanced the Base Plan and two commissioners had suggested additional changes.

146.    He walked through those two changes. *First*, King wanted part of the riverfront area that the Base Plan moved from District 5 to District 1 restored to her district.

147.    De Grandy noted this request's racial impacts and said he needed more direction.

148.    *Second*, Russell had renewed his request to restore all of Coconut Grove to District 2, rather than moving portions into Districts 3 and 4.

21



*Fig. 5. Slide from De Grandy's March 11 presentation, showing areas the Initial Russell Plan moved from the Base Plan.*

149.  To equalize population, Russell proposed moving a strip west of South Miami Avenue from District 2 to 3, starting at the US 1/I-95 fork and going north to the Miami River ("Area 6" in Fig. 5).

150.  This proposal (the "Initial Russell Plan") was similar to what Russell sketched out on February 25. It did not alter Districts 1 or 5 in the Base Plan, or the District 3/4 border.

151.  De Grandy also addressed "allegations of racism" in the Base Plan. In so doing, he walked through the Black population of each district and of the West Grove area proposed to be moved into District 4 from District 2, as well as the number of Hispanic residents "represented by a Black commissioner in a Black-majority district" in District 5, and "represented by a non-Hispanic commissioner" in District 2.

152.  He went on: "the only allegation of racism results from the proposed movement of 114 Black residents who are currently represented by a commissioner who is not Black to a district

22

that is represented by a commissioner who is not Black."

153.    De Grandy concluded, "you do not have to be a redistricting expert to conclude that the allegation of this plan is somehow racist is simply false and inflammatory."

154.    Russell pushed back, explaining that Black West Grove residents weren't simply looking for a Black commissioner, but one who will be responsive to their neighborhood's needs and issues: "displacement, gentrification, social justice, affordable housing." Russell asked De Grandy if Black residents in the West Grove formed a cohesive voting bloc with the rest of Coconut Grove, and De Grandy acknowledged they did.

155.    Continuing to defend his map, De Grandy pointed out that more Black residents were moved out of District 2 in Golden Pines on the north side of US 1, than were moved out of District 2 in the West Grove.

156.    Russell responded by explaining that the dividing line should not be reduced to race: Black residents of Golden Pines have different interests and priorities than Black residents of the West Grove, whose shared interests with the rest of Coconut Grove were "not based on color."

157.    Russell's arguments failed to win in the end.

158.    Significant public comment again focused on residents objecting to the division of Coconut Grove, and in particular the West Grove. Among those who spoke was South Dade NAACP President Dwight Bullard, who described Coconut Grove as "a community of common interest irrespective of race, irrespective of ethnicity."

159.    Responding to the public comment and Russell's explanations, Reyes asked what would happen if just the West Grove triangle was returned to District 2. De Grandy explained he would need to take from elsewhere in District 2 to equalize population, pointing to two areas as options: between 22nd and 27th Avenues in North Coconut Grove, and the "Area 6" strip that

23

Russell had proposed moving.

160. Reyes then expressed that he would honor the community's desires and support keeping the West Grove intact in District 2 instead of including a slice of it in his district.

161. The Commission adjourned after directing De Grandy to meet with commissioners individually and bring back different options that accommodated each commissioner's wishes.

### F. The March 24, 2022 Meeting and Enacted Plan Adoption

162. The Commission reconvened on March 24 for its last redistricting meeting.

163. Carollo announced he would participate since he had no actual or apparent conflict of interest.

164. De Grandy then presented the options that each commissioner directed him to develop since March 11. There were proposals from King, Díaz de la Portilla, Russell, and Reyes.



*Fig. 6. Slide from De Grandy's March 24 presentation showing King's proposed change to the Base Plan.*

165.    King requested only one change to the Base Plan: moving the unpopulated Wharf development along the Miami River from District 1 into District 5.

166.    Díaz de la Portilla advised he supported the Base Plan, but had one change he would not object to: moving a single block just to the north of the Wharf, encompassing the Flagler on the River tower, from District 1 and back into District 5, where it was in the 2013 Plan.



***Fig. 7.** De Grandy's slide showing Díaz de la Portilla's suggested change to the Base Plan.*

167.    Russell had a revised proposal (the "Revised Russell Plan"). As with the Initial Russell Plan, this restored all of Coconut Grove to District 2. However, it shifted less population from District 2 into District 3, with the one-block-wide strip running along South Miami Avenue from the I-95/US 1 fork north to 10th Street, rather than all the way to the Miami River. De Grandy announced the racial demographics of this strip: 44.6% HVAP, 39% WVAP. Russell's new plan also included King's Wharf change.

25



*Fig. 8. De Grandy's slide showing the Revised Russell Plan's changes to the Base Plan.*



*Fig. 9. De Grandy's slide showing the Reyes Plan's changes to the Base Plan.*

168.    Reyes proposed a plan (the "Reyes Plan") that restored the West Grove triangle to District 2. In exchange, the proposal moved from District 2 to District 3 an area on the north/west side of South Miami Avenue between Alatka and 13th Streets. De Grandy reported that area's demographics: 51% HVAP, 39% WVAP. Reyes' plan also included King's Wharf change.

169.    Unlike the Revised Russell Plan, the Reyes Plan kept in District 3 the portion of North Coconut Grove that the Base Plan had moved into District 3.

170.    Carollo did not propose any amendment.

171.    De Grandy concluded by advising that each proposed amendment complied with the Constitution and the Voting Rights Act.

172.    Public comment, yet again, centered on keeping Coconut Grove whole. Among the speakers were South Dade NAACP Secretary Brad Brown and Miami-Dade NAACP President Daniella Pierre.

173.    Each commissioner then spoke in turn. Díaz de la Portilla and Carollo both stated they would support the Base Plan with King's Wharf amendment.

174.    Revisiting the subject of his Morris Lane house moving into District 3, Carollo stated he had "no problem, none whatsoever" with it being moved into District 4 instead.

175.    He did, however, object to the Reyes and Russell proposals to move more territory from District 2 into District 3.

176.    Russell advocated for his plan and keeping Coconut Grove whole in District 2, listing how his plan met all the criteria the Commission had adopted at the beginning of the process.

177.    Reyes stood by his earlier support for removing the West Grove triangle from District 4.

178.    Russell proposed adopting his Revised Russell Plan, but that failed 4-1.

179.    Díaz de la Portilla then made a motion to adopt the Base Plan with King's Wharf amendment, *and* with removing the West Grove triangle from District 4.

180.    But De Grandy and Carollo explained that moving the West Grove triangle would necessitate shifting District 3 further into Brickell to bring the plan's overall population deviation range under 10%.

181.    So, Díaz de la Portilla withdrew that motion and moved to adopt the Base Plan with King's Wharf amendment.

182.    That motion carried 3-2, and the Base Plan with the Wharf change passed as the Enacted Plan.

183.    Reyes explained he was opposed because District 4 still included a portion of the West Grove.

184.    Similarly, Russell voted no because the plan divided Coconut Grove.

185.    Díaz de la Portilla, Carollo, and King voted yes.

186.    Community members and advocacy organizations urged Mayor Suarez to veto the map. For example, the NAACP Branches wrote a letter to Suarez, requesting he reject the plan as an unfair redistricting plan that goes against traditional redistricting principles and threatens equal representation under the law.

187.    Nevertheless, Suarez let the plan become law without his signature.

### IV. Racial Considerations Predominated in the Line-Drawing Process

188.    The Commission's overriding goal in crafting the Enacted Plan was to separate Hispanic, Black, and Anglo voters as much as possible into "their" respective districts.

189.    Improper racial considerations predominated throughout the Commission's line-drawing process. Race featured centrally at every redistricting meeting, with race placed above

28

race-neutral, traditional redistricting criteria.

190.    These race-based decisions resulted in a map that splits neighborhoods, ignores traditional redistricting criteria, and eschews fair, public-minded representation.

191.    Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are ignored, race predominates. Unless the use of race is necessary to ensure fair and equal opportunity for voters of color to participate in the electoral process, its use is constitutionally suspect.

192.    But rather than advancing representation, the Commission delivered separation.

193.    At the very first redistricting meeting, Reyes and Carollo discussed how the existing map "was drawn in a way that every single ethnic group would be represented," and that explained "the odd shape that we have now" and why certain neighborhoods were split.

194.    Indeed, Carollo explained on February 25, to accommodate maximal racial separation, the Commission "broke up numerous neighborhoods."

195.    Reyes agreed: "just ask all the communities who are divided, because we have to preserve a seat that will represent every single community of the City of Miami."

196.    Racially heterogeneous districts were out of the question. After discussing the racial dynamics and demographics of the districts on November 18, Commissioner Carollo stressed how they needed to ensure "that the balance is not really shifted."

197.    Again on February 7, Carollo explained his "goals from day one:" "to have guaranteed Anglo representation, and to have three districts that were Hispanics," concluding "these are my intentions here today."

198.    This attitude which elevated racial considerations above all other redistricting decisions was shared by other commissioners.

199. Díaz de la Portilla, for example, explained on March 11, "our goal here is to have an African American district, for lack of a better term, a white district, . . . and three Hispanic districts."

200. In response to public criticism of gerrymandering, Reyes was blunt: "Yes, we are gerrymandering to preserve those seats"—to preserve and enhance the maximal division of races into separate districts as much as possible.

201. Shortly before the final vote, Carollo summarized his goals in locking in a particular and precise racial division in the map:

> I do not want to change the District 3 voting patterns, the types of people that are there with different people. I don't want to do that to District 4, nor to District 1. Just like I want to be able to leave District 2 where it could still elect a guy like you [referring to Russell], if they want to. In District 5, that will be a majority-African American district.

202. The Commission's policy of maximal racial separation manifested in three specific ways: (1) creating an "Anglo access district" in District 2, (2) maintaining an arbitrary BVAP quota for District 5, and (3) packing Hispanic residents into Districts 1, 3, and 4 as much as possible.

### A. Creating an "Anglo Access District" in District 2

203. Race predominated in the design of District 2.

204. At its first redistricting meeting on November 18, Díaz de la Portilla asked De Grandy whether the VRA required the Commission to maintain "what we call here in Miami, in practical terms, an Anglo . . . seat."

205. De Grandy explained that "white, non-Hispanic, is not a protected class under the Voting Rights Act."

206. The Commission would ignore this legal advice, instead increasing the Anglo

population of District 2 as much as possible, stripping Black and Hispanic residents from it with the explicit goal that it would elect an Anglo commissioner.

207.    At the February 7 meeting, Carollo shared that originally, District 2 "was gerrymandered—but it was a legal gerrymander so that you would have an Anglo elected commissioner."

208.    As the Commission drew new lines, it sought to maintain and enhance this. On February 7, for example, Reyes expressed that they had to make changes to protect "the Anglo seat" and asked De Grandy if his Feb. 7 Draft was the best he could do to protect it. The same meeting, Carollo stated his "intention here today" to "have guaranteed Anglo representation." On February 25, Reyes too stated his "commitment" that "the so-called Anglo-district will . . . stand the test of time." At the final meeting, Carollo reiterated "we're going to have to keep one district that you could get an Anglo."

209.    To achieve this goal, the Commission "purposely divided neighborhoods in other districts to try to keep District 2 into a district that a non-Hispanic would be elected," as Carollo explained on February 25. For example, he continued, "Silver Bluff is one of those communities that was split in half to be able to create a District 2 that would elect someone like Mr. Russell"—someone "of an Anglo background, not Hispanic."[2]

210.    Carollo listed others divided to achieve that goal: Shenandoah, Little Havana, Flagami—split "down the middle"—and more.

211.    Díaz de la Portilla recounted how, as Mayor, Carollo "broke up Hispanic

---

[2]    When Russell interrupted to point out he was Japanese American, Carollo dismissed him, saying "you didn't quite mention the Oriental part when you were running." Carollo's comment exemplifies the Commission's essentialist and reductive attitude toward race and representation: there are Hispanic residents, there are Black residents, and there are Anglo residents. To the Commission, "representation" means having a co-ethnic commissioner.

neighborhood after Hispanic neighborhood because he had to for the greater good"—to "have *a white* on our City Commission."

212. Reyes and Carollo reprised this theme at the final meeting. If Shenandoah, Silver Bluff, Flagami, and Little Havana had not been divided, Reyes said, "probably we would not have Mr. Russell sitting there."

213. Reyes continued that "it was fine to divide" these neighborhoods, "because we wanted to achieve what we want to achieve now:" "great" "probabilities of electing an Anglo."

214. Finally, in his last speech before passing the Enacted Plan, Carollo summed it up again: "We're gonna have to keep one district that you can get an Anglo, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can get elected."

215. The Commission sacrificed other traditional redistricting criteria to draw an explicitly Anglo district, including compactness. As Díaz de la Portilla explained, "if . . . you want to have an Anglo district, it's almost impossible to emphasize compactness."

216. On February 25, to assuage his "main concern," Reyes sought to confirm with De Grandy that District 2 would still have a high probability of electing an Anglo. De Grandy replied simply: "Yes."

### B. Maintaining an Arbitrary BVAP Quota for District 5

217. Race predominated in the design of District 5.

218. Coming into the process, District 5 under the 2013 Plan was 54.4% BPOP, 52.9% BVAP, and 59.4% BCVAP, but was underpopulated and needed to add population.

219. The Commission's overriding goal for District 5 was to keep those numbers as high as possible while equalizing population, and particularly to attain a BVAP above 50%.

220. This arbitrary threshold was not based on any functional analysis of what was necessary to afford Black voters the ability to elected preferred candidates, or justified by any compelling interest, including compliance with the VRA.

221. Moreover, the Commission ignored key markers of District 5's functional performance, like CVAP, voter registration, and turnout in recent elections.

222. At the first redistricting meeting on November 18, De Grandy commented how during the 2013 cycle, he moved the northern end of District 2 into District 5, but "that did dilute the Black voting percentage."

223. Moving much more in this area, though, concerned him. He warned against doing so, because "District 5 may not be a performing district anymore for the minority community." "I have a wall that separates D2 and D5," De Grandy said.

224. De Grandy did not explain what analysis he did to conclude District 5 would be at risk of vote dilution in violation of the VRA.

225. De Grandy's analysis—focused on making District 5's Black population as high as possible—was nothing more than an arbitrary numerical target based on uninformed guesswork.

226. In De Grandy's initial, Feb. 7 Draft, District 5 was 51.7% BPOP, 49.8% BVAP, and 58.7% BCVAP.

227. De Grandy explained he deliberately underpopulated District 5, "because bringing in additional population from most any side of the district might reduce the African American population percentage."

228. In particular, De Grandy explained that around the District 2/5 border, "we could not move further east without affecting the African American population's ability to elect a candidate of its choice in D5."



**Fig. 10.** *Areas moved into and out of District 5 in the Feb. 7 Draft.*

229.    "There were only roughly 1,000 African Americans" in that area added from District 2, so, "the only reason we were able to rebalance the ethnic and racial population" was to remove the riverside areas from District 5 and move them into District 1, he continued.

230.    He went on: "That was essential because as you moved east . . . , there was less and less African American population."

231.    Notwithstanding the fact that the Feb. 7 Draft featured a District 5 with a BVAP under 50% and a BPOP under 52%, De Grandy said his analysis of voting patterns confirmed Black voters had an equal opportunity to elect the candidate of their choice.

232.    But this did not satisfy the Commission.

233.    First, Reyes pressed De Grandy if "this is the best you can do to protect the African American seat," calling it his "main concern."

234.    King also stated she was "concerned . . . that District 5 is 51% African American."

235.    De Grandy responded to their concerns in his Feb. 22 Draft, the Base Plan.

34

236. He explained that "by reconfiguring areas around the boundaries of D5, we were also able to slightly increase the total Black population, as well as the voting-age population, above 50%."

237. De Grandy explained that underpopulating District 5 also allowed for an increase in its Black population.

238. He was firm that District 5 could not move further east into District 2 without "diminishing the African American community's opportunity to elect a candidate of choice."

239. He concluded his presentation of the Base Plan by recapping "the directives you gave." Third on the list: "We increased D5's Black voting-age population above 50%."



**Fig. 11.** *Downtown changes to District 5 in the Base Plan, compared to the Feb. 7 Draft.*

240. The Base Plan's reconfigurations included swapping areas between Districts 2 and 5 in Downtown. 1,638 people in two city blocks bounded by NW 8th and 10th Streets, Miami Avenue, and the railroad tracks were moved back into District 2, where they had been in the 2013 Plan. These two blocks are 13.0% BVAP.

241.    In exchange, 2,521 people in a two-block wide strip between Miami and NE/SE 2nd Avenues were moved into District 5. This strip is 32.1% BVAP.

242.    However, 1,407 people in this strip—more than half—are incarcerated at the Federal Detention Center (FDC). A plurality of the FDC population is Black.

243.    Not including the incarcerated population, the strip De Grandy moved into District 5 to satisfy the Commission's 50% quota is 16.4% BVAP.

244.    When members of the public raised concerns about the Commission's arbitrary BVAP quota, they were dismissed out of hand.

245.    On February 25, a representative of the ACLU of Florida raised these concerns, noting that setting an arbitrary 50% target, divorced from any actual analysis of what is necessary to afford Black voters an opportunity to elect preferred candidates, raised equal protection concerns and may constitute unlawful packing.

246.    The representative reminded the Commission that it was required to take the full breadth of available data into account, rather than looking merely at surface-level Census population totals. The ACLU of Florida pointed out that voter registration and actual turnout data showed that Black voters make up a substantially higher share of registered voters and actual voters than Census VAP figures indicated for the proposed District 5: 55.5% of registered voters, 53.2% of voters at the last state general election, and 61.3% of voters at the last state primary election.

247.    Moreover, the district was nearly 60% Black "as refined by citizenship." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997).

248.    In response to the ACLU representative's statement, De Grandy said "it was hard for me to understand that."

249.    Further, De Grandy claimed that "packing doesn't apply."

250. The Commission's consideration—and rejection—of alternatives to the Base Plan also illustrates its fixation on the racial targets.

251. For example, after Russell presented his sketch for District 2 on February 25, King was interested in considering it—but only if it wouldn't reduce District 5's Black share: "Would that upset the balance in my district? Would it take me from 52 to less or more?"

252. De Grandy assured her it wouldn't impact District 5, and King was willing to consider it at the next meeting.

253. At that next meeting on March 11, De Grandy noted how King had requested moving riverside areas back into District 5 from District 1. King's request had a problem: it would "lower the Black VAP to 49%," as De Grandy explained.

254. Díaz de la Portilla crystalized the Commission's reaction to the slight BVAP decline in a single word: "Worse."

255. De Grandy expressed confidence this problem "could be remedied" to "increase D5's Black voting-age population."

256. Indeed, De Grandy took a recess to "work on that better and maybe that would solve the problem."

257. He came back from recess with a new amendment to the Base Plan that moved several unpopulated riverfront blocks (the Wharf development) from District 1 into District 5—ensuring District 5 stayed above the 50% BVAP threshold.

258. Even so, Díaz de la Portilla shared his worry with King that "the growth that's going to occur over the next ten years" would "make your district minority African American." Since the area proposed to be moved back into District 5 from District 1 was "an area that's predominantly Hispanic."

259. Eventually, Díaz de la Portilla was satisfied with District 5's demographics, once he understood that it was still majority-BVAP, at 50.3%.

260. The Commission eventually adopted King's change, going back to the Base Plan with the minor Wharf alteration, rather than the draft proposal with a 49% BVAP District 5.

261. The Commission's adherence to the 50% BVAP quota was underscored by another proposed riverfront change. On March 24, De Grandy discussed moving the Flagler on the River development into District 5 from District 1, a suggestion of Díaz de la Portilla's.

262. De Grandy reported the single block in question had 510 residents and was roughly 73% HVAP. He said moving it into District 5 would drop District 5's BVAP to 49.97%.

263. De Grandy advised the proposal was VRA-compliant, but nevertheless counseled "additional tweaks to the plan to bring the Black voting-age population back above 50%."

264. The Commission did not end up accepting the Flagler on the River suggestion.

265. As the Commission neared a final vote on March 24, the 50% BVAP quota and its impact on the map continued to be a point of discussion. Carollo stressed "we have to keep one district that is going to have a majority of African Americans," explaining that hitting that target was "the reason we're having to do this"—referring to dividing Coconut Grove.

266. Indeed, the "wall" between Districts 2 and 5 was a large reason why part of Coconut Grove ended up removed from District 2. Since removing more of District 2 from its northern end would further reduce District 5's Black proportion, the Commission instead removed areas from District 2 at its southern end, in Coconut Grove, to equalize District 2's population.

267. As Reyes, Russell, and King tried unsuccessfully to reach agreement on Coconut Grove, De Grandy stressed he "cannot put one more resident into Commissioner King's district" because it "would dilute the Black majority."

38

268.    Díaz de la Portilla discussed how striving for the quota also impacted another area of the map, his own District 1 in Allapattah: "I can't go north, because if I go north I jeopardize the African American seat" by taking Black voters from District 5.

269.    The Commission successfully hit its target: the BVAP of District 5 is 50.3%.

### C. Packing Hispanic Residents into Districts 1, 3, and 4

270.    Race predominated in the design of Districts 1, 3, and 4 as well.

271.    The Commission's goal was to make the Hispanic populations of Districts 1, 3, and 4 as high as possible, thereby stripping Hispanic residents from Districts 2 and 5 and diminishing their influence in those two districts.

272.    Carollo set the tone at the second redistricting meeting, before any maps were drafted: "My main interest in my district and your district, Díaz de la Portilla, and Mr. Reyes' district, is that I'm sure that we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there."

273.    Carollo reiterated on February 7 that Districts 1 and 3 need to "keep the same type of last name and faces."

274.    Shortly before the Enacted Plan passed, Carollo again stated, "We have to keep three districts that are going to be majority-Hispanic."

275.    Commissioners were concerned by the relative Hispanic populations of these three districts and obsessed over small changes in Hispanic population. For example, Carollo discussed the relative "purity" of the three districts on December 9, noting the Commission had to keep in mind that Districts 1 and 3 "are not as pure in the percentage of the Hispanics that vote" compared with District 4.

276.    But at no point did the Commission undertake an actual analysis of voting patterns

to determine what Hispanic population a district needs to have to comply with the VRA, instead shooting for as high a population as possible.

*1. District 1/5 Border*

277. The border between Districts 1 and 5 was drawn along racial lines, to put Hispanic residents into District 1 and strip them from District 5. At the same time, the border packed Black residents into District 5 and stripped them from District 1.

278. District 1, which under the 2013 Plan was underpopulated by 6,999 residents and needed to grow, ended up gaining all its new population from District 5.

279. The Commission first discussed specific areas to add into District 1 on December 9. Carollo highlighted two "logical" and "attractive" areas: Wynwood—noting "that's mainly a Hispanic area"—and along the north side of Miami River—"non-African American areas, mainly Hispanic or Anglo basically."

280. At the same meeting, Díaz de la Portilla reflected on how he "really can't go north" to gain population in Allapattah, because "it's an African American area."

281. Carollo interjected, noting there might be an area by 36th Street (which served as District 1's northern border under the 2013 Plan) that could be added to District 1, but he wasn't sure "if it's mainly Hispanic or if it's more African American." Díaz de la Portilla agreed he might be able to extend north to 40th Street, but not past State Road 112, because "north of 112 we are entering into African American neighborhoods—and we can't touch that area."

282. De Grandy's Feb. 7 Draft moved the riverside area Carollo had suggested. De Grandy explained: "We felt this movement was needed because this area has a high percentage of Hispanics and a greater voter cohesion with D1 residents."



*Fig. 12. Riverside area moved into District 1 from District 5 in the Feb. 7 Draft. The 2013 Plan is overlaid in blue.*

283.   The Base Plan moved a small portion of that riverside area around the MRC back into District 5. In exchange, the draft moved another part of Downtown—eight city blocks bounded by NW 7th Avenue, I-95, and NW 6th and 8th Streets—into District 1.



***Fig. 13. Riverside areas moved between Districts 1 and 5 in the Base Plan. The Feb. 7 Draft is overlaid in blue.***

284.    De Grandy explained that "again, we felt this movement was needed because Hispanics in the area constitute roughly 70% of the population. Thus, they have greater voter cohesion" with the rest of District 1.

285.    The Enacted Plan ended up moving a supermajority-Hispanic area of Downtown from District 5 into District 1, giving District 1 an irregular appendage that splits neighborhoods along racial lines, including historic Overtown. The entire area moved is 70.7% HVAP.

286.    The Enacted Plan ended up extending District 1 north to 40th Street/SR 112 but no further, moving a supermajority-Hispanic chunk from District 5 between NW 12th and 19th Avenues that is 76.6% HVAP and 33.0% BVAP.

42



*Fig. 14. Allapattah areas moved between Districts 1 and 5 in the Base Plan.*

287. Even though District 1 needed to gain population, the Enacted Plan also ended up moving a less-Hispanic area of Allapattah *out* of District 1 and into District 5, creating a jagged stair-step border that chopped up the neighborhood along racial lines.

288. This area, bounded by NW 32nd and 36th Streets, NW 8th Avenue, and I-95, is 66.7% HVAP and 37.1% BVAP.

289. District 1 in the Enacted Plan is 89.5% HVAP and 84.8% HCVAP.

### 2. District 2/3 Border

290. The boundary between Districts 2 and 3 was also drawn along racial lines, to pack Hispanic residents into District 3 and strip them from District 2.

291. Díaz de la Portilla first suggested moving areas "where Hispanic voters live" from District 2 and into Districts 3 and 4 at the second redistricting meeting, mentioning Coconut Grove and Bay Heights specifically.

292. De Grandy incorporated this suggestion into his Feb. 7 Draft. That map moved portions of District 2 into District 3, stretching from SW 15th Road in the north to SW 17th Avenue in the south, over to South Miami Avenue. This area included Bay Heights.

43



***Fig. 15.*** *Areas moved out of District 2 and into 3/4 in the Feb. 7 Draft (compared to 2013 Plan).*

293.    Discussion of Feb. 7 Draft's 2/3 border focused on whether part of Downtown/Brickell should be moved into District 3 instead. Russell suggested doing that so District 2 could keep all of Coconut Grove and avoid splitting the West Grove.

294.    De Grandy explained he didn't move District 3 into Downtown "because the demographics were dissimilar," but acknowledged that was a choice the Commission could make. He clarified that he could equalize the district populations and keep Coconut Grove whole within District 2 by adding part of Downtown to District 3.

295.    The Commission considered that option at the next meeting, rejecting it for racial reasons.

296.    Walking through the Base Plan on February 22, De Grandy again explained that he "did not feel it was appropriate to move east" and grow District 3 into Downtown "because of

44

dissimilar demographics." At a later meeting, De Grandy was more explicit: "the Hispanic population in that area was in the 40's," "whereas District 3 is in the 80's."



**Fig. 16.** *Areas moved out of District 2 and into 3/4 in the Base Plan (compared to 2013 Plan).*

297.    Carollo supported this approach, explaining Brickell was "totally different in your demographics" from District 3, so they had no choice but to move people from the Grove into Districts 3 and 4 instead: "we can't go anywhere else."

298.    To Carollo, "throwing" Brickell into District 3 would unacceptably "change the whole component of one district" with "a domino effect" to "change the composition of the other districts."

299.    Díaz de la Portilla agreed, saying the Grove was "the only place to go."

300.    This subject came up again when the Commission considered the Initial Russell Plan. That proposed extending District 3's eastern boundary one block east to South Miami

45

Avenue, from where US 1 and I-95 fork on the south end, northward to the Miami River.



*Fig. 17. Areas moved out of District 2 into 3/4 in the Initial Russell Plan (compared to 2013 Plan).*

301. Even De Grandy advised that the Initial Russell Plan's District 3 was still a "Hispanic district" and complied with the VRA.

302. But that assurance was not enough for the Commission. Reyes first flagged the issue: "I don't agree with it because [] there is a lot of Anglos in that area and it's going to affect them. The district as such, is going to be affected."

303. This prompted Russell to ask De Grandy about the relative Hispanic population of the strip he proposed moving into District 3, versus the area around Natoma Manors moved in the Base Plan.

304. De Grandy explained Russell's strip had a Hispanic population "in the 40's," dissimilar from the rest of District 3.

305. Meanwhile, the Natoma area De Grandy had proposed moving into District 3 was

46

"in the 50 range," so he felt it more appropriate to move.

306. Furthermore, the Natoma area was smaller in population, so De Grandy wasn't concerned about that reducing District 3's Hispanic population.

307. Russell concluded the areas were close enough in their impact on District 3's Hispanic population "to where we're splitting hairs."

308. But the majority of the Commission wanted to split those hairs to achieve its overall goal: packing as many Hispanic residents as possible into District 3.

309. The Commission revisited this theme at its final meeting, as it debated the Revised Russell Plan.



**Fig. 18.** *Areas moved out of District 2 into 3/4 in Revised Russell Plan (compared to 2013 Plan).*

310. De Grandy again explained he "did not go east" into Brickell "when I was doing District 3 [] because I found the population to be dissimilar. It was approximately 40-some percent Hispanic, going into a district that's approximately 88% Hispanic."

311.    Zooming in on particular city blocks, Díaz de la Portilla pressed De Grandy on the demographics of the "buildings in the West Brickell area" the Revised Russell Plan moved: "those buildings that are now inhabited are predominately Anglo."

312.    De Grandy confirmed those buildings were "markedly different than the population in District 3."

313.    So instead of shifting District 3 eastward into Brickell, De Grandy "decided that the best move will be to go south and not go east" into Brickell, because the people to the south "are more similar" to the rest of District 3, he again explained.

314.    He advised that "in any of the plans," "District 3 is still a majority-Hispanic district," but was a "stronger Hispanic district under the base plan, absolutely."

315.    Discussing the Reyes Plan and Revised Russell Plan's removing the West Grove triangle from District 4, Carollo stressed that District "is still the most Hispanic district out of the three Hispanic districts in the city" "even with the [West Grove] sliver of 1,600 additional people."

316.    District 3, on the other hand, would be forced to gain more than 1,600 people from District 2 to balance the population deviations, as Carollo explained it.

317.    That population would come from Brickell, where "it's not cohesive anymore" and where "the numbers also change" compared to the rest of District 3.

318.    And, he continued, that "would put District 3 into the future in possible jeopardy."

319.    Carollo spelled out the problem in blunt terms: "bringing in a transplant from another part of the country, and because they speak a little Spanish and they smile all the time, they feel they can sneak in. . . . And this district now is gonna be skewed where it's not gonna be clear on the kind of person that could get elected from it."

320.    That is why, he concluded, he would "strongly object to West Brickell going into

48

District 3."

321.   Reyes agreed, saying he "totally, totally oppose[d] that," and explaining that he originally agreed with De Grandy's first suggestion to shift District 3 into Bay Heights rather than Brickell, since Bay Heights was "close to 52% Hispanic." But he opposed moving District 3 eastward into Brickell.

322.   Díaz de la Portilla agreed too, saying "Carollo hit the nail on the head."

323.   He explained why the Revised Russell Plan did not adequately pack Hispanic voters: "What Mr. Russell's plan does, down the line, . . . is disintegrate that Hispanic district, District 3."

324.   "And then we'll have a minority-Hispanic Commission in a majority-Hispanic city. How's that democracy?" Díaz de la Portilla concluded, "You're shifting the balance of power in a Hispanic district."

325.   Under the Revised Russell Plan, District 3 was 86.6% HVAP and 84.8% HCVAP.

326.   In the Base Plan and Enacted Plan, it is 88.3% HVAP and 86.9% HCVAP.

### 3. District 2/4 Border

327.   The boundary between Districts 2 and 4 was also drawn to pack Hispanic residents into District 4 and strip them from District 2.

328.   At the first redistricting meeting, Díaz de la Portilla highlighted the Douglas Park area, which was in District 2 under the 2013 Plan, that "probably doesn't belong there." Using the phrase "political cohesion" to euphemistically refer to racial groups, Díaz de la Portilla opined, "if you look at political cohesion, it probably belongs in Commissioner Reyes' district," because it has "more commonalities" with the rest of District 4 "than with Coconut Grove or Edgewater."

329.   Carollo agreed, stating at the following meeting that this "very Hispanic area"

"should have always been part of District 4."

330. The area referred to, bounded by SW 25th Street, SW 27th Avenue, and US 1, is 81.8% HVAP and 13.6% WVAP.

331. That overwhelmingly Hispanic area was moved into District 4 in the Enacted Plan, thereby packing Hispanic residents into District 4 and stripping them from District 2 (*see* Fig. 16).

332. As with other areas of the map, the rejected proposals for District 4 clarify the Commission's racial intent.

333. On February 7, Carollo proposed moving a chunk of North Coconut Grove between 22nd and 27th Avenues and South Bayshore Drive into District 4 from District 2.

334. Reyes objected strongly to this area—which is 54.4% WVAP—being added to his district. Carollo tried to reassure Reyes by reminding him that he has "the most Hispanic" and "the most Cuban district" in the city, and that the Feb. 7 Draft already gave him "a huge Hispanic area on the other side of US 1," referring to the Douglas Park area.

335. Comparing that 82% HVAP Douglas Park addition to his 54% WVAP North Grove proposal, Carollo explained Reyes can't be "getting all the sirloin but none of the bone."

336. In the end, the Hispanic-rich "sirloin" was moved into District 4, while most of the majority-white "bone" remained in District 2.

337. District 4 does, however, add a portion of Coconut Grove from District 2. Following Díaz de la Portilla's early suggestion to move areas "where Hispanic voters live" given the "ethnic diversity in Coconut Grove," District 4 adds a 59.2% HVAP triangle from the West Grove, bounded by US 1, Day Avenue, and SW 27th Avenue (*see* Fig. 16).

338. That triangle was not as Hispanic as the rest of District 4, but given the Commission considered District 4 to be the "purest" Hispanic district already, it was acceptable for it to add

just "a slice, sliver" of less-Hispanic "bone."

339.    In later meetings, Reyes begrudgingly accepted adding part of Coconut Grove because he thought it necessary to maintain the racial balance of District 5: "The only reason that I will accept that is to save that seat that is there," he said on March 11, pointing to King.

340.    District 4 in the Enacted Plan is 89.5% HVAP and 88.2% HCVAP.

### 4. *Internal Borders of Districts 1, 3, and 4*

341.    The borders that Districts 1, 3 and 4 share were also drawn to facilitate the Enacted Plan's packing of Hispanic voters into these districts and more generally, to accomplish the tripartite racial separation throughout the map.



**Fig. 19.** *Enacted Plan borders between Districts 1, 3, and 4, showing neighborhoods split and areas moved (compared to 2013 Plan).*

342.    Hispanic voters on the borders of these districts were largely treated as fungible because these areas are all predominately Hispanic.

343.    As Carollo, Reyes, and Díaz de la Portilla recounted multiple times, Flagami, Little Havana, Shenandoah, and Silver Bluff were all split between these three districts to effectuate the

Commission's policy of maximum racial separation.

344. When he presented his Feb. 7 Draft, De Grandy acknowledged shifting areas between Districts 3 and 4 because he "tried to find adjacent areas with similar demographics in order to maintain voter cohesion."

345. Following Carollo's discussion of District 4 not keeping all the "sirloin," Carollo suggested moving into District 3 a heavily Hispanic portion of District 4 between SW 27th and 32nd Avenues, in Little Havana.

346. When Reyes objected, Carollo explained to him why it was necessary to add that territory to District 3: "you're getting more than two squares here," referring to the Douglas Park area, "in prime Hispanic area, and you're diluting the Hispanic vote."

347. "There has to be a balance," Carollo continued, and in exchange for getting "a huge chunk of rich Hispanic voters" around Douglas Park, District 4 needed to balance its Hispanic population out with District 3.

348. Reyes eventually agreed to "work[] out in a way that we can make it as Hispanic as you can."

349. The area Carollo wanted to add to District 3—bounded by SW 27th and 33nd Avenues, NW 7th Street, and SW 8th Street—was indeed moved into District 3 in the Enacted Plan. It is 89.5% HVAP.

350. Explaining the shift on February 25, De Grandy explained, "we tried to find adjacent areas with similar demographics in order to maintain voter cohesion."

### V. Lack of Narrow Tailoring to Achieve a Compelling Interest in Racial Predominance

351. Where, as here, race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden . . . shifts to the [government] to prove that

52

its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (internal quotations omitted). Traditionally, compliance with the Voting Rights Act, namely Section 2, has served as the primary justification for predominant considerations of race. The Commission's use of race, however, was not narrowly tailored to any compelling government interest, including compliance with the VRA.

352.    To ensure its use of race was narrowly tailored to compliance with the VRA, the Commission was obligated to assess the level of minority citizen voting-age population or registered voters necessary for those voters to have the opportunity to usually elect their candidates of choice.

353.    The Commission centered its "analysis" on total population and voting-age population figures instead of reviewing "voting-age population *as refined by citizenship*." *Negron*, 113 F.3d at 1569 (emphasis added).

354.    Despite their facial concern for protecting diverse representation, neither the Commission nor its consultants took steps to meaningfully assess VRA compliance. There is no indication the Commission conducted an analysis of racially polarized voting (RPV) or any other analysis key to assessing compliance with the VRA.

355.    Instead, the Commission relied on blanket racial targets and sought to increase the Black, Anglo, and Hispanic populations of the respective districts as much as possible.

356.    Without conducting a functional analysis of RPV, the Commission's race-based mapdrawing was not narrowly tailored to achieve VRA compliance.

357.    The Commission identified no other compelling interest to justify its use of race when it drew the Enacted Plan.

## CLAIM FOR RELIEF

**Racial Gerrymandering
in Violation of the Fourteenth Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

358.  Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

359.  The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

360.  Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

361.  As alleged in detail above, race was the predominant factor in the design of all five Miami City Commission districts. Race predominated over all other redistricting criteria when each of these districts was drawn.

362.  The use of race as the predominant factor in creating the districts was not narrowly tailored to advance any compelling state interests, including compliance with the VRA.

363.  Consequently, the districts do not survive strict scrutiny.

364.  Therefore, the districts violate Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the Court enter judgment in their favor and:

A.  Declare the five Miami City Commission districts adopted in Resolution 22-131 to be unconstitutional in violation of the Fourteenth Amendment as racially gerrymandered;

B.  Preliminarily and permanently enjoin the City and its officers and agents from calling, conducting, supervising, or certifying any elections under the Enacted Plan;

C.     Order the City to hold special elections to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regularly scheduled elections;

D.     Award each Plaintiff nominal damages of $100;

E.     Award Plaintiffs their attorneys' fees in this action;

F.     Award Plaintiffs their costs of suit;

G.     Retain jurisdiction to render any further orders this Court may deem necessary; and

H.     Grant any other relief this Court deems just and proper.


Respectfully submitted this 15th day of December, 2022,


_/s/ Nicholas Warren_

Nicholas Warren (FBN 1019018)
**ACLU Foundation of Florida, Inc.**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

*\* Pro hac vice motion forthcoming*

*Counsel for Plaintiffs*

JS 44 (Rev. 04/21) FLSD Revised 12/02/2022

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

### I. (a) PLAINTIFFS
GRACE, Inc.; (see attachment)

### DEFENDANTS
City of Miami

**(b)** County of Residence of First Listed Plaintiff Miami-Dade
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Miami-Dade
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Nicholas Warren, ACLU Foundation of Florida, Inc. (see attachment)

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

*PERSONAL INJURY*
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☒ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**

*Habeas Corpus:*
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty

*Other:*
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee – Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

### V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed *(See VI below)*
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

### VI. RELATED/ RE-FILED CASE(S)
*(See instructions):* a) Re-filed Case ☐YES ☒ NO    b) Related Cases ☐YES ☒ NO
JUDGE: ___    DOCKET NUMBER: ___

### VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983, 1988; challenging Miami City Commission districts as unconstitutional racial gerrymanders
LENGTH OF TRIAL via 7 days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $800
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

DATE 12/15/2022

SIGNATURE OF ATTORNEY OF RECORD /s/ Nicholas Warren

FOR OFFICE USE ONLY : RECEIPT # ___ AMOUNT ___ IFP ___ JUDGE ___ MAG JUDGE ___

### Attachment to Civil Cover Sheet

**I. (a) Plaintiffs:**

1. GRACE, Inc.
2. Engage Miami, Inc.
3. South Dade Branch of the NAACP
4. Miami-Dade Branch of the NAACP

5. Clarice Cooper
6. Jared Johnson
7. Alexandra Contreras
8. Yanelis Valdes

**I. (c) Attorneys for Plaintiffs:**

Nicholas Warren (FBN 1019018)
**ACLU Foundation of Florida, Inc.**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
neil.steiner@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
christopher.merken@dechert.com

* Pro hac vice motion forthcoming

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Southern District of Florida ▼

| | |
|---|---|
| GRACE, Inc.; Engage Miami, Inc; South Dade Branch of the NAACP; Miami-Dade Branch of the NAACP; Clarice Cooper; Jared Johnson; Yanelis Valdes; and Alexandra Contreras, <br><br>_Plaintiff(s)_ <br><br>v. <br><br>City of Miami, <br><br>_Defendant(s)_ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:22-cv-24066

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_ City of Miami
Office of the City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Nicholas Warren
ACLU Foundation of Florida, Inc.
336 East College Avenue, Suite 203
Tallahassee, FL 32301

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

USCA11 Case: 22-24066-KMM Document 32 Date Filed: 10/18/2022 Page 87 of 235

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 1:22-cv-24066

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

DE 7

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:22-cv-24066-KMM

GRACE, Inc. et al v. City of Miami
Assigned to: Judge K. Michael Moore
Referred to: Magistrate Judge Lauren Fleischer Louis
Cause: 42:1983 Civil Rights Act

Date Filed: 12/15/2022
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

Plaintiff

GRACE, Inc.

represented by **Caroline Andrews McNamara**
American Civil Liberties Union of Florida
4343 West Flagler Street
Suite 400
Miami, FL 33134
786-363-1392
Email: cmcnamara@aclufl.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Boaz Tilley**
ACLU Foundation of Florida, Inc.
4343 West Flagler Street
Suite 400
Miami, FL 33134
United Sta
786-363-2714
Fax: 786-363-1257
Email: dtilley@aclufl.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Merken**
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
Email: Christopher.Merken@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Kirsch**
Dechert LLP
2929 Arch Street
Philadelphia, PA 191047
(215) 994-2000
Email: Jocelyn.Kirsch@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

333 SE 2 Avenue
Suite 3200
Miami, FL 33131
305-416-6880
Fax: 305-416-6887
Email: marlene.quintana@gray-robinson.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/15/2022 | 1 | COMPLAINT against City of Miami. Filing fees $ 402.00 receipt number AFLSDC-16174909, filed by Yanelis Valdes, South Dade Branch of the NAACP, Jared Johnson, Engage Miami, Inc., Alexandra Contreras, GRACE, Inc., Miami-Dade Branch of the NAACP, Clarice Cooper. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s))(Warren, Nicholas) (Entered: 12/15/2022) |
| 12/15/2022 | 2 | Clerks Notice of Judge Assignment to Judge K. Michael Moore. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lauren F. Louis is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (rbe) (Entered: 12/15/2022) |
| 12/15/2022 | 3 | Summons Issued as to City of Miami. (rbe) (Entered: 12/15/2022) |
| 12/15/2022 | 4 | Bar Letter re: Admissions sent to attorney Neil A. Steiner, Christopher J. Merken, mailing date December 15, 2022, (pt) (Entered: 12/15/2022) |
| 12/15/2022 | 5 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Neil A. Steiner. Filing Fee $ 200.00 Receipt # AFLSDC-16176168 by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 12/29/2022 (Attachments: # 1 Certification of Neil A. Steiner, # 2 Text of Proposed Order)(Warren, Nicholas) (Entered: 12/15/2022) |
| 12/15/2022 | 6 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Christopher J. Merken. Filing Fee $ 200.00 Receipt # AFLSDC-16176211 by Alexandra Contreras, Clarice Cooper, Engage Miami, Inc., GRACE, Inc., Jared Johnson, Miami-Dade Branch Of The NAACP, South Dade Branch Of The NAACP, Yanelis Valdes. Responses due by 12/29/2022 (Attachments: # 1 Certification of Christopher J. Merken, # 2 Text of Proposed Order)(Warren, Nicholas) (Entered: 12/15/2022) |
| 12/16/2022 | 7 | PAPERLESS PRETRIAL ORDER. This order has been entered upon the filing of the complaint. Plaintiffs counsel is hereby ORDERED to forward to all defendants, upon receipt of a responsive pleading, a copy of this Order. It is further ORDERED that S.D. Fla. L.R. 16.1 shall apply to this case and the parties shall hold a scheduling conference no later than twenty (20) days after the filing of the first responsive pleading by the last responding defendant, or within sixty (60) days after the filing of the complaint, whichever occurs first. However, if all defendants have not been served by the expiration of this deadline, Plaintiff shall move for an enlargement of time to hold the scheduling conference, not to exceed 90 days from the filing of the Complaint. Within ten (10) days of the scheduling conference, counsel shall file a joint scheduling report. Failure of counsel to file a joint scheduling report within the deadlines set forth above may result in dismissal, |

default, and the imposition of other sanctions including attorney's fees and costs. The parties should note that the time period for filing a joint scheduling report is not tolled by the filing of any other pleading, such as an amended complaint or Rule 12 motion. The scheduling conference may be held via telephone. At the conference, the parties shall comply with the following agenda that the Court adopts from S.D. Fla. L.R. 16.1: (1) Documents (S.D. Fla. L.R. 16.1.B.1 and 2) - The parties shall determine the procedure for exchanging a copy of, or a description by category and location of, all documents and other evidence that is reasonably available and that a party expects to offer or may offer if the need arises. Fed. R. Civ. P. 26(a)(1)(B). (a) Documents include computations of the nature and extent of any category of damages claimed by the disclosing party unless the computations are privileged or otherwise protected from disclosure. Fed. R. Civ. P. 26(a)(1)(C). (b) Documents include insurance agreements which may be at issue with the satisfaction of the judgment. Fed. R. Civ. P. 26(a)(1)(D). (2) List of Witnesses - The parties shall exchange the name, address and telephone number of each individual known to have knowledge of the facts supporting the material allegations of the pleading filed by the party. Fed. R. Civ. P. 26(a)(1)(A). The parties have a continuing obligation to disclose this information. (3) Discussions and Deadlines (S.D. Fla. L.R. 16.1.B.2) - The parties shall discuss the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case. Failure to comply with this Order or to exchange the information listed above may result in sanctions and/or the exclusion of documents or witnesses at the time of trial. S.D. Fla. L.R. 16.1.I.

**The parties are hereby on notice that this Court requires all filings to be formatted in 12 point Times New Roman font and double spaced, including any footnotes, with one inch margins on all sides.** Failure to follow these formatting guidelines may result in the filing being stricken, any opposing filing being granted by default, and the imposition of other sanctions, including attorney's fees and costs. **Multiple Plaintiffs or Defendants shall file joint motions with co-parties unless there are clear conflicts of position.** If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with ANY of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. **The parties shall seek extensions of time in a timely fashion.** "A motion for extension of time is not self-executing.... Yet, by filing these motions on or near the last day, and then sitting idle pending the Court's disposition of the motion, parties essentially grant their own motion. The Court will not condone this." Compere v. Nusret Miami, LLC, 2020 WL 2844888, at *2 (S.D. Fla. May 7, 2020) (internal citations omitted).

Pursuant to Administrative Order 2016-70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal Operating Procedures, within three (3) days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non-documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016-70 unless directed otherwise by the Court.

Telephonic appearances are not permitted for any purpose. Upon reaching a settlement in this matter the parties are instructed to notify the Court by telephone and to file a Notice of Settlement within twenty-four (24) hours.

Signed by Judge K. Michael Moore on 12/16/2022. (fpi) (Entered: 12/16/2022)

| 12/16/2022 | 8 | PAPERLESS ORDER REFERRING PRETRIAL DISCOVERY MATTERS TO MAGISTRATE JUDGE LAUREN F. LOUIS. PURSUANT to 28 U.S.C. § 636 and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, the above- |

DE 23

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRANCH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; ALEXANDRA
CONTRERAS; and STEVEN MIRO,

      *Plaintiffs,*

v.

CITY OF MIAMI,

      *Defendant.*

                                      /

## FIRST AMENDED COMPLAINT

1.     This action challenges the five Miami City Commission districts as racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause. But Miami's is not merely a run-of-the-mill racial gerrymander in which the majority seeks to diminish minority voters' influence and power. Rather, it is the product of a calculated scheme in which communities and neighborhoods were split along racial lines for the predominant purpose of maintaining racially segregated districts. As Commissioner Alex Díaz de la Portilla put it: "Our goal here is to have an African American district, . . . a white district, . . . and three Hispanic districts."

2.     Indeed, as detailed below, race-based considerations were not simply *a* factor in redrawing district lines; they were the *predominant* factor. Race was the predominant factor in maintaining arbitrary racial quotas for certain districts. It was the predominant factor in packing certain districts with as many Hispanic and Black residents as possible. It was the predominant factor in maintaining racial "purity" with the "same type of last name and faces." It was the predominant factor resulting in diminished Black and Hispanic influence. And it was the

1

predominant factor in the Commission's overt command that Black, Hispanic, and Anglo residents *must* be separated as much as possible into different districts because, in the Commission's view, each race needs to be represented by a co-ethnic, irrespective of communities, interests, and values.

3.     The predominance of race-based thinking in the City Commission's decisions does not advance representation and cannot be justified by compliance with the Voting Rights Act or any other compelling interest.

4.     Stated simply, Miami's racially gerrymandered redistricting scheme violates Plaintiffs' rights to the equal protection of the laws. They bring suit to vindicate those rights.

## INTRODUCTION

5.     On March 24, 2022, the Miami City Commission passed Resolution 22-131 (the "Enacted Plan"), redrawing the City Commission districts for the next decade. Mayor Francis X. Suarez declined to veto it, allowing the new map to go into effect for the next regularly scheduled City Commission elections on November 7, 2023.

6.     Plaintiffs—four community and civil rights organizations and five individual Miamians—bring suit to challenge all five City Commission districts as racially gerrymandered in violation of the Fourteenth Amendment.

7.     While redistricting bodies "will ... almost always be aware of racial demographics," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), and are often required to look at race in drawing maps, the Fourteenth Amendment prohibits the unnecessary centering of race in redistricting decisions.

8.     Map-drawing in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making, is presumptively invalid under the Equal Protection Clause. This type of excessively race-based line drawing is constitutional only where it

2

satisfies strict scrutiny—where it is narrowly tailored to advance a compelling government interest. The Enacted Plan falls far short of this exacting standard.

9.     In developing the Enacted Plan, the Commission impermissibly elevated race above all other considerations. Commissioners and their consultants obsessed over an overriding racial goal: isolating Black from Hispanic from Anglo residents as much as possible into separate districts.

10.     In so doing, the Commission not only reduced the interests of Black, Hispanic, and Anglo Miamians to their race, but also ignored the interests of Miami's 14,000 American Indian, Asian American, and Pacific Islander residents, who were never once considered in the process.

11.     In furtherance of its goal of maximum racial separation, race dictated even the most granular line-drawing decisions in the Enacted Plan. The Commission was preoccupied by racial considerations, agonizing over the effects of minute changes on the racial composition of the districts, even debating the racial implications of moving individual city blocks and condo towers.

12.     The Commission presented no compelling governmental interest to justify this racial sorting. Compliance with Section 2 of the Voting Rights Act (VRA) is one of the few permissible justifications for allowing race to predominate when drawing district lines. But the Commission was not entitled to set racial targets based on uninformed guesses of what VRA compliance *might* look like. It was instead required to actually *assess* what VRA compliance involved. The Commission never attempted to do that. Nor do any facts indicate the Enacted Plan is necessary to achieve VRA compliance.

13.     The resulting harm to Plaintiffs is acute, and threefold. *First*, racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their

constituency as a whole." *Shaw v. Reno*, 509 U.S. 630, 650 (1993).

14.     ***Second***, Plaintiffs are further harmed because, in pursuit of its racial goals, the Commission sacrificed genuine communities of interest, dividing neighborhoods across the city. Coconut Grove, Little Havana, Flagami, Allapattah, Shenandoah, Omni/Downtown, Brickell, and others were broken up. Commissioners explicitly acknowledged dividing these communities to maintain and enhance the racial separation of the five districts.

15.     ***And third***, the Commission's racial gerrymandering packed Black and Hispanic voters into designated districts, stripping them from adjacent districts and reducing their influence there.

16.     The Commission was on notice of the unjustness of its work. Miamians—including many of the Plaintiffs in this suit—stepped up to call out the Commission's blatantly unconstitutional actions. But they were ignored.

17.     Indeed, the Commission's consultant responded to the public outcry with a PowerPoint slide bluntly titled: "Allegations of Racism are False and Inflammatory."

18.     His PowerPoint was wrong. The Commission's intentional sorting by race, absent narrow tailoring to achieve a compelling governmental interest, violates the Equal Protection Clause and renders the map—all five districts—an unconstitutional racial gerrymander.

## PARTIES

19.     Plaintiff GROVE RIGHTS AND COMMUNITY EQUITY, INC. (GRACE) is a nonprofit community-based membership organization serving Miami's West Coconut Grove neighborhood since 2019. GRACE advocates for equitable economic development while preserving the historic culture and community of the West Grove. GRACE's members, most of whom are Black, reside in Commission Districts 2 and 4.

4

20.     Plaintiff ENGAGE MIAMI, INC. is a nonprofit membership organization centering young people's participation in civic engagement, with members who are largely Gen Z and Millennial Black and Latino Miamians who reside in all five districts. Founded in 2015, the mission of Engage Miami is to build a more just, democratic, and sustainable Miami by developing a local culture of civic participation for young people that is bold, creative, and impactful.

21.     Plaintiff SOUTH DADE BRANCH OF THE NAACP (South Dade NAACP) is a nonprofit membership organization serving Miami-Dade County south of Flagler Street.

22.     Plaintiff MIAMI-DADE BRANCH OF THE NAACP (Miami-Dade NAACP) is a nonprofit membership organization serving Miami-Dade County north of Flagler Street.

23.     The South Dade NAACP and Miami-Dade NAACP (together, NAACP Branches) are affiliate branches of the Florida State Conference of Branches and Youth Units of the NAACP, the oldest civil rights organization in the state, formed in 1909. Their mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. Consistent with this mission, the NAACP Branches advocate for the voting rights of African Americans and other voters of color in Miami, including their members. The NAACP Branches' members—most of whom are Black—reside in all five districts (the South Dade NAACP's in Districts 2, 3, and 4; the Miami-Dade NAACP's in Districts 1, 2, 3, 4, and 5).

24.     If the Enacted Plan is not enjoined, the members of GRACE, Engage Miami, and the NAACP Branches (together, "Organizational Plaintiffs") will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

25.     Plaintiff CLARICE COOPER is a Black resident of the West Grove in District 2.

26.     Plaintiff JARED JOHNSON is a Black resident of Brickell in District 3.

27.     Plaintiff STEVEN MIRO is a Hispanic, Cuban American resident of Little Havana

5

in District 3.

28.     Plaintiff ALEXANDRA CONTRERAS is a Latina, Cuban American resident of Little Havana in District 4.

29.     Plaintiff YANELIS VALDES is a Latina, Cuban American resident of Omni/Downtown in District 5.

30.     The Enacted Plan places Plaintiffs Cooper, Johnson, and Valdes, and Organizational Plaintiffs' members, in districts where they are not the predominant racial group. The Enacted Plan sends the message that their commissioner's job is to represent the predominant group, not them.

31.     The Enacted Plan places Plaintiffs Miro and Contreras, and Organizational Plaintiffs' members, in districts where they *are* the predominant racial group. The Enacted Plan sends the message that they were placed in their districts simply because of their race.

32.     Individual Plaintiffs and Organizational Plaintiffs' members are further harmed because the Enacted Plan splits up their neighborhoods—and they are split along racial lines.

33.     Defendant CITY OF MIAMI is a Florida municipality. As a municipal corporation established under Florida law, Miami has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law. Fla. Const. art. VIII, §§ 2(b), 3; Fla. Stat. § 100.3605; Miami Code of Ordinances (City Code) ch. 16.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

35.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)

because the Defendant resides in this District and a substantial part of the events giving rise to the claim occurred in this District.

36. This Court has personal jurisdiction over the City of Miami.

## FACTS

### I. Overview of the City Commission and Its Elections

37. Miami is governed by a five-member City Commission and a Mayor. Miami City Charter (Charter) § 4(a).

38. Except where the Charter provides otherwise, municipal elections are conducted according to the state's general election laws. *Id.* § 7.

39. Since 1997, commissioners have been elected from single-member districts. *Id.* § 4(b).

40. Commissioners run on a nonpartisan basis and serve four-year staggered terms, with Districts 1, 2, and 4 last elected in 2019 and next up in 2023, and Districts 3 and 5 last elected in 2021 and next up in 2025. *Id.*

41. General municipal elections are held on the first Tuesday after the first Monday in November of odd-numbered years. *Id.* § 7.

42. If no candidate receives a majority in the general election, a runoff between the top-two vote-getters is held fourteen days later. *Id.*

43. Candidates file to run by filing an affidavit of candidacy with the City Clerk during the qualifying period, which is between 60 and 45 days before the general election. *Id.*

44. For the 2023 election, candidate qualifying opens on September 8 and closes at 6:00 pm on September 23.

45. Candidates may qualify by paying the $100 fee by the end of the qualifying period,

or by the petition method. *Id.*; Fla. Stat. § 99.095.

46.     To qualify by petition, a candidate must, by the 28th day preceding the first day of the qualifying period, submit petitions signed by at least one percent of the total number of registered voters in their district as of the last state general election. Fla. Stat. § 99.095(2)(a), (3).

47.     However, the state's general election laws provide that in "a year of apportionment," a candidate may collect the requisite number of signatures from anywhere in the jurisdiction, regardless of district boundaries. *Id.* § 99.095(2)(d).

48.     Regardless of whether a candidate qualifies by fee or petition, they must also pay a $582 state election assessment. *Id.* § 99.093.

49.     However, a candidate is exempt from paying the qualifying fee and/or election assessment if doing so would impose an undue burden on their resources. *Id.* § 99.093(2); City Code § 16-7. In these cases, a candidate may qualify without paying the fee or submitting petitions.

50.     The current commissioners are Alex Díaz de la Portilla (District 1), Joe Carollo (District 3), Manolo Reyes (District 4), and Christine King (District 5). The District 2 commissioner during the 2021–22 redistricting process was Ken Russell, but the seat has been vacant since December 29, 2022.

51.     Díaz de la Portilla, Carollo, and Reyes are Hispanic and Cuban American. King is Black and not Hispanic. Russell is Japanese American and not Hispanic.

52.     Commissioners are limited to two consecutive terms. Charter § 4.

53.     Díaz de la Portilla was first elected in 2019 and is eligible for reelection in 2023.

54.     King was first elected in 2021 and is eligible for reelection in 2025.

55.     Reyes was first elected in a 2017 special election and is eligible for reelection when his current term ends in 2023.

56.    Carollo was first elected in 2017 and cannot run for reelection when his current term ends in 2025.

57.    Before the redistricting process began, Russell planned to resign from the Commission to run for higher office in the 2022 election.

58.    Russell ran for Congress in the 2022 election and resigned on December 29, 2022.

## II. Miami Redistricting History

59.    Before 1997, the Commission was elected at-large, citywide.

60.    Carollo served as Mayor from 1996 to 1997, and in 1997, he appointed a blue-ribbon panel to recommend a single-member district map for the Commission.

61.    Among the members of the blue-ribbon panel were Reyes and Miguel De Grandy.

62.    The blue-ribbon panel made recommendations and the Commission further developed a map with the assistance of redistricting consultant Allan Lichtman.

63.    The Commission adopted its 1997 map as Resolution 97-495 (the "1997 Plan").

64.    In September 1997, the voters adopted a charter amendment adopting single-member district elections. The 1997 Plan was implemented in the November 1997 elections.

65.    The Commission redistricted the map in 2003 and 2013 through Resolutions 03-448 and 13-208 (the "2003 Plan" and "2013 Plan").

66.    Miguel De Grandy and Stephen M. Cody served as the city's redistricting consultants for the 2003 and 2013 processes.

## III. The 2021–22 Redistricting Process

67.    Following the 2020 Census, the Commission again embarked on redistricting.

68.    On February 25, 2021, the Commission again hired De Grandy and Cody to serve as the City's redistricting consultants.

9

Case 1:22-cv-24066-KMM Document 23 Entered on FLSD Docket 02/10/2023 Page 10 of 35

69. The process proceeded through six Commission meetings between November 18, 2021 and March 24, 2022.

70. During these meetings, De Grandy—assisted by Cody—gave presentations on the law and brought draft maps for commissioners to workshop.

### A. The November 18, 2021 Meeting

71. At the November 18 meeting, De Grandy presented an initial report on redistricting considerations and the 2020 Census demographics of the districts under the 2013 Plan.



*Fig. 1. Miami City Commission districts under the 2013 Plan.*

10

72.     The Census data revealed that Miami's population had grown by 42,752 residents over the decade, to 442,241. The ideal population of each Commission district was now 88,448.

73.     De Grandy shared that redistricting was needed to bring the districts within the constitutionally allowable population range, to have no greater than 10% difference between the smallest and largest district.

74.     Analyzing the 2013 Plan under the 2020 Census numbers, Districts 1, 3, 4, and 5 were each under the ideal population (by 6,999; 8,279; 7,847; and 5,707 people, respectively) and needed to gain population.

75.     District 2 was overpopulated by 28,833 residents and needed to shed population.

76.     Under the 2013 Plan, Districts 1, 3, and 4 were majority Hispanic, with Hispanic voting-age populations (HVAPs) of 91.0, 88.5, and 91.6%, respectively, and Hispanic citizen voting-age populations (HCVAPs) of 86.6, 86.8, and 90.1%, respectively.[1]

77.     Under the 2013 Plan, District 5 was majority Black, with a Black voting-age population (BVAP) of 52.9% and a Black citizen voting-age population (BCVAP) of 59.4%.

78.     District 2 under the 2013 Plan had the highest non-Hispanic white (hereinafter "white" or "Anglo") population of the five districts, at 34.5% white voting-age population (WVAP) and 38.1% white citizen voting-age population (WCVAP).

79.     De Grandy explained the applicability of the Voting Rights Act to Miami and that "we can consider race as one of several factors that we will be conscious of in crafting a plan."

80.     De Grandy warned, however, that under the Supreme Court's racial

---

[1]     Total population and voting-age population figures cited herein are from the 2020 Census. Citizen voting-age population figures are from the Census Bureau's 2019 5-year American Community Survey (ACS).

11

gerrymandering jurisprudence, race "cannot be the overriding factor."

81. The Commission ignored De Grandy's warning as the process unfolded.

82. The Commission gave De Grandy four ranked directives for map-drafting. The first, moved by King, was to achieve substantial equality of population between districts, rather than precise mathematical equality.

83. The second-ranked criterion, moved by Díaz de la Portilla, was to "maintain the core constituencies of the districts."

84. The third-ranked instruction, moved by Carollo, was that, separate from what the VRA required, "the minority voters must be politically cohesive." The phrase "political cohesion" was subsequently used throughout the process as a shorthand for keeping racially homogenous areas together.

85. The fourth-ranked instruction was to avoid splitting traditional communities and neighborhoods when feasible.

86. However, Díaz de la Portilla noted that some neighborhoods could be divided if they "will elect the same kind of representative," for example Flagami—which is overwhelmingly Hispanic—being split between Reyes and himself. But, he said, putting part of Overtown or Liberty City (both predominantly Black) in his district would be unacceptable.

87. Also at that meeting, Carollo recounted why single-member City Commission districts were instituted when he was Mayor: "The original idea" was "to keep an even population and that minority voters would be politically cohesive within these districts," so that "there would be an African American sitting in this Commission and there would be an Anglo," and "that there were three Hispanic districts." And he explained that during the 2022 redistricting, each district would have to change to carry forward that "original idea."

### B. The December 9, 2021 Meeting

88.     The Commission met again on December 9, with De Grandy recapping his instructions and commissioners discussing what areas might be moved between districts.

89.     Some of the key elements of the Enacted Plan's racial gerrymandering originated at this meeting.

90.     Díaz de la Portilla stated that underpopulated Districts 3 and 4 would have to gain from overpopulated District 2, and cautioned De Grandy to add to each only "peripherally, a little bit into District 2" so as not to disrupt "the ethnic integrity" of Districts 3 and 4.

91.     With that warning in mind, Díaz de la Portilla asked if there was a problem with splitting Coconut Grove—which was wholly in District 2 under the 2013 Plan—and adding parts to Districts 3 and 4, given "there's ethnic diversity in Coconut Grove." He clarified that his question was "based on where the Hispanic voters live," giving Bay Heights as an example.

92.     De Grandy responded that there was no legal impediment to breaking up any community of interest.

93.     De Grandy continued that he functionally had "a wall" between Districts 2 and 5 and could only "play around the edges there without diluting that minority community." So, District 2 would have to shed population from its southern end—bordering Districts 3 and 4.

94.     Díaz de la Portilla urged De Grandy to shift the 2/5 "wall" eastward as much as he could, "without impacting the minority district, District 5," and De Grandy confirmed he would do so, "without diluting," but that he couldn't move it much.

95.     Given that explanation, Díaz de la Portilla suggested giving Districts 3 and 4 a little bit of Coconut Grove "to make sure we don't jeopardize the ethnic integrity of our districts."

96.     Carollo echoed that suggestion, stating that parts of Coconut Grove would have to

13

be moved out of District 2 but "the biggest danger lies . . . in changing one or two of the Hispanic seats," given Districts 1 and 3 "are not as pure in the percentage of Hispanics" as District 4.

97.     Finally, De Grandy clarified a few additional criteria at this meeting. He confirmed the Commission wanted districts to be contiguous (*i.e.*, not broken up into different pieces).

98.     De Grandy advised that drawing compact districts should not be a consideration. The Commission agreed.

99.     On that subject, Díaz de la Portilla noted that "if you want to have an African American district and you want to have an Anglo district, it's almost impossible to emphasize compactness," so it's "a foregone conclusion" that districts would not be compact. De Grandy concurred.

100.     Finally, De Grandy asked if using man-made and natural boundaries should be a factor, but there was no consensus.

101.     De Grandy agreed to take the Commission's directives, meet with commissioners one-on-one, and develop a draft plan to be presented at the next meeting.

### C. *The February 7, 2022 Meeting*

102.     De Grandy presented a draft plan on February 7, 2022 (the "Feb. 7 Draft") (Fig. 2).

103.     De Grandy walked through the populations and racial demographics of each draft district, noting Districts 1, 3, and 4 had HVAPs of 88.7, 88.4, and 88.0%; District 2 "remains a swing district" at 37.2% white population (WPOP) and 48% Hispanic population (HPOP); and District 5 was 51.7% Black population (BPOP) and 49.8% BVAP.

104.     Explaining the draft, De Grandy noted many of the race-based decisions he made in developing it.

105.     The Feb. 7 Draft proposed moving part of the historically Black West Grove

neighborhood from District 2 into District 4, extending the southern boundary of District 4 across US 1. This proposal prompted intense criticism from members of the public, who objected to the division of a cohesive neighborhood and its excision from District 2.



*Fig. 2. The Feb. 7 Draft, showing the 2013 Plan overlaid with blue lines.*

106.    Among the members of the public who spoke against the division of Coconut Grove were Plaintiff Cooper; GRACE Chair Rev. Nathaniel Robinson III; and West Grove native and GRACE Board of Directors member Reynold Martin, who spoke on behalf of the South Dade NAACP. As Mr. Martin said: "We oppose anything that removes the area of the Grove as a unit. We work together as a family and we'd like to stay that way."

107.    Rev. Robinson explained how GRACE objected to the map's "sever[ing] the cultural, social and historical ties to Coconut Grove and District 2 governance" and "disparately impact[ing] the voting rights of Village West Black residents by diluting their political impact," adding, "although it might be small, we do have a political impact."

108.    Responding to the public comment, De Grandy "put into context what we're moving into a majority-Hispanic district," noting the West Grove portion moved had 2,460 Hispanic, 1,915 white, and 497 Black residents—*i.e.*, it was nearly a majority-Hispanic area.

109.    And, De Grandy made clear that, because he "cannot take any more population out of D2 into D5" without reducing District 5's Black numbers, he had to remove population from District 2 either from the Downtown area or from Coconut Grove.

110.    Carollo, also responding to the public criticism, objected to claims that by moving a portion of "the Black part of Coconut Grove to a district that's Hispanic, this disenfranchises them"—but "leav[ing] it in an Anglo area" would be fine.

111.    Carollo pointed out that no African Americans had ever been elected to District 2, implying that, since District 2 was the "Anglo seat" and District 4 was a "Hispanic seat," Black residents of the West Grove had no grounds to complain about being moved from one to the other.

112.    Carollo's comments exemplify the Commission's approach to the redistricting process: the preeminent consideration was ethnic/racial solidarity, and their mapmaking must revolve around that.

113.    Speaking more generally about the map's history, Carollo recounted that districts were established "to assure . . . that there would always be an African American commissioner and an Anglo commissioner," and that the other three districts stayed majority Hispanic.

114.    To accomplish that, Carollo explained, neighborhoods across the city were split:

16

Silver Bluff, Shenandoah, Little Havana, and Flagami. Díaz de la Portilla mentioned another: Allapattah.

115.    So, to keep "that same balance and having a balance in the Hispanic districts," Carollo went on, a portion of Coconut Grove would have to be split as well.

116.    Following that discussion, the Commission voted 4-1 to direct De Grandy to consider going south of US 1 into District 2 to "obtain voter consistency" and balance population, as he had done in Feb. 7 Draft. Only Russell voted no.

117.    The Enacted Plan would indeed have Districts 3 and 4 "go south" of US 1 into District 2, moving portions of Coconut Grove.

118.    De Grandy received further feedback from commissioners and would return with a revised plan.

### D. The February 25, 2022 Meeting

119.    On February 25, De Grandy presented a revised plan he had submitted three days prior (the "Feb. 22 Draft") (Fig. 3). Except for three unpopulated census blocks that were later moved from District 1 to 5, the Feb. 22 Draft became the Enacted Plan.

120.    The Feb. 22 Draft incorporated certain feedback shared during earlier Commission meetings, and during private meetings De Grandy had with individual commissioners.

121.    The Feb. 22 Draft differed from the Feb. 7 Draft in several respects. *First*, District 4 added only 1,597 residents from the West Grove, rather than 5,071 under the Feb. 7 Draft. The portion moved into District 4 now had a higher Hispanic population—59.2% HVAP compared to 49.1% in the Feb. 7 Draft.

122.    *Second*, District 3 added from District 2 an area near Bay Heights, including Natoma Manors, between 22nd Avenue and Alatka Street, rather than adding the area from 17th

17

Avenue to 15th Road.

123.  *Third*, a 76.6%-HVAP area in Allapattah was moved into District 1 from 5, and a

66.7%-HVAP area was moved out of District 1 into 5.



**Fig. 3.** *The Feb. 22 Draft/Base Plan, showing the Feb. 7 Draft overlaid with blue lines.*

124.  *Fourth*, at King's request, District 5 gained a small, 40% BVAP area of Downtown

around the Miami Riverside Center (MRC) from District 1. In exchange, District 1 gained a 71.1%

HVAP area between NW 6th and 8th Streets and NW 7th Avenue and I-95. As part of this shift,

District 2 regained some area from District 1 that the Feb. 7 Draft had removed.

125.  *Fifth*, certain Downtown areas were swapped along the District 2/5 "wall:" Two

census blocks with a BVAP of 13.0% were moved into District 2; and a 32.2% BVAP area was moved into District 5.

126. *Finally*, the boundaries between Districts 1, 3, and 4 shifted around Little Havana.

127. As he did with his first draft, De Grandy walked through the populations and racial demographics of each draft district, noting Districts 1, 3, and 4 had HVAPs of 89.5, 88.3, and 89.5%; District 2 "remains a swing district" at 37% WPOP and 48.7% HPOP; and District 5 was 52.2% BPOP and 50.3% BVAP.

128. De Grandy had managed to increase the dominant-group VAP in Districts 1, 4, and 5 from the Feb. 7 Draft. Of the three majority-Hispanic districts, the HVAP of the least-Hispanic district increased. The average HVAP of those three districts also increased.

129. In terms of citizen voting-age population, Districts 1, 3, and 4 were 84.8, 86.9, and 88.2% HCVAP. District 2 was 41.5% WCVAP and 45.6% HCVAP. District 5 was 59.0% BCVAP.

130. Public comment at this meeting again centered on objections to splitting Coconut Grove, including the continued division of a portion of the West Grove.

131. Among those who gave comments were South Dade NAACP Second Vice President Carole Jackson, who spoke on behalf of the NAACP Branches; GRACE Board Vice Chair, South Dade NAACP Housing Committee Chair, and West Grove native Carolyn Donaldson; Plaintiff Valdes, who represented Engage Miami; and Engage Miami member Jessica Saint-Fleur. Plaintiff Cooper and Mr. Martin both spoke again as well.

132. Diaz de la Portilla, Carollo, and Reyes were satisfied with the Feb. 22 Draft, though Reyes was willing to make some changes, including to remove the part of Coconut Grove in District 4. Russell wanted to try to avoid splitting Coconut Grove. King wanted more time to consider the map and to see if Russell's concerns could be accommodated.

133.    Russell sketched out his own suggestion for the border of District 2 at this meeting (the "Russell Sketch"), which showed how it might be possible for District 2 to keep all of Coconut Grove, rather than splitting the neighborhood across Districts 2, 3, and 4.



*Fig. 4. The Russell Sketch (dark blue line).*

134.    Referencing the overwhelming public comment, Russell discussed the many nuanced reasons for keeping Coconut Grove in District 2—not just to preserve an African American community in the West Grove, but also because of the area's history, architecture, cultural diversity, natural aesthetic, walkable character, access to the water, common tree canopy issues, affordable housing concerns, and its placement in two of Miami's three Neighborhood Conservation Districts (NCD-2 and NCD-3).

135.    Compared to the Feb. 22 Draft, the Russell Sketch kept all of Coconut Grove in District 2 and removed from District 2 the strip west of South Miami Avenue from 32nd Road to

the Miami River (including part of Brickell).

136.  The Russell Sketch did not alter the boundary between Districts 2 and 5 from the Feb. 22 Draft.

137.  The Russell Sketch better equalized District 2's population, with its deviation dropping to within 2% of the ideal, compared to being 5.49% overpopulated in the Feb. 22 Draft.

138.  De Grandy confirmed that Russell's proposal did not violate any of the mapmaking directions the Commission had given him, and that it complied with all legal standards.

139.  But the Commission would reject the proposal for racial reasons later in the process.

140.  The meeting concluded with the Commission voting 4-1 to take the Feb. 22 Draft as the "Base Plan" for future changes, to be debated at the next meeting. Only Russell voted no.

### E. The March 11, 2022 Meeting

141.  The Commission took up the Base Plan again on March 11.

142.  The meeting opened with Carollo discussing allegations that the map moved a portion of North Coconut Grove into District 3 because he owned a house there, on Morris Lane.

143.  Carollo clarified that he was not supporting the changed District 2/3 boundary because it included his house.

144.  Carollo said he wanted to make sure that the fact that his house was being moved into District 3 would not be raised as grounds for challenging the redistricting in court later. So, he decided to abstain from the discussions that day.

145.  De Grandy summarized where they were in the process: the Commission had advanced the Base Plan and two commissioners had suggested additional changes.

146.  He walked through those two changes. *First*, King wanted part of the riverfront area that the Base Plan moved from District 5 to District 1 restored to her district.

21

147.    De Grandy noted this request's racial impacts and said he needed more direction.

148.    **Second**, Russell had renewed his request to restore all of Coconut Grove to District 2, rather than moving portions into Districts 3 and 4.



**Fig. 5.** *Slide from De Grandy's March 11 presentation, showing areas the Initial Russell Plan moved from the Base Plan.*

149.    To equalize population, Russell proposed moving a strip west of South Miami Avenue from District 2 to 3, starting at the US 1/I-95 fork and going north to the Miami River ("Area 6" in Fig. 5).

150.    This proposal (the "Initial Russell Plan") was similar to what Russell sketched out on February 25. It did not alter Districts 1 or 5 in the Base Plan, or the District 3/4 border.

151.    De Grandy also addressed "allegations of racism" in the Base Plan. In so doing, he walked through the Black population of each district and of the West Grove area proposed to be moved into District 4 from District 2, as well as the number of Hispanic residents "represented by a Black commissioner in a Black-majority district" in District 5, and "represented by a non-

22

Hispanic commissioner" in District 2.

152. He went on: "the only allegation of racism results from the proposed movement of 114 Black residents who are currently represented by a commissioner who is not Black to a district that is represented by a commissioner who is not Black."

153. De Grandy concluded, "you do not have to be a redistricting expert to conclude that the allegation of this plan is somehow racist is simply false and inflammatory."

154. Russell pushed back, explaining that Black West Grove residents weren't simply looking for a Black commissioner, but one who will be responsive to their neighborhood's needs and issues: "displacement, gentrification, social justice, affordable housing." Russell asked De Grandy if Black residents in the West Grove formed a cohesive voting bloc with the rest of Coconut Grove, and De Grandy acknowledged they did.

155. Continuing to defend his map, De Grandy pointed out that more Black residents were moved out of District 2 in Golden Pines on the north side of US 1, than were moved out of District 2 in the West Grove.

156. Russell responded by explaining that the dividing line should not be reduced to race: Black residents of Golden Pines have different interests and priorities than Black residents of the West Grove, whose shared interests with the rest of Coconut Grove were "not based on color."

157. Russell's arguments failed to win in the end.

158. Significant public comment again focused on residents objecting to the division of Coconut Grove, and in particular the West Grove. Among those who spoke was South Dade NAACP President Dwight Bullard, who described Coconut Grove as "a community of common interest irrespective of race, irrespective of ethnicity."

159. Responding to the public comment and Russell's explanations, Reyes asked what

would happen if just the West Grove triangle was returned to District 2. De Grandy explained he would need to take from elsewhere in District 2 to equalize population, pointing to two areas as options: between 22nd and 27th Avenues in North Coconut Grove, and the "Area 6" strip that Russell had proposed moving.

160. Reyes then expressed that he would honor the community's desires and support keeping the West Grove intact in District 2 instead of including a slice of it in his district.

161. The Commission adjourned after directing De Grandy to meet with commissioners individually and bring back different options that accommodated each commissioner's wishes.

### F. *The March 24, 2022 Meeting and Enacted Plan Adoption*

162. The Commission reconvened on March 24 for its last redistricting meeting.

163. Carollo announced he would participate since he had no actual or apparent conflict of interest.

164. De Grandy then presented the options that each commissioner directed him to develop since March 11. There were proposals from King, Díaz de la Portilla, Russell, and Reyes.

165. King requested only one change to the Base Plan: moving the unpopulated Wharf development along the Miami River from District 1 into District 5.



*Fig. 6. Slide from De Grandy's March 24 presentation showing King's proposed change to the Base Plan.*



*Fig. 7. De Grandy's slide showing Díaz de la Portilla's suggested change to the Base Plan.*

166.    Díaz de la Portilla advised he supported the Base Plan but had one change he would

not object to: moving a single block just to the north of the Wharf, encompassing the Flagler on

the River tower, from District 1 and back into District 5, where it was in the 2013 Plan.



*Fig. 8. De Grandy's slide showing the Revised Russell Plan's changes to the Base Plan.*

167.    Russell had a revised proposal (the "Revised Russell Plan"). As with the Initial

Russell Plan, the Revised Russell Plan restored all of Coconut Grove to District 2. However, it

shifted less population from District 2 into District 3, with the one-block-wide strip running along

South Miami Avenue from the I-95/US 1 fork north to 10th Street, rather than all the way to the

Miami River. De Grandy announced the racial demographics of this strip: 44.6% HVAP, 39%

WVAP. Russell's new plan also included King's Wharf change.

26



*Fig. 9. De Grandy's slide showing the Reyes Plan's changes to the Base Plan.*

168.    Reyes proposed a plan (the "Reyes Plan") that restored the West Grove triangle to District 2. In exchange, the proposal moved from District 2 to District 3 an area on the north/west side of South Miami Avenue between Alatka and 13th Streets. De Grandy reported that area's demographics: 51% HVAP, 39% WVAP. Reyes' plan also included King's Wharf change.

169.    Unlike the Revised Russell Plan, the Reyes Plan kept in District 3 the portion of North Coconut Grove that the Base Plan had moved into District 3.

170.    Carollo did not propose any amendment.

171.    De Grandy concluded by advising that each proposed amendment complied with the Constitution and the Voting Rights Act.

172.    Public comment, yet again, centered on keeping Coconut Grove whole. Among the speakers were South Dade NAACP Secretary Brad Brown and Miami-Dade NAACP President Daniella Pierre.

173. Each commissioner then spoke in turn. Díaz de la Portilla and Carollo both stated they would support the Base Plan with King's Wharf amendment.

174. Revisiting the subject of his Morris Lane house moving into District 3, Carollo stated he had "no problem, none whatsoever" with it being moved into District 4 instead.

175. He did, however, object to the Reyes and Russell proposals to move more territory from District 2 into District 3.

176. Russell advocated for his plan and keeping Coconut Grove whole in District 2, listing how his plan met all the criteria the Commission had adopted at the beginning of the process.

177. Reyes stood by his earlier support for removing the West Grove triangle from District 4.

178. Russell proposed adopting his Revised Russell Plan, but that failed 4-1.

179. Díaz de la Portilla then moved to adopt the Base Plan with King's Wharf amendment, *and* with removing the West Grove triangle from District 4.

180. But De Grandy and Carollo explained that moving the West Grove triangle would necessitate shifting District 3 further into Brickell to bring the plan's overall population deviation range under 10%.

181. So, Díaz de la Portilla withdrew that motion and moved to adopt the Base Plan with King's Wharf amendment.

182. That motion carried 3-2, and the Base Plan with the Wharf change passed as the Enacted Plan.

183. Reyes explained he was opposed because District 4 still included a portion of the West Grove.

184. Similarly, Russell voted no because the plan divided Coconut Grove.

185. Díaz de la Portilla, Carollo, and King voted yes.

186. Community members and advocacy organizations urged Mayor Suarez to veto the map. For example, the NAACP Branches wrote a letter to Suarez, requesting he reject the plan as an unfair redistricting plan that goes against traditional redistricting principles and threatens equal representation under the law.

187. Ignoring Miamians' concerns, Suarez let the plan become law without his signature.

### IV. Racial Considerations Predominated in the Line-Drawing Process

188. The Commission's overriding goal in crafting the Enacted Plan was to separate Hispanic, Black, and Anglo voters as much as possible into "their" respective districts.

189. Improper racial considerations predominated throughout the Commission's line-drawing process. Race featured centrally at every redistricting meeting, with race placed above all race-neutral, traditional redistricting criteria.

190. These race-based decisions resulted in a map that splits neighborhoods, ignores traditional redistricting criteria, and eschews fair, public-minded representation.

191. Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are ignored, race predominates. Unless the use of race is *necessary* to ensure fair and equal opportunity for voters of color to participate in the electoral process, its use is constitutionally suspect.

192. But rather than advancing representation, the Commission delivered separation.

193. At the very first redistricting meeting, Reyes and Carollo discussed how the existing map "was drawn in a way that every single ethnic group would be represented," and that explained "the odd shape that we have now" and why certain neighborhoods were split.

194. Indeed, Carollo explained on February 25, to accommodate maximal racial

29

separation, the Commission "broke up numerous neighborhoods."

195.    Reyes agreed: "just ask all the communities who are divided, because we have to

preserve a seat that will represent every single community of the City of Miami."

196.    Racially heterogeneous districts were out of the question. After discussing the racial

dynamics and demographics of the districts on November 18, Carollo stressed how they needed to

ensure "that the balance is not really shifted."

197.    Again on February 7, Carollo explained his "goals from day one:" "to have

guaranteed Anglo representation, and to have three districts that were Hispanics," concluding

"these are my intentions here today."

198.    This attitude which elevated racial considerations above all other redistricting

decisions was shared by other commissioners.

199.    Díaz de la Portilla, for example, explained on March 11, "our goal here is to have

an African American district, for lack of a better term, a white district, . . . and three Hispanic

districts."

200.    In response to public criticism of gerrymandering, Reyes was blunt: "Yes, we are

gerrymandering to preserve those seats"—to preserve and enhance the maximal division of races

into separate districts as much as possible.

201.    Shortly before the final vote, Carollo summarized his goals in locking in a particular

and precise racial division in the map:

> I do not want to change the District 3 voting patterns, the types of
> people that are there with different people. I don't want to do that to
> District 4, nor to District 1. Just like I want to be able to leave
> District 2 where it could still elect a guy like you [referring to
> Russell], if they want to. In District 5, that will be a majority-African
> American district.

202.    The Commission's policy of maximal racial separation manifested in three specific

ways: (1) creating an "Anglo access district" in District 2; (2) maintaining an arbitrary BVAP quota for District 5; and (3) packing Hispanic residents into Districts 1, 3, and 4 as much as possible.

### A. Creating an "Anglo Access District" in District 2

203.    Race predominated in the design of District 2.

204.    At its first redistricting meeting on November 18, Díaz de la Portilla asked De Grandy whether the VRA required the Commission to maintain "what we call here in Miami, in practical terms, an Anglo . . . seat."

205.    De Grandy explained that "white, non-Hispanic, is not a protected class under the Voting Rights Act."

206.    The Commission would ignore this legal advice, instead increasing the Anglo population of District 2 as much as possible, stripping Black and Hispanic residents from it with the explicit goal that it would elect an Anglo commissioner.

207.    At the February 7 meeting, Carollo shared that originally, District 2 "was gerrymandered—but it was a legal gerrymander so that you would have an Anglo elected commissioner."

208.    As the Commission drew new lines, it sought to maintain and enhance this. On February 7, for example, Reyes expressed that they had to make changes to protect "the Anglo seat" and asked De Grandy if his Feb. 7 Draft was the best he could do to protect it. During that same meeting, Carollo stated his "intention here today" to "have guaranteed Anglo representation." On February 25, Reyes too stated his "commitment" that "the so-called Anglo-district will . . . stand the test of time." At the final meeting, Carollo reiterated "we're going to have to keep one district that you could get an Anglo."

31

209.    To achieve this goal, the Commission "purposely divided neighborhoods in other districts to try to keep District 2 into a district that a non-Hispanic would be elected," as Carollo explained on February 25. For example, he continued, "Silver Bluff is one of those communities that was split in half to be able to create a District 2 that would elect someone like Mr. Russell"— someone "of an Anglo background, not Hispanic."[2]

210.    Carollo listed others divided to achieve that goal: Shenandoah, Little Havana, Flagami—split "down the middle"—and more.

211.    Díaz de la Portilla recounted how, as Mayor, Carollo "broke up Hispanic neighborhood after Hispanic neighborhood because he had to for the greater good"—to "have *a white* on our City Commission."

212.    Reyes and Carollo reprised this theme at the final meeting. If Shenandoah, Silver Bluff, Flagami, and Little Havana had not been divided, Reyes said, "probably we would not have Mr. Russell sitting there."

213.    Reyes continued that "it was fine to divide" these neighborhoods, "because we wanted to achieve what we want to achieve now:" "great" "probabilities of electing an Anglo."

214.    Finally, in his last speech before passing the Enacted Plan, Carollo summed it up again: "We're gonna have to keep one district that you can get an Anglo, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can

---

[2]      When Russell interrupted to point out he was Japanese American, Carollo dismissed him, saying "you didn't quite mention the Oriental part when you were running." Carollo's comment exemplifies the Commission's essentialist and reductive attitude toward race and representation: there are Hispanic residents, there are Black residents, and there are Anglo residents. To the Commission, "representation" means having a co-ethnic commissioner.

32

get elected."

215.    The Commission sacrificed other traditional redistricting criteria to draw an explicitly Anglo district, including compactness. As Díaz de la Portilla explained, "if . . . you want to have an Anglo district, it's almost impossible to emphasize compactness."

216.    On February 25, to assuage his "main concern," Reyes sought to confirm with De Grandy that District 2 would still have a high probability of electing an Anglo. De Grandy replied simply: "Yes."

### B. Maintaining an Arbitrary BVAP Quota for District 5

217.    Race predominated in the design of District 5.

218.    Coming into the process, District 5 under the 2013 Plan was 54.4% BPOP, 52.9% BVAP, and 59.4% BCVAP, but was underpopulated and needed to add population.

219.    The Commission's overriding goal for District 5 was to keep those numbers as high as possible while equalizing population, and particularly to attain a BVAP above 50%.

220.    This arbitrary threshold was not based on any functional analysis of what was necessary to afford Black voters the ability to elected preferred candidates, or justified by any compelling interest, including compliance with the VRA.

221.    Moreover, the Commission ignored key markers of District 5's functional performance, like CVAP, voter registration, and turnout in recent elections.

222.    At the first redistricting meeting on November 18, De Grandy commented how during the 2013 cycle, he moved the northern end of District 2 into District 5, but "that did dilute the Black voting percentage."

223.    Moving much more in this area, though, concerned him. He warned against doing so, because "District 5 may not be a performing district anymore for the minority community." "I

have a wall that separates D2 and D5," De Grandy said.

224.    De Grandy did not explain what analysis he did to conclude District 5 would be at risk of vote dilution in violation of the VRA.

225.    De Grandy's analysis—focused on making District 5's Black population as high as possible—was nothing more than an arbitrary numerical target based on uninformed guesswork.

226.    In De Grandy's initial, Feb. 7 Draft, District 5 was 51.7% BPOP, 49.8% BVAP, and 58.7% BCVAP.

227.    De Grandy explained he deliberately underpopulated District 5, "because bringing in additional population from most any side of the district might reduce the African American population percentage."

228.    In particular, De Grandy explained that around the District 2/5 border, "we could not move further east without affecting the African American population's ability to elect a candidate of its choice in D5."



*Fig. 10. Areas moved into and out of District 5 in the Feb. 7 Draft.*

229.   "There were only roughly 1,000 African Americans" in that area added from District 2, so, "the only reason we were able to rebalance the ethnic and racial population" was to remove the riverside areas from District 5 and move them into District 1, he continued.

230.   He went on: "That was essential because as you moved east . . . , there was less and less African American population."

231.   Notwithstanding the fact that the Feb. 7 Draft featured a District 5 with a BVAP under 50% and a BPOP under 52%, De Grandy said his analysis of voting patterns confirmed Black voters had an equal opportunity to elect the candidate of their choice.

232.   But this did not satisfy the Commission.

233.   First, Reyes pressed De Grandy if "this is the best you can do to protect the African American seat," calling it his "main concern."

234.   King also stated she was "concerned . . . that District 5 is 51% African American."

235.   De Grandy responded to their concerns in his Feb. 22 Draft, the Base Plan.

236.   He explained that "by reconfiguring areas around the boundaries of D5, we were also able to slightly increase the total Black population, as well as the voting-age population, above 50%."

237.   De Grandy explained that underpopulating District 5 also allowed for an increase in its Black population.

238.   He was firm that District 5 could not move further east into District 2 without "diminishing the African American community's opportunity to elect a candidate of choice."

239.   He concluded his presentation of the Base Plan by recapping "the directives you gave." Third on the list: "We increased D5's Black voting-age population above 50%."

35



***Fig. 11.*** *Downtown changes to District 5 in the Base Plan, compared to the Feb. 7 Draft.*

240.    The Base Plan's reconfigurations included swapping areas between Districts 2 and 5 in Downtown. 1,638 people in two city blocks bounded by NW 8th and 10th Streets, Miami Avenue, and the railroad tracks were moved back into District 2, where they had been in the 2013 Plan. These two blocks are 13.0% BVAP.

241.    In exchange, 2,521 people in a two-block-wide strip between Miami and NE/SE 2nd Avenues were moved into District 5. This strip is 32.1% BVAP.

242.    However, 1,407 people in this strip—more than half—are incarcerated at the Federal Detention Center (FDC). A plurality of the FDC population is Black.

243.    Not including the incarcerated population, the strip De Grandy moved into District 5 to satisfy the Commission's 50% quota is 16.4% BVAP.

244.    When the public raised concerns about the Commission's arbitrary BVAP quota, they were dismissed out of hand.

245.    On February 25, the ACLU of Florida raised these concerns, noting that setting an

arbitrary 50% target, divorced from any actual analysis of what is necessary to afford Black voters an opportunity to elect preferred candidates, raised equal protection concerns and may constitute unlawful packing.

246.    The ACLU of Florida reminded the Commission that it was required to take the full breadth of available data into account, rather than looking merely at surface-level Census population totals. It further pointed out that voter registration and actual turnout data showed that Black voters make up a substantially higher share of registered voters and actual voters than Census VAP figures indicated for the proposed District 5: 55.5% of registered voters, 53.2% of voters at the last state general election, and 61.3% of voters at the last state primary election.

247.    Moreover, the district was nearly 60% Black "as refined by citizenship." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997).

248.    In response to the ACLU of Florida's statement, De Grandy said "it was hard for me to understand that."

249.    Further, De Grandy claimed that "packing doesn't apply."

250.    The Commission's consideration—and rejection—of alternatives to the Base Plan also illustrates its fixation on the racial targets.

251.    For example, after Russell presented his sketch for District 2 on February 25, King was interested in considering it—but only if it wouldn't reduce District 5's Black share: "Would that upset the balance in my district? Would it take me from 52 to less or more?"

252.    De Grandy assured her it wouldn't impact District 5, and King was willing to consider it at the next meeting.

253.    At that next meeting on March 11, De Grandy noted how King had requested moving riverside areas back into District 5 from District 1. King's request had a problem: it would

37

"lower the Black VAP to 49%," as De Grandy explained.

254.    Díaz de la Portilla crystalized the Commission's reaction to the slight BVAP decline in a single word: "Worse."

255.    De Grandy expressed confidence this problem "could be remedied" to "increase D5's Black voting-age population."

256.    Indeed, De Grandy took a recess to "work on that better and maybe that would solve the problem."

257.    He came back from recess with a new amendment to the Base Plan that moved several unpopulated riverfront blocks (the Wharf development) from District 1 into District 5— ensuring District 5 stayed above the 50% BVAP threshold.

258.    Even so, Díaz de la Portilla shared his worry with King that "the growth that's going to occur over the next ten years" would "make your district minority African American." Because the area proposed to be moved back into District 5 from District 1 was "an area that's predominantly Hispanic."

259.    Eventually, Díaz de la Portilla was satisfied with District 5's demographics, once he understood that it was still majority-BVAP, at 50.3%.

260.    The Commission eventually adopted King's change, going back to the Base Plan with the minor Wharf alteration, rather than the draft proposal with a 49% BVAP District 5.

261.    The Commission's adherence to the 50% BVAP quota was underscored by another proposed riverfront change. On March 24, De Grandy discussed moving the Flagler on the River condo development into District 5 from District 1, a suggestion of Díaz de la Portilla's.

262.    De Grandy reported the single block in question had 510 residents and was roughly 73% HVAP. He said moving it into District 5 would drop District 5's BVAP to 49.97%.

263. De Grandy advised the proposal was VRA-compliant, but nevertheless counseled "additional tweaks to the plan to bring the Black voting-age population back above 50%."

264. The Commission did not end up accepting the Flagler on the River suggestion.

265. As the Commission neared a final vote on March 24, the 50% BVAP quota and its impact on the map continued to be a point of discussion. Carollo stressed "we have to keep one district that is going to have a majority of African Americans," explaining that hitting that target was "the reason we're having to do this"—referring to dividing Coconut Grove.

266. Indeed, the "wall" between Districts 2 and 5 was a large reason why part of Coconut Grove ended up removed from District 2. Because removing more of District 2 from its northern end would further reduce District 5's Black proportion, the Commission instead removed areas from District 2 at its southern end, in Coconut Grove, to equalize District 2's population.

267. As Reyes, Russell, and King tried unsuccessfully to reach agreement on Coconut Grove, De Grandy stressed he "cannot put one more resident into Commissioner King's district" because it "would dilute the Black majority."

268. Díaz de la Portilla discussed how striving for the quota also impacted another area of the map, his own District 1 in Allapattah: "I can't go north, because if I go north I jeopardize the African American seat" by taking Black voters from District 5.

269. The Commission successfully hit its target: the BVAP of District 5 is 50.3%.

### C. Packing Hispanic Residents into Districts 1, 3, and 4

270. Race predominated in the design of Districts 1, 3, and 4 as well.

271. The Commission's goal was to make the Hispanic populations of Districts 1, 3, and 4 as high as possible, thereby stripping Hispanic residents from Districts 2 and 5 and diminishing their influence in those two districts.

272. Carollo set the tone at the second redistricting meeting, before any maps were drafted: "My main interest in my district and your district, Díaz de la Portilla, and Mr. Reyes' district, is that I'm sure that we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there."

273. Carollo reiterated on February 7 that Districts 1 and 3 need to "keep the same type of last name and faces."

274. Shortly before the Enacted Plan passed, Carollo again stated, "We have to keep three districts that are going to be majority-Hispanic."

275. Commissioners were concerned by the relative Hispanic populations of these three districts and obsessed over small changes in Hispanic population. For example, Carollo discussed the relative "purity" of the three districts on December 9, noting the Commission had to keep in mind that Districts 1 and 3 "are not as pure in the percentage of the Hispanics that vote" compared with District 4.

276. But at no point did the Commission undertake an actual analysis of voting patterns to determine what Hispanic population a district needs to have to comply with the VRA, instead shooting for as high a population as possible.

### 1. District 1/5 Border

277. The border between Districts 1 and 5 was drawn along racial lines, to put Hispanic residents into District 1 and strip them from District 5. At the same time, the border packed Black residents into District 5 and stripped them from District 1.

278. District 1, which under the 2013 Plan was underpopulated by 6,999 residents and needed to grow, ended up gaining all its new population from District 5.

279. The Commission first discussed specific areas to add into District 1 on December

9. Carollo highlighted two "logical" and "attractive" areas: Wynwood—noting "that's mainly a Hispanic area"—and along the north side of Miami River—"non-African American areas, mainly Hispanic or Anglo basically."

280.    At the same meeting, Díaz de la Portilla reflected on how he "really can't go north" to gain population in Allapattah, because "it's an African American area."

281.    Carollo interjected, noting there might be an area by 36th Street (which served as District 1's northern border under the 2013 Plan) that could be added to District 1, but he wasn't sure "if it's mainly Hispanic or if it's more African American." Díaz de la Portilla agreed he might be able to extend north to 40th Street, but not past State Road 112, because "north of 112 we are entering into African American neighborhoods—and we can't touch that area."



*Fig. 12. Riverside area moved into District 1 from District 5 in the Feb. 7 Draft. The 2013 Plan is overlaid in blue.*

41

282. De Grandy's Feb. 7 Draft moved the riverside area Carollo had suggested. De Grandy explained: "We felt this movement was needed because this area has a high percentage of Hispanics and a greater voter cohesion with D1 residents."

283. The Base Plan moved a small portion of that riverside area around the MRC back into District 5. In exchange, the draft moved another part of Downtown—eight city blocks bounded by NW 7th Avenue, I-95, and NW 6th and 8th Streets—into District 1.



***Fig. 13.*** *Riverside areas moved between Districts 1 and 5 in the Base Plan. The Feb. 7 Draft is overlaid in blue.*

284. De Grandy explained that "again, we felt this movement was needed because Hispanics in the area constitute roughly 70% of the population. Thus, they have greater voter cohesion" with the rest of District 1.

285. The Enacted Plan ended up moving a supermajority-Hispanic area of Downtown from District 5 into District 1, giving District 1 an irregular appendage that splits neighborhoods

along racial lines, including historic Overtown. The entire area moved is 70.7% HVAP.

286.    The Enacted Plan ended up extending District 1 north to 40th Street/SR 112 but no further, moving a supermajority-Hispanic chunk from District 5 between NW 12th and 19th Avenues that is 76.6% HVAP and 33.0% BVAP.



***Fig. 14.*** *Allapattah areas moved between Districts 1 and 5 in the Base Plan.*

287.    Even though District 1 needed to gain population, the Enacted Plan also ended up moving a less-Hispanic area of Allapattah *out* of District 1 and into District 5, creating a jagged stair-step border that chopped up the neighborhood along racial lines.

288.    This area, bounded by NW 32nd and 36th Streets, NW 8th Avenue, and I-95, is 66.7% HVAP and 37.1% BVAP.

289.    District 1 in the Enacted Plan is 89.5% HVAP and 84.8% HCVAP.

### 2. District 2/3 Border

290.    The boundary between Districts 2 and 3 was also drawn along racial lines, to pack Hispanic residents into District 3 and strip them from District 2.

291.    Díaz de la Portilla first suggested moving areas "where Hispanic voters live" from District 2 and into Districts 3 and 4 at the second redistricting meeting, mentioning Coconut Grove

and Bay Heights specifically.

292. De Grandy incorporated this suggestion into his Feb. 7 Draft. That map moved portions of District 2 into District 3, stretching from SW 15th Road in the north to SW 17th Avenue in the south, over to South Miami Avenue. This area included Bay Heights.



***Fig. 15.*** *Areas moved out of District 2 and into 3/4 in the Feb. 7 Draft (compared to 2013 Plan).*

293. Discussion of Feb. 7 Draft's 2/3 border focused on whether part of Downtown/Brickell should be moved into District 3 instead. Russell suggested doing that so District 2 could keep all of Coconut Grove and avoid splitting the West Grove.

294. De Grandy explained he didn't move District 3 into Downtown "because the demographics were dissimilar," but acknowledged that was a choice the Commission could make. He clarified that he could equalize the district populations and keep Coconut Grove whole within District 2 by adding part of Downtown to District 3.

295.    The Commission considered that option at the next meeting, but rejected it for racial reasons.

296.    Walking through the Base Plan on February 22, De Grandy again explained that he "did not feel it was appropriate to move east" and grow District 3 into Downtown "because of dissimilar demographics." At a later meeting, De Grandy was more explicit: "the Hispanic population in that area was in the 40's," "whereas District 3 is in the 80's."



*Fig. 16. Areas moved out of District 2 and into 3/4 in the Base Plan (compared to 2013 Plan).*

297.    Carollo supported this approach, explaining Brickell was "totally different in your demographics" from District 3, so they had no choice but to move people from the Grove into Districts 3 and 4 instead: "we can't go anywhere else."

298.    To Carollo, "throwing" Brickell into District 3 would unacceptably "change the whole component of one district" with "a domino effect" to "change the composition of the other

districts."

299.    Díaz de la Portilla agreed, saying the Grove was "the only place to go."

300.    This subject came up again when the Commission considered the Initial Russell Plan. That proposed extending District 3's eastern boundary one block east to South Miami Avenue, from where US 1 and I-95 fork on the south end, northward to the Miami River.



***Fig. 17.*** *Areas moved out of District 2 into 3/4 in the Initial Russell Plan (compared to 2013 Plan).*

301.    Even De Grandy advised that the Initial Russell Plan's District 3 was still a "Hispanic district" and complied with the VRA.

302.    But that assurance was not enough for the Commission. Reyes first flagged the issue: "I don't agree with it because [] there is a lot of Anglos in that area and it's going to affect them. The district as such, is going to be affected."

303.    This prompted Russell to ask De Grandy about the relative Hispanic population of the strip he proposed moving into District 3, versus the area around Natoma Manors moved in the

Base Plan.

304.    De Grandy explained Russell's strip had a Hispanic population "in the 40's," dissimilar from the rest of District 3.

305.    Meanwhile, the Natoma area De Grandy had proposed moving into District 3 was "in the 50 range," so he felt it more appropriate to move.

306.    Further, the Natoma area was smaller in population, so De Grandy wasn't concerned about that reducing District 3's Hispanic population.

307.    Russell concluded the areas were close enough in their impact on District 3's Hispanic population "to where we're splitting hairs."

308.    But the majority of the Commission wanted to split those hairs to achieve its overall goal: packing as many Hispanic residents as possible into District 3.



*Fig. 18. Areas moved out of District **2 into 3/4** in Revised Russell Plan (compared to 2013 Plan).*

309. The Commission revisited this theme at its final meeting, as it debated the Revised Russell Plan.

310. De Grandy again explained he "did not go east" into Brickell "when I was doing District 3 [] because I found the population to be dissimilar. It was approximately 40-some percent Hispanic, going into a district that's approximately 88% Hispanic."

311. Zooming in on individual city blocks, Díaz de la Portilla pressed De Grandy on the demographics of the "buildings in the West Brickell area" the Revised Russell Plan moved: "those buildings that are now inhabited are predominately Anglo."

312. De Grandy confirmed those buildings were "markedly different than the population in District 3."

313. So instead of shifting District 3 eastward into Brickell, De Grandy "decided that the best move will be to go south and not go east" into Brickell, because the people to the south "are more similar" to the rest of District 3, he again explained.

314. He advised that "in any of the plans," "District 3 is still a majority-Hispanic district," but was a "stronger Hispanic district under the base plan, absolutely."

315. Discussing the Reyes Plan and Revised Russell Plan's removing the West Grove triangle from District 4, Carollo stressed that District "is still the most Hispanic district out of the three Hispanic districts in the city" "even with the [West Grove] sliver of 1,600 additional people."

316. District 3, on the other hand, would be forced to gain more than 1,600 people from District 2 to balance the population deviations, as Carollo explained it.

317. That population would come from Brickell, where "it's not cohesive anymore" and where "the numbers also change" compared to the rest of District 3.

318. And, he continued, that "would put District 3 into the future in possible jeopardy."

48

319.  Carollo spelled out the problem in blunt terms: "bringing in a transplant from another part of the country, and because they speak a little Spanish and they smile all the time, they feel they can sneak in. . . . And this district now is gonna be skewed where it's not gonna be clear on the kind of person that could get elected from it."

320.  That is why, he concluded, he would "strongly object to West Brickell going into District 3."

321.  Reyes agreed, saying he "totally, totally oppose[d] that," and explaining that he originally agreed with De Grandy's first suggestion to shift District 3 into Bay Heights rather than Brickell, since Bay Heights was "close to 52% Hispanic." But he opposed moving District 3 eastward into Brickell.

322.  Díaz de la Portilla agreed too, saying "Carollo hit the nail on the head."

323.  He explained why the Revised Russell Plan did not adequately pack Hispanic voters: "What Mr. Russell's plan does, down the line, . . . is disintegrate that Hispanic district, District 3."

324.  "And then we'll have a minority-Hispanic Commission in a majority-Hispanic city. How's that democracy?" Díaz de la Portilla concluded, "You're shifting the balance of power in a Hispanic district."

325.  Under the Revised Russell Plan, District 3 was 86.6% HVAP and 84.8% HCVAP.

326.  In the Base Plan and Enacted Plan, it is 88.3% HVAP and 86.9% HCVAP.

*3. District 2/4 Border*

327.  The boundary between Districts 2 and 4 was also drawn to pack Hispanic residents into District 4 and strip them from District 2.

328.  At the first redistricting meeting, Díaz de la Portilla highlighted the Douglas Park

area, which was in District 2 under the 2013 Plan, that "probably doesn't belong there." Using the

phrase "political cohesion" to euphemistically refer to racial groups, Díaz de la Portilla opined, "if

you look at political cohesion, it probably belongs in Commissioner Reyes' district," because it

has "more commonalities" with the rest of District 4 "than with Coconut Grove or Edgewater."

329. Carollo agreed, stating at the following meeting that this "very Hispanic area"

"should have always been part of District 4."

330. The area referred to, bounded by SW 25th Street, SW 27th Avenue, and US 1, is

81.8% HVAP and 13.6% WVAP.

331. That overwhelmingly Hispanic area was moved into District 4 in the Enacted Plan,

thereby packing Hispanic residents into District 4 and stripping them from District 2 (*see* Fig. 16).

332. As with other areas of the map, the rejected proposals for District 4 clarify the

Commission's racial intent.

333. On February 7, Carollo proposed moving a chunk of North Coconut Grove between

22nd and 27th Avenues and South Bayshore Drive into District 4 from District 2.

334. Reyes objected strongly to this area—which is 54.4% WVAP—being added to his

district. Carollo tried to reassure Reyes by reminding him that he has "the most Hispanic" and "the

most Cuban district" in the city, and that the Feb. 7 Draft already gave him "a huge Hispanic area

on the other side of US 1," referring to the Douglas Park area.

335. Comparing that 82% HVAP Douglas Park addition to his 54% WVAP North Grove

proposal, Carollo explained Reyes can't be "getting all the sirloin but none of the bone."

336. In the end, the Commission moved the Hispanic-rich "sirloin" into District 4, while

most of the majority-white "bone" remained in District 2.

337. District 4 does, however, add a portion of Coconut Grove from District 2.

Following Díaz de la Portilla's early suggestion to move areas "where Hispanic voters live" given the "ethnic diversity in Coconut Grove," District 4 adds a 59.2% HVAP triangle from the West Grove, bounded by US 1, Day Avenue, and SW 27th Avenue (*see* Fig. 16).

338.    That triangle was not as Hispanic as the rest of District 4, but given the Commission considered District 4 to be the "purest" Hispanic district already, it was acceptable for it to add just "a slice, sliver" of less-Hispanic "bone."

339.    In later meetings, Reyes begrudgingly accepted adding part of Coconut Grove because he thought it necessary to maintain the racial balance of District 5: "The only reason that I will accept that is to save that seat that is there," he said on March 11, pointing to King.

340.    District 4 in the Enacted Plan is 89.5% HVAP and 88.2% HCVAP.

### 4. Internal Borders of Districts 1, 3, and 4

341.    The Commission also drew the borders that Districts 1, 3 and 4 share to facilitate the Enacted Plan's packing of Hispanic voters into these districts and more generally, to accomplish the tripartite racial separation throughout the map.

342.    The commission largely treated Hispanic voters on the borders of these districts as fungible because these areas are all predominately Hispanic.

343.    As Carollo, Reyes, and Díaz de la Portilla recounted multiple times, Flagami, Little Havana, Shenandoah, and Silver Bluff were all split between these three districts to effectuate the Commission's policy of maximum racial separation.

344.    When he presented his Feb. 7 Draft, De Grandy acknowledged shifting areas between Districts 3 and 4 because he "tried to find adjacent areas with similar demographics in order to maintain voter cohesion."

345.    Following Carollo's discussion of District 4 not keeping all the "sirloin," Carollo

suggested moving into District 3 a heavily Hispanic portion of District 4 between SW 27th and 32nd Avenues, in Little Havana.

346.    When Reyes objected, Carollo explained to him why it was necessary to add that territory to District 3: "you're getting more than two squares here," referring to the Douglas Park area, "in prime Hispanic area, and you're diluting the Hispanic vote."

347.    "There has to be a balance," Carollo continued, and in exchange for getting "a huge chunk of rich Hispanic voters" around Douglas Park, District 4 needed to balance its Hispanic population out with District 3.

348.    Reyes eventually agreed to "work[] out in a way that we can make it as Hispanic as you can."



*Fig. 19. Enacted Plan borders between Districts 1, 3, and 4, showing neighborhoods split and areas moved (compared to 2013 Plan).*

349.    The area Carollo wanted to add to District 3—bounded by SW 27th and 32nd Avenues, NW 7th Street, and SW 8th Street—was indeed moved into District 3 in the Enacted Plan. It is 89.5% HVAP.

350.     Explaining the shift on February 25, De Grandy explained, "we tried to find adjacent areas with similar demographics in order to maintain voter cohesion."

### V. Lack of Narrow Tailoring to Achieve a Compelling Interest in Racial Predominance

351.     Where, as here, race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden . . . shifts to the [government] to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (internal quotations omitted). Traditionally, compliance with the Voting Rights Act, namely Section 2, has served as the primary justification for predominant considerations of race. The Commission's use of race, however, was not narrowly tailored to any compelling government interest, including compliance with the VRA.

352.     To ensure its use of race was narrowly tailored to achieve VRA compliance, the Commission was obligated to assess the level of minority citizen voting-age population or registered voters necessary for those voters to have the opportunity to usually elect their candidates of choice.

353.     The Commission centered its "analysis" on total population and voting-age population figures instead of reviewing "voting-age population *as refined by citizenship*." *Negron*, 113 F.3d at 1569 (emphasis added).

354.     Despite their facial concern for protecting diverse representation, neither the Commission nor its consultants took steps to meaningfully assess VRA compliance. There is no indication the Commission conducted an analysis of racially polarized voting (RPV) or any other analysis key to assessing VRA compliance.

355.     Instead, the Commission relied on blanket racial targets and sought to increase the Black, Anglo, and Hispanic populations of the respective districts as much as possible.

356. Without conducting a functional analysis of RPV, the Commission's race-based map drawing was not narrowly tailored to achieve VRA compliance.

357. The Commission identified no other compelling interest to justify its use of race when it drew the Enacted Plan.

## CLAIM FOR RELIEF

### Racial Gerrymandering
### in Violation of the Fourteenth Amendment to the U.S. Constitution
### (42 U.S.C. § 1983)

358. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

359. The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

360. Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

361. As alleged in detail above, race was the predominant factor in the design of all five Miami City Commission districts. Race predominated over all other redistricting criteria when each of these districts was drawn.

362. The use of race as the predominant factor in creating the districts was not narrowly tailored to advance any compelling state interests, including compliance with the VRA.

363. Consequently, the districts do not survive strict scrutiny.

364. Therefore, the districts violate Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the Court enter judgment in their favor and:

A.      Declare the five Miami City Commission districts adopted in Resolution 22-131 to be unconstitutional in violation of the Fourteenth Amendment as racially gerrymandered;

B.      Preliminarily and permanently enjoin the City and its officers and agents from calling, conducting, supervising, or certifying any elections under the Enacted Plan;

C.      Order the City to hold special elections to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regularly scheduled elections;

D.      Award each Plaintiff nominal damages of $100;

E.      Award Plaintiffs their attorneys' fees in this action;

F.      Award Plaintiffs their costs of suit;

G.      Retain jurisdiction to render any further orders this Court may deem necessary; and

H.      Grant any other relief this Court deems just and proper.

Respectfully submitted this 10th day of February, 2023,

*/s/ Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida, Inc.**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
Jocelyn Kirsch*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com
jocelyn.kirsch@dechert.com
* *Admitted pro hac vice*

*Counsel for Plaintiffs*

DE 24-3

<u>**11/18/21 Slide Presentation**</u>

**Miguel De Grandy, *Redistricting the City of Miami*,
Nov. 18, 2021**



REDISTRICTING THE CITY OF MIAMI

Submitted into the public
record for item(s) _DI.1_
on _11/3/21_.    City Clerk

10978 Sben Hal - Miguel de Grandy - Powerpoint Presentation

Submitted into the public
record for item(s) __ 01   2 __
on 11/13/21 .        City Clerk

# Census data

2010 total population was 399,489

2020 population is 442,241

Increase of 42,752 residents or 10.7% increase in population.

Submitted into the public
record for item(s) ____
on _____. City Clerk

$$442{,}241 \div 5 = 88{,}448.2$$

POPULATION          DISTRICTS          IDEAL
                                       POPULATION



Submitted into the public
record for item(s) ___
on _____ . City Clerk





Submitted into the public
record for item(s) OI.1
on 11/18/21    City Clerk



Submitted into the public
record for item(s) OE 1
on 11/19/21   City Clerk

# TOTAL DEVIATION OF THE CURRENT PLAN

32.09% Over - District 2

+ 10.26% Under- District 3

42.35% Total Deviation

Submitted into the public
record for item(s) ___ DE. 1
on 11/18/21.   City Clerk



# FEDERAL COURTS
# HAVE LIMITED
# TOTAL DEVIATION
# OF A LOCAL PLAN
# TO 10%

Submitted into the public record for item(s) ____ on _____. City Clerk



FEDERAL COURTS
HAVE LIMITED
TOTAL DEVIATION
OF A LOCAL PLAN
TO 10%

PRESENT PLAN
WITH 42.35%
DEVIATION WOULD
BE STRUCK DOWN



Submitted into the public
record for item(s) ___
on _____ City Clerk

# THE VOTING RIGHTS ACT OF 1965

Section 2 of the Voting Rights Act of 1965 prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in one of the language minority groups

This can include the use of redistricting to pack protected minorities into fewer districts than they could form the majority in (PACKING)

Or splitting compact minority population between districts to lessen the number they could form a majority in (CRACKING)

Submitted into the public
record for item(s) ___ - ___
on _____ . City Clerk

# VOTING RIGHTS ACT THRESHOLD

A protected minority group must be large enough and compact enough to comprise a majority in a single-member district

Minority voters must be politically cohesive

The majority must usually vote as a bloc to thwart the election of the minority preferred candidate

Submitted into the public
record for item(s) DI 1
on 1/13/22.    City Clerk

## 2020 REDISTRICTING ANALYSIS

The black population in the District 5 area is relatively compact.

Voting analysis shows that Black voters are still politically cohesive

Voting analysis also shows that Non-Black voters still prefer different candidates than Black voters.

Submitted into the public
record for item(s) _____
on _____ City Clerk

## PRIME DIRECTIVES

Comply with the requirements of the U.S. Constitution to achieve substantial population equality among districts.

Comply with the Federal Voting Rights Act.

Comply with the 14th Amendment (race conscious, but not race driven)

Submitted into the public
record for item(s) _____
on _____ City Clerk

# TRADITIONAL REDISTRICTING CRITERIA

Compactness (a measure of a district's geometric shape)

Contiguity (all parts of the district must be connected)

Preserving communities of interest (single-family residential, high-density residential areas, traditional neighborhoods, business districts, coastal or environmentally sensitive areas, etc.)

Preserving the cores of prior districts (to provide continuity of representation and avoid voter confusion)

Use of man made or natural boundaries when feasible (a river, a major expressway, major roads such as section lines, roads, or the boundaries of traditional neighborhoods)

Any other non racial or ethnic rational or important city interest.

Submitted into the public
record for item(s) DI.1
on 11/17/21. City Clerk

## COMMISSION'S POLICY DIRECTION

Mathematical equality or "substantial equality"?

Determine what Traditional Redistricting principles to employ

Provide guidance on how it wishes the these Traditional Redistricting Criteria to be balanced.

For instance, emphasizing compactness could mean the creation of districts that may not respect the core of existing districts.

Submitted into the public
record for item(s) _OE_
on _11/1/21_. _____ City Clerk

# COMMISSION'S POLICY DIRECTION

Policy direction regarding public hearings.

**Before the plan is developed, or when the draft plan is presented for the Commission's consideration in a public meeting?**

Delay in release of Census data has impacted the timeline.

Division of Elections needs to re-precinct for County's 2022 election. Requested completion of plan by end of February 2022.

DE 24-9

# 3/11/22 Initial Russell Plan Presentation

**Miguel De Grandy & Stephen Cody,**
*Alternative: Keep Areas South of US 1 in D2 and Adjust D3,*
**Mar. 11, 2022**

Submitted into the public record for item(s) SP.1 on 3/11/2022 – City Clerk

# Alternative: Keep Areas South of US 1 in D2 and Adjust D3

## City of Miami

Miguel A. De Grandy, Esq and Stephen Cody, J.D. - March 11, 2022

11582 Submittal - Miguel DeGrandy - Keep Area South of US1 in D2 with ADJUSTMENT Presentation – 03-11-2022



## Deviations

| Dist No. | Total Pop | Deviation | % Dev |
|---|---|---|---|
| D1 | 88,108 | -340 | -0.38% |
| D2 | 89,309 | 861 | 0.97% |
| D3 | 93,246 | 4,798 | 5.42% |
| D4 | 85,000 | -3,448 | -3.90% |
| D5 | 86,578 | -1,870 | -2.11% |
| Total | 442,241 | Total Dev | **9.32%** |
| Ideal | 88,448 | | |



## Population by Race & Ethnicity

| District No. | D1 | % | D2 | % | D3 | % | D4 | % | D5 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Pop | 88,108 | | 89,309 | | 93,246 | | 85,000 | | 86,578 | |
| SR White | 4,011 | 4.55% | 32,913 | 36.85% | 9,575 | 10.27% | 7,020 | 8.26% | 8,310 | 9.60% |
| Black | 9,762 | 11.08% | 6,727 | 7.53% | 5,055 | 5.42% | 2,660 | 3.13% | 45,182 | **52.19%** |
| Hisp | 77,604 | **88.08%** | 43,876 | 49.13% | 78,948 | **84.67%** | 75,473 | **88.79%** | 34,571 | 39.93% |

## Voting Age Population by Race & Ethnicity

| District No. | D1 | % | D2 | % | D3 | % | D4 | % | D5 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Total VAP | 72,844 | | 77,482 | | 77,752 | | 72,388 | | 68,734 | |
| SR White | 2,523 | 3.46% | 28,777 | 37.14% | 7,695 | 9.90% | 5,190 | 7.17% | 7,243 | 10.54% |
| Black | 8,037 | 11.03% | 5,673 | 7.32% | 4,219 | 5.43% | 2,174 | 3.00% | 34,551 | 50.27% |
| Hisp | 65,206 | 89.51% | 38,058 | 49.12% | 66,247 | 85.20% | 65,212 | 90.09% | 27,929 | 40.63% |

DE 24-11

# Meeting Transcript 1

**Miami City Commission**
**November 18, 2021**
**Afternoon Session**

Transcript of excerpt of video recording available at:
https://www.youtube.com/watch?v=w1qOdmCteM8

## Transcript 1 - Miami City Commission - Nov. 18, 2021 - Afternoon Session

1    justified on the basis of being a coastal district, being a high density district, being an

2    environmentally sensitive district. Steve you had something that you wanted to add.

3        Mr. Cody: No, I wanted, on another subject, but finish your thought.

4        Mr. De Grandy: All right.

5        Commissioner Reyes: And also, one thing that is, I mean, it's also worrisome to District 1

6    and 3 because you have the highest population of non-voters, residents. It is, you have a task in

7    front of you. And I personally will love to preserve the integrity of the core of my district, and I

8    think that you have to start from that.

9        Mr. De Grandy: And Commissioner if I may, as you're giving me your individual

10   guidance, I can, and I think your attorney will tell you, I can only follow guidance that is given to

11   me as a body. And so, if there's three of you that want to maintain the core of existing districts,

12   that's what I do. If there's three of you that want to keep traditional communities together, keep

13   Allapattah, keep Little Havana, keep Wynwood, etcetera, within a district where possible, that's

14   what I do. But as you develop your discussion, please understand I would suggest you make

15   motions as to what criteria you will want to direct me to use, and that's what I'll do.

16       Commissioner Díaz de la Portilla: I think we want both of those things.

17       Commissioner Reyes: That's right.

18       Commissioner Díaz de la Portilla: Yes, so I think, and I'll make a motion to that end. I

19   guess for discussion purposes, we can then change it. That we want to maintain the core

20   constituencies of the districts, and we want to maintain traditional communities, as we know

21   them in Miami. Allapattah is Allapattah. Flagami is Flagami. Wynwood is Wynwood. Overtown

22   is Overtown. Those communities need to be protected. What you don't want to do is you don't

23   want to split them. You don't want to cut them in half. You don't want to dilute their voting

## Transcript 1 - Miami City Commission - Nov. 18, 2021 - Afternoon Session

1    strength or their ability to elect one of their own.

2          Commissioner Carollo: You have many that have been cut in half, for instance

3    Shenandoah.

4          Commissioner Díaz de la Portilla: Yeah of course, I'm —

5          Commissioner Carollo: Silver Bluff.

6          Commissione Russell: Wynwood.

7          Commissioner Carollo: Wynwood.

8          Commissioner Díaz de la Portilla: But those are communities that are similar in nature.

9          Commissioner Reyes: Flagami is split in half, Flagami is split.

10         Commissioner Díaz de la Portilla: Flagami is split in half between you and me.

11         Commissioner Carollo: If we could go back to a couple of the pages that you have.

12         Mr. De Grandy: Which ones?

13         Commissioner Carollo: I think there were a couple before this last one that we have here.

14         Mr. De Grandy: Traditional redistricting principles?

15         Commissioner Díaz de la Portilla: I withdraw the part of traditional communities, and I'll

16    leave the part of only core constituencies. How about that? This is a recommended motion, not to

17    debate it now, just out there.

18         Commissioner Russell: You're making a motion at this point?

19         Commissioner Díaz de la Portilla: I'm making a motion.

20         Commissioner Russell: Is there a second for Commissioner Díaz de la Portilla's motion?

21         Commissioner Díaz de la Portilla: I'm making a motion just to preserve core

22    constituencies.

23         Commissioner Carollo: That I think we're all in agreement on.

18

**Transcript 1 - Miami City Commission - Nov. 18, 2021 - Afternoon Session**

1       Commissioner Reyes: I second.

2       Commissioner Russell: Seconded my Commissioner Reyes. Keep on discussing.

3       Commissioner Carollo: Can we go back one more?

4       Mr. De Grandy: One more Steve.

5       Commissioner Carollo: One more back if we could. One more.

6       Mr. De Grandy: One more Steve. One more.

7       Commissioner Carollo: No, no, let's go forward.

8       Mr. De Grandy: One with the map or text.

9       Commissioner Carollo: The text.

10      Mr. De Grandy: Text, okay.

11      Commissioner Carollo: You can go forward.

12      Mr. De Grandy: Go forward?

13      Commissioner Carollo: Okay, hold on a minute Steve. Okay, let's go to the next one.

14  Okay.

15      Commissioner Russell: We're drawing, we're drawing it now.

16      Commissioner Carollo: You can hold on for one second. If not I'm going to get you

17  pampers for the next meeting. This is important. Hold it, you're a big boy. Breathe. Minority

18  voters must be politically cohesive. Okay?

19      Mr. De Grandy: Yes sir.

20      Commissioner Carollo: Okay and this to me is one of the most important aspects of what

21  we need to give him instructions on. And I think we all understand why that is important.

22  Minority voters must be politically cohesive. I will make a motion that this will be part of what

23  you use to put the districts together, also. The minority voters must be politically cohesive.

DE 24-31

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

 *Plaintiffs*,

v.

CITY OF MIAMI,

 *Defendant*.

_____/

## EXPERT REPORT OF DR. CAROLYN ABOTT

### January 31, 2023

**Introduction and Summary**

The Enacted Miami City Commission Districting Plan is the byproduct of many decades of racialized Commission maps. Changes made from the 2013 enacted plan were also racially motivated, though these changes are minimal compared to the inherited racialization from previous plans.

 I was asked by Plaintiff's counsel in this case to use data on voting-age population (VAP), citizen voting-age population (CVAP), and voting patterns within individual city precincts in order to determine whether and to what extent race can explain the overall shapes of the 2022 Enacted Plan districts as well as the changes between the 2013 Plan and the 2022 Plan. In particular, I will examine the Black, White, and Hispanic voting-age populations in the precincts that border all five Commission Districts and draw conclusions about the way race was used to determine the district boundaries. I will also consider alternative explanations for the boundary

1

changes, and show that these alternatives cannot explain the patterns I observe. Finally, Plaintiff's counsel asked me to draw a majority White-CVAP district but was unable to do so due to the geographic distribution of racial groups.

Based on my examination, I reach the conclusion that areas moved from one district to another were done so on the basis of race and that other areas could have been moved without further segregating the districts by race but were rejected by the Commission or not considered at all. I also have observed the Commission's practice of splitting precincts along racial lines. Finally, I note that there are several alternative precincts that could have been moved out of District 2 for population equality reasons that would not have enhanced the racial divisions of districts to the same extent as the Enacted Plan. Most changes to Districts 1, 3, 4 and 5 that did not involve District 2 were unnecessary and can only be understood on the basis of race.

### Qualifications

I am an Assistant Professor of Political Science at Baruch College, City University of New York, where I teach courses in American Government, State and Local Politics, Political Economy, Public Policy, and Public Administration. Prior to joining the faculty at Baruch, I taught at St. John's University in Queens, New York and completed a postdoctoral fellowship at The Ohio State University. I received a Ph.D. in political science and social policy from Princeton University in 2016. Both my research and teaching focuses on various aspects of American politics and public policy, particularly at the state and local level. This work includes research on American elections, including publications in top peer-reviewed journals on local elections, minority representation, voting rights, and voting behavior. Further details about my

2

professional qualifications and experience are listed in the copy of my curriculum vitae attached. I am being compensated for my work on this report at an hourly rate of $450/hour. No part of my compensation depends on the outcome of this case or on the nature of the opinions that I provide.

**Sources and Methodology**

In preparing this report, I have relied on my personal knowledge gathered through my years of researching, studying, and publishing. I also utilize the standard methodology that political scientists use when investigating precinct and census data. The 2020 Census provided data on voting-age populations (VAP) by race at the block level that could then be aggregated up to the precinct and split-precinct level. Data on 2019 citizen voting-age population (CVAP) by race provided in the Appendix comes from the 2019 American Community Survey 5-Year Estimates (ACS).

City Commission district maps and incumbent addresses were provided to me by Counsel. Precinct shapefiles and statewide election results were downloaded from the Voting and Election Science Team on Harvard's Dataverse (https://dataverse.harvard.edu/dataverse/electionscience). Dr. Moy provided me with election results for the 2020 County Mayor race.

**Overview of District Maps Prior to 2022 Enacted Plan**

When embarking upon the current round of redistricting, the City of Miami had inherited district maps from 2013 and beyond that exhibited clear patterns of racial segregation. *Table 1*

3

depicts the VAP by race in all five districts under the 2013 Plan. Majorities tend to be

exaggerated in districts (Districts 1, 3, and 4 for Hispanic voters; District 5 for Black voters) while

voters of those races tend to be spread out across districts in which they do not hold a majority.

This is particularly true of Black voters. The Black VAP is 14.8% in the City of Miami. Only one

district (District 5) had equal or greater Black VAP under the 2013 Plan. Under the previous

map, District 1 contained 10% Black VAP, District 2 contained 7.7% Black VAP, District 3

contained 5.6% Black VAP, and District 4 contained 2.9% Black VAP. District 5, however, had

53% Black VAP, and is the only district in which Black voters could conceivably have any "voice"

in a Commission election.

*Table 1: District Racial Compositions Under the 2013 Plan*

| District | Black VAP | White VAP | Hispanic VAP |
|----------|-----------|-----------|--------------|
| 1 | 10.1% | 3.0% | 91.0% |
| 2 | 7.7% | 34.5% | 51.9% |
| 3 | 5.6% | 7.4% | 88.5% |
| 4 | 2.9% | 6.0% | 91.6% |
| 5 | 52.9% | 7.8% | 41.6% |

Districts 2 and 5 are the most racially diverse districts in the sense that there is no clear

racial supermajority of voters. Unlike District 5, however, District 2 needed to be redrawn

substantially in order to satisfy population equality concerns (District 5 needed to grow only

somewhat). *Table 2* shows the size of the VAP in districts before and after the most recent

round of redistricting. Under the 2013 Plan, District 2 contained 34,540 more residents than the

next largest district. This is equivalent to being more than 40% larger than any of the other

districts. As a result, District 2 shrunk considerably under the 2022 Enacted Plan while the other

four districts all grew. As we will see, however, District 2 was not the only donor of precincts; all

districts except District 3 (the smallest under the 2013 plan) donated precincts or portions of

precincts, often receiving different precincts from the very districts they were donating to.

*Table 2: Population Before and After Redistricting*

| District | 2013 Plan | 2022 Enacted Plan |
|----------|-----------|-------------------|
| 1 | 81,449 | 88,108 |
| 2 | 117,281 | 93,300 |
| 3 | 80,169 | 87,658 |
| 4 | 80,601 | 86,597 |
| 5 | 82,741 | 86,578 |

*Table 3* depicts the racial VAP composition after redistricting. Overall, Black VAP in District 2

decreased slightly as a percentage of total VAP (from 7.7% to 7.2%), as did Hispanic VAP (from

52% to 49%) after redistricting. This was due to the fact that White VAP increased from 34% to

37% after redistricting. White VAP also increased in District 5 while both Black and Hispanic VAP

decreased. On the whole, however, there was no statistical difference between VAP by race

before and after redistricting at the district level. There were, however, significant patterns of

change at a more granular level, which I will discuss in the next section.

*Table 3: District Racial Compositions Under the 2022 Enacted Plan*

| District | Black VAP | White VAP | Hispanic VAP |
|----------|-----------|-----------|--------------|

| 1 | 11.0% | 3.5% | 89.5% |
| 2 | 7.2% | 37.4% | 48.6% |
| 3 | 5.4% | 7.7% | 88.3% |
| 4 | 3.1% | 7.6% | 89.5% |
| 5 | 50.3% | 10.5% | 40.6% |

**Changes Made Between 2013 and 2022 Plan**

<u>District 1</u>

District 1 is a super-majority Hispanic district with a small Black and even smaller White population. The district was third largest by population under the 2013 Plan so, in theory, needed to gain only a few residents. The changes under the 2022 Enacted Plan resulted in District 1 growing both in absolute and relative terms (it is now second largest, after District 2).

Changes made to District 1 occurred in tandem with changes only to District 5. Areas 6 and 8 were moved from District 5 into District 1 while Area 7 was moved out of District 1 and into District 5 (please see *Figure 1*). These swaps appear to be entirely motivated by race. Areas 6 and 8 are less Black than the nearby areas surrounding it that remained in District 5, while the reverse is true of Area 7.

At the precinct level, the portions of precincts that were split during the redistricting and remained in their original district looked significantly different from the portions that were moved. In Area 6, the portion of Precinct 531 that was moved from District 5 to District 1 had lower Black VAP and greater Hispanic VAP compared to the portion that remained in District 5.

6

In Area 8, Precinct 522 also had a split with lower Black VAP and greater Hispanic VAP that was moved into District 1 in addition to a portion of Precinct 512 that had comparatively lower White VAP. And in Area 7, the portion of Precinct 523 that was moved from District 1 to 5 had greater Black VAP and lower Hispanic VAP compared to the portion that remained in District 1. *Table 4* lists these disparities in greater detail.

*Table 4: Black, White, and Hispanic Voting-age Population in Precinct Splits that Were Located in Different Districts Under the 2022 Enacted Plan, Areas 6, 7, and 8*

| Precinct | District 1 Split | District 5 Split |
|---|---|---|
| Area 6 | | |
| 531 | 27.2%, 44.9%, 71.1% | 62.5%, 2.7%, 38.7% |
| Area 7 | | |
| 523 | 27.4%, 1.8%, 82.0% | 40.5%, 0.5%, 65.7% |
| 529 | 18.7%, 2.7%, 86.6% | 13.3%, 13.3%, 73.3% |
| Area 8 | | |
| 512 | 50.0%, 37.5%, 37.5% | 61.2%, 1.3%, 41.6% |
| 522 | 32.8%, 1.1%, 77.0% | 60.1%, 2.5%, 41.1% |

Because District 5 took on additional precincts from District 2 as was necessary for population equalization purposes, District 5 needed to give precincts to either District 1 or District 3. In this regard, it is understandable why District 5 would have been a net donor to District 1. But the areas that were chosen were deliberately done so on the basis of race. That District 5 also received precincts from District 1 (which were also racially distinct from the

surrounding areas) when this should not have been necessary for equalizing, further bolsters

the argument that changes made to District 1 were done so on a racialized basis.



*Figure 1: Areas moved between 2013 Plan and 2022 Enacted Plan*

District 2

As previously discussed, District 2 is one of the two ethnically and racially diverse

Commission districts in the City (District 5 being the other). It was also the largest in terms of

population going into the redistricting process and needed to shrink in order to be in

compliance with the law. This was accomplished by donating precincts and portions of precincts

to Districts 3, 4, and 5. Three areas that were moved from District 2 stand out. The first is Area

8

USCA11 Case: 23-12472 Document 38-1 Date Filed: 10/18/2023 Page: 188 of 235

10/11 that was given to District 5. This section of donated precincts had a lower White VAP and a greater Hispanic and Black VAP compared to areas that were not moved. This is particularly pronounced among some precincts that were split across District 2 and 5 during the redistricting. Precinct 534A, for instance, was split in such a way that the portion donated to District 5 had nearly 10 percentage points greater Black VAP than the portion that remained in District 2. Precinct 536A saw a split given to District 5 that contained Black VAP that was 45 percentage points higher than the split that stayed in District 2. *Table 5* lists the VAP by race for each of these split precincts.

Area 17, a former section of the southwest part of District 2 directly below US 1, did not substantially differ from the other portions of District 2 surrounding it. It did, however, differ markedly from the racial composition of the receiving District 4, which undercuts the argument that Commissioners were seeking to maintain the core of the Districts' racial compositions. Looking at the split precincts in this area also raises concerns about race-based motivations. *Table 6* lists the areas' two precinct splits and the VAP by race in each district. These precincts were split into sections with very different racial compositions: Precinct 583 gave District 4 a section with a greater percentage of Black and Hispanic voters, while Precinct 584 gave District 4 a much lower percentage of Black voters.

It should be noted, however, that the District 4 split of Precinct 584 contains about 10% of the VAP that the District 2 split contains (235 individuals versus 2,108). This pattern is generally true across all districts and precincts: on average, portions of splits precincts that were moved were one-third the size of the portions that remained in their original 2013 districts.

9

*Table 5: Black, White, and Hispanic Voting-age Population in Precinct Splits that Were Located in Different Districts Under the 2022 Enacted Plan, Areas 10/11*

| Precinct | District 2 Split | District 5 Split |
|---|---|---|
| Area 10/11 | | |
| 538 | 8.3%, 31.1%, 54.8% | 8.3%, 31.1%, 56.7% |
| 534 | 6.6%, 24.7%, 60.0% | 9.8%, 20.4%, 65.8% |
| 534A | 8.3%, 47.3%, 34.2% | 17.5%, 28.2%, 42.5% |
| 536A | 13.0%, 16.6%, 67.0% | 54.8%, 0.0%, 74.2% |
| 984A | 7.8%, 23.6%, 61.3% | 20.0%, 20.0%, 65.0% |
| 984 | 7.3%, 35.6%, 48.8% | 16.7%, 22.8%, 57.4% |

*Table 6: Black, White, and Hispanic Voting-age Population in Precinct Splits that Were Located in Different Districts Under the 2022 Enacted Plan, Area 17*

| Precinct | District 2 Split | District 4 Split |
|---|---|---|
| Area 17 | | |
| 583 | 5.3%, 50.3%, 41.6% | 8.3%, 35.6%, 53.9% |
| 584 | 34.2%, 21.8%, 42.1% | 1.3%, 14.0%, 83.4% |

Area 13 is also notable for a number of reasons. The first is the odd and unintuitive shape that this carve-out of District 2 creates. For compactness reasons, it would have made more sense to give District 3 portions of District 2 that were further north and closer to District 5. These portions further north along US 1 could have even been donated to District 3 in addition to Area 13. Instead, however, District 3 took on portions of District 4 (discussed below) that did not make sense strictly for purposes of population equalization. Secondly, while Area

10

13 does not differ markedly from the surrounding areas in terms of Black VAP, it has

considerably lower Hispanic VAP than both the surrounding areas of District 2 and – by quite a

bit – of the receiving District 3. Though the split precincts in Area 13 do not markedly differ

from one another across districts in terms of VAP by race, the movement of Area 13 had ripple

effects in the drawing of other districts that was largely adjudicated by racial concerns. *Table 7*

lists these split precincts and how the portions between Districts 2 and 3 differ by racial VAP.

*Table 7: Black, White, and Hispanic Voting-age Population in Precinct Splits that Were Located in Different Districts Under the 2022 Enacted Plan, Area 13*

| Precinct | District 2 Split | District 3 Split |
|----------|-----------------|-----------------|
| *Area 13* | | |
| 546 | 3.1%, 51.3%, 40.5% | 2.8%, 52.4%, 37.6% |
| 582 | 1.6%, 49.9%, 43.5% | 2.5%, 51.7%, 37.7% |

District 3

District 3 is the second smallest district by population. As discussed in the previous section,

District 3 needed to add portions of other districts in order to address population equalization

issues, and did so by taking on areas from District 2 – the largest district in the City – and from

District 4.

As discussed above, Area 13 was moved from District 2 to 3 for reasons that appear to

be unmotivated by race as the precinct splits are not substantively distinct across district lines.

Area 13, however, contains only 1,396 people. This is a relatively small (18.6) percent of the

total 7,493 people that were moved into District 3. These 1,396 residents in Area 13 make up

11

only 1.6% of District 3's overall population of 87,658 under the 2022 Enacted Plan. The bulk of the population that was moved came instead from Area 14/15 that originated in District 4.

Area 14/15 did not strongly differ from the areas immediately surrounding it, either in District 3 or District 4. The two split precincts in this area also did not look different from the split portions that remained in District 4. Area 14/15, however, has a very high Hispanic VAP of 96.2%. This very high proportion of potential Hispanic voters helped to offset the lower proportion of Hispanic voters that were gained by District 3 in Area 13 (37.6% Hispanic VAP). Adding additional portions of District 2 – rather than unnecessarily adopting Area 14/15 from District 4 – would have lowered the overall percentage of Hispanic VAP. It is likely that Area 14/15 was adopted by District 3 in order to balance the addition of Area 13.

Changes to Districts 4 and 5 were discussed in the sections on Districts 1-3.

**Alternative explanations**

Partisan gerrymander

Partisan gerrymanders are loosely defined as an attempt by a single party in charge of redistricting to maximize the number of seats held by the party. Partisan gerrymanders often occur when the majority party is tasked with drawing the maps and has full control over the district lines. This allows the majority party to draw districts in such a way as to narrowly guarantee the most number of majority-held seats in the legislative body, i.e., create competitive districts that give the majority party a narrow victory while splitting the minority party's voters into as few districts as possible that could grant them a victory.

12

This is not a viable explanation for what happened during the most recent round of

redistricting of the Miami City Commission for a number of reasons. First, City Commission

elections are nonpartisan. While it is quite easy to figure out the partisan affiliation of a

candidate, there are no partisan primaries nor general elections that are guaranteed to pit

candidates of different parties against one another. Second, the redistricting process was under

the purview of the entire Commission, not just the "majority party" (in quotations as the

Commission is nonpartisan and as such cannot have explicit partisan control), which meant that

all Commissioners had at least nominal input on the map. Finally, the 2022 Enacted Plan was

approved by a margin of 3-2 with one Democratic Commissioner joining two Republican

Commissioners in the majority. Approval of traditional partisan gerrymanders cannot cross

party lines as no minority party member would agree to the final product.


Maintaining the partisanship of the district cores

A similar but unrelated alternative explanation to partisan gerrymandering is the idea that the

2022 Enacted Plan was designed to maintain the current partisan makeup of the cores of the

districts, i.e., in order to guarantee that a Democrat would always represent District 5 and that

a Republican would always represent District 3.

This alternative explanation does not hold water. For moved precincts that were not

split and still had geographically contiguous neighboring precincts that remained and could be

used for comparison, either partisan voting patterns in both the 2018 gubernatorial election

and the 2020 county mayor election looked remarkably similar or the comparison precinct was

too small (i.e., only one person voting) to make reasonable inferences.

13

Additionally, moved precincts – generally speaking – did not look like the cores of the receiving districts. There were other precincts that could have been moved, even if they were not directly nearby to the precincts that were moved (but were geographically contiguous to the receiving district), that would have been preferable for maintaining partisan voting patterns of the adopting or donating district. For example, part of Precinct 548 was moved into District 3 from District 4. Precinct 548 looked nothing like the core of District 3. 59.4% of voters voted for DeSantis (the Republican candidate) in Precinct 548 that was moved, while 41.2% of District 3 voted for DeSantis using the 2013 map. Conversely, 53.4% of District 4 - the giving District - went for DeSantis. A more reasonable precinct to have been moved, had the plan been truly concerned about maintaining core partisanship patterns, would have been Precinct 572, 49.2% of which voted for DeSantis.

As another example, part of Precinct 583 was moved from District 2 to 4. 22% of this precinct voted for DeSantis compared to the overall 53.4% of District 4 and the 29.4% of District 2. A better portion of District 2 to move (which, again, was necessary for population equalization reasons) would have been 546 which went 29.9% for DeSantis. This precinct was split in the 2022 map, with one portion remaining in District 2 and one portion moved to District 3. If the map had truly aimed to preserve core partisanship, it would have made more sense to keep 546 in District 2 (or cede it to District 4) rather than give it to District 3 and instead move 582, 993, and/or 569 to District 3 where partisan voting patterns were far more similar. District 2 could have also donated its north end, which is heavily Democratic (i.e., Precincts 516, 544, 534B or the remaining portions of 999, 538, 534, 534A, 536A, 984A, 984

14

which each went 25.6%, 24.2%, 24.1% 26.5%, 18.1%, 23.2%, 24%, 14%, 23%, and 23% for

DeSantis), and given them to District 5 which is also heavily Democratic.


Keeping incumbents in their districts

    I have reviewed the locations of the five incumbents' addresses as given to me by Counsel

and as reported on their voting registration, and I have come to the conclusion that no

incumbent lives near one another, nor do they live near district boundaries that needed to

change for population-equalization reasons, and that this consideration could not have affected

the drawing of the district lines.


Maintaining the cores of existing districts

Cores of existing districts were not changed; only boundary areas were affected. That said,

there were a number of other boundary precincts and areas that could have made equal or

greater sense to have been moved. These have been discussed in previous sections of the

report.


Compactness

Visual inspection reveals that the 2022 Enacted Plan is less compact than the 2013 Plan and as

such compactness concerns cannot be used as an explanation for redistricting decisions.

Notable features of the 2022 Enacted Plan that stand out as being strangely drawn include

splits of Precincts 536A and 534A (District 2) that act as a finger that juts into District 5.

Similarly, splits of Precincts 546 and 582 belonging to District 3 extend past US-1 into District 2

15

when the rest of District 2's border is contiguous with US-1. The exception to this are splits of Precincts 583 and 584 belonging to District 4, and also appear to be drawn without regard to natural geographic boundaries.

**Alternative Map Proposals**

A number of alternative maps were proposed but not enacted. All maps tended to shore up existing racial compositions within individual Commission districts, particularly those of Districts 1, 2, and 5. The alternative maps did differ from one another in a number of ways, however, as described below.

A February 7, 2022 draft map

This alternative map (please refer to *Figure 2*) proposed to move Area B from District 2 to 5 and has 32.1% Black VAP, 22% White VAP, and 46.4% Hispanic VAP. This area was proposed to be moved to District 5 in exchange for keeping a small carve out of Area A in District 2. Area A has 14.2% Black VAP, 20.9% White VAP, and 61% Hispanic VAP.

The February 7 draft map also proposed to keep Area D in its 2013 district (District 5) but was instead moved to District 1 under the 2022 Enacted Plan. Area D has 29.9% Black VAP, 3.5% White VAP, and 72.1% Hispanic VAP. In exchange, Area C stayed in District 5. This area is very small with only 647 residents (580 of whom are of voting age) and has 7.6% Black VAP, 27.9% White VAP, and 58.8% Hispanic VAP.

Commissioner Russell's rejected proposal

This map (please see *Figure 3*) would have moved a less Hispanic area into District 3, lowering

the District's overall Hispanic share. Areas 13 and 17 from *Figure 1* were not planned to be

moved out of District 2 in this proposal, though they eventually were in the 2022 Enacted Plan.

These areas are 5.1% Black VAP, 40.8% White VAP, and 49.5% Hispanic VAP. Under this

proposal, there was also an area that would be moved from District 2 to District 3 that did not

come to pass. This area has 5.6% Black VAP, 40.8% White VAP, and 42.9% Hispanic VAP.


Commissioner Russell's rejected revised proposal

This proposal (*Figure 4)* differed from the original Russell proposal in that the area proposed to

be moved from District 2 to District 3 was cut in half. The area that was proposed to remain in

District 2 has 4.9% Black VAP, 46.8% White VAP, and 37.6% Hispanic VAP. In comparison, the

area that was proposed to continue to move to District 3 has 5.8% Black VAP, 38.9% White VAP,

and 44.6% Hispanic VAP.



*Figure 2: Areas of difference between February 7, 2022 draft map and 2022 Enacted Plan*

18



*Figure 3: Commissioner Russell's initial proposal*



*Figure 4: Commissioner Russell's revised proposal*

<u>Commissioner Reyes's rejected proposal</u>

This map (*Figure 5*) proposed to move an area that would have been less Hispanic than the one

that was eventually moved. This proposal is similar to the Russell proposals except that it adds

in a portion of District 2 to be moved to District 3 that encompasses both Area 13 in *Figure 1*

and the area that connects Area 13 to the Russell area. This strip has 0.9% Black VAP, 31.4%

White VAP, and 61.6% Hispanic VAP. These numbers do not include Area 13.

20



*Figure 5: Commissioner Reyes's proposal*

<u>Map with a majority White CVAP district</u>

Counsel asked me to attempt to draw a district that contained 50% or more White CVAP but I found it impossible to do so due to the distribution of racial groups across the city.

**Conclusion**

The 2022 Enacted Plan for the Miami City Commission has been designed around racial and ethnic considerations. While the Commission inherited a 2013 Plan that was already highly segregated by race, many of the changes made during the most recent round of redistricting were also motivated by race. Apart from a small portion of District 2 that was moved into

District 3 that objective demographic data does not demonstrate to be race-based, I found no

evidence that any factors other than race and ethnicity affected the drawing of district lines in

pursuit of equalizing population across districts.

Dr. Carolyn Abott, Ph.D.

January 31, 2023, in New York City, NY

Appendix

| Demographics of the 2013 Plan | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Population and Deviations | | | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
| Dist. | Total Pop. | Pop. Dev. | % Dev. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| 1 | 81,449 | −6,999 | −7.9% | 91.0% | 10.1% | 3.0% | 86.6% | 8.0% | 4.8% |
| 2 | 117,281 | +28,833 | +32.6% | 51.9% | 7.7% | 34.5% | 49.4% | 9.5% | 38.1% |
| 3 | 80,169 | −8,279 | −9.4% | 88.5% | 5.6% | 7.4% | 86.8% | 3.5% | 8.8% |
| 4 | 80,601 | −7,847 | −8.9% | 91.6% | 2.9% | 6.0% | 90.1% | 1.1% | 7.5% |
| 5 | 82,741 | −5,707 | −6.5% | 41.6% | 52.9% | 7.8% | 30.9% | 59.4% | 8.2% |
| City | 442,241 | — | — | 71.1% | 14.8% | 13.9% | 66.4% | 17.6% | 14.5% |

| Demographics of the February 7 Draft | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Population and Deviations | | | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
| Dist. | Total Pop. | Pop. Dev. | % Dev. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| 1 | 88,775 | +327 | +0.4% | 88.7% | 10.5% | 4.3% | 84.8% | 8.7% | 5.9% |
| 2 | 88,363 | -85 | -0.1% | 47.8% | 7.8% | 37.6% | 44.7% | 10.4% | 41.5% |
| 3 | 87,600 | -848 | -1.0% | 88.4% | 5.5% | 7.6% | 86.6% | 3.2% | 9.3% |
| 4 | 90,437 | +1,796 | +2.3% | 88.1% | 3.4% | 8.7% | 86.7% | 1.7% | 10.2% |
| 5 | 87,066 | -1,382 | -1.6% | 41.6% | 49.8% | 10.1% | 30.9% | 58.7% | 8.9% |
| City | 442,241 | — | — | 71.1% | 14.8% | 13.9% | 66.4% | 17.6% | 14.5% |

| Demographics of the Feb. 22 Draft/Base Plan/Enacted Plan | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Population and Deviations | | | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
| Dist. | Total Pop. | Pop. Dev. | % Dev. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| 1 | 88,108 | -340 | -0.4% | 89.5% | 11.0% | 3.5% | 86.1% | 8.2% | 5.0% |
| 2 | 93,300 | +4,852 | +5.5% | 48.6% | 7.3% | 37.4% | 44.4% | 8.7% | 40.5% |
| 3 | 87,658 | -790 | -0.9% | 88.3% | 5.4% | 7.7% | 85.6% | 3.9% | 9.9% |
| 4 | 86,597 | -1,851 | -2.1% | 89.5% | 3.1% | 7.6% | 89.6% | 1.3% | 8.2% |
| 5 | 86,578 | -1,870 | -2.1% | 40.6% | 50.3% | 10.5% | 30.8% | 58.2% | 9.5% |
| City | 442,241 | — | — | 71.1% | 14.8% | 13.9% | 66.4% | 17.6% | 14.5% |

| Demographics of the Initial Russell Plan | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Population and Deviations | | | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
| Dist. | Total Pop. | Pop. Dev. | % Dev. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| 1 | 88,108 | -340 | -0.4% | 89.5% | 11.0% | 3.5% | 84.8% | 9.3% | 5.4% |
| 2 | 89,309 | +861 | +1.0% | 49.1% | 7.3% | 37.1% | 46.0% | 9.4% | 41.1% |
| 3 | 93,246 | +4,798 | +5.4% | 85.2% | 5.4% | 9.9% | 84.8% | 3.2% | 11.1% |
| 4 | 85,000 | -3,448 | -3.9% | 90.1% | 3.0% | 7.2% | 89.1% | 1.4% | 8.2% |
| 5 | 86,578 | -1,870 | -2.1% | 40.6% | 50.3% | 10.5% | 30.1% | 59.0% | 9.2% |
| City | 442,241 | — | — | 71.1% | 14.8% | 13.9% | 66.4% | 17.6% | 14.5% |

| Demographics of the Revised Russell Plan | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Population and Deviations | | | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
| Dist. | Total Pop. | Pop. Dev. | % Dev. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| 1 | 88,108 | -340 | -0.4% | 89.5% | 11.0% | 3.5% | 84.8% | 9.3% | 5.4% |
| 2 | 91,619 | +3,171 | +3.6% | 48.8% | 7.3% | 37.4% | 46.0% | 9.4% | 41.1% |
| 3 | 90,936 | +2,488 | +2.8% | 86.6% | 5.4% | 8.9% | 84.8% | 3.2% | 11.1% |
| 4 | 85,000 | -3,448 | -3.9% | 90.1% | 3.0% | 7.2% | 89.1% | 1.4% | 8.2% |
| 5 | 86,578 | -1,870 | -2.1% | 40.6% | 50.3% | 10.5% | 30.1% | 59.0% | 9.2% |
| City | 442,241 | — | — | 71.1% | 14.8% | 13.9% | 66.4% | 17.6% | 14.5% |

| Demographics of the Reyes Plan | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Population and Deviations | | | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
| Dist. | Total Pop. | Pop. Dev. | % Dev. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| 1 | 88,108 | -340 | -0.4% | 89.5% | 11.0% | 3.5% | 84.8% | 9.3% | 5.4% |
| 2 | 92,617 | +4,169 | +4.7% | 48.7% | 7.3% | 37.2% | 45.5% | 9.2% | 41.7% |
| 3 | 89,938 | +1,490 | +1.7% | 87.3% | 5.3% | 8.6% | 86.0% | 3.3% | 9.9% |
| 4 | 85,000 | -3,448 | -3.9% | 90.1% | 3.0% | 7.2% | 89.1% | 1.4% | 8.2% |
| 5 | 86,578 | -1,870 | -2.1% | 40.6% | 50.3% | 10.5% | 30.1% | 59.0% | 9.2% |
| City | 442,241 | — | — | 71.1% | 14.8% | 13.9% | 66.4% | 17.6% | 14.5% |

Case 1:22-cv-24066-KMM    Document 24-31    Entered on FLSD Docket 02/10/2023    Page 25 of 34

## Comparison of 2013 Plan and Feb. 7 Draft

| Area Description | Boundaries | Precincts | Total Population Total Pop. | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Coconut Grove area moved from D2 to D4 | US 1, SW 27th Ave, Day Ave, city limits | Parts of 532, 583, 584, 585, 587 | 5,071 | 49.1% | 10.1% | 37.4% | 43.5% | 6.5% | 46.3% |
| Golden Pines area moved from D2 to D4 | SW 25th St, SW 27th Ave, US 1, city limits | 577, 578 | 10,496 | 81.8% | 3.6% | 13.6% | 83.9% | 3.8% | 11.8% |
| Area moved from D2 to D3 | SW 17th Ave, S Miami Ave, SW 15th Rd, SW 1st Ave, I-95, US 1 | 993, part of 582 | 1,313 | 56.2% | 2.3% | 36.9% | 60.3% | 0.8% | 34.8% |
| Little Havana area moved from D4 to D3 | SW 27th Ave, SW 9th St, SW 17th Ave, SW 12th St | Parts of 572, 574 | 3,221 | 91.1% | 4.1% | 5.6% | 85.4% | 0.9% | 13.0% |
| Little Havana area moved from D4 to D1 | NW 37th Ave, NW 7th St, NW 27th Ave, NW 4th St | Parts of 510, 548 | 2,510 | 96.1% | 2.2% | 2.5% | 99.1% | 0.0% | 0.1% |
| Little Havana area moved from D1 to D3 | Dolphin Expy, NW 22nd Ave, NW 7th St, NW 27th Ave | Part of 545 | 2,897 | 96.1% | 4.2% | 1.8% | 98.2% | 0.6% | 0.8% |
| Riverside area moved from D5 to D1 | Miami River, Dolphin Expy, NW 7th Ave, NW 6th Ave, I-95, SW 2nd St, Metrorail | 530, 540, 656, 656A, 985, 990, parts of 531, 655 | 5,230 | 70.4% | 20.0% | 10.6% | 62.5% | 21.2% | 15.3% |
| Riverside area moved from D2 to D1 | Miami River, Metrorail, SW 2nd St, S Miami Ave | Part of 984 | 2,483 | 56.7% | 6.0% | 30.2% | 60.0% | 7.5% | 29.0% |
| Downtown/Omni/Wynwood/Edgewater area moved from D2 to D5 | | 536, 536A, 599, parts of 534, 538, 658A, 984, 984A, 999 | 9,555 | 56.9% | 10.8% | 27.9% | 60.5% | 11.9% | 26.4% |
| Portion of D1 remaining in D1 | | | 78,552 | 90.8% | 10.3% | 3.1% | 86.3% | 8.3% | 4.9% |
| Portion of D2 remaining in D2 | | | 88,363 | 47.8% | 7.8% | 37.6% | 44.7% | 10.4% | 41.5% |
| Portion of D3 remaining in D3 | | | 80,169 | 88.5% | 5.6% | 7.4% | 86.8% | 3.5% | 8.8% |
| Portion of D4 remaining in D4 | | | 74,870 | 91.5% | 2.9% | 6.1% | 89.9% | 1.2% | 7.5% |
| Portion of D5 remaining in D5 | | | 77,511 | 39.4% | 55.4% | 7.6% | 29.1% | 61.6% | 7.8% |

## Comparison of Feb. 7 Draft and Base/Enacted Plan

| Area Description | Boundaries | Precincts | Total Population | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Total Pop. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Allapattah area moved from D5 to D1 | SR 112, NW 12th Ave, NW 36th St, NW 19th Ave | Parts of 512, 522 | 995 | 76.6% | 33.0% | 1.5% | 62.8% | 34.9% | 2.3% |
| Allapattah area moved from D1 to D5 | I-95, NW 32nd St, NW 8th Ave, NW 36th St | Parts of 523, 529 | 329 | 66.7% | 37.1% | 2.1% | 50.0% | 50.0% | 1.4% |
| Downtown area moved from D5 to D1 | I-95, NW 6th St, NW 7th Ave, NW 8th St | Part of 531 | 794 | 72.1% | 29.9% | 3.5% | 64.8% | 32.6% | 0.7% |
| Riverside area moved from D1 back to D5 (including the Wharf) | Miami River, SW 1st St, I-95, SW 2nd St, S Miami Ave, SW 3rd St, Metrorail | Parts of 655, 656, 984 | 81 | 52.6% | 40.4% | 7.0% | 61.5% | 15.4% | 15.4% |
| Downtown areas moved from D2 to D5 | N/S Miami Ave, SW 2nd St, SE/NE 2nd Ave, NE 8th St; and N Miami Ave, NE 10th St, NE 2nd Ave, Dolphin Expy | 982A, parts of 534A, 658A, 984, 984A | 2,521 | 46.4% | 32.1% | 22.0% | 46.1% | 33.0% | 19.1% |
| Downtown area moved from D5 back to D2 | N Miami Ave, NW 8th St, Metrorail, NE 10th St | Part of 536A | 1,638 | 67.0% | 13.0% | 16.6% | 72.6% | 10.7% | 15.6% |
| Riverside area moved from D1 back to D2 | Miami River, Metrorail, SW 3rd St, S Miami Ave | Part of 984 | 2,433 | 56.7% | 5.5% | 30.5% | 60.0% | 5.5% | 30.3% |
| Area moved from D3 back to D2 | Alatka St, S Miami Ave, SW 15th Rd, SW 1st Ave, I-95, US 1 | 993, part of 582 | 918 | 62.9% | 1.6% | 31.3% | 57.7% | 0.9% | 37.1% |
| Coconut Grove area moved from D2 to D3 | US 1, SW 17th Ave, S Bayshore Dr, SW 22nd Ave | Parts of 546, 582 | 997 | 36.7% | 2.2% | 52.8% | 36.2% | 0.0% | 61.7% |
| Coconut Grove area moved from D4 back to D2 | US 1, Bird Ave, SW 27th Ave, Day Ave | Parts of 532, 583, 584, 585, 587 | 3,474 | 44.5% | 11.5% | 40.0% | 43.6% | 8.0% | 44.7% |
| Little Havana area moved from D3 back to D4 | SW 27th Ave, SW 9th St, SW 17th Ave, SW 12th St | Parts of 572, 574 | 3,221 | 91.1% | 4.1% | 5.6% | 85.4% | 0.9% | 13.0% |
| Little Havana area moved from D4 to D3 | SW 8th St, SW/NW 32nd Ave, NW 4th St, NW/SW 27th Ave | Parts of 548, 670 | 5,026 | 96.2% | 3.0% | 2.5% | 96.8% | 0.4% | 2.3% |
| Little Havana area moved from D1 to D3 | NW 4th St, NW 32nd Ave, NW 7th St, NW 27th Ave | Part of 548 | 1,071 | 96.1% | 3.7% | 2.5% | 98.2% | 0.0% | 1.8% |
| Little Havana area moved from D1 back to D4 | NW 4th St, NW 37th Ave, NW 7th St, NW 32nd Ave | Parts of 510, 548 | 1,439 | 96.1% | 1.1% | 2.5% | 99.7% | 0.0% | 0.1% |
| Little Havana area moved from D3 back to D1 | Dolphin Expy, NW 22nd Ave, NW 7th St, NW 27th Ave | Part of 545 | 2,897 | 96.1% | 4.2% | 1.8% | 98.2% | 0.6% | 0.8% |
| West Grove Triangle moved from D2 to D4 in Feb. 7 Draft and remaining in D4 | US 1, SW 27th Ave, Bird Ave | Parts of 583, 584 | 1,597 | 59.2% | 7.1% | 31.7% | 43.1% | 3.5% | 49.6% |

**Comparison of 2013 Plan and Base/Enacted Plan**

| Area Description | Boundaries | Precincts | Total Population Total Pop. | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Allapattah area moved from D5 to D1 | SR 112, NW 12th Ave, NW 36th St, NW 19th Ave | Parts of 512, 522 | 995 | 76.6% | 33.0% | 1.5% | 62.8% | 34.9% | 2.35% |
| Allapattah area moved from D1 to D5 | I-95, NW 32nd St, NW 8th Ave, NW 36th St | Parts of 523, 529 | 329 | 66.7% | 37.1% | 2.1% | 50.0% | 50.0% | 1.4% |
| Downtown area moved from D5 to D1 | Miami River, Dolphin Expy, NW 7th Ave, NW 8th St, I-95, SW 1st St | 530, 540, 656A, 985, 990, and parts of 531, 656 | 5,993 | 70.8% | 21.1% | 9.7% | 62.7% | 22.2% | 14.1% |
| Downtown/Omni/Wynwood/Edgewater area moved from D2 to D5 | Metrorail, NW/NE 8th St, NE 2nd Ave, SW/SE 2nd St, S Miami Ave, SW 3rd St; and FEC Railway, NW 14th St, NW 1st Ave, NW 22nd St, N Miami Ave, SR 112, Biscayne Blvd, NE 36th St, NE 2nd Ave, NE 10th St | 536, 599, 658A, 982A, and parts of 534, 534A, 536A, 538, 984, 984A, 999 | 10,496 | 52.8% | 15.9% | 28.0% | 51.5% | 21.4% | 25.6% |
| Coconut Grove area moved from D2 to D3 | US 1, Alatka St, S Bayshore Dr, Kirk St, SW 22nd Ave | Parts of 546, 582 | 1,392 | 37.6% | 2.6% | 52.1% | 47.1% | 0.3% | 49.9% |
| Entire Golden Pines/Coconut Grove area moved from D2 to D4 | SW 25th, SW 27th Ave, Bird Ave, US 1, city limits | 577, 578, and parts of 583, 584 | 12,093 | 78.9% | 4.0% | 15.9% | 76.7% | 3.8% | 18.5% |
| Little Havana area moved from D4 to D3 | SW 8th St, SW/NW 32nd Ave, NW 7th Ave, NW 27th Ave | Parts of 548, 670 | 6,097 | 96.2% | 3.1% | 2.5% | 97.1% | 0.3% | 2.1% |
| Portion of D1 remaining in D1 | | | 81,120 | 91.1% | 10.0% | 3.0% | 86.7% | 7.9% | 4.8% |
| Portion of D2 remaining in D2 | | | 93,300 | 48.6% | 7.3% | 37.4% | 45.6% | 9.3% | 41.5% |
| Portion of D3 remaining in D3 | | | 80,169 | 88.5% | 5.6% | 7.4% | 86.8% | 3.5% | 8.8% |
| Portion of D4 remaining in D4 | | | 74,504 | 91.3% | 2.9% | 6.3% | 89.6% | 1.2% | 7.8% |
| Portion of D5 remaining in D5 | | | 75,753 | 38.5% | 56.0% | 7.7% | 28.3% | 62.2% | 7.9% |

| | | | Total Population | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| **2022 Enacted Plan's Division of the Southeast Overtown/Park West CRA** | | | | | | | | | |
| Area Description | Boundaries | Precincts | Total Pop. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Portion in D1 | | | 1,760 | 74.4% | 27.9% | 2.4% | 67.1% | 30.4% | 1.8% |
| Portion in D2 (6-block appendage off NE 2nd Ave) | | | 1,972 | 61.0% | 14.2% | 21.0% | 70.9% | 11.8% | 16.1% |
| Portion in D5 | | | 8,072 | 38.2% | 61.0% | 4.7% | 23.6% | 71.2% | 4.4% |

**Miscellaneous Areas**

| | | | Total Population | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| Area Description | Boundaries | Precincts | Total Pop. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Portion of Allapattah in D1 | NW 27th Ave, Miami River, Dolphin Expy, NW 7th Ave, NW 22nd St, I-95, NW 32nd St, NW 8th Ave, NW 36th St, NW 12 Ave, SR 112 | | 40,669 | 86.8% | 17.0% | 2.9% | 78.6% | 15.3% | 5.3% |
| Portion of Allapattah in D5 | SR 112, I-95, NW 23rd St, NW 8th Ave, NW 36th St, NW 12 Ave | | 774 | 54.7% | 47.4% | 3.1% | 49.2% | 49.2% | 1.6% |
| Portion of D5 protruding west of I-95 | I-95, NW 8th St, NW 7th Ave, NW 22nd St | | 1,634 | 39.6% | 60.5% | 5.1% | 38.6% | 58.5% | 2.5% |
| Portion of D2 west of SE 2nd Ave by Miami River | SE 2nd Ave, Miami River, Metrorail, SW 3rd St, S Miami Ave, SW 2nd St | | 2,433 | 56.7% | 5.5% | 30.5% | 60.0% | 7.5% | 29.0% |
| Portion of the North Grove | US 1, SW 22nd Ave, Kirk St, S Bayshore Dr, SW 27th Ave | | 2,832 | 36.7% | 2.4% | 55.0% | 29.9% | 1.4% | 67.7% |

### Comparison of Initial Russell Plan to Base Plan

| Area Description | Boundaries | Precincts | Total Population | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Total Pop. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Area moved from D2 to D3 | I-95, US 1, S Miami Ave, Miami River, Metrorail, SW 1st Ave | 568, 668, 993, 996, and part of 541 | 6,980 | 42.2% | 5.5% | 41.5% | 37.4% | 2.8% | 56.2% |

### Comparison of Revised Russell Plan to Base Plan

| Area Description | Boundaries | Precincts | Total Population | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Total Pop. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Area moved from D2 to D3 | I-95, US 1, S Miami Ave, SW 10th St, Metrorail, SW 1st Ave | 993 and parts of 668, 996 | 4,670 | 44.6% | 5.8% | 38.9% | 37.4% | 2.8% | 56.2% |

### Comparison of Reyes Plan to Base Plan

| Area Description | Boundaries | Precincts | Total Population | 2020 Census Voting-Age Population (VAP) | | | 2019 American Community Survey Citizen VAP (CVAP) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Total Pop. | Hisp. VAP | Black VAP | White VAP | Hisp. CVAP | Black CVAP | White CVAP |
| Area moved from D2 to D3 | Alatka St, S Miami Ave, SW 13 St, Metrorail, SW 1st Ave, I-95, US 1 | 993 and parts of 582, 668, 996 | 2,280 | 50.8% | 3.0% | 39.0% | 48.0% | 6.0% | 43.6% |

# Carolyn B. Abott

Baruch College - CUNY
Department of Political Science
One Bernard Baruch Way
New York, NY 10010

Office: Vertical Campus, 5th Floor, Room 271
Phone: +1 (646) 312-4421
Email: carolyn.abott@baruch.cuny.edu
Website: https://sites.google.com/view/carolynabott/

## Academic Positions

Assistant Professor, Department of Political Science, Baruch College - CUNY, 2021 —

Assistant Professor, Department of Government and Politics, St. John's University, 2018 –21

Postdoctoral Research Fellow, John Glenn College of Public Affairs and Department of Political Science, The Ohio State University, 2016 – 18

## Education

Ph.D., Politics and Social Policy, Princeton University, 2016

Dissertation: *The Politics of Public Sector Pensions*

Committee: Nolan McCarty, Brandice Canes-Wrone, and Charles Cameron

M.A., Politics, Princeton University, 2013

Fields: American Politics, Formal and Quantitative Methods,
Inequality and Public Policy

B.A. Economics and Political Science, with High Honors, Swarthmore College, 2008

## Research and teaching interests

American politics, representation and accountability, state and local politics, public budgeting and finance, interest groups and political parties, federalism, inequality, macro political economy.

## Publications

**Abott, Carolyn** and Akheil Singla. (2021). Helping or Hurting? The Financial Costs and Benefits of Municipal Bankruptcy, *Public Administration Review*, 81(3), pp. 428-445.

**Abott, Carolyn** and Akheil Singla. (2021). Service Solvency and Quality of Life After Municipal Bankruptcy, *Journal of Political Institutions and Political Economy*, 2(2), pp. 249-280.

**Abott, Carolyn** and Asya Magazinnik. (2020). At-Large Elections and Minority Representation in Local Government, *American Journal of Political Science*, 64(3), pp. 717-733.

**Abott, Carolyn,** Vladimir Kogan, Stéphane Lavertu, and Zachary Peskowitz. (2020). School district operational spending and student outcomes: Evidence from tax elections in seven states. *Journal of Public Economics*, 183, 104142.

**Abott, Carolyn.** (2018). Book review of Michael A. McCarthy, *Dismantling Solidarity: Capitalist Politics and American Pensions since the New Deal* (Ithaca: Cornell University Press, 2017). *Political Science Quarterly*, 133(2), pp. 371-372.

**Abott, Carolyn.** (2010). Federal Reserve System. *Encyclopedia of United States Political History, Vol. 7: 1976-present.* Ed. Rick Valelly. Washington, DC: CQ Press.

## Under Review

Book project: *The Politics of Public Pensions: How Strong Parties and Cooperative Politics Can Save State Government* **Revisions submitted.**

## Available working papers

"Voter Responsiveness to Measures of Local Fiscal Performance" (with Matthew Incantalupo and Akheil Singla)

"A Distaste for Deficits: Voter Opinion and Balanced Budget Laws in the U.S. States"

## Research in progress

"Local Electoral Institutions and Fiscal Outcomes in the United States" (with Pengju Zhang)

"The Fiscal Federalism Dimension of the SALT Cap and Its Potential Repeal" (with Rahul Pathak)

"Special District Bankruptcies" (with Pengju Zhang)

## Invited talks, presentations, and workshops

"A Distaste for Deficits: Voter Opinion and Balanced Budget Laws in the U.S. States"

*Research in Progress Faculty Seminar, Marxe School of Public and International Affairs, Baruch College - CUNY, 2021.*

Roundtable on Capital Assets Reporting Standards

*Governmental Accounting Standards Board (GASB), 2021.*

"Service Solvency and Quality of Life After Municipal Bankruptcy"

*Local Political Economy Symposium, Bedrosian Center at Sol Price School of Public Policy, University of Southern California, 2021.*

"Municipal Bankruptcy as Policy: Local Fiscal Stress and the Decision to File"[‡]

Case 1:22-cv-04096-KMW-2 Document 24-318 Entered on FLSD Docket 06/10/2023 Page 32 of 34

*Public Financial Management Northeastern Workshop, School of Public Affairs and Administration, Rutgers, The State University of New Jersey-Newark, 2020.*

"Municipal Bankruptcy as Policy: Local Fiscal Stress and the Decision to File"

*Fiscal Policy Series, Federal Reserve Bank of New York, 2019.*

"At-Large Elections and Minority Representation in Local Government"

*Department of Government and Politics Fall Graduate Colloquium, St. John's University, 2018.*

"The Differential Impact of Single-Member and At-Large Voting Districts on Local Democracy: New Tests and Evidence"

*Yale Center for the Study of American Politics Annual Conference, Yale University, 2017.*

[‡]Canceled due to COVID-19 pandemic.

## Conference presentations

Annual Meeting of the American Political Science Association: 2016, 2017, 2022.

Annual Conference of the Association for Budgeting and Financial Management: 2016, 2018,[†] 2022.[†]

Annual Public Finance Consortium: 2021.

Annual Meeting of the Southern Political Science Association: 2015, 2016, 2019, 2020,[*] 2021.

Brookings Municipal Finance Conference: 2020.

Annual State Politics and Policy Conference: 2015, 2020.[‡]

Urban Affairs Association Conference: 2019.[†]

Annual Conference of the Association for Education Finance and Policy: 2019.[†]

Annual Conference of the Association for Public Policy Analysis & Management: 2018, 2019.[†]

Annual Meeting of the Midwest Political Science Association: 2015, 2017.

Public Management Research Conference: 2017.[†]

[‡]Canceled due to COVID-19 pandemic;[*]Canceled due to earthquake;[†]Paper presented by coauthor.

## Grants, awards, & fellowships

Faculty Innovation Seed Grant (with Rahul Pathak), Provost's Office, Baruch College, 2022 ($12,000)

Cycle 53 PSC-CUNY Traditional B Research Award, City University of New York, 2022 ($6,000)

Travel Grant, APSA Annual Meeting, 2017

Prestage-Cook Travel Award, SPSA Annual Meeting, 2016

Grant, Graduate Student Travel, Center for the Study of Democratic Politics, Princeton, 2015

Grant, Dean's Fund for Scholarly Travel, Princeton, 2015

Grant (with Nolan McCarty), The Social and Economic Effects of the Great Recession, Russell Sage Foundation, 2012 ($114,921)

Graduate School Centennial Fellowship in the Humanities and Social Sciences, Department of Politics, Princeton, 2010 - 2015

Honorable Mention, National Science Foundation Graduate Research Fellowships Program, 2010

# Teaching experience

## *Graduate level*

Research Methodology and Quantitative Analysis

State and Local Government and Administration

Public Budgeting and Finance

## *Undergraduate level*

Introduction to Publicy Policy

The Politics of Inequality in the U.S.

Introduction to Public Administration

Research Methods for Political Science and Public Administration

Introduction to American Government

# Professional service

Member, Committee to Design the Baruch Public Service Capstone Seminar - 2023-present

Co-chair, Baruch Political Science Department Research Seminar - 2022-present

Member, Baruch Political Science Student Awards Committee - 2022

Member, Baruch Political Science Search Committee in Comparative Politics - 2021

Co-chair, SJU Government & Politics Committee to Redesign the Public Administration Major - 2019-2021

Member, SJU Government & Politics Graduate Education Policy Committee - 2018-2021

Member, SJU Government & Politics Undergraduate Education Policy Committee - 2018-2021

Referee, *American Journal of Political Science, American Political Science Review, Economics & Politics, Economics Letters, Journal of Public Administration Research and Theory, National Tax Journal, Political Analysis, Public Budgeting & Finance, Public Finance & Management*

## Professional memberships

Association for Public Policy Analysis & Management, American Political Science Association, Midwest Political Science Association, Southern Political Science Association, American Society for Public Administration, Association for Budgeting and Financial Management

## Computer skills

R, Stata, LaTeX, Bloomberg API, SAS, Matlab, EViews

Last updated: January 31, 2023

DE 24-32

# Racially Polarized Voting in Miami, Florida

Bryant J. Moy, PhD

February 10, 2023

## 1  Executive Summary

In this report, I examine past election data from the City of Miami, Florida, to determine whether and the extent to which racially polarized voting exists. Racially polarized voting (RPV) exists if minority voters systematically prefer one candidate and the majority ethnic group preferences another. I examine twenty elections between 2017 to 2021. Of the twenty elections, six were endogenous citywide elections, and fourteen were exogenous elections from the federal, county, or state levels. I conclude the following:

- Racially polarized voting exists in ten of the twenty elections studied.

- For endogenous (municipal) elections, two of six exhibited signs of racially polarized voting. In those contests, the Latino-preferred candidate prevailed over the Anglo-preferred candidate.

- For exogenous elections, eight of the fourteen exhibited signs of racially polarized voting. In five of those eight contests, the Latino-preferred candidate won, blocking either the Anglo-preferred candidate, the Black-preferred candidate or both.

- The Latino-preferred candidate won the majority of polarized races at 70% (7/10). Black- and Anglo-preferred candidates won 50% (4/8) and 33% (3/9) of the polarized contests they were involved in.

- Black and Anglo voters tended to have the same preferred candidates in six of the ten races with racially polarized voting. Alternatively, Black and Latino voters had the same candidate once in polarized races.

## 2  Background and Qualifications

I am a Data Science Faculty Fellow at the Center for Data Science and a Visiting Assistant Professor in the Wilf Family Department of Politics at New York University.[1] I received a Ph.D. in Political Science from Washington University in St. Louis in 2022. My concentration in graduate school was American Politics and Political Methodology.

My current area of expertise is related to local government, race and ethnic politics, and the use of advanced statistical models to understand political phenomena. My research has been published in the *Journal of Experimental Political Science* and *Political Behavior*. Other writings have appeared in the *Oxford Bibliographies in Political Science* and the *Political Science Educator*.

My research has won the Best Poster Award from the Society of Political Methodology, and I have received the Susan Clarke Young Scholar Award from the Urban and Local Politics Section of the American Political Science Association. In addition, I provide a copy of my curriculum vitae in the Appendix of this report.

---

1. I have also accepted an appointment as a tenure-track Assistant Professor in the Wilf Family Department of Politics at New York University starting in 2024.

# 3  Racially Polarized Voting

Racially polarized voting occurs when a minority group votes for one candidate and the dominant racial or ethnic group votes for an opposing candidate. For the City of Miami, Florida, we are interested in three ethnic groups: Anglos, Blacks, and Latinos. Indeed, according to the 2020 Census, Latinos of any race make up 70% of the population, while non-Hispanic whites – Anglos – and non-Hispanic Blacks make up 14% and 12%, respectively.[2]

I classify the candidates as Latino-, Black-, or Anglo-preferred if there is sufficient evidence that the ethnic group votes in a cohesive block. For this report, I use the 60% threshold of support as a sign of cohesive voting. In other words, if a candidate receives higher than 60% support among members of the same ethnic group, that candidate is that group's preferred candidate. If racially polarized voting exists, I would expect to see the ethnic groups have different preferred candidates in large numbers.

To assess racially polarized voting patterns, I will rely on ecological inference. In the next section, I detail ecological inference and my approach.

# 4  Methodology: Ecological Inference

Researchers typically examine patterns of racial polarization by inferring individual voting behavior from aggregate data – also known as ecological inference. We infer an individual's voting behavior by examining voting patterns within and between precincts. Ecological inference estimates racial group-level preferences from aggregate precinct data.

I conduct this analysis using two approaches. First, I examine each election and present a bivariate scatterplot between the ethnic composition of the electorate and candidate vote share. In this analysis, each dot represents a precinct. The x-axis will indicate the electorate's composition, and the y-axis will indicate the candidates' vote share. I draw a fitted line and display the correlation coefficient and the corresponding p-value, which will indicate whether the correlation is statistically significant. For a racial group to have a preferred candidate, I expect the fitted line to fall over the 60% threshold of candidate vote share when the precincts are racially homogeneous. The fitted line extrapolates to racially homogeneous precincts even when no observed precinct exists. Second, I run an iterated ecological inference algorithm using eiCompare, which estimates a candidate's support among each ethnic group.[3] This method is widely accepted to estimate candidate support among ethnic or racial groups (Collingwood et al. 2020; King and Roberts 2016; Lau, Moore, and Kellermann 2020).

Researchers typically use the voting age population or citizen voting age population estimate derived from the U.S. Census and predict the racial composition of voters in a given geographic area (i.e., precincts). Fortunately, Miami-Dade County provides a publicly available count of registered voters by precinct and racial/ethnic group using the information on their voter file.[4] Using the Miami-Dade County data and voter file is preferable to the U.S. Census and prediction approach because it provides a more accurate measure of the racial composition of the electorate.

# 5  List of Elections Analyzed and Additional Statistics

I examine twenty elections, including six municipal-level (endogenous) contests and fourteen non-municipal (exogenous) contests. Endogenous elections originate from the city itself. This includes races for City Mayor and City Commissioner. Exogenous races are contests that overlap with Miami precincts but do not originate at the city level. Examples of exogenous races include contests for the President, Governor, and County Mayor. Analyzing exogenous races – alongside endogenous one – are essential because they provide

---

2. The data comes from the U.S. Census Bureau. The table is entitled, "Hispanic or Latino, and Not Hispanic or Latino by Race" in the Decennial Census.

3. The eiCompare (Collingwood et al. 2020) $R$ package relies and builds upon two other packages for ecological inference: "ei" (King and Roberts 2016) and "eiPack" (Lau, Moore, and Kellermann 2020) I include this analysis only for elections where these quantities can be calculated reliably. In all cases, the substantive results from the scatterplots and ecological inference packages are the same.

4. Miami-Dade County's Elections Department Data:https://www.miamidade.gov/elections/voter-statistics-current-archive.html

additional information about the nature of racially polarized voting. The exogenous contests examined in this report are similar to the city-level races in that most are non-partisan local contests. Yet, we benefit from the varying levels of competitiveness found in exogenous races. Indeed, most of the endogenous municipal contests were non-competitive. Thus, it is probative to endogenous and exogenous elections.

In my sample of elections, I include all municipal (endogenous) elections from 2017 to 2021. Beyond municipal elections, I include exogenous contests that have sufficient overlap with Miami precincts. In Table 1 I provide a full list of elections analyzed.

Table 2 shows the composition of the 2020 citizen voting age population using the district line from the 2013 plan. Similarly, Table 3 shows the 2020 citizen voting age population using the district lines from the current 2022 enacted plan.

Table 1: List of Elections Analyzed

| Year | Election | Endo/Exo | Office |
|------|----------|----------|--------|
| 2021 | Municipal | Endogenous | City Mayor |
| 2021 | Municipal | Endogenous | City Comm. Dist. 3 |
| 2021 | Municipal | Endogenous | City Comm. Dist. 5 |
| 2017 | Municipal | Endogenous | City Mayor |
| 2017 | Municipal | Endogenous | City Comm. Dist. 3 |
| 2017 | Municipal | Endogenous | City Comm. Dist. 4 |
| 2020 | General | Exogenous | Congress, 24 |
| 2020 | General | Exogenous | County Comm. Dist. 3 |
| 2020 | General | Exogenous | County Mayor |
| 2020 | General | Exogenous | Clerk of the Court |
| 2020 | General | Exogenous | President |
| 2020 | Primary | Exogenous | County Property Appraiser |
| 2020 | Primary | Exogenous | County Judge, Grp. 24 |
| 2020 | Primary | Exogenous | County Judge, Grp. 9 |
| 2020 | Primary | Exogenous | Circuit Judge, Grp. 75 |
| 2020 | Primary | Exogenous | Circuit Judge, Grp. 67 |
| 2020 | Primary | Exogenous | Circuit Judge, Grp. 65 |
| 2020 | Primary | Exogenous | Circuit Judge, Grp. 57 |
| 2020 | Primary | Exogenous | Circuit Judge, Grp. 55 |
| 2018 | General | Exogenous | Governor |

Table 2: Citizen Voting Age Population by District, 2013 Plan

| District | Map/Plan | Anglo | Black | Latino |
|----------|----------|-------|-------|--------|
| District 1 | 2013 | 4.2% | 7.6% | 87.4% |
| District 2 | 2013 | 36.8% | 9.2% | 48.7% |
| District 3 | 2013 | 9.5% | 4.2% | 85.8% |
| District 4 | 2013 | 7.3% | 1% | 90.8% |
| District 5 | 2013 | 8% | 59.8% | 32.3% |

4

Table 3: Citizen Voting Age Population by District, 2022 Enacted Plan

| District | Map/Plan | Anglo | Black | Latino |
|----------|----------|-------|-------|--------|
| District 1 | 2022 | 5% | 8.1% | 86% |
| District 2 | 2022 | 40.4% | 8.7% | 44% |
| District 3 | 2022 | 9.9% | 3.9% | 85.6% |
| District 4 | 2022 | 8.2% | 1.3% | 89.6% |
| District 5 | 2022 | 9% | 58.1% | 30.8% |

Table 4: 2020 Citizen Voting Age Population

| City | Anglo | Black | Latino |
|------|-------|-------|--------|
| Miami | 14% | 17% | 67% |

## 6   Does RPV Exist Across Elections?

In this section, I examine twenty races in the City of Miami. The first six are municipal-level endogenous races, including the mayor and city commissioners. The next fourteen races are exogenous and include races for federal office (i.e., Congress and President), county offices (i.e., county commission, county mayor, county judge, and property appraiser), and state government (Governor).

### 6.1   Election 1: Mayor 2021

The 2021 Miami mayoral contest was between five candidates: Francis Suarez, Max Martinez, Marie Exantus, Anthony Dutrow, and Francisco Pichel. Francis Suarez won the race with overwhelming support by receiving 78.6% of the vote, with the next closest candidate – Max Martinez – receiving only 11.6% of the vote. Figure 1 shows the bivariate relationship between the precinct's demographic composition and Suarez's support. First, we can examine the fitted line in the scatterplot and extrapolate the estimated vote share of the candidate if there were homogeneous precincts (i.e., a precinct with all Anglos, Blacks, or Latinos). Across all groups, Suarez would have received higher than 60% of the vote. Second, these results are verified using the ecological inference algorithm to estimate the candidate's vote share if only one race or ethnic group voted (Collingwood et al. 2020; King and Roberts 2016; Lau, Moore, and Kellermann 2020). Indeed, Francis Suarez is estimated to receive over 70% support from all racial groups.

I find no evidence of racially polarized voting in this election.

5

Figure 1: Scatterplot: Race/Ethnic Composition by Candidate Vote Share





Figure 2: Estimated Candidate Support by Race/Ethnicity

## 6.2    Election 2: District 3 2021

In 2021, the City of Miami held an election for District 3 City Commissioner between four candidates: Joe Carollo, Andriana Oliva, Quinn Smith, and Miguel Soliman. Joe Carollo won with 64.4% of the vote, while Quinn Smith received the second most votes at 21.8%. Figure 3 depicts the bivariate relationship between the racial composition of the electorate and candidate choice. The Anglo-preferred candidate is Quinn Smith, as shown by the positive relationship between Anglo share of the electorate and Smith vote share. In contrast, as the share of Anglo voters increases, the share of Carollo votes declines. The Latino-preferred candidate is Joe Carollo. As the Latino share of the electorate increases, the share of Carollo votes increase, and the share of Smith votes decrease. I find no relationship between the Black share of the electorate and candidate vote choice. This finding (or lack of one) is driven by the low proportions of Black voters within the commission district. Indeed, the Black share of the electorate is lower than 5% across every precinct in this district.

I find evidence that racially polarized voting exists in this district between Anglos (who preferred Smith) and Latinos (who preferred Carollo). Joe Carollo – the Latino-preferred candidate – won the race.

Figure 3: Scatterplot: Race/Ethnic Composition by Candidate Vote Share



## 6.3 Election 3: District 5 2021

The City of Miami held an election for District 5 City Commissioner between seven candidates: Francois Alexandre, Zico Fremont, Michael Hepburn, Christine King, Revran Lincoln, Stephanie Thomas, and Jeffrey Watson. Christine King won with 64.92% of the vote, with Jeffrey Watson receiving the second most votes at 15.81%. Figure 4 depicts the bivariate relationship between electorate demographics and candidate vote choice. The Black-preferred candidate and the Latino-preferred candidate was Christine King. I find no evidence that Anglo support for any candidate reached the 60% threshold.

I find no evidence of racially polarized voting in this election.

Figure 4: Scatterplot: Race/Ethnic Composition by Candidate Vote Share



9

## 6.4 Election 4: Mayor 2017

Miami held an election for Mayor in 2017 between four candidates: Francis Suarez, Williams Armbrister, Christian Canache, and Cynthia Jaquith. Francis Suarez won with 85.81% of the vote, with Cynthia Jaquith receiving 5.47% of the vote. Figure 5 depicts the bivariate relationship between electorate demographics and candidate choice. Across all racial and ethnic groups, Suarez was the preferred candidate.

I find no evidence of racially polarized voting in this contest.

Figure 5: Scatterplot: Race/Ethnic Composition by Candidate Vote Share





Figure 6: Estimated Candidate Support by Race/Ethnicity

## 6.5    Election 5: City Commissioner District 3 2017

Miami held an election for District 3 City Commissioner on December 7th between seven candidates. This contest proceeded to a runoff election between Joe Carollo and Alfonzo Leon. I analyze the runoff election. Joe Carollo won with 52.7% of the vote. Alfonzo Leon was the Anglo- and Black-preferred candidate. Both groups were cohesive in their support (95.7% and 99%). The Latino-preferred candidate was Joe Carollo. I estimate the Latino support for Carollo to be 60.8%, which is near the threshold. It's important to note that most precincts in this district had a Latino super-majority. Indeed, no precinct in this district had less than 50% Latino share of the electorate.

I find evidence of racially polarized voting in this contest. The Latino-preferred candidate prevailed.

Figure 7: Scatterplot: Race/Ethnic Composition by Candidate Vote Share





Figure 8: Estimated Candidate Support by Race/Ethnicity

## 6.6   Election 6: District 4 2017

Miami held an election for District 4 Commissioner between three candidates: Manolo Reyes, Ralph Rosado, and Denise Turros. Manolo Reyes won the election with 56.74% of the vote, with Ralph Rosado receiving the second most votes at 36.15%. Figure 9 depicts the bivariate associations between the racial composition of the electorate and vote choice. No candidates were deeply preferred by any racial group, as shown by the lack of relationships throughout Figure 9. District 4 is a predominantly Latino district with all precincts having more than 70% Latino electorate.

   I find no evidence of racially polarized voting in this election.

Figure 9: Scatterplot: Race/Ethnic Composition by Candidate Vote Share



## 6.7   Election 7: Congress 24 2020

The northern part of Miami sat in Florida's 24th Congressional District prior to the 2022 redistricting. I examine precincts in the City of Miami. In the 2020 election, there were three candidates in the race: Frederica Wilson (Democrat), Lavern Spicer (Republican), and Christina Olivo (Independent). Frederica Wilson was the preferred candidate among Black voters. I do not find evidence that Anglo or Latino voters had a preferred candidate. As Figure 11 shows, support for Frederica Wilson was only greater than 60%

among Black voters, even though all racial groups nominally supported Wilson. While the Miami portion of this congressional district was majority Black, Wilson won the plurality of the votes in both the Anglo and Latino majority precincts. Wilson won Miami precincts with 76.5% of the vote.

I find no evidence of racially polarized voting across the Miami precincts in this election.

Figure 10: Scatterplot: Race/Ethnic Composition by Candidate Vote Share





Figure 11: Estimated Candidate Support by Race/Ethnicity

## 6.8   Election 8: County Commission 3 2020

The exogenous election of County Commissioner District 3 was between Keon Hardemon and Gepsie Metellus. If the election were held in Miami precincts, Hardemon would have won with 66.7%. The Black-preferred and Latino-preferred candidate was Keon Hardemon, and the Anglo-preferred candidate was Gepsie Metellus.

I find evidence that racially polarized voting exists between the Miami precincts of County Commission 3. The Black and Latino preferred candidate (Keon Hardemon) won against the Anglo-preferred candidate (Gepsie Metellus).

Figure 12: Scatterplot: Race/Ethnic Composition by Candidate Vote Share



17



Figure 13: Estimated Candidate Support by Race/Ethnicity

## 6.9 Election 9: County Mayor 2020

The 2020 Miami-Dade County Mayor race was between five candidates: Daniella Levine Cava, Esteban Bovo, Alex Penelas, Xavier Suarez, and Monique Barley. During the runoff election, Daniella Levine Cava won with 54% of the vote. I analyze the runoff results in the Miami precincts. Figure 14 depicts the bivariate association between the electorate's racial composition and the candidate's vote share. The Black- and Anglo-preferred candidate was Daniella Levine Cava. The Latino-preferred candidate was Esteban Bovo. Latino support for Bovo is estimated near the 60% threshold.

I find evidence of racially polarized voting in this contest. The Black- and Anglo-preferred candidate won.

Figure 14: Scatterplot: Race/Ethnic Composition by Candidate Vote Share





Figure 15: Estimated Candidate Support by Race/Ethnicity

## 6.10    Election 10: Clerk 2020

The contest for the County Clerk of the Courts was between two candidates: Harvey Ruvin (Democrat) and Rubin Young (Independent). I use Miami precincts in this analysis. Harvey Ruvin won with 76.5% of the vote in Miami precincts. All racial and ethnic groups preferred Harvey Ruvin.

I find no evidence of racially polarized voting in this contest.

Figure 16: Scatterplot: Race/Ethnic Composition by Candidate Vote Share





Figure 17: Estimated Candidate Support by Race/Ethnicity